# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

MATTHEW DUNLAP
148 State House Station, Augusta, ME 04333,

Civil Action No. _____

       Plaintiff,

   - versus -

**COMPLAINT**

PRESIDENTIAL ADVISORY COMMISSION ON ELECTION
INTEGRITY
1600 Pennsylvania Ave NW, Washington DC 20500

MICHAEL R. PENCE, IN HIS OFFICIAL CAPACITY AS
CHAIR OF THE PRESIDENTIAL ADVISORY
COMMISSION ON ELECTION INTEGRITY
1600 Pennsylvania Ave NW, Washington DC 20500

KRIS W. KOBACH, IN HIS OFFICIAL CAPACITY AS VICE
CHAIR OF THE PRESIDENTIAL ADVISORY
COMMISSION ON ELECTION INTEGRITY
1600 Pennsylvania Ave NW, Washington DC 20500

ANDREW KOSSACK, IN HIS OFFICIAL CAPACITY AS
DESIGNATED FEDERAL OFFICER FOR THE
PRESIDENTIAL ADVISORY COMMISSION ON ELECTION
INTEGRITY
1600 Pennsylvania Ave NW, Washington DC 20500

GENERAL SERVICES ADMINISTRATION
1800 F. St. NW, Washington, DC 20405

TIMOTHY R. HORNE, IN HIS OFFICIAL CAPACITY AS
ACTING ADMINISTRATOR OF THE GENERAL SERVICES
ADMINISTRATION
1800 F. St. NW, Washington, DC 20405

EXECUTIVE OFFICE OF THE PRESIDENT
1600 Pennsylvania Ave NW, Washington, DC 20500

OFFICE OF THE VICE PRESIDENT
1600 Pennsylvania Ave NW, Washington, DC 20500

OFFICE OF ADMINISTRATION
1600 Pennsylvania Ave NW, Washington, DC 20500

MARCIA L. KELLY, IN HER OFFICIAL CAPACITY AS
DIRECTOR OF THE OFFICE OF ADMINISTRATION
1600 Pennsylvania Ave NW, Washington, DC 20500,

                    Defendants.

Plaintiff Matthew Dunlap, Secretary of State of the State of Maine and

Commissioner of the Presidential Advisory Commission on Election Integrity, alleges against

Defendants as follows:

## NATURE OF THE ACTION

1.     Plaintiff Matthew Dunlap, Secretary of State of Maine and member of the

Presidential Advisory Commission on Election Integrity (the "Commission") brings this suit as

an action of last resort to enable him to fulfill the oath he took and the obligations to which he

committed when he joined the Commission.  The law and good conscience require Secretary

Dunlap to participate meaningfully in the work of the Commission; however, despite diligent

efforts to gain access, Secretary Dunlap has been, and continues to be, blocked from receiving

Commission documents necessary to carry out his responsibilities.  Secretary Dunlap reluctantly

undertakes this action in good faith to proactively pursue his rights and obligations in court, in an

endeavor to ensure that he can fulfill his responsibilities as a Commissioner and in hopes that the

Commission can salvage a process that, at present, risks becoming exactly the kind of one-sided,

partisan undertaking the Federal Advisory Committee Act was designed to prohibit.

2.     The Commission was established by President Trump, who has made

statements that between 3 to 5 million illegal votes were cast against him in the 2016 Presidential

election.  A majority of the Commission members endorsed President Trump's unsubstantiated

statements about voter fraud in the 2016 election or have a history of working to restrict access to the

ballot box.

3.      President Trump (who established the Commission), Vice President Pence (the Chair of the Commission), and Kansas Secretary of State Kris Kobach (Vice Chair of the Commission) have attempted to afford the Commission and its prospective findings a veneer of legitimacy by making the Commission's membership bipartisan.  But by obstructing certain commissioners' access to information and failing to allow substantive participation of commissioners with balance in terms of points of view, the Commission and its staff have compromised the legitimacy of any findings that may emerge from this process.

4.      Federal law, as enacted in the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1-16, guards against the use of advisory committees to lend a false imprimatur of bipartisanship and legitimacy to their findings and recommendations.  FACA does so primarily by requiring two things of advisory commissions.  First, membership of commissions must be "fairly balanced in terms of the points of view represented."  *Id.* § 5(b)(2). Second, an advisory commission must make available to all commissioners materials "which were made available to or prepared for or by" the commission.  *Id.* § 10(b); *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999).

5.      The Commission and other defendants have violated FACA by excluding certain members of the Commission from substantively participating in its work and by preventing certain members of the Commission from accessing documents made available to some Commission members and prepared for or by the Commission.

## THE PARTIES

6.      Plaintiff Matthew Dunlap is the Secretary of State of the State of Maine. On May 11, 2017, Secretary Dunlap was appointed by President Donald J. Trump to serve as a commissioner on the Presidential Advisory Commission on Election Integrity.

7.      In Maine, the Secretary of State is elected by the Maine State Legislature.

Secretary Dunlap, a Democrat, served as Secretary of State of the State of Maine from 2005 through 2010, and was reelected Secretary of State in 2013.

8.      As Secretary of State, Secretary Dunlap oversees the Bureau of Corporations, Elections and Commissions, which is responsible for the conduct of state elections in Maine.  As such, Secretary Dunlap has extensive expertise in elections and the importance of facilitating citizen participation in elections.  Secretary Dunlap believes that it is his role to help and encourage American citizens to exercise their right to vote, not to discourage it.

9.      Secretary Dunlap has particular insights into the issues before the Commission based on Maine's recent experience in commissioning the recommendations of a January 2013 report of the 2012 Maine Elections Commission, a commission of five Maine citizens that studied and offered strategies to improve Maine's election system.  Although the report was commissioned by Secretary Dunlap's predecessor, a Republican, Secretary Dunlap deemed it important to honor the work commissioned by his predecessor.

10.     The 2012 Commission met five times, held eight public hearings throughout the state of Maine, received written testimonial submissions, and held three deliberative meetings.  Based on this process, the 2012 Commission made several unanimous recommendations, including to maintain same-day voter registration and to institute early voting. The 2012 Commission also determined, by a 4-1 vote, that the negative aspects of a Voter ID law outweighed its potential benefits.

11.     Defendant Presidential Advisory Commission on Election Integrity is a federal advisory committee established by Executive Order on May 11, 2017.

12.     Defendant Michael R. Pence is the Vice President of the United States and Chair of the Commission.  Defendant Pence is named in this suit in his official capacity as Chair of the Commission.

13.     Defendant Kris W. Kobach is the Secretary of State of Kansas and the Vice Chair of the Commission.  Defendant Kobach is named in this suit in his official capacity as Vice Chair of the Commission.

14.     Defendant Andrew Kossack is named in this suit in his official capacity as the Designated Federal Officer for the Commission.

15.     Defendant General Services Administration is a federal agency that, under the Executive Order creating the Commission and the Commission's Charter, provides the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary, and must perform the President's functions under FACA.

16.     Defendant Executive Office of the President is a federal agency that consists of fourteen components, including the Office of the Vice President.  Upon information and belief, the Commission's electronic records are kept on the Executive Office of the President's computer network.

17.     Defendant Office of the Vice President is a component of the Executive Office of the President.  The official email address of the Commission is associated with the Office of the Vice President, at ElectionIntegrityStaff@ovp.eop.gov.

18.     Defendant Office of Administration is a component of the Executive Office of the President.  Upon information and belief, the Office of Administration manages the unclassified computer network and electronic records of the Executive Office of the President.

19.     Defendant Timothy R. Horne is named in this suit in his official capacity as the Acting Administrator for the General Services Administration.

20.     Defendant Marcia L. Kelly is named in this suit in her official capacity as the Director of the Office of Administration.

## JURISDICTION AND VENUE

21.     The Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1361.

22.     The Court may award declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Administrative Procedure Act, 5 U.S.C. § 706, and may enter writs of mandamus under the Mandamus and Venue Act, 28 U.S.C. § 1361.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 1391(e)(1) because Defendants are United States agencies or officers sued in their official capacities and a substantial part of the events or omissions giving rise to this claim occurred in this District.

## FACTUAL BACKGROUND

### I.     Statutory and Regulatory Framework

24.     Congress passed the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1-16, in 1972 to address whether and to what extent advisory committees should be maintained to advise Executive Branch officers and agencies.  5 U.S.C. app. 2 § 2(a); *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999).  One of the principal concerns of Congress in enacting FACA was that "interest groups may use their membership on such bodies to promote their private concerns."  H.R. REP. NO. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491, 3496.

25.     To guard against the danger that commissions would be captured by special interests, Congress prescribed rules for advisory committees "to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals."  *National Anti-Hunger Coalition v. Executive Comm. of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1072 (D.C. Cir. 1983).

26.     FACA requires, among others, two critical things: balance and transparency.  Together, these requirements are "strong safeguard[s] of the public interest."  H.R. REP. NO. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491, 3500.

27.     FACA requires that advisory committee membership be "fairly balanced in terms of the points of view represented and the functions to be performed."  5 U.S.C. app. 2 § 5(b)(2).  FACA also requires that the advisory committee not be "inappropriately influenced by the appointing authority or . . . any special interest," but rather that any advice is "the result of the advisory committee's independent judgment."  *Id.* § 5(b)(3).

28.     An advisory committee must have a "plan to attain fairly balanced membership" which ensures that membership "will consider a cross-section of those directly affected, interested, and qualified."  41 C.F.R. § 102-3.60(b)(3).

29.     Congress has recognized the dangers associated with the "lack of balanced representation of different points of view and the heavy representation of parties whose private interests could influence their recommendations."  H.R. REP. NO. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491, 3496; *see also Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 424 (D.C. Cir. 1989).  FACA prohibits this by setting restrictions on who may be appointed to a federal advisory committee.

30.     In addition to balance, FACA demands transparency in the procedures and meetings of advisory committees.  It requires that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying."  5 U.S.C. app. 2 § 10(b).

31.     This requirement "serves to prevent the surreptitious use of advisory committees to further the interests of any special interest group."  H.R. REP. NO. 92-1017

(1972), reprinted in 1972 U.S.C.C.A.N. 3491, 3500. It is contrary to federal law for advisory committees to work in secret and to impact government action based on consultations that are shielded from the public and from some of the advisory committee's own members.

32. Advisory committees are affirmatively obligated to provide access to the Section 10(b) materials. *Food Chem. News v. Dep't of Health and Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1993).

33. Timely access to advisory committee materials is "an important element of" FACA because it "provide[s] a meaningful opportunity to comprehend fully the work undertaken by the advisory committee." 41 C.F.R. § 102-3.170.

34. In addition to the minimum statutory requirements, advisory committees are encouraged "to be as inclusive as possible" in terms of "post[ing] advisory committee information and seek[ing] broader input from the public." 41 C.F.R. § 102-3.95(d).

35. Each of the requirements of FACA is mandatory on the advisory committee itself and on the advisory committee's Chair, Vice Chair, and Designated Federal Officer.

## II.    Creation of the Presidential Advisory Commission on Election Integrity

36. President Trump established the Commission by Executive Order on May 11, 2017. Exec. Order 13799. President Trump appointed Vice President Pence to serve as Chair of the Commission. *Id.* § 2. The Executive Order declared that the Commission's purpose is to "study the registration and voting processes used in Federal elections" and to report to the President on topics including "those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting." *Id.* § 3.

37. Also on May 11, 2017, President Trump named Secretary Kobach as Vice

Chair of the Commission.  Press Release, Office of the Press Secretary, President Announces Formation of Bipartisan Presidential Commission on Election Integrity (May 11, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission.  Per his official website, Kobach was elected Secretary of State on a platform focused on stopping voter fraud. http://www.kssos.org/about/about_news_biography.html

38.     Also on May 11, 2017, President Trump named five additional members of the Commission: Connie Lawson, Secretary of State of Indiana; Bill Gardner, Secretary of State of New Hampshire; Secretary Dunlap; Ken Blackwell, Former Secretary of State of Ohio; and Christy McCormick, Commissioner, Election Assistance Commission.  Press Release, Office of the Press Secretary, President Announces Formation of Bipartisan Presidential Commission on Election Integrity (May 11, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission.

39.     On June 21, 2017, President Trump named three additional Commission members: Luis Borunda, Deputy Secretary of State of Maryland, David K. Dunn, prior member of the Arkansas House of Representatives, and Mark Rhodes, county clerk of Wood County, West Virginia.  Press Release, Office of the Press Secretary, President Donald J. Trump Announces Intent to Nominate Personnel to Key Administration Posts (June 21, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/21/president-donald-j-trump-announces-intent-nominate-personnel-key.

40.     Deputy Secretary of State Borunda resigned from the Commission on July 3, 2017.  Mr. Dunn passed away on October 16, 2017.

41.     On June 29, 2017, President Trump named Hans A. von Spakovsky as a member of the Commission.  Press Release, Office of the Press Secretary, President Donald J.

Trump Announces Key Additions to his Administration (June 29, 2017), *available at*

https://www.whitehouse.gov/the-press-office/2017/06/29/president-donald-j-trump-announces-

key-additions-his-administration.

42.     On July 10, 2017, President Trump named Alan King, a judge of the

Alabama probate court, and J. Christian Adams, a private attorney, as members of the

Commission.  Press Release, Office of the Press Secretary, President Donald J. Trump

Announces Key Additions to his Administration (July 10, 2017), *available at*

https://www.whitehouse.gov/the-press-office/2017/07/10/president-donald-j-trump-announces-

key-additions-his-administration.

43.     As currently constituted, the Commission has seven Republican members

and four Democratic members.

44.     The commissioners who had been appointed before June 28, 2017

participated in an organizational conference call on June 28, 2017.  On that call, Defendant

Kobach informed the commissioners that "a letter w[ould] be sent today to the 50 states and

District of Columbia on behalf of the Commission requesting publicly-available data from state

voter rolls."  Press Release, Office of the Vice President, Readout of the Vice President's Call

with the Presidential Advisory Commission on Election Integrity (June 28, 2017).  The

conference call—which took place mere hours before the letters were sent—was the first time

Secretary Dunlap was informed of the letters requesting voter information.  The timing of this

disclosure deprived Secretary Dunlap of the opportunity to consult with other members of the

Commission or to formulate and express his views as to the legality or propriety of this action.

45.     An overwhelming majority of states refused to provide the data sought

because of privacy and other concerns.  Indeed, Defendant Kobach, acting in his capacity as the

Kansas Secretary of State, did not provide the Commission with the requested data, even though

he was a proponent of the request in his capacity as Commission Vice Chair.  *See* Christopher

Ingram, "Kris Kobach says he can't comply with Kris Kobach's voter data request," Washington

Post (June 30, 2017), *available at*

https://www.washingtonpost.com/news/wonk/wp/2017/06/30/kris-kobach-says-hes-cant-comply-

with-kris-kobachs-voter-data-request/?utm_term=.b59787cf71b5.  Several lawsuits have been

filed seeking to enjoin the Commission's collection of data.  *See Electronic Privacy Information*

*Center v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-1320-CKK

(D.D.C.); *Joyner v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-22568-

MGC (S.D. Fl.).

### III.    The Commission Denies Secretary Dunlap Meaningful Access to Commission Documents and Operations and Prevents Him From Meaningfully Participating In the Commission's Activities.

46.    The Commission next held an official meeting on July 19, 2017 in

Washington, D.C.  Secretary Dunlap was provided with only four documents prior to the

meeting: the executive order establishing the Commission; the Commission's charter; the

Commission's by-laws; and a meeting agenda.  Several Commission members (including

Defendant Kobach) introduced and distributed documents at the July 19, 2017 meeting that were

not provided to Secretary Dunlap in advance of the meeting.

47.    This Court determined that the Commission's failure to make public,

before the July 19, 2017 meeting, documents prepared for and discussed during the meeting was

contrary to the law.  Order, *Lawyers' Committee for Civil Rights Under Law v. Presidential*

*Advisory Commission on Election Integrity*, No. 1:17-cv-1354-CKK (Dkt. 25).  The Court held

that "nothing in the law of this circuit excuses the disclosure of materials prepared for an

advisory committee meeting simply because they are prepared by an individual committee

member."  *Id.*

48.     President Trump addressed the July 19, 2017 meeting.  President Trump made reference to the FACA principles of balancing and transparency, mentioning the "bipartisan panel consisting of both Republican and Democratic leaders and experts on voter integrity" and promising that the Commission's work "will be a very transparent process.  It's going to be very open for everybody to see."

49.     In fact, the Commission's superficial bipartisanship has been a facade.  In February 2017, Commissioner von Spakovsky wrote an email expressing his view that the Commission should not be bipartisan and should not include Democrats or mainstream Republicans.  The Commission has, in effect, not been balanced because Secretary Dunlap and the other Democratic commissioners have been excluded from the Commission's work.  The Commission's operations have not been open and transparent, not even to the commissioners themselves, who have been deprived access to documents prepared by and viewed by other commissioners.

50.     After the July 19, 2017 meeting, Secretary Dunlap received no communications regarding the work of the Commission, other than a small number of logistical planning emails.  He was not asked to assist in any voting-related work nor was he involved with any fact gathering or analysis.

51.     Secretary Dunlap attended the next Commission meeting, held on September 12, 2017 at Saint Anselm College in Manchester, New Hampshire.  Other than the logistical emails referenced above, Secretary Dunlap received no substantive information about the meeting, such as prepared testimony, invitations to or correspondence with participants, or materials to be discussed at the meeting.  Secretary Dunlap did not receive a meeting agenda until days before the meeting.  The agenda was prepared without his input; Secretary Dunlap was not consulted about topics or meeting participants.

52.     Since the Commission's meeting on September 12, 2017, Secretary Dunlap has received no information or updates from Commission staff or leadership about ongoing active research, inquiries for research requests, documents for consideration at future meetings, or any information about the Commission's plans to hold another meeting.  He has received no communications regarding the substantive work of the Commission.

53.     On October 17, 2017, Secretary Dunlap wrote to Defendant Kossack "requesting copies of any and all correspondence between Commission members in the possession of the Commission dating from the signing of the Executive Order on May 11th, 2017 until the receipt of this request."  (Ex. 1).  He specifically requested "communications between Commissioners themselves, between Commissioners and/or staff and other Federal agencies, communications used in the development of public documents, and any ongoing discourse between Commissioners and staff about the development of policies and/or policy proposals that may be offered to policymakers as either a component of any report or under separate cover." *Id.*

54.     It is beyond dispute that hundreds of documents exist that are responsive to Secretary Dunlap's request.  These include communications between commissioners; communications between commissioners and commission staff; communications between commissioners and third parties; research documents; and draft reports.  *See* Decl. of Andrew J. Kossack, *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-1354-CKK (Dkt. 33-2).

55.     It is impossible to imagine that a federal advisory commission does not generate such documents, and it is now public knowledge, due to another litigation pending before this Court, that a considerable volume of such documents do, in fact, exist.  In this other litigation, the Court ordered Defendant Kossack to prepare a *Vaughn*-type index "detailing what

specific documents have been collected with respect to the Commission to date, which of those have been disclosed, and if they have not been disclosed, on what basis." *See* Decl. of Andrew J. Kossack, *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-1354-CKK (Dkt. 33-1).  The index, which only covers the period from May 11, 2017 through September 29, 2017, contains more than 800 entries.  *See* Index, *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-1354-CKK (Dkt. 33-3).  Because many entries are for categories of documents rather than individual documents, the actual number of Commission documents that have not been shared with Secretary Dunlap is even higher.

56.    The index includes communications and documents that are highly relevant to the Commission's activities and ultimate recommendations, and which are required to be shared with Secretary Dunlap, including but not limited to:

- "[e]mails and associated materials sent to or from one or more Commission members and/or to or from Commission staff, about suggestions for research and/or future activities of the Commission";

- "[e]mails sent by individual Commission members to Commission staff forwarding studies, news reports, and articles";

- "[e]mails between individual Commission members and Commission staff discussing potential third-party assistance with the Commission";

- "[m]aterial gathered or received by individual Commission members, either as part of their own research or sent to them by third parties, but not shared with other Commission members or staff";

- "[c]ommunications with the public received or sent by individual Commission members but not shared with the Commission";

- "[e]mails, including attachments, circulated among Commission staff and between one and three present or future Commission members commenting on draft documents that will eventually be provided to the full Commission";

- "[e]mails with panelists or potential panelists about their participation in" Commission meetings;

- "[e]mails and documents received from third parties volunteering to collaborate on Commission work and any associated responses or exchanges";

- "[s]ubstantive communications between staff of government agencies and Commission staff."

57.     The *Vaughn* index includes many documents and communications between May 11, 2017 and June 23, 2017.  The Commission filed its Charter on June 23, 2017. The Charter, which is required under FACA, stated that the Commission was established under "the provisions of the Federal Advisory Committee Act."  Despite the requirement that "[n]o advisory committee shall meet or take any action until an advisory committee charter has been filed," 5 U.S.C. app. 2 § 9(c); 41 C.F.R. § 102-3.70, commissioners and Commission staff had been meeting, communicating, and working on Commission matters prior to June 23, 2017. These actions were undertaken *ultra vires* and in violation of FACA.

58.     The documents on the index likely do not constitute the full universe of documents to which Secretary Dunlap is entitled in his role as commissioner.  Many commissioners, including Defendant Kobach, have used and continue to use personal and non-governmental email addresses for Commission business.  Prior to August 4, 2017, when a litigation hold was circulated, commissioners were not directed to preserve emails and Commission records, and were not provided instructions on how to ensure compliance with the Presidential Records Act.  By failing to provide such direction with respect to the use of an

official email account, the Commission's leadership also are overlooking the possible data security risks presented by using a non-governmental email system.  Secretary Dunlap has asked commissioners to use his official Maine governmental email address for Commission business to ensure records are properly maintained.  Despite repeated requests, commissioners and Commission staff continue to use Secretary Dunlap's personal email address.  Secretary Dunlap forwards each Commission email to his Maine governmental email address but other commissioners may not be as diligent.  It is likely that some communications sent to and from commissioners' personal email addresses were not collected and included on the *Vaughn* index.

59.    In his October 17 letter, Secretary Dunlap explained to Defendant Kossack that without the information he requested and is entitled to, he could not competently carry out his duties as a Commissioner.  (Ex. 1).  He also explained that he was entitled to the information pursuant to Section 10(b) of FACA and *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999).

60.    On October 25, 2017, Defendant Kossack responded to Secretary Dunlap's request for information.  Defendant Kossack did not address Secretary Dunlap's assertions that the Commission possesses the materials specified in Secretary Dunlap's letter or that materials have been selectively shared with only a subset of commissioners.  Defendant Kossack did not provide any documents or agree to provide any documents.  Defendant Kossack wrote only that he was "consulting with counsel regarding a response to [the] request" and "will be back in touch soon."

61.    In a subsequent email, Defendant Kossack declined to confirm that the Commission's work is "on hold."  On information and belief, certain commissioners continue to work, research, and communicate behind the scenes without involving Secretary Dunlap or sharing documents with Secretary Dunlap as required by law.  In fact, in a recent press interview, Commissioner von Spakovsky stated that the Commission is planning to meet again.  Lydia

Wheeler, "Trump voter fraud panel member fights back against critics," THE HILL, (November 2, 2017), *available at* http://thehill.com/business-a-lobbying/358107-trump-voter-fraud-panel-member-fights-back-against-critics.

62.     On November 1, 2017, Secretary Dunlap renewed his request for Commission documents.  He explained to Defendant Kossack that documents are required "so that [he] can fully participate as a commissioner."  He noted that he was "at a loss to understand how" the agenda for the September 12 meeting was formed, "how the witnesses who testified were chosen or invited, or even what our goal was for that meeting."

63.     Secretary Dunlap has not received a response to his requests for documents and information.

64.     Lack of access to Commission communications and documents prevents Secretary Dunlap from evaluating the relevant evidence and from contributing to and shaping the Commission's findings, advice, and recommendations to the President.

65.     Defendants' course of depriving Secretary Dunlap access to Commission communications and documents also will interfere with Secretary Dunlap's participation in the preparation of any report, including but not limited to the exercise of his right to craft a concurrence or dissent to the Commission's findings, if he should conclude that such a concurrence or dissent is appropriate.  If he were to reach such a conclusion, Secretary Dunlap has a right to have his concurrence or dissent published with the Commission's final report. *Cummock*, 180 F.3d at 293.

66.     The Commission's failure to communicate with or involve Secretary Dunlap and other Democratic commissioners in proceedings renders them mere figureheads and violates FACA's requirement that advisory committees be balanced.

67.     The D.C. Circuit has "flatly reject[ed]" the view that "appointed

committee members possess no particular rights of participation, and may even be denied access to information underscoring the committee's recommendations." *Cummock*, 180 F.3d at 291.

68.     Secretary Dunlap and other members of the Commission have also been frozen out of the Commission's plans to hold further meetings.  On October 24, 2017, Vice Chair Kobach told the PBS Newshour that no date had been set for the next meeting. (https://www.pbs.org/newshour/politics/whats-become-of-trumps-voter-fraud-commission-even-some-of-its-members-arent-sure).  Yet the Minnesota Voters Alliance, a 501(c)(3) organization dedicated to "preventing voter fraud" sent a fundraising email on October 19, 2017 stating that it "was invited to speak at the December 2017 meeting of the" Commission.  While Defendant Kossack has denied knowledge that a December meeting has been scheduled, the limited information that is being provided to Secretary Dunlap and other commissioners leaves Secretary Dunlap unable to prepare for meetings and to participate in the Commission's work.

69.     In addition to freezing Secretary Dunlap out from all substantive Commission activities and information, Defendants have refused to answer repeated inquiries from members of Congress regarding the Commission's activities.

**IV.     The Commission is Subject to FACA**

70.     The Commission from the outset took actions that demonstrate that it is a Federal Advisory Committee subject to FACA.  It filed a Charter as required by FACA on June 23, 2017.  In the section on the "Authority" under which the Commission is established, the Charter states: "The Commission is established in accordance with Executive Order 13799 of May 11, 2017, . . . and the provisions of the Federal Advisory Committee Act (FACA), as amended (5 U.S.C. app.)."  Charter, Presidential Advisory Commission on Election Integrity, *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/commission-charter.pdf

71.     The Charter endeavors to provide the information required by law for federal advisory committee charters, 41 C.F.R. § 102-3.75, including the Commission's objectives and scope, the time necessary to carry out the Commission's work, the Federal officer to whom the advisory committee reports (here, the President), and the agency responsible for providing the Commission necessary support (here, GSA).  The Charter also provides that the Commission "may include both regular Government Employees and Special Government Employees," and that "[t]he records of the Commission and any subcommittees shall be maintained pursuant to the Presidential Records Act of 1978 and FACA."  *Id.* §§ 11, 13.

72.     The Commission is registered in GSA's "FACA database" and the Charter has been posted to the Commission's page within that database. http://www.facadatabase.gov/commiftee/conunittee.aspx?cid=2612&aid=74.

73.     GSA posted notice in the Federal Register on July 5, 2017 that the Commission would meet on July 19, 2017.  2017 Fed. Reg. 14210.  The Federal Register notice explained that "[t]he Commission was established in accordance with E.O. 13799 of [May] 11, 2017, the Commission's charter, and the provisions of FACA."  *Id.*

74.     The Commission's bylaws state that the "Commission has voluntarily agreed to operate in accordance with the Federal Advisory Committee Act."

75.     In an email to the commissioners, Defendant Kossack wrote that he will "ensure the Commission complies with the Federal Advisory Committee Act."

76.     The Commission is not composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government.

## CLAIM I

## Violation of the Federal Advisory Commission Act § 5

77.     Secretary Dunlap repeats and re-alleges paragraphs 1 through 76 of the Complaint, as if fully set forth herein.

78.     As confirmed by the Executive Order establishing the Commission and its Charter, the Commission is an "advisory committee" as defined under Section 3 of FACA.  5 U.S.C. app. 2 § 3.  The Commission is "established or utilized by the President" and is not composed wholly of full-time, or permanent part-time, federal employees.  *Id.*

79.     Section 5(b)(2) of FACA requires that "the membership of the advisory committee" "be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. app. 2 § 5(b)(2).

80.     Section 5(b)(3) of FACA requires that advisory committees "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriate influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  5 U.S.C. app. 2 § 5(b)(3).

81.     Even were the Commission "nominally balanced" — which is questionable given that the Commission currently consists of seven Republicans and only four Democrats — it is "effectively unbalanced" because Secretary Dunlap and other commissioners have been precluded from meaningful participation.  *Cummock*, 180 F.3d at 291.

82.     The Commission has violated FACA by appointing Secretary Dunlap to the Commission and then walling him "off from the committee's operations, rendering membership essentially meaningless."  *Cummock*, 180 F.3d at 291.

83.     By depriving Secretary Dunlap of full participation in the work of the committee, the Commission has "nullif[ied] Congress's express intent" in violation of FACA. *Cummock*, 180 F.3d at 291.

84.     Absent declaratory and injunctive relief, Secretary Dunlap will suffer irreparable harm from Defendants' continued violation of FACA.  The Defendants' failure to meet FACA's statutory requirements prevented and continue to prevent Secretary Dunlap's full participation in the Commission's deliberations and preclude the submission of advice and recommendations to the President that include his input.

85.     Secretary Dunlap has no adequate remedy at law.

## CLAIM II

## Violation of the Federal Advisory Committee Act § 10(b)

86.     Secretary Dunlap repeats and re-alleges paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

87.     As confirmed by the Executive Order establishing the Commission and its Charter, the Commission is an "advisory committee" as defined under Section 3 of FACA.  5 U.S.C. app. 2 § 3.  The Commission is "established or utilized by the President" and is not composed wholly of full-time, or permanent part-time, federal employees.  Id.

88.     As a commissioner, Secretary Dunlap "has an even greater right of access than does the public under § 10(b)."  *Judicial Watch v. Nat'l Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 31 (D.D.C. 2002).

89.     Section 10(b) of FACA requires that the Commission make available "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Commission and its members.  5 U.S.C. app. 2 § 10(b).  Section 10(b) "affirmatively obligates the Government to

provide access to the identified materials," and it must do so "before or at" the Commission's meetings. *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992). These requirements apply to Presidential advisory commissions, including commissions that are based out of the White House and/or chaired by the Vice President. *Cummock v. Gore*, 180 F.3d 282, 292 (D.C. Cir. 1999).

90. The records the Commission must disclose include, but are not limited to, emails between the Commission's members. In addition to constituting "records" prepared by the Commission for purposes of Section 10(b), any emails involving between two or more Commission members that discuss the Commission's substantive work constitute a "committee meeting" that must be disclosed. Under FACA, a "committee meeting" includes "any gathering of advisory committee members (whether in person or through electronic means) held with the approval of an agency for the purpose of deliberating on the substantive matters upon which the advisory committee provides advice or recommendations." 41 C.F.R. § 102-3.25.

91. Defendants have violated Section 10(b) of FACA by refusing to provide Secretary Dunlap with access to these and the other requested records of the Commission. Defendants have not substantively responded to Secretary Dunlap's repeated requests for documents and have provided no indication that they will ever produce the Commission's records. The Court's intervention is necessary to enforce FACA's record disclosure requirements.

92. Absent declaratory and injunctive relief, Secretary Dunlap will suffer irreparable harm from Defendants' continued violation of FACA. The Defendants' failure to meet FACA's statutory requirements prevented and continue to prevent Secretary Dunlap's full participation in the Commission's deliberations and preclude the submission of advice and recommendations to the President that include his input.

93.    Secretary Dunlap has no adequate remedy at law.

## CLAIM III

### Violation of the Federal Advisory Committee Act § 9(c)

94.    Secretary Dunlap repeats and re-alleges paragraphs 1 through 93 of the Complaint as if fully set forth herein.

95.    The Commission charter was filed on June 23, 2017.

96.    Upon information and belief, the Commission and certain commissioners, including Defendant Kobach conducted activities prior to the filing of the Charter on June 23, 2017, including, *inter alia*, the preparation of the letters to states seeking voter data; seeking and discussing research regarding voter fraud and other issues relevant to the Commission; and communications with the Department of Homeland Security.

97.    FACA and its implementing regulations prohibit any action by the Commission until after the Charter has been filed.  5 U.S.C. app. 2 § 9(c) ("No advisory committee shall meet or take any action until an advisory committee charter has been filed."); 41 C.F.R. § 102-3.70.

98.    The Commission's activities prior to the filing of the Charter violated FACA and its implementing regulations.

99.    The commencement of activities prior to the filing of the Charter impaired Secretary Dunlap's right to participate fully in the Commission's activities.

100.    Absent declaratory and injunctive relief, Secretary Dunlap will suffer irreparable harm from Defendants' continued violation of FACA.  The Defendants' failure to meet FACA's statutory requirements prevented and continue to prevent Secretary Dunlap's full participation in the Commission's deliberations and preclude the submission of advice and recommendations to the President that include his input.

101.    Secretary Dunlap has no adequate remedy at law.

## CLAIM IV

## Violation of the Administrative Procedure Act

102.    Secretary Dunlap repeats and re-alleges paragraphs 1 through 101 of the Complaint as if fully set forth herein.

103.    Defendants have each violated the Administrative Procedure Act (APA) by (i) refusing to provide Secretary Dunlap with the Commission's records, in violation of Section 10 of FACA; and (ii) failing to ensure that the Commission is fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee in violation of Section 5 of FACA. 5 U.S.C. § 706. These failures to comply with FACA's requirements constitute final agency action.

104.    These failures to comply with FACA's requirements constitute arbitrary and capricious agency action in violation of the APA.

105.    Absent declaratory and injunctive relief, Secretary Dunlap will suffer irreparable harm from Defendants' continued violation of the APA. The Defendants' failure to meet FACA's statutory requirements prevented and continue to prevent Secretary Dunlap's full participation in the Commission's deliberations and preclude the submission of advice and recommendations to the President that include his input.

106.    Secretary Dunlap has no adequate remedy at law.

## CLAIM V

## Mandamus and Venue Act (28 U.S.C. § 1361)
## (in the alternative to Counts I, II, III, and IV)

107.    Secretary Dunlap repeats and re-alleges paragraphs 1 through 106 of the Complaint as if fully set forth herein.

108.    In the alternative to Counts I – IV, this Court should enter a writ of

mandamus compelling Defendants to comply with their clear, indisputable, non-discretionary obligations under FACA.

109.    Absent mandamus relief, Secretary Dunlap will suffer irreparable harm from Defendants' continued violation of their obligatory duties under FACA.  The Defendants' failure to meet FACA's statutory requirements prevented and continue to prevent Secretary Dunlap's full participation in the Commission's deliberations and preclude the submission of advice and recommendations to the President that include his input.

110.    Secretary Dunlap has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Secretary Dunlap demands judgment awarding the following relief:

A.  A declaration that the Commission is subject to FACA and all of its requirements;

B.  A declaration that Defendants violated FACA and/or the APA by failing to comply with the requirement that the membership of the Commission "be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee" and that the Commission "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment";

C.  A declaration that Defendants violated FACA and/or the APA by failing to comply with the requirement that commissioners be provided with all materials made available to or prepared by the Commission;

D.  A declaration that the Commission has operated in violation of FACA and its implementing regulations and that the actions taken by the Commission are *ultra vires*;

E.  An order that Defendants produce records responsive to Secretary Dunlap's request without delay;

F.  An order that all future documents made available to or prepared by or for the Commission be promptly made available to Secretary Dunlap;

G. An order that Defendants permit Secretary Dunlap to fully participate on an equal basis as all other commissioners, including but not limited to: setting meeting agendas; inviting witnesses; being copied on all communications between commissioners, between commissioners and Commission staff, and between commissioners and non-commissioners; and directing activities of Commission staff;

H. An order enjoining the Commission from releasing a final report prior to Secretary Dunlap receiving the documents to which he is entitled and having an opportunity to review them, participating in the drafting of the report or, if necessary, completing a concurrence or dissent to the report.

I. In the alternative to (A) – (H), issue a writ of mandamus providing the same relief.

J. Such other relief as the Court deems just and proper.

Dated: November 9, 2017

Respectfully submitted,

By:
   /s/ Daniel S. Ruzumna

PATTERSON BELKNAP WEBB & TYLER LLP
Daniel S. Ruzumna (D.C. Bar No. 450040)
Harry Sandick (*pro hac vice* application to be filed)
Daniel A. Friedman (*pro hac vice* application to be filed)
1133 Avenue of the Americas
New York, N.Y. 10036
Tel:  (212) 336-2000
Fax:  (212) 336-2222
druzumna@pbwt.com
hsandick@pbwt.com
dfriedman@pbwt.com

AMERICAN OVERSIGHT
Austin R. Evers (D.C. Bar No. 1002367)
Melanie Sloan (D.C. Bar No. 434584)
John E. Bies (D.C. Bar No. 483730)
1030 15th Street NW, B255
Washington, DC 20005
Tel: (202) 869-5246
austin.evers@americanoversight.org
msloan@americanoversight.org
john.bies@americanoversight.org

*Attorneys for Plaintiff Matthew Dunlap*