# Exhibit 1

STATE OF MAINE

OFFICE
OF THE
SECRETARY OF STATE

MATTHEW DUNLAP
SECRETARY OF STATE

1. February 2013

The Hon. John Tuttle, Senate Chair
Joint Standing Committee on Veterans and Legal Affairs
100 State House Station
Augusta, ME 04333

The Hon. Louis Luchini, House Chair
Joint Standing Committee on Veterans and Legal Affairs
100 State House Station
Augusta, ME 04333

Dear Senator Tuttle and Representative Luchini,

Please find attached the report of the 2012 Elections Commission, which was commissioned by
Secretary of State Charles E. Summers, Jr. as the Legislature entertained a number of changes to
election laws in the 125th Legislature. It was decided that a study of election law was prudent
before adoption of broad changes to those laws; the bills were then relegated to the legislative
files.

Because the commission was a creature not of legislation, but wholly of the office of the Secretary
of State, it was speculated that with the change of administration following the November
elections and the attendant changes in political philosophy, that my administration would state that
the commission's work was moot, and let it simply expire.

It is my personal policy to honor the work of *all* elected officials, and let the facts stand and speak
for themselves. After meeting with members of the commission, I determined to let their work go
forward and to present their report, with the caveat that the decision of whether or not to support
the findings of this report was mine alone.

I do agree almost entirely with the report's findings. Indeed, I find the work of the commission to
be a refreshing reflection of the general skill employed in the conduct of Maine elections and a
fluent narrative of the exploration of issues whose resolutions have proven to be controversial. The
deft handling of these topics earns my complete praise and thanks for a difficult job well done. In
the report, the findings include one that in a widely split vote of 4-1 the commission recommends
deferring action on proposed requirements to provide a photographic identification card in order to
access a ballot; they are unanimous in their recommendation to let the people's decision stand on
Election Day Registration; and they give a unanimous and ringing endorsement of early voting,
which reflects feedback our office received after the successful conclusion of the pilot projects we
completed at the direction of the Legislature.

There are other points about absentee balloting, polling place activity, campaign sign usage and other issues that are arguable, given the many proposals your committee will consider this session, but there, findings are reflective of the many changes made to increase access to the ballot and to address the overall conduct of elections over the last fifteen years.

The controversial issue of voting by students matriculated and residing at our institutions of higher learning, however, remains problematic in the report, and it is one I will spend some time reflecting on here, not for the sake of arguing with the work of the commission, but rather to observe at a high level the elements of this discussion and the stakes involved as I see them. I appreciate the thoughtful consideration the commission has given in its recommendation; I feel strongly however that the thesis and analysis of the issues raised are yet lacking a synthesis. Their recommendation to follow the model of New Hampshire law and replace the term "residence" with the term "domicile" may come closer to the heart of the discussion, and it has the salutary effect of partially addressing the concerns of some critics. But given the results of the investigation of the voter activity of over 200 college students by the Secretary of State's office last year that failed to produce a single prosecutable instance of voter misconduct, but did prompt many of these Americans to *cancel their voter registrations* serves to illustrate the point that the focus on college student voting is a series of answers looking for a problem. Under this recommendation, the attendant information that New Hampshire—and presumably Maine, were the recommendation to be adopted—then provides, including intelligence that by declaring a *domicile* the voter is now also assuming *other responsibilities of residency,* including but not limited to transferring vehicle registration, driver license and other provenances of citizenship to be fulfilled within given legal time frames. This assumes that the citizen will otherwise shirk these duties, and wrongly gives the pedestrian privileges of administrative compliance equal weight to the right to vote.

It is my belief that in the drive to "secure" elections by closely defining the *eligibility* of voters in a given precinct that we may inadvertently be constructing barriers—barriers that serve no public purpose—to *American citizens* and discouraging them from voting. To be sure, a registrar of voters *may* consider a prospective voter's status in terms of vehicle registration or possession of certain resident credentials to determine voter eligibility, but a lack of possession of these documents does not impeach one's right to vote, and we should not lose sight of this.

The cries of 'voter suppression' infer an intent that I do not believe to be manifest. The elections officials and policymakers who have voiced concerns about residency of voters in many jurisdictions, particularly municipalities that host institutions of higher learning, bring forward many well-thought out contentions and concerns about voter eligibility. They maintain that if a citizen wants to vote here, they should do more than just say they live here. They should pay taxes, they should make permanent their intentions manifestly by getting Maine driver licenses, registering their cars here, and paying the accompanying excise taxes to support the communities they are voting in; in short, they should establish a strong and tangible connection to the community. After all, they aren't just voting in a presidential election, they also are accessing ballots for municipal issues and for elections to the state legislature as well. They should prove their commitment.

But we're still talking about American citizens.
American citizens are endowed with the right to vote. I believe firmly that it is the role of my office to in every way facilitate the exercise of that right, and to not discourage it. Yes, it is true that if a citizen chooses to domicile in Maine, they must also—within well-defined legal time

frames—obtain a Maine driver license, register their car in Maine, pay taxes in Maine, and, if they choose to participate in Maine elections, to register to vote in Maine. The key question here is at what point is it appropriate for government to give notice to a citizen of the obligation of that citizen to the greater community, once they decide to be a resident of that community?

Our office conducted a study in 2007 of a sampling of residency requirements in Maine, pursuant to a legislative resolve adopted during deliberations about tightening requirements for obtaining a Maine driver license. In that review, we found that residency in Maine has a distinctly different meaning depending on the public purpose. Eligibility for seeking public office has one definition; eligibility for reduced in-state tuition rates very much another. Perhaps the strictest requirements for resident status involve, curiously, the acquisition of a resident hunting or fishing license, which includes a sworn statement punishable, if untrue, as a Class D crime.

The courts have ruled that it is invalid to exclude temporary residents, non-property owners, or other classes of people with arguably less stake in the outcome of local elections from the franchise (*Kramer v. Union Free School District* No. 15, 395 U.S. 621 (1969)). The requirement is not where you were domiciled last summer, yesterday, or where you will be domiciled in a week, a month or a year; the requirement is to aver where you intend to be domiciled on Election Day— where you intend to return at the end of the day and have no immediate intention to depart from (*Poirier, Sr. v. City of Saco* Maine Supreme Judicial Court 529 A.2d 329 (1987).

In all chapters of Maine law, we count on our citizens to be engaged. We count on our citizens to *voluntarily* comply with enacted statutes for the common good. Where gaps arise, we enforce laws to ensure compliance. We do not, when issuing a driver license, remind the driver that by accepting that license, they are also bound to use their turn signal, or to come to a complete stop at a stop sign. We rely on the citizen to understand those obligations. Our citizens are overwhelmingly law-abiding, and not because we are always checking on them. It is notable here that in the aforementioned case of hunting and fishing licenses, there is a positive pecuniary benefit in obtaining a resident versus a non-resident hunting or fishing license. Despite the apparent presented temptation to attempt to cheat the system by either attempting to obtain a permit for which one is not eligible, or to not get a permit at all, the reality is that Maine enjoys a very high compliance rate with its hunting and fishing licensing laws.

In my consideration of this topic, I have reflected greatly on the poll tax. Poll taxes were common in America, including in Maine, until they were struck by the United States Supreme Court as an unconstitutional impediment designed, in some jurisdictions, to prevent poor minorities from participating in the election process. In practice, in order to vote, the voter had to participate up front by paying a tax, in many areas based on a per capita basis for each member of the household. Until they participated in this act of citizenship, the voter could not participate in an election. In areas where those same poor minorities *could* pay, additional restrictions such as literacy tests were imposed—presumably, again, to keep them from voting.

The recommendation that we, as elections officials, take the initiative beyond making sure that a voter is only registered in one place and to make mindful in the voter that by registering to vote, they are assuming a host of other non-voting obligations attendant to Maine residents domiciled here as citizens will undoubtedly have a dampening effect on a population whose futures are filled with promising fluidity. Sensing a warning of long-term commitment with ramifications they do not have time to discern or understand, many American citizens will forego the exercise of their

right to vote here in Maine. Converse to the poll tax, which unconstitutionally discouraged voters by installing barriers *before* one could vote, this recommendation calls for proclaiming obligations to the citizen *after* they vote. The prospect of the effort needed to assume privileges after exercising a right will certainly leave the right, for some, unused; and for those who make and administer the laws of society, there is a diminished risk of reproof from the people, and they would instead remain comfortably unvexed, so that the will of the public will then be thrown from balance. I cannot support that unforeseen potential harm of voter silence, and thus, I do not support that recommendation in this report.

I will be happy to make myself available for any questions you may have.

Sincerely,

Matthew Dunlap
Secretary of State

# Report of the 2012 Elections Commission
# January 28, 2013



**The Honorable John R. Atwood, Chair**
**The Honorable Paula D. Silsby**
**Ms. Linda Cohen**
**Mr. Timothy (Tim) Wilson**
**The Honorable N. Laurence Willey, Jr.**

John R. Atwood
124 The King's Highway
Newcastle, ME 04553

January 28, 2013

The Hon. Matthew Dunlap
Secretary of State
148 State House Station
Augusta, ME 04333-0148

Re: 2012 Elections Commission Report

Dear Secretary Dunlap:

It is my great pleasure to present you with the above-noted report which was created by the Elections Commission appointed by your predecessor.

I believe you'll find that we have fulfilled our mission by offering a number of strategies to improve Maine's elections system as enumerated in this report. These entail a number of changes in our laws, but I think that you will find that, with the exception of a constitutional amendment to allow early voting, they represent only minor modifications in our law. This is because our review of Maine's election practices demonstrated what most citizens already understand: our State enjoys a credible, well-administered elections system. We hope that you and your colleagues in the Legislature will consider what we offer here as a means to further improve this essential part of our democracy.

If you choose to adopt some or all of this report in your in your recommendations to the Legislature, we would be honored to appear as may be needed in that forum to discuss this report.

Finally, let me reiterate the appreciation of the Commission for the support of your office during this process, especially the assistance of Julie Flynn and Melissa Couture. I also want to thank my fellow Commissioners, Linda Cohen, Paula Silsby, Tim Wilson and Larry Willey for their many contributions to this report

Respectfully submitted,


John R. Atwood, Chair

Introduction

The 2012 Elections Commission was formed at the request of Secretary of State Charles E. Summers, Jr., who asked the five citizens who comprised the members of the Commission to carry out the terms of the Resolve which directed him to conduct a study of "voter participation, the current system for registering voters and the conduct of elections in the State." Resolves 2011, ch.133.

The five citizens appointed to the Commission were Paula D. Silsby of Portland, Linda C. Cohen of South Portland, Timothy (Tim) P. Wilson of Portland, N. Laurence Willey, Jr. of Bangor and John R. Atwood of Newcastle, who served as chair.

The Commission met five times, starting on May 11, 2012, with staff from the Secretary of State's Office and the Attorney General's Department in order to become familiar with Maine's election laws and any issues which may relate to the directive in the legislative resolve. Thereafter, the Commission held eight public hearings in Augusta, Portland, Wells, Farmington, Bangor, Lewiston, Machias and Presque Isle. These hearings were webcast, and all Commission functions followed proper public notice.

 The Commission also met with local election officials at their annual training conference at Sugarloaf.  Further, Commission members observed the 2012 primary and/or general elections in Portland, Bangor, Ellsworth, Auburn, Hampden and Lewiston. Finally, the Commission received written testimonial submissions from citizens and interested organizations. The purpose of all these activities was to educate the Commission as to issues concerning Maine's election practices which the public and local officials had identified.

Finally, the Commission held three deliberative meetings at which they reviewed the material they had accumulated over the previous eight months and settled on the recommendations contained in this report. All recommendations, except the one concerning Voter ID, were unanimously arrived at.

In preparing this report, the Commission took a non-expansive approach to the mandate contained in the Resolve. That is, the Commission decided that its limited expertise and the time constraints they faced meant that they should limit their work to the prescription in the Resolve and not address some of the other interesting issues surrounding elections such as "ranked choice voting", open v. closed primaries, campaign financing, and the like.  Our interest was instead broadly directed to the three goals of HAVA, the Help America Vote Act,  42 USC secs. 15301-15545, namely, "security, accuracy and accessibility." We regret that such omissions may cause disappointment to those who have expressed interest in our work.

This report does not recommend any radical changes in our election laws. Indeed, we believe our suggestions are modest and, if adopted, will cause only minor changes in our election laws and practices. This result is undoubtedly due to the fact that our State has heretofore done an outstanding job in administering its elections year in and year out. We can boast a very high rate of registration among eligible citizens, and a

nationally recognized high voter participation rate. As important, Maine is blessed with dedicated, knowledgeable, and hardworking election officials at the local and state levels who make voting in Maine work so well. It has been a privilege for this Commission to work with many of these officials.

This report would not be complete without thanking Secretaries of State Charles E. Summers, Jr., and Matthew Dunlap, Deputy Secretary of State Julie Flynn, Assistant Attorney General Phyllis Gardiner, and Barbara Redmond, Megan Sanborn and Debbey French of the Secretary of State's Office for their support and many thoughtful suggestions for our work.

Finally, the Commission would especially like to thank Melissa Couture, Director of Constituent Services at the Secretary of State's Office, for her invaluable assistance and many courtesies as she worked with us in exercising the responsibilities assigned to us.

I.     Voter ID

Generally speaking, "Voter ID" means that a voter who presents himself/herself at the polls must, by law, present a valid, current, government issued identification which also contains a photograph of its bearer. Numerous arguments run in favor of, and in opposition to, this voting requirement. The Commission benefitted from a variety of publications on this topic as well as opinions from a variety of courts, including the U.S. Supreme Court, and written and oral testimony from Maine citizens and organizations concerned about this issue. Indeed, it is fair to say that the Commission received more information on this topic than any other, perhaps because the origin of the Commission's establishment stems from the effort to enact a Voter ID law in Maine.

One way of assessing the advisability of adopting a Voter ID law in Maine is to weigh its pros and cons on our electoral system. The Commission adopted this subjective approach on this issue as it was unaware of any objective or formulaic analysis which could guide it in this endeavor.  Accordingly, we developed the following lists which, while not complete, recited the factors which we believe should be weighed in this process. They are as follows:

A.   Factors which would support a Voter ID law; the "pros":
-   A Voter ID law would provide an effective tool against voter impersonation, an example of voter fraud.
-   In today's, post 9/11 world, the need for a personal identification is widespread throughout American society and is needed for many common activities such as:
    -   Taking a bus, train, or airplane;
    -   Obtaining Social Security or Medicare;
    -   Admission to a hospital or obtaining medical treatment;
    -   Purchasing any alcoholic beverage retail or at sporting events;
    -   Obtaining a public transportation pass;
    -   Opening a bank account or moving substantial sums of money;
    -   Checking into a hotel;
    -   Obtaining certain prescription drugs;
    -   Getting a document notarized or signing an affidavit;
    -   Many other activities too numerous to list here;
-   Voter ID laws are popular, and have been in enacted in 30 states, according to the National Conference of State Legislatures. The concept also does well in polling.
-   Barriers to obtaining a photo ID are overstated and can be overcome with planning.
-   Voter ID laws can be drafted to allow for less stringent forms of ID than a current, government issued photo ID.
-   Costs to implement a free voter ID system may be exaggerated as it will be necessary to provide IDs only to the small number of people who have none.

B.   Factors which would not support a Voter ID law; the "cons":

- A voter ID law is unnecessary as there is little or no history in Maine of voter impersonation or identification fraud. [Although the Commission heard testimony at its Bangor and Portland hearings which recited complaints about putative voters who were bussed to polling stations and then allowed to vote even though they could present little or no evidence of identity or residency. It was alleged that the Bangor incident may have affected a close legislative race.]

- It would slow down the voting process on Election Day, (one city clerk estimated it would take 16 more hours of work at the polls with voter ID for 6,000 voters at 10 seconds per voter.) The MTCCA (Maine Town and City Clerks' Association) opposes Voter ID for this reason.

- It can create confusion on Election Day as to the currency of an ID when the address or last name of a female voter has recently been changed.

- It is difficult for the homeless to obtain a current, valid ID because they lack a "current" address, the cost of obtaining necessary background documents is prohibitive, and getting an ID can be slow. Also, it is difficult to get out-of-state documents without a credit card and access to the internet.

- It is difficult for elderly African-Americans to document their births so obtaining a birth certificate as a means to get a photo ID is a serious challenge.

- It is also difficult for those who live in a rural area, without means of transportation, to get access to facilities which issue IDs.

- Citizens with disabilities face similar difficulties as their access to transportation, public offices and financial resources can be compromised.

- Currently it can take as many as 10 days to get a photo ID from State government which would frustrate the purposes of our same day registration law.

- It is inconsistent to require a voter who presents himself /herself in person at the polls to have a photograph ID, but not require the same for someone who votes absentee and is not applying for the absentee ballot in person.  [In such cases, the clerk is to compare the signatures on the application with the signature on the ballot envelope]. The unavailability of identification might push people without an ID into voting absentee which is more susceptible to fraud and abuse.

- Studies have shown that the requirement of a Voter ID may deter 10 to 11% of eligible voters from voting. Because Maine has a disproportionate number of citizens who are elderly, poor and/or living in rural areas, the percentage of voters who would be discouraged from voting may be higher. Thus, while a Voter ID requirement might deter a few fraudulent voters, many others could be kept from voting by virtue of this requirement. Moreover, if it is true that 10 to 11% of citizens are kept

from voting for lack of an ID, the results of elections would be questioned as not representing the true will of the people.

- Because an official voter identification card, or its substitute, may cost the potential voter money, it can be viewed as a poll tax and is therefore constitutionally suspect.
- In order to avoid the poll tax problem, it will be incumbent on Maine to establish the means to obtain a cost free voter ID. Indiana spent $10 million to institute their "free" Voter ID program; Missouri estimates it will cost that state $20 million over three years to implement theirs. A professor at UMF estimates a "free" ID program might cost Maine $2 to $6.3 million.
- There are bound to be on-going, year-to-year costs in maintaining a "free" voter ID system, including the hiring of state workers to run and maintain the system.
- If IDs must be government issued, other forms of ID, such as college IDs would not qualify.
- The Commission, via its public hearings, discerned very little support for a voter ID law.
- The problem of voter impersonation, if it exists at all, will be mooted over time as technology is applied to the voting process.

C.  Conclusion

The Commission, by a 4 to 1 vote, finds that the negative aspects of a Voter ID law outweigh its potential benefits and recommends that a Voter ID system not be pursued in Maine.

If the Legislature should disagree, and wishes to consider a Voter ID law, the Commission recommends that a statute providing for same include the following:

- Municipal election officials should be authorized to vouch for the identity of a voter in lieu of the presentation of an ID;
- A Voter ID system should be phased in gradually, and allow for the use of IDs which expired within a certain time frame;
- A Voter ID should be free and easy to obtain at a variety of public offices with operating hours on evenings and weekends during the election season;
- Documentation to support the issuance of a Voter ID, such as birth certificates, should also be free;
- Voters over a certain apparent age or in nursing homes, or who are disabled, should be excluded from the Voter ID requirement or be permitted to use expired IDs;
- State government should take the initiative and promote the availability of photo IDs for a variety of services it provides.

II.   Registration

A.   Same Day Registration

While the Commission heard considerable testimony on this issue, it believes that the voters have already spoken recently on this matter, deciding that we should keep same day registration in Maine. That being the case, we determined that we should and would not recommend disturbing this decision. Moreover, we found that many city and town election officials have adapted their Election Day processes to same day registration and see no need for change. That said, it must also be reported that same day registration does put a significant burden on local election officials whose Election Day staffing is thinner than other towns'.  Towns with an understaffed cadre of election officials work very long and unreasonable hours to complete their responsibilities, sometimes resulting in clerical errors which might have been avoided with a larger, trained cadre of election workers. The solution for this problem is not, the Commission believes, the repeal of the same day registration law, but, instead, action on the part of local officials to devote more resources to Election Day functions.

B.   Third Party Registrations

"Third Party Registrations", for the purpose of this report, simply means the registration of voters by third parties such as political parties, advocacy groups, candidates or the like, as opposed to registrations conducted by public entities such as town clerks, BMV, or other governmental organizations.

The concern or controversy with third party registrations is four-fold. First, the quality of the registration cards turned in can be poor. They are sometimes filled out in a rush and are missing signatures or other key data, including the important indicia of citizenship. Second, because cards can contain critical errors, it falls on the municipal clerk to correct them – a time consuming task as the process of correcting registration cards usually entails an effort to track down the putative voter. Third, some registrations are duplicates which also involve clerical time to verify or correct. Fourth, there is no means to hold third party registrars accountable for the extra workload they create by submitting incomplete registration cards as there is no means to track them once they are distributed by the Secretary of State's Office to the third parties.

The remedies for the general problem of poorly prepared registration cards are difficult to identify. While there is no specific statute which authorizes third parties to conduct voter registration drives, current law references them, see e.g. 21-A M.R.S. secs. 130, 181, and the NVRA requires states to allow them. Thus it appears

that we must continue with this registration process despite the extra work it can create for local voting officials.

That said, there are several modest ways to mitigate this problem. First, while it would increase the costs of preparing the green third party registration cards, numbering them in a series would at least allow the Secretary of State to identify trends in mistakes made so that erring third party registrars could be held accountable for their practices. Similarly, those entities that wish to conduct registration drives could be required to participate in training, perhaps by webinar, as to how to make out cards correctly. Next, the number of public entities which are authorized to register voters could be increased beyond those listed at 21-A M.R.S. sec. 181(1)(B).  In the end, though, the best means of eliminating the need for third party voter registrations will be the institution of on-line voter registration, the prospects for which are not addressed in this report.

III.    *Early Voting

The Commission heard considerable testimony in support of the institution of Early Voting in Maine. Although there has been some confusion about what "Early Voting" means because it is often confused with voting early by absentee ballot, it will suffice for the purpose of this report to define "Early Voting" as voting in person on a date before election Day in the same manner as one would vote in person on election Day at a polling place established by local officials. Thus, an early voter's participation and the manner in which his/her ballot would be processed would be the same as if the voter were voting on Election Day with the possible exception that the place for voting may differ.

The Commission unanimously supports the establishment of an early voting system in our state for the following reasons:

1) The pilot programs overseen by the Secretary of State in 2007 and 2009 in which early voting was permitted in select municipalities at referenda elections were a resounding success. They were widely accepted and endorsed by the voters and municipal officials where they were conducted.
2) Nearly all the written and oral testimony received by the Commission favored an Early Voting system.
3) It is likely that voter participation would increase if voters could vote in person on a day other than Election Day. The surveys conducted after the pilot efforts showed that certain groups of voters were more likely to vote if they could vote "early".
4) It would relieve local municipal election officials of the burdens attendant to the handling of absentee ballots as it is likely that many voters would choose to "vote early" instead of voting by absentee ballot.

Instituting an early voting system in Maine will have its challenges. Foremost among them will be the legislative and public approval of an amendment to Article II, section 4 of the Maine Constitution which would authorize the Legislature to set an election period preceding the traditional Election Day for general elections.

Moreover, assuming that a campaign to amend the Constitution succeeds, a variety of changes to our elections system will need to be undertaken to accommodate an early voting system.

Thus, for example, the Secretary of State's Office has recommended, and this Commission concurs, that participation in an early voting system be subject to a local option in towns approved by the Secretary of State. The reason to limit participation to only certain towns, at least in the early years of an early voting system, is that the conduct of early elections will have to comply with all the rules attendant to the regular Election Day. Thus, for example, a participating town will need to establish all the security procedures necessary to run an election including the staffing requirements and party participation which would ordinarily be present on a "regular" election day.

This and other necessary changes would, of course, create additional burdens for town officials which, it may be assumed, will be easier for larger towns and cities to accommodate.

In those towns which do not choose to participate in early voting or which are not approved by the Secretary of State, voters will still be permitted to vote "early" by absentee ballot. Moreover, with the approval of the Legislature or the Secretary of State, as the case may be, the law or procedures may be changed to allow the processing of absentee ballots well before Election Day, provided the integrity of processing same is assured. In sum, voters in non-participating towns may still have the convenience and benefits of voting before Election Day. Thus, as a practical matter, voters in "approved" towns will have no advantage over their fellow citizens in "unapproved" towns. Nevertheless, the Commission anticipates that voters may become confused as to their right to vote "early" depending on the town in which they live. It is hoped that an adequate public information campaign can address this issue. Whether a voter lives in a participating town or not, it is anticipated that all voters will continue to be able to vote absentee before the early voting time period.

With respect to the early voting time period, the Commission understands that it will, of course, be a legislative decision as to what that might be. The Commission recommends, however, that the early voting period should begin no earlier than the Monday of the week preceding Election Day. It is believed that any longer time period would place an undue burden on local election officials. As to the last day for the early voting period, a number of choices confront policy makers and arguments can be made in support of any one of an assortment of dates to end this period. Again, it is recognized that this will be a legislative decision, but the Commission sees merit in selecting a date that would correspond with the last date on which one can apply for an absentee ballot. Other meritorious possibilities would be to allow the localities to choose the final day for early voting or empower the Secretary of State to choose the schedule.

In sum, the Commission believes that Maine should participate in the national trend and institute an Early Voting system.

IV.    At the Polling Place

A.    Candidates at the Polls

The Commission heard from many citizens that the presence of candidates at the polls was an unfortunate part of the Election Day process in our state. Some testified that they voted absentee or avoided voting altogether in order to avoid running the gauntlet of campaigners at their polling place.  Commission members who monitored elections this year witnessed this phenomenon at the polling places they visited.

Specifically, one city clerk testified that the most frequent complaint she receives on Election Day is the intimidation that voters feel when they are approached by candidates at the polling place, a circumstance which is aggravated by the consolidation of polling places in some cities.  A candidate from last year's election opined that, "A candidate at the polls is a clear attempt to influence the outcome of the vote." On the other hand we had one individual defend this practice, a candidate for the State Senate, who offered that, "Having candidates at the polls gives a sense of camaraderie and community [to the process]."

On balance, the Commission unanimously concluded that the presence of candidates at the polls adds nothing to the electoral process and does serve to depress the vote among those who wish to go to their polling place unhindered by advances made by candidates. Accordingly, the Commission recommends that 21-A M.R.S. sec. 682(2)(c) be repealed as unenforceable and an impingement on the free access of voters to their voting places. Instead, the Commission recommends that the Legislature consider a ban on the presence of candidates or their surrogates, except for voting themselves, within 250 feet of a building containing a polling place. Such a provision would be consistent with the restrictions on campaign signs found at 21-A  M.R.S. sec. 682(3).

In sum, the Commission, consistent with the weight of the testimony it heard, believes that polling places should be electioneering-free zones.

B.    Petitioners at the Polls

The Commission received oral and written testimony on the topic of petitioners at the polls which, while not nearly as adamant as the submissions concerning candidates at the polls, nevertheless was critical of this aspect of the Election Day process. One town clerk offered that, "Petitioners ignore the rules and try to block voters as they exit. It is a constant battle for the wardens." A city clerk testified that, "While some petitioners are difficult, it is a logical function of the democratic process which is effectively managed by state law."

The Commission is concerned that the presence of petitioners at the polls does suppress turnout on Election Day as voters wish to avoid being accosted by petitioners. On the other hand, unlike the presence of candidates at polling places, the solicitation by petitioners does serve a legitimate, albeit modest, purpose in that local election officials can be confident that the signatures on the petitions are "good" in that they were from voters who were registered to vote as opposed to petitions which are presented outside shopping malls or the like.

Moreover, the Commission is persuaded that with modest statutory changes, petitioners may be convinced to conform their behavior to the law. Specifically, the Commission recommends that the restrictions on petitioners' activities be consolidated into one section, merging the provisions of sections 662(2) and (4) with 681(4) in Title 21-A, and creating a new section which prescribes and proscribes their activities. So, for example, while allowing a petitioner to solicit a voter, "solicit" may be defined in the statute so as to exclude loud, unreasonable or harassing activities. At the same time the authority of the warden as described in section 662 ought to be retained or strengthened as the Legislature may deem appropriate.

The Commission unanimously recommends that the privilege of petitioners to appear at the polls be retained albeit with a strengthening of prohibitions on their activities and the warden's authority.

C.   Campaign Signs

It is questionable that the placement of campaign signs fits within the charge to the Secretary of State as expressed in Resolves 2011, ch.133. Nevertheless, it is a topic worthy of brief mention in this report as it was presented to us as an issue by some of the testimony heard by the Commission.

It is certainly beyond the scope of this effort to argue about the usefulness of campaign signs. The Commission, however, endorses the current limitation as to the placement of campaign signs as may be found at 21-A  M.R.S. sec. 682(3). The Commission also unanimously recommends that the Legislature consider as a local option the establishment of the authority of a municipality to regulate or prohibit the placement of campaign signs, (or any other signs for that matter), on municipal property, as opposed to town easements over private property. The Commission also recommends that as a local option that municipal officials, through appropriate law enforcement officials, be authorized to remove political or other signs which affect the free passage of vehicles and pedestrians or block their visibility at intersections, traffic circles or the like.

D. Voting Machines

Although the Commission heard from only one citizen who was concerned about the use of voting machines, we felt it was important to address this issue because, as of this last election, we are using more voting machines in Maine and the Commission wants to encourage this trend.

Our citizen's concern is that the use of voting machines raises questions about the integrity of the balloting process. That is, the count is not conducted publicly as required by law and the software which operates the machines is subject to tampering so that a machine may be programmed or "hacked" to affect the outcome. Moreover, it is said that the machines are privately owned and therefore not under the custody and control of accountable public officials. In addition, it is alleged that they leave no paper trail so that election results cannot be verified.

We believe that the concerns here described are without merit as here explained. First and foremost, it must be understood that our voting machines are "tabulators", not "voting machines". That is, the voter fills out a paper ballot, feeds it into the tabulator which "reads" the marks on the ballot, and totals the results on a tape. The tabulator is cleared before the voting begins as would be shown on the tape. The machine is thereafter in public view at all times, including at the end of the day when it produces a final tally. In the meantime the paper ballots it has counted are preserved and can be used for a recount or for auditing purposes. Any possibilities for tampering would have to occur in public on a paper ballot, such as double voting, and escape detection to be successful. The same would be true for the traditional way of casting a ballot.

64 new tabulators were put into use for the 2012 election and results from hand counts of the paper ballots in recounts showed that the machines operated nearly flawlessly. The Commission understands that the Secretary of State plans on distributing more new machines so that by the next general election, 200 towns will have the tabulators available, none of which would be privately owned. The Commission endorses the effort to expand the use of tabulators as it is convinced that they present no threat to the integrity of the ballot counting process, are likely more reliable than the traditional vote counting methods, and save Maine election officials many hours of work ordinarily spent hand counting ballots.

E. Access to the Polls

The Commission received only one complaint concerning access to the polls and the Secretary of State advises they have received only two complaints concerning the Accessible Voting System (AVS).

As to the complaint the Commission received, it appears the citizen involved objects to the practice of some towns or school districts failing or refusing to put local questions on the "spoken ballot" accessible by phone because it costs about $130 to have written ballot questions coded for this purpose, an expense borne by the town. Further, if a town has a number of issues on the ballot, it takes an inordinate amount of time to get the ballot to the voter by phone and to return same. The Commission explored this issue with the Secretary of State's Office and concluded that this citizen's complaint had merit but that its selection of this voting option was sensible until technology improves.

As to the cost to the towns of providing ballot questions via the AVS, we can only suggest that towns be required to accommodate voters who need this system and therefore absorb this cost. Alternatively, the Legislature may want to consider appropriating funds to the Secretary of State's Office to reimburse towns for this expense.

V.     Local Responsibility and Accountability.

In Maine, all elections are conducted locally by local election officials. They are bound by state laws and procedures, however, when overseeing "state" elections. But, by virtue of Maine's "Home Rule" tradition, local officials enjoy some latitude when conducting their own municipal elections.

The Commission understands that this approach is well established in our State and that there is no sentiment to change the local nature of our elections administration. Indeed, the Commission heard no testimony that we abandon this approach. (Although the Commission did hear from citizens in one town who were upset about the conduct of a local election in the recent past.) Moreover, it is true that the great majority of Maine towns do an excellent job administering our elections – a demanding task which entails a mastery of complex election laws as well as a lot of hard work and long hours.

 That said, the Commission heard complaints about the level of training and competence of some local election officials. To be sure, the number of towns which disappoint their electorate is probably quite small, but the Secretary of State's Office advised us of the following issues which have arisen in recent elections:

-    a substantial number of experienced, trained local election officials calling during the election season with questions which demonstrate a lack of understanding of election processes;
-    approximately 75 towns in 2012 filing their election returns after the deadline of the Friday following primary election day, and about half of all municipalities filing forms in that election which were incomplete; (The Secretary of State advised that performance in the 2012  general election showed significant improvement.)
-    some town select boards or administrators not allowing their town clerk and/or registrar to attend the election officials' training conducted by the Secretary of State as required by law, see 21-A M.R.S. sec. 101(9);
-    a few towns failing or refusing to cooperate with recounts and other post-election processes;

In the Commission's view, while these kinds of problems are not widespread, they engender lack of confidence in the electoral process which, in turn, undermines the process itself. Indeed, a study at Columbia University showed that poor election administration is usually mislabeled as "fraud". Minnite, "The Politics of Voter Fraud", Project Vote, 2006 (est. date).

The Commission struggled to come up with recommended solutions to the problems experienced in a small minority of towns, as illustrated above, and came up with the following list which the Legislature may wish to consider:

- Currently, there is nothing the Secretary of State can do to correct errant practices on the local level. Thus, empowering the Secretary of State as follows might be worthy of consideration:
  o Authorize the Secretary of State to suspend the authority of a town to conduct a "state" election and assign that responsibility to a neighboring town or oversee the election itself. Obviously such a drastic step should only follow efforts at remediation or graded sanctions.
  o Clarify the penalties provision at 21-A M.R.S. sec. 32 to allow for the assessment of fines against a town which violates a mandate of the elections laws. (See e.g. 21-A  M.R.S. sec. 32(2) which only applies to officials.). Obviously, too, such a step might be appropriate only after other correction efforts have failed.
  o Increase the fines assessable under 30-A M.R.S. sec. 2607 for the neglect or refusal of a municipal officials to perform their duties.
  o Authorize county government to take the place of municipal officials in towns which do not administer elections according to law.

The Commission is mindful that this is a sensitive area and here reiterates the notion that suspension of elections authority or penalties against local officials or a town itself should only be considered when all other efforts at correcting poor practices have not succeeded.

VI.    Absentee Ballots

The Commission was provided with an abundance of oral and written testimony concerning Maine's current absentee ballot system. From this, the Commission concluded that the system works well as currently constructed but would be benefitted by at least two minor changes.

First, the Commission finds no fault with our "no reason" basis to apply for an absentee ballot. Thus, because a voter need not give a reason to apply for an absentee ballot, the Commission believes that more qualified citizens are likely to vote and that they will do so absentee for reasons that are personal to them, even if it is only for convenience.

With reference to the current system, the Commission believes that the calendar for the availability of absentee ballots is a generous one and need not be changed. That is, applications for ballots must be made available 3 months before Election Day, and ballots must be available 30 days before Election Day. However, the latter period ends, except for emergency situations, on the Thursday before Election Day. With reference to this deadline, the Commission heard testimony advocating for a system in which a voter can apply for an absentee ballot through Election Day itself. Nevertheless, the Commission concurred with the position of many town clerks and the Secretary of State's Office that the Friday, Saturday and Monday before Election Day should be left for the preparation of Election Day itself without the additional burden of last minute applications for absentee ballots. Moreover, the Commission recommends that if Early Voting were to be instituted, the election calendar should have the last day for early voting correspond with the last day to apply for an absentee ballot. It may also be that the institution of Early Voting will take some pressure off the work associated with processing absentee ballots.

The Commission was made aware of a potential for abuse in the absentee ballot system which needs to be examined further or addressed by legislation. That is, when someone applies for an absentee ballot for a family member, there is no requirement for a notary or witness certification for the ballot envelope and the family member can then return the ballot to the clerk. See 21-A M.R.S. sec.754-A(1)(C),(E). Under such a system the person who solicited the ballot for a family member could vote the ballot, forge the voter's signature and thereby commit a fraud.  Apparently, there is at least one case in recent years in which a person was prosecuted for pursuing this very ruse. The solution to this problem may simply be to eliminate the exception for a family member's role in absentee balloting, and require all absentee voters who rely on a third person for assistance to follow the procedure requiring the presence of a witness, notary or the clerk  as outlined at 21-

A M.R.S. sec.754-A (2). Another option would be to require the voter to request a ballot to be delivered or returned by an immediate family member, rather than allowing the family member to make the request, possibly without the knowledge of the voter. That would still allow the family member to return the ballot if the voter requests it and would eliminate the need for one or more witnesses.

Moreover, it is recommended that when clerks receive the standard absentee ballot, they should be sure to compare the voter's signature on the application with the signature on the ballot to be sure that they appear to be the same. Both these documents are retained so that members of the public can be satisfied that the person applying for an absentee ballot appears to be the same one who voted that ballot.

Finally, we were advised that because local elections do not have to comport with the absentee ballot process which attends statewide elections, towns and RSUs are free to shorten the period within which absentee ballot applications are made available with the result that not only can absent voters be frustrated in their desire to exercise their right to vote, town clerks are inundated with the work associated with processing absentee ballot applications in a compressed time frame. The Commission respectfully suggests that legislation be considered which would require local jurisdictions to institute an absentee ballot system which may be more convenient for voters and election administrators alike.

VII.   Residency

It is an axiomatic principle in American elections that citizens have the right to vote where they are residents for voting purposes. And, "A person can have only one residence at any given time." Maine has codified these principles at 21-A M.R.S. secs 111(3)&112(2). Moreover, a person who votes in a community where he/she is not a bona fide resident dilutes the votes of those citizens who properly voted in that community.   While these appear to be straightforward concepts, controversy and confusion have surrounded the application of the word "residency" in establishing the qualifications of a potential voter. All three branches of our state government have addressed the problem of defining who is qualified to vote.

For its part, the Legislature, as the entity who makes the "rules" concerning residency, has defined "residence" for purposes of the qualification to vote as, "...that place where the person has established a fixed and principal home to which the person, whenever temporarily absent, intends to return." 21-A M.R.S. secs. 1(40), &112(1). "This definition of voting residence has been held to be equivalent to domicile, which means living in a locality with the intent to make it a fixed and principal home." Op. Me. Att'y Gen. 2008-01 at 3, citing, Poirier v. City of Saco, 529 A.2d,329 330, n.2 (Me. 1987). The Legislature has also established a menu of factors which a potential voter may offer to a registrar as proof of residency. 21-A M.R.S. sec.112(1)(A).

As will be discussed herein, the executive branch, through the attorney general and the secretary of state, and the courts have been called upon from time to time to interpret the laws concerning voter qualification as they relate to residency. Most frequently their attention has been directed to the clarification of the law or the resolution of disputes concerning the application of the law to college students. Typically, the controversy is centered on students who come to Maine from another state to obtain their college education. Since many, if not most, of these students return "home" or go elsewhere on vacations or breaks, and don't vote in person or absentee in elections, such as primaries, which do not occur during the school year, it is often argued that they should not be considered Maine "residents" for voting purposes. [A similar argument is made as to students who attend college in Maine and who are from Maine, but vote in their college community rather than their town of origin.]

While these concerns have legitimacy, and complainants correctly argue that the axiom cited above should be inviolate, namely that citizens should vote where they "reside", court decisions and attorney general opinions provide consistent legal

guidance to the effect that college students are free to establish a Maine residency and vote here just as any other non-student individual might.

Thus, as Attorney General Rowe opined in 2008, "Where a fundamental right, such as the right to vote, is at issue, the state has to meet a higher burden in order to justify any limitations on that right. Restrictions on the right to vote must be justified by a compelling state interest and must be narrowly tailored to serve that interest." Op. Me. Att'y Gen. 2008-01, at 5, citing Dunn v. Blumstein, 405 U.S. 330, 336-37 (1972). Accordingly, as noted, a college student cannot be barred from voting simply because of that status; instead it is a neutral factor and the student is free to establish voting residency, as any other potential voter might, by the fair application of the statutory guidelines by which qualification to vote may be established. Said better, "[U]nder Maine law, local [election officials] should not place students in any better nor in any worse position than non-students when making a determination as to whether a voting residence has been established." Memorandum from AG Erwin to Sec'y of State Edgar, 1/4/72, at 2, attached to Op. Me. Att'y Gen. 2008-01; See also, 21-A M.R.S. sec. 112(7).

From all this it may be fairly concluded that as long as a student studying here satisfies one or more of the factors enumerated at 21-A  M.R.S. sec. 112(1)(A), he or she must be permitted to register to vote.  Typically, for a student coming to Maine from another state, that would likely entail subsections 1, 2, 9 or 16 of section 112(1)(A).

The Commission also believes that establishing this important right of citizenship confers certain responsibilities upon that individual. In this regard, Maine law, as interpreted by previous attorneys general and secretaries of state, requires that bona fide citizens who establish a voting residency here also comply with other laws which apply to Maine citizens. Thus, as opined by Attorney General Cohen, "…[W]e conclude that a person, such as a student, physically located in this State who registers to vote and by that act claims Maine as his or her fixed habitation, is thereby precluded from claiming nonresident status so as to continue his or her exemption from Maine's registration and operator licensing laws. Thus it appears plain that anyone physically located in this State who registers to vote in a Maine municipality must register his or her motor vehicle in Maine and must obtain a Maine operator's license." Op. Me. Att'y Gen. 80-38 at 2. The same precedent concludes that one who establishes a voting residence in Maine is domiciled here for purposes of our property, income and excise tax laws. Id. at 3. So, while Maine statutes are silent on the issue, the essential point of Attorney General Cohen's opinion is that if one is claiming a Maine residence for voting purposes, then one has claimed Maine as one's domicile for all purposes.

While the responsibilities attendant to establishing one's domicile in Maine appear to be well settled, it is also true that an individual's failure to register a vehicle, obtain a motor vehicle license, or pay taxes in Maine after becoming a Maine voter do not, by themselves, extinguish the individual's right to vote here. Instead, such a citizen becomes vulnerable to prosecution for the failure to adhere to the laws which impose obligations on those who become Maine residents.

At least one advocacy group which appeared before the Commission on a number of occasions offered the notion that the right to vote should be "decoupled" from any citizen responsibilities which are tied to establishing Maine as one's domicile. The idea, apparently, is that college students, or any other person wishing to exercise the franchise in Maine, should not, by that act, be required to adhere to any law which imposes responsibilities on such aspiring Maine citizens. The Commission would reject this approach as contrary to the history and law of Maine which has always been to the contrary. Further, in the Commission's view, full citizenship with its concomitant rights also entails responsibilities which are universally imposed for the greater good, such as paying taxes, serving as a juror, etc.. Indeed, to immunize those with citizen rights from the burdens of citizen responsibilities, especially if the former were to benefit only one group of people, like college students, would place those who are entitled to select our political leaders and enact our ordinances without any direct or indirect responsibility for the consequences of those choices. In our view, participation in civic life should not segregate a right dependent on residency with the obligations which accompany the declaration of residency. In this regard, a bona fide resident of Maine should not be free to select which laws based on residency he/she wishes to obey and those which he/she does not.

Two other groups of citizens present challenges to the concept of "residency" as it relates to the right to vote. The first of these is the non-domiciled resident who has a vacation or second home in Maine. Because these folks have a "residence" in our State, a few believe they can vote here as "residents". While this is not a common phenomenon, it does arise in the administration of local elections when there is interest and incentive to vote on local issues such as zoning ordinances.

The same problem has arisen when a bona fide Maine resident has two homes in Maine but can, and should, be domiciled for voting purposes in only one of them. Nevertheless, such voters purposely or mistakenly decide to vote in the community where they have a "residence" but are not domiciled. Such events occur, as with the non-Maine residents, when there is strong interest in a local election where the voter has a non-domiciled "residence". So, for example, the Commission was advised that some voters with a non-voting residency on Peak's Island attempted to vote there in the secession referendum even though they were domiciled elsewhere.

Whether this was intentional or through misunderstanding, the issue remains that a few voters will attempt to vote, especially in local elections, where they are not properly domiciled.

Before addressing possible cures for the problems set out here, it is worth raising the complaints we heard from a variety of citizens and election officials concerning the list of potential factors which a registrar may use to establish a voter's residency as found at 21-A M.R.S. sec. 112(1)(A).

The first of these is the use of an oath as authorized by section 121(1) as a "direct statement of intention," to establish residency under section 112(1)(A). Unfortunately, the form of the oath to be used is not prescribed by statute, although the Secretary of State's Office does provide registrars with an oath form and instructions to require proof of identity from the potential voter who is taking the oath.

Two other forms of identification to establish residency have been criticized. One is, "[t]he place where any motor vehicle owned by the person is registered." 21-A M.R.S. sec. 112(1)(A)(6). The other is, "[t]he residence address, not a post office box, shown on any current resident hunting or fishing licenses held by the person. Id., sec. 112(1)(A)(10). As to the latter, because one can obtain such a license without proof of residency in a particular town, and need only establish Maine residency to get a license, it is argued that an IFW license should not suffice as proof of residency in a particular town. With respect to motor vehicle registration as proof of residency, it has been reported that a few town clerks will, on occasion, register a motor vehicle in their town without proof of residency in order to collect excise tax for their town. While such incidents are probably rare, it may be worth reviewing this factor as evidence of residency for voting purposes.

More substantively, the Commission believes that much of the confusion and controversy over the question of residency would be cured by changing the law to substitute the word "domicile" for the word "residence" wherever applicable. This amendment to our election laws would make it clear that residency for voting purposes means domicile, just as the law's interpreters have always said. Thus, persons who have more than one "residence", and were confused in thinking that they had more than one forum to choose from when voting, would understand that they could only vote where they are domiciled, that is, the place which they intend to make "their fixed and principal home", 21-A M.R.S. sec. 112(1), even if that intent may be short-lived. Thus, as the Secretary of State correctly offered in his guidance to registrars in 1974, "All that is required is the applicant's residency within the community plus the present intention to claim that community as the applicant's

SOLE residence." (emphasis supplied). Indeed, our current statute defines "residency" as "domicile" without using the latter word. 21-A M.R.S. sec.112(1).

As a remedy for the problems surrounding the use of an oath as one means to establish voting residency, (or, preferably, "domicile"), the Commission respectfully suggests adopting a statutorily prescribed oath as New Hampshire has done at N.H.RS, sec. 654:12. By codifying the oath of "domicile" and requiring that the oath be taken in the same manner as one taken before a notary, the Legislature would be insuring that the practice was uniform statewide, was consistent with other laws concerning oath-taking, and would, hopefully, put to rest the unease some town clerks and registrars feel in relying on this method to establish voting domicile.

Additionally, if the Legislature were inclined to amend this aspect of our law as it applies to establishing voter qualifications, the Commission also recommends that the voter registration form currently used be revised to use the word "domicile" and to make it clear to the registrant that he/she can only have one domicile for purposes of voting. Again, New Hampshire has adopted such a form which has the additional positive purpose of advising the registrant that by registering to vote, he/she is taking on other responsibilities of citizenship, such as obtaining a driver's license and registering his or her motor vehicle. See N.H.RS, sec. 654:7 IV.

With further respect to the proper voting venue for college students, the Commission believes that the minor changes suggested above will help clarify their participation in Maine elections. The Commission strongly believes, however, that college administrators must take a more pro-active approach in assisting their students in the exercise of their right to vote by affirmatively and effectively reaching out to them to encourage them to engage in our democratic processes. Thus, for example, a timely memo to students advising them of their rights and obligations when registering to vote here would be a service to them and the college's community. At the same time these officials should offer to assist those students who wish to remain domiciled at their original homes so they may obtain absentee ballots in a timely way. Further, it is hoped that the Secretary of State will continue to communicate with college officials and offer to assist them with the proper registration of their students.