# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW DUNLAP,<br><br>                         Plaintiff,<br><br>        - versus -<br><br>PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; MICHAEL R. PENCE, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; KRIS W. KOBACH, IN HIS OFFICIAL CAPACITY AS VICE CHAIR OF THE PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; ANDREW KOSSACK, IN HIS OFFICIAL CAPACITY AS DESIGNATED FEDERAL OFFICER FOR THE PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; GENERAL SERVICES ADMINISTRATION; TIMOTHY R. HORNE, IN HIS OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE GENERAL SERVICES ADMINISTRATION; EXECUTIVE OFFICE OF THE PRESIDENT; OFFICE OF THE VICE PRESIDENT; OFFICE OF ADMINISTRATION; MARCIA L. KELLY, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE OFFICE OF ADMINISTRATION,<br><br>                       Defendants. | Civil Action No. 17-cv-2361-CKK |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A
# PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ............................................................................................................1

II.   FACTUAL BACKGROUND ........................................................................................3

    A.    Secretary Dunlap.................................................................................................3

    B.    The Presidential Advisory Commission on Election Integrity ...........................4

        1.    The Formation and Membership of the Commission ..................................4

        2.    The Commission Conducts Business Without Providing Secretary Dunlap
             With Advance Access To Documents .........................................................5

III.  APPLICABLE LAW:  The Federal Advisory Committee Act Grants Commissioners a
Right of Access to Documents............................................................................................7

IV.   Argument ......................................................................................................................9

    A.    Secretary Dunlap Is Likely to Succeed on the Merits.......................................9

        1.    Defendants Have Violated—And Continue to Violate—FACA ................9

        2.    Secretary Dunlap Can Bring a Cause of Action for FACA Violations. ....13

            a.    Secretary Dunlap Is Entitled to Relief Under the APA .................13

            b.    Secretary Dunlap Is Entitled to a Writ of Mandamus...................15

    B.    Secretary Dunlap Will Be Irreparably Harmed Absent a Preliminary Injunction. 18

    C.    The Balance of Harms Weighs in Favor of Preliminary Relief...........................22

    D.    Preliminary Relief Will Serve the Public Interest.................................................23

V.    CONCLUSION............................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Trump*,
  2017 U.S. Dist. LEXIS 111293 (D.D.C. July 18, 2017)................................................14, 19

*ACLU v. Trump*,
  No. 17-cv-1351 (D.D.C.) .........................................................................................17

*Ala.-Tombigbee Rivers Coal., v. Dep't of Interior*,
  26 F.3d 1103 (11th Cir. 1994) ..................................................................................22

*Am. Airlines, Inc. v. Austin*,
  778 F. Supp. 72 (D.D.C. 1991)..................................................................................14

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016)..................................................................................15

*Ass'n of Am. Physicians & Surgeons v. Clinton*,
  813 F. Supp. 82 (D.D.C. 1993), *rev'd on other grounds*, 997 F.2d 898 (D.C.
  Cir. 1993) ...............................................................................................................20

*Byrd v. United States EPA*,
  174 F.3d 239 (D.C. Cir. 1999) ..................................................................................11

*Chamber of Commerce of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ..................................................................................15

*Council on Am.-Islamic Relations v. Gaubatz*,
  667 F. Supp. 2d 67 (D.D.C. 2009) ..............................................................................9

*Ctr. for Arms Control & Non-Proliferation v. Lago*,
  2006 U.S. Dist. LEXIS 83226 (D.D.C. Nov. 15, 2006) ..................................................13, 17

*Ctr. for Biological Diversity v. Tidwell*,
  239 F. Supp. 3d 213, 221 (D.D.C. 2017) ....................................................................13, 17

\* *Cummock v. Gore*,
  180 F.3d 282 (D.C. Cir. 1999) ........................................................................... *passim*

*EPIC v. Presidential Advisory Commission*,
  No. 17-cv-1320 (D.D.C.) .........................................................................................17

*Food Chem. News v. Dep't of Health and Human Servs.*,
  980 F.2d 1468 (D.C. Cir. 1993) ............................................................................8, 10, 17

*Freedom Watch, Inc. v. Obama*,
  807 F. Supp. 2d 28 (D.D.C. 2011) ..............................................................................15

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

*Gates v. Schlesinger*,
   366 F. Supp. 797 (D.D.C. 1973) ........................................................................22, 23

*Joyner v. Presidential Advisory Commission*,
   No. 17-cv-22568 (S.D. Fl.) .....................................................................................17

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
   736 F. Supp. 2d 24 (D.D.C. 2010) ...........................................................13, 15, 16

*Judicial Watch v. Nat'l Energy Policy Dev. Grp.*,
   219 F. Supp. 2d 20 (D.D.C. 2002) ...........................................................13, 15, 16

*Lawyers' Comm. for Civ. Rights Under Law v. Presidential Advisory Comm'n on
   Election Integrity*,
   2017 U.S. Dist. LEXIS 111184 (D.D.C. July 18, 2017) (CKK).......................15, 19

*Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory
   Commission on Election Integrity*,
   No. 17-cv-1354 (D.D.C.) .................................................................................11, 12, 17

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...............................................................................9, 22

*In re Medicare Reimbursement Litig.*,
   414 F.3d 7 (D.C. Cir. 2005) .....................................................................................15

*National Anti-Hunger Coalition v. Executive Comm. of the President's Private
   Sector Survey on Cost Control*,
   557 F. Supp. 524 (D.D.C. 1983) ..............................................................................11

*National Anti-Hunger Coalition v. Executive Comm. of the President's Private
   Sector Survey on Cost Control*,
   711 F.2d 1071 (D.C. Cir. 1983) ................................................................................8

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004)....................................................................................................14

*Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*,
   886 F.2d 419 (D.C. Cir. 1989) ..................................................................................7

*Pub. Citizen v. Nat'l Econ. Com.*,
   703 F. Supp. 113 (D.D.C. 1989) ..............................................................................21

*Public Citizen v. U.S. Dep't of Justice*,
   491 U.S. 440 (1989)...............................................................................11, 12, 13, 17

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971) ............................................................................14

**Statutes**

5 U.S.C. app. 2 § 3 .................................................................................................7, 9

5 U.S.C. app. 2 § 5(b)(2).......................................................................................7, 11

5 U.S.C. app. 2 § 9(c)........................................................................................8, 12, 17

5 U.S.C. app. 2 § 10(b) .........................................................................................8, 9

5 U.S.C. § 551(1) ...................................................................................................15

5 U.S.C. §§ 704, 706..............................................................................................14

**Other Authorities**

41 C.F.R. § 102-3.60(b)(3) ......................................................................................7

41 C.F.R. § 102-3.170..............................................................................................8

H.R. REP. NO. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491 ..............................7, 8, 23

H.R. REP. NO. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491 .........................................8

## I.       INTRODUCTION

Plaintiff Matthew Dunlap, Secretary of State of Maine and member of the Presidential

Advisory Commission on Election Integrity (the "Commission") brings this motion for

injunctive relief to compel the Commission and its co-defendants to provide him with the

documents and access necessary to fulfill his obligations as a commissioner.  Secretary Dunlap

brought this lawsuit reluctantly, only after repeated attempts to gain access to the Commission

documents to which he is entitled under federal law, and after additional meet-and-confer with

counsel for the Defendants.  Despite these efforts and the filing of this action, he continues to be

blocked from receiving Commission documents.  This denial of access by the Commission and

its leadership and staff prevents Secretary Dunlap from carrying out his responsibilities and

blocks his full participation in the Commission's activities.

This is an easy case.  It is crystal clear that Secretary Dunlap is entitled to receive access

to the documents that he seeks in this lawsuit.  The Federal Advisory Committee Act ("FACA")

mandates that members of advisory committees—like Secretary Dunlap—be provided with the

documents necessary to participate in the advisory committee's investigation, deliberations, and

reporting.  FACA's requirement that advisory committees are truly balanced is not satisfied

unless commissioners who represent a cross-section of the American public are appointed and

then granted actual access to Commission documents and permitted to participate in all

Commission deliberations.  The D.C. Circuit has squarely held that commissioners themselves

are entitled to see all information "made available to the Commission" so that they can "fully and

adequately participate" in the Commission's "deliberative process."  *Cummock v. Gore*, 180 F.3d

282, 292 (D.C. Cir. 1999).  Here, the defendants have violated FACA by withholding

Commission documents and communications from Secretary Dunlap and by walling him off

from Commission deliberations.

A preliminary injunction is necessary to compel Defendants' compliance with FACA and to prevent continuing irreparable harm.  Under clear and controlling precedent, Secretary Dunlap is entitled to the documents he has requested from the Commission that will enable him to fulfill his duties and serve fully as a commissioner.  *Id.* at 292.  Each day that he is denied access to Commission documents, Secretary Dunlap suffers and will continue to suffer irreparable injury.  Defendants' failure to provide documents in a timely fashion limited Secretary Dunlap's ability to participate at the Commission's July 2017 and September 2017 meetings.  Although Secretary Dunlap has been told that he will receive advance notice of the next meeting, he also was told that he cannot expect to receive the documents he needs to participate in that meeting in a meaningful fashion.  Meanwhile, press accounts and comments from other commissioners suggest that the Commission continues to forge ahead in secret toward a final report that will not be the product of a balanced committee immune from special interests, as FACA requires.  Absent an order requiring the prompt production of documents and enjoining the publication of any report until Secretary Dunlap has time to review those documents and participate in discussions, Secretary Dunlap will continue to be unable to participate in the Commission's meetings or deliberations.  Finally, Defendants will suffer no harm from the order sought by this motion.  This order will do nothing more than insist on compliance with FACA by including all of the Commission's own members in the Commission's deliberations.  The public interest likewise will be served by compliance with FACA.

Accordingly Secretary Dunlap respectfully requests that this Court grant his motion for a preliminary injunction and (1) order Defendants promptly to produce records requested by Secretary Dunlap; (2) order Defendants to product to Secretary Dunlap all future documents made available to or prepared for or by the Commission promptly and no later than two weeks in advance of any future Commission meeting; (3) order Defendants to permit Secretary Dunlap to

fully participate on an equal basis as all other commissioners; and (4) enjoin the Commission

from releasing a final report until Secretary Dunlap has received all documents to which he

entitled and has had an opportunity to review them, has participated in the drafting of the report

or, if necessary, has completed a concurrence or dissent to the report.[1]

## II.      FACTUAL BACKGROUND

### A.      Secretary Dunlap

Plaintiff Matthew Dunlap is the Maine Secretary of State.  He has served since he was

elected by the Maine State Legislature in 2013.  (Dunlap Decl. ¶ 1).  Secretary Dunlap

previously served as Maine Secretary of State from 2005 through 2010.  (*Id.*)  One of Secretary

Dunlap's responsibilities is to oversee the Bureau of Corporations, Elections and Commissions,

which is responsible for state elections in Maine.  (*Id.*)  Secretary Dunlap therefore has extensive

first-hand experience and expertise in issues surrounding the right to vote in the United States.

Beyond the election experience he gains every day as Secretary of State, Secretary Dunlap has

also carefully studied issues concerning voting and elections.  He reviewed the findings of the

2012 Maine Elections Commission, a committee of five Maine citizens that studied and offered

strategies to improve Maine's election system.  (*Id.* ¶ 2).  In this process, Secretary Dunlap

carefully considered the pros and cons of various hot-button voting rights issues, including same-

day voter registration, early voting, and voter ID laws.  (*Id.* and Ex. 1).

As a longtime advocate for the sovereign right of each citizen to exercise the franchise of

self-governance, Secretary Dunlap agreed to join the Commission in order to lend his

considerable expertise to the process and to provide his perspective concerning the issues the

---

[1] In a November 16, 2017 letter, Defendants' counsel promised that the Commission would not punish, retaliate against, or terminate Secretary Dunlap as a Commission member for asserting his rights under FACA and promised to inform Secretary Dunlap of any plans for scheduling future meetings.  (Sandick Decl. ¶ 8 and Ex. 3).  In light of these representations, Secretary Dunlap does not seek preliminary relief in the form of an injunction ordering Defendants not to punish, retaliate against, or terminate Secretary Dunlap and ordering them to notify Secretary Dunlap of any future meeting.

Commission is considering.  (*Id.* ¶¶ 3, 4).  He is aware that some observers have called for Democrats to refuse to serve on the Commission, but he believes that participation will allow him to influence and shape the Commission's recommendations and report; at a minimum, he may publish a concurrence or dissent to the report, which only commissioners have the right to do.  (*Id.* ¶¶ 4, 19).

### B.    The Presidential Advisory Commission on Election Integrity

#### 1.    The Formation and Membership of the Commission

President Trump established the Commission by Executive Order on May 11, 2017. Exec. Order 13799.  The Executive Order declared that the Commission's purpose is to "study the registration and voting processes used in Federal elections" and to report to the President on topics including "those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting."  *Id.* § 3.  On May 11, 2017, President Trump appointed Vice President Mike Pence to serve as Chair of the Commission.  *Id.* § 2.  He also named Kansas Secretary of State Kris Kobach as Vice Chair of the Commission.[2]  Between May 11, 2017 and July 10, 2017, President Trump named additional members of the Commission, including Secretary Dunlap.[3]  With these appointments, the resignation of one commissioner, and the

---

[2] Press Release, Office of the Press Secretary, President Announces Formation of Bipartisan Presidential Commission on Election Integrity (May 11, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission.

[3] *Id.*; Press Release, Office of the Press Secretary, President Donald J. Trump Announces Intent to Nominate Personnel to Key Administration Posts (June 21, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/21/president-donald-j-trump-announces-intent-nominate-personnel-key; Press Release, Office of the Press Secretary, President Donald J. Trump Announces Key Additions to his Administration (June 29, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/29/president-donald-j-trump-announces-key-additions-his-administration; Press Release, Office of the Press Secretary, President Donald J. Trump Announces Key Additions to his Administration (July 10, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/07/10/president-donald-j-trump-announces-key-additions-his-administration

untimely passing of another, the Commission is currently comprised of seven Republicans and four Democrats.

**2.       The Commission Conducts Business Without Providing
Secretary Dunlap With Advance Access To Documents**

The Commission convened a phone call on June 28, 2017, during which Defendant Kobach announced his plans to send letters to each state and the District of Columbia seeking voter data.  (Dunlap Decl. ¶ 5).  Those letters were sent later that same day, without giving time for other commissioners to review the request and state concerns or objections.  (*Id.*)

The Commission's first public meeting was held on July 19, 2017.  (*Id.* ¶ 6).  The commissioners were provided with only four documents prior to the meeting: the executive order establishing the Commission; the Commission's charter; the Commission's by-laws; and a meeting agenda.  (*Id.*)  Several Commission members (including Defendant Kobach) introduced and distributed documents at the July 19, 2017 meeting that were not provided to Secretary Dunlap or to the other commissioners in advance of the meeting.  (*Id.* ¶ 7).

The Commission held another meeting on September 12, 2017.  (*Id.* ¶ 8).  Other than logistical emails, Secretary Dunlap received no substantive information about the September meeting, such as prepared testimony, invitations to or correspondence with participants, or materials to be discussed at the meeting.  (*Id.*)  Secretary Dunlap was not informed of how the speakers or the agenda for the September meeting were prepared.  (*Id.*)

Between the September meeting and the filing of this lawsuit, Secretary Dunlap received no substantive communications or information regarding the work of the Commission.  (*Id.* ¶ 9).  On October 13, 2017, a Commission staff member, Ronald Williams, was arrested and charged with possession and distribution of child pornography.  (*Id.* ¶ 10).  Secretary Dunlap was not

5

informed of the arrest by the Commission or any other Defendant and his inquiries regarding whether Mr. Williams has been fired have been ignored.  (*Id.*)

On October 17, 2017, Secretary Dunlap wrote to Andrew Kossack, the Commission's Designated Federal Officer, asking him to provide all Commission-related correspondence and documents.  (*Id.* ¶ 11 and Ex. 2).  Defendant Kossack responded that he was "consulting with counsel" and did not provide any materials in response to Secretary Dunlap's request.  (*Id.* ¶ 13 and Ex. 4).  Secretary Dunlap sent several follow-up emails but received no documents from the Commission.  (*Id.* ¶¶ 14-17 and Exs. 5-7).

However, despite the silence from the Commission and its staff, press accounts and comments by other commissioners make clear that the Commission's work continues. Commissioner von Spakovsky said, in an article published on November 2, 2017, that the Commission "is planning to meet again."  Lydia Wheeler, "Trump voter fraud panel member fights back against critics," THE HILL, (November 2, 2017), *available at* http://thehill.com/business-a-lobbying/358107-trump-voter-fraud-panel-member-fights-back-against-critics.  And an interest group, the Minnesota Voters Alliance, stated publicly that it had been invited to speak at a December Commission meeting.  (Dunlap Decl. ¶ 12 and Ex. 3).  The Commission's charter provides for meetings every 60 - 90 days, and so while Secretary Dunlap does not know the date of the next meeting, there will be a meeting in the near future.

Secretary Dunlap filed this lawsuit on November 9, 2017.  On November 14, 2017, Secretary Dunlap's attorney sent a letter to the DOJ attorneys representing Defendants asking, *inter alia*, that they provide the documents and information requested by Secretary Dunlap. (Sandick Decl. ¶¶ 4, 5 and Ex. 1).  On November 16, 2017, counsel for Defendants responded, writing that Defendants would not agree to produce *any* documents that Secretary Dunlap requested, stating that "the Commission has taken the position . . . that these incidental

communications are not subject to disclosure under FACA section 10(b)." (*Id.* ¶¶ 8, 9 and Ex.

3).  Counsel for Defendants did not agree to produce Commission documents created in the

future to Secretary Dunlap in advance of any meeting or agree to permit Secretary Dunlap to

participate in the setting of meeting agendas or topics for discussion.  (*Id.*)  Having reached

impasse with the Defendants over the subject of access to documents, this motion followed.

## III.   APPLICABLE LAW:  THE FEDERAL ADVISORY COMMITTEE ACT GRANTS COMMISSIONERS A RIGHT OF ACCESS TO DOCUMENTS

The Federal Advisory Committee Act ("FACA") applies to commissions "established or

utilized by the President" that are not "composed wholly of full-time, or permanent part-time

officers or employees of the Federal Government."  5 U.S.C. app. 2 § 3.  FACA requires that

advisory committee membership be "fairly balanced in terms of the points of view represented

and the functions to be performed."  5 U.S.C. app. 2 § 5(b)(2).  It also requires that the advisory

committee not be "inappropriately influenced by the appointing authority or . . . any special

interest," but rather that any advice is "the result of the advisory committee's independent

judgment."  *Id.* § 5(b)(3).  An advisory committee must have a "plan to attain fairly balanced

membership" which ensures that membership "will consider a cross-section of those directly

affected, interested, and qualified."  41 C.F.R. § 102-3.60(b)(3).  Congress has recognized the

dangers associated with the "lack of balanced representation of different points of view and the

heavy representation of parties whose private interests could influence their recommendations."

H.R. REP. NO. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491, 3496; *see also Pub.*

*Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 424 (D.C.

Cir. 1989).

FACA also demands transparency in the procedures and meetings of advisory

committees.  It requires that "the records, reports, transcripts, minutes, appendixes, working

papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying." 5 U.S.C. app. 2 § 10(b). This requirement "serves to prevent the surreptitious use of advisory committees to further the interests of any special interest group." H.R. REP. NO. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491, 3500. Advisory committees are affirmatively obligated to provide access to the Section 10(b) materials. *Food Chem. News v. Dep't of Health and Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1993). Timely access to advisory committee materials is "an important element of" FACA because it "provide[s] a meaningful opportunity to comprehend fully the work undertaken by the advisory committee." 41 C.F.R. § 102-3.170. And commissioners themselves have rights "beyond those given to members of the general public." *Cummock*, 180 F.3d at 292.

One of the principal concerns of Congress in enacting FACA was that "interest groups may use their membership on such bodies to promote their private concerns." H.R. REP. NO. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491, 3496. For 45 years, FACA has stood as a safeguard against the danger that commissions would be captured by special interests and has worked to "open to public scrutiny the manner in which government agencies obtain advice from private individuals." *National Anti-Hunger Coalition v. Executive Comm. of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1072 (D.C. Cir. 1983). To effectuate these goals, each of the FACA requirements is mandatory. *See* 5 U.S.C. app. 2 § 9(c) ("No advisory committee shall meet or take any action until an advisory committee charter has been filed . . .") (emphasis added); *id.* § 10(b) ("[T]he records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying.") (emphasis added).

8

## IV.  ARGUMENT

A preliminary injunction is warranted where the party seeking relief makes a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of equities in its favor, and accord with the public interest."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal quotation marks and citation omitted); *see also Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 74 (D.D.C. 2009).  Secretary Dunlap easily satisfies each factor.

### A.  Secretary Dunlap Is Likely to Succeed on the Merits.

#### 1.  Defendants Have Violated—And Continue to Violate—FACA

As a commissioner, Secretary Dunlap is statutorily entitled to obtain and review information prepared by or used by the Commission "during the course of its deliberative process."  *Cummock*, 180 F.3d at 292.  This includes all documents "that were prepared for or relied upon by the Commission."  *Id.* at 284; *see also* 5 U.S.C. app. 2 § 10(b).[4]

Secretary Dunlap's entitlement to Commission documents is beyond question.  *Cummock v. Gore* controls here.  M. Victoria Cummock was a commissioner of the White House Commission on Aviation Safety and Security who sued the Commission, the Commission's chair (then-Vice President Gore), and the Commission's Designated Federal Officer for violating her rights under FACA "by denying her access to . . . documents and information, and thereby compromis[ing] her ability to participate in Commission proceedings."  *Cummock*, 180 F.3d at 284.  In *Cummock*, the Commission had disbanded before Cummock filed suit, but Cummock

---

[4] It is clear that the Commission is an advisory committee subject to FACA.  The Commission was established by the President pursuant to an executive order and is not composed wholly of federal government employees.  See 5 U.S.C. app. 2 § 3.

wished to prepare a dissent based on previously undisclosed documents and append it to the Commission's report.  *Id.* at 287, 290.

The D.C. Circuit found that the commissioner "readily satisfie[d] the standing requirements" and held that Section 10(b) compelled the Commission to provide the commissioner "access to information that it reviewed and relied upon."  *Id.* at 290, 292.  A commission member "possesses an even greater right [to documents] than a member of the public" because a commissioner "is entitled to fully participate in its deliberations."  *Id.*  In *Cummock*, the D.C. Circuit emphatically rejected the Government's argument that "advisory committee membership accords no real right to participate in committee proceedings."  *Id.* at 291.

Secretary Dunlap has been injured in the same way, although here there is an opportunity to mitigate the irreparable harm because the Commission has not yet issued a report or disbanded.  He has been walled off "from the committee's operations, rendering membership essentially meaningless."  *Cummock*, 180 F.3d at 291.  He was notified of the Commission's decision to request voter data from the states mere hours before the letters were sent.  (Dunlap Decl. ¶ 5).  He did not receive any substantive materials, testimony, or other information before the Commission's first meeting in July 2017, (*Id.* ¶ 6), even though FACA "affirmatively obligates the Government to provide access to the identified materials."  *Food Chem. News*, 980 F.2d at 1472.  And since the September meeting, Secretary Dunlap has received no documents or substantive information from the Commission or its staff.  (Dunlap Decl. ¶ 9).  Secretary Dunlap's complete walling off is illustrated by the Commission's failure to even notify Secretary Dunlap when a Commission staff member was arrested and charged with possession and distribution of child pornography.  (*Id.* ¶ 10).  Secretary Dunlap's inquiries about the actions, if any, that the Commission has taken in response to the arrest have been met with silence.  (*Id.*)

Secretary Dunlap's repeated requests for these documents from Defendant Kossack, the Commission's Designated Federal Officer, have gone unfulfilled, giving him standing to pursue his requests via litigation.  *See Public Citizen*, 491 U.S. at 449 (standing requires only that that plaintiff "sought and w[as] denied records"); *Byrd v. United States EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) ("[A] refusal to provide information to which one is entitled under FACA constitutes a cognizable injury sufficient to establish Article III standing."); *National Anti-Hunger Coalition v. Executive Comm. of the President's Private Sector Survey on Cost Control*, 557 F. Supp. 524, 527 (D.D.C. 1983) (plaintiff had standing to challenge the "balance" of committee membership).

It is apparent that certain commissioners and the Commission's staff continue to work behind the scenes even while Secretary Dunlap is denied access.  In related litigation before this Court, Defendants prepared and filed a *Vaughn*-type index listing more than 800 documents and categories of documents relating to the Commission's work.  Third Decl. of Andrew J. Kossack, *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-1354 (CKK) (Dkt. 33-1).  Defendants have provided Secretary Dunlap with virtually none of these documents or others that have been created relating to the Commission's work.  (Dunlap Decl. ¶ 17).

Secretary Dunlap is also likely to succeed on his claims that Defendants have violated Section 5 of FACA.  Section 5 requires "the membership of the advisory committee to be fairly balanced in terms of the points of view represented . . . ."  5 U.S.C. app. 2 § 5(b)(2); *see also id.* § 5(b)(3) (requiring that "the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest").  Advisory committees "must also be 'fairly balanced in terms of the points of view represented and the

functions' they perform." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 447 (1989) (citing 5 U.S.C. app. 2 §§ 5(b)(2), (c)).

In *Cummock*, the D.C. Circuit held that failing to provide documents to a commissioner "would fly in the face" of FACA's balancing requirement because a commissioner walled off from Commission documents and deliberations would be "precluded from meaningful participation" and the Commission would be "effectively unbalanced." *Cummock*, 180 F.3d at 291. When an individual agrees to serve on an advisory committee, "the Government obtains valuable advice and political legitimacy with respect to its policy decisions." *Id*. at 292. The Commission received this legitimacy when Secretary Dunlap, a respected public official with an extensive background in conducting elections, agreed to serve as a commissioner. An advisory committee may not do what it has done to Secretary Dunlap: "appoint an individual to an advisory committee and then wall that individual off from the committee's operations, rendering membership essentially meaningless." *Id*. By being denied access to the Commission's documents, Secretary Dunlap has been excluded from meaningful participation in the Commission's activities in violation of Section 5.

Defendants also have violated Section 9 of FACA, which provides that "[n]o advisory committee shall meet or take any action until an advisory committee charter has been filed." 5 U.S.C. app. 2 § 9(c). Six weeks passed between the establishment of the Commission by executive order and the filing of the Commission's charter. Charter, Presidential Advisory Commission on Election Integrity ¶ 14 ("The filing date of this charter is June 23, 2017."). In that time, members of the Commission met, conferred, communicated, and discussed substantive issues relevant to the Commission's work in violation of Section 9(c). *See* Index, *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-1354-CKK (Dkt. 33-3).

2.      **Secretary Dunlap Can Bring a Cause of Action for FACA Violations.**

Although this Court has held that FACA does not provide a private cause of action, *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017),[5] it is clear that a commissioner—like Secretary Dunlap—who has been denied access to Commission documents can obtain relief for this FACA violation.  There are two avenues by which this Court may grant relief:  (i) by violating FACA, Defendants have acted arbitrarily and capriciously in violation of the Administrative Procedure Act, or, in the alternative, (ii) Secretary Dunlap is entitled to a writ of mandamus compelling Defendants to perform their non-discretionary duties under FACA. Whichever path is chosen, FACA violations like those suffered by Secretary Dunlap are judicially reviewable.  *See Cummock*, 180 F.3d at 291 (finding violation of FACA); *Tidwell*, 239 F. Supp. at 228 (allowing claim for violation of Section 10(b) of FACA to go forward); *Judicial Watch v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 43 (D.D.C. 2002) (denying motion to dismiss FACA causes of action; *cf. Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989) (reviewing district court decision that FACA did not apply to the ABA's Standing Committee on Federal Judiciary).

a.      **Secretary Dunlap Is Entitled to Relief Under the APA**

Secretary Dunlap may obtain relief through the Administrative Procedure Act.  A plaintiff may assert APA claims against federal agencies for violating the requirements of FACA.  *See, e.g.*, *Tidwell*, 239 F. Supp. 3d at 221; *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 30-31 (D.D.C. 2010) ("[P]laintiff may bring its [FACA] claims

---

[5] *But see, e.g.*, *Ctr. for Arms Control & Non-Proliferation v. Lago*, 2006 U.S. Dist. LEXIS 83226, at *12 (D.D.C. Nov. 15, 2006) ("Although FACA does not contain a provision providing a private right of action to enforce its provisions, it appears that the Supreme Court has essentially assumed that citizens may sue if they have been denied access to records under FACA.").

pursuant to the APA.").  Secretary Dunlap has brought claims against the General Services

Administration ("GSA") and its Acting Administrator.  Compl. ¶¶ 15, 19.  GSA indisputably is a

federal agency subject to the APA.  *See Am. Airlines, Inc. v. Austin*, 778 F. Supp. 72, 75 (D.D.C.

1991).  Under the Executive Order creating the Commission and the Commission's Charter,

GSA provides the Commission with such administrative services, funds, facilities, staff,

equipment, and other support services as may be necessary, and must perform the President's

functions under FACA.  Charter, Presidential Advisory Commission on Election Integrity ¶ 6;

*see also ACLU v. Trump*, 2017 U.S. Dist. LEXIS 111293, at *18 (D.D.C. July 18, 2017) ("[T]he

GSA is the agency responsible for administering FACA.") (internal citation and quotation marks

omitted).  GSA's actions in providing administrative support to the Commission without

disclosing Commission documents as required by FACA constitutes "final agency action" that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§§ 704, 706.

      A plaintiff may maintain a claim under Section 706(1) of the APA "where a plaintiff

asserts that an agency failed to take a discrete agency action that it is required to take."  *Norton v.*

*S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).  Secretary Dunlap has

identified a discrete action that GSA is required to, but has failed to, take:  providing him with

Commission documents pursuant to Section 10(b) of FACA.  Relief is available under the APA

even if GSA's responsibilities are merely administrative in terms of carrying out orders from the

Commission or the other Defendants.  Where an entity not subject to the APA (such as the Vice

President) orders an agency to take action, courts have "power to review the legality of" the

agency's action under the APA, because "courts have power to compel subordinate executive

officials to disobey illegal . . . commands."  *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C.

Cir. 1971).  In other words, the fact that an agency's actions "are based on" the directive of an

APA-exempt entity does not "insulate them from judicial review under the APA," even if APA

review of the agency's actions will "draw[] into question" "the validity of" the directive from the

APA-exempt entity. *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir.

1996). The APA thus authorizes this Court to review any action by GSA to implement a

directive that is inconsistent with FACA, whether the directive came from the Commission, the

Vice President, or anyone else allegedly exempt from the APA.[6]

### b.      Secretary Dunlap Is Entitled to a Writ of Mandamus

Alternatively, Secretary Dunlap is likely to succeed in obtaining a writ of mandamus

compelling each Defendant to perform their mandatory duties under FACA. "[A] district court

may grant mandamus relief if (1) the plaintiff has a clear right to relief; (2) the defendant has a

clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *In re*

*Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005). If the requirements are met, a

court may grant relief "when it finds compelling equitable grounds." *Am. Hosp. Ass'n v.*

*Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).

All requirements have been found sufficient to state a claim in cases alleging FACA

violations and are likewise satisfied here. *See Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d

28, 34 (D.D.C. 2011) ("The mandamus statute may provide an avenue to remedy violations of

statutory duties even when the statute that creates the duty does not contain a private right of

action."); *Judicial Watch, Inc. v. United States*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010)

("[P]laintiff may bring his claim for alleged FACA violations under the Mandamus Act.");

*Judicial Watch v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 42 (D.D.C. 2002)

---

[6] Defendants Office of Administration (OA), Office of the Vice President (OVP), and the Executive Office of the President (EOP) also are "agencies" for purposes of the APA. The APA defines "agency" broadly to include "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," subject to specified exclusions not relevant here. 5 U.S.C. § 551(1).

(mandamus statute provides a remedy for FACA violation); *cf. Lawyers' Comm. for Civ. Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, 2017 U.S. Dist. LEXIS 111184, at \*21-22 (D.D.C. July 18, 2017) (CKK) (acknowledging that mandamus relief may "be appropriate for alleged FACA violations").

*First*, Secretary Dunlap has a "clear right to relief" under FACA.  In *Cummock*, the D.C. Circuit held that a commissioner who was denied advisory committee documents and records in violation of Sections 5 and 10(b) was entitled to an order compelling the committee to provide her with those documents.  *Cummock*, 180 F.3d at 292 ("[T]o the extent that Cummock seeks information that was made available to the Commission during the course of its deliberative process and without which her ability to fully and adequately participate in that process was impaired, she is entitled to review such materials.").  On remand in *Cummock*, this Court ordered the defendants to "disclose to Plaintiff all non-classified records or documents of any kind created by, made available to, or relied upon by the Commission."  Memorandum Order, *Cummock v. Gore* No. 97-00981-CKK (D.D.C.) (Dkt. 91).  Secretary Dunlap is similarly situated and is clearly entitled to the same relief.

*Second*, Defendants have a "clear duty" to comply with Sections 5 and 10(b) of FACA by providing the requested documents to Secretary Dunlap and allowing him to participate in the Commission's work.  "When a federal official has an obligation to perform a ministerial or non-discretionary duty, a federal district court may issue a writ of mandamus under § 1361 to compel that officer to fulfill the obligation."  *Judicial Watch*, 219 F. Supp. 2d at 42.  The relevant sections of FACA contain mandatory language, leaving no room for interpretation.  "[N]early every provision of the FACA that explains the statutory duties of advisory committees, like those at issue here, includes the word 'shall.'"  *Judicial Watch*, 736 F. Supp. 2d at 31.  "Section 10(b) contains unambiguous language that identifies certain materials, and describes in detail the

methods and location by and at which the Government must make those materials available to the public." *Food Chemical News*, 980 F.2d at 1472. "Any advisory committee operating under FACA has no discretion or choice in the matter." *Ctr. for Arms Control & Non-Proliferation v. Lago*, 2006 U.S. Dist. LEXIS 83226, *14-15 (D.D.C. Nov. 15, 2006). Sections 5 and 9(c) include similar nondiscretionary language. *See Cummock*, 180 F.3d at 291 (Sections 5(b)(2) and (3) of FACA "*requir[e]* that committee membership be fairly balanced in terms of viewpoints and functions, and that committees exercise independent judgment free from improper influences.") (emphasis added); 5 U.S.C. app. 2 § 9(c) ("No advisory committee shall meet or take any action until an advisory committee charter has been filed.").

*Third*, mandamus is likely the only remedy available to Secretary Dunlap. This Court has held that FACA does not provide a private cause of action. *Tidwell*, 239 F. Supp. 3d at 221. And the Government has argued in related cases that the APA remedy is unavailable to plaintiffs asserting violations of FACA in connection with this Commission. *See Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission*, No. 17-cv-1354 (D.D.C.) (Dkt. 15) at 10-13; *ACLU v. Trump*, No. 17-cv-1351 (D.D.C.) (Dkt. 16) at 10-13; *EPIC v. Presidential Advisory Commission*, No. 17-cv-1320 (D.D.C.) (Dkt. 49-1) at 24-36; *Joyner v. Presidential Advisory Commission*, No. 17-cv-22568 (S.D. Fl.) (Dkt. 53) at 12-20. If this Court were to find that Secretary Dunlap is not entitled to relief pursuant to the APA, then he is entitled to relief under the mandamus statute.

*Finally*, there are compelling equitable grounds for this Court to grant relief. Courts have consistently held that the lack of a private right of action within the FACA statute does not permit advisory committees to violate FACA with impunity. *See Public Citizen*, 491 U.S. at 451 (plaintiffs had standing to pursue a FACA violation because they could be entitled to "significant relief if they prevail in their suit"); *Cummock*, 180 F.3d at 291 (finding violation of FACA);

*Tidwell*, 239 F. Supp. at 228 (allowing claim for violation of Section 10(b) of FACA to go forward).  Here, Defendants have prevented Secretary Dunlap from carrying out his responsibilities as a commissioner.  Continued refusal to provide relevant documents to Secretary Dunlap will prevent his full participation in the Commission's work.  The Commission's ultimate report will not reflect the expertise of a cross-section of the American public.  It will not reflect, as FACA requires, the work of a balanced committee of experts in election law, but rather the inappropriate influence of special interests.  Secretary Dunlap will be denied the "recognition and even prestige" that accompanies appointment to a federal advisory committee.  *Cummock*, 180 F.3d at 292.  As the D.C. Circuit held in *Cummock*, the failure to provide documents to commissioners is judicially reviewable and this Court should grant the requested relief.

> **B.    Secretary Dunlap Will Be Irreparably Harmed Absent a Preliminary Injunction.**

Prompt access to the Commission's documents is essential to Secretary Dunlap's ability to fulfill his "right and responsibility to participate" in the Commission's deliberations and contribute to the work of the Commission.  *Cummock*, 180 F.3d at 290.  Secretary Dunlap has suffered—and will continue to suffer—concrete harm.  The Commission's refusal to provide relevant documents in advance of the phone calls and meetings at which they were discussed has already severely hampered Secretary Dunlap's ability to discharge his responsibilities to the Commission.  (Dunlap Decl. ¶¶ 5, 7-8).  Denied time to adequately review—or even review at all—materials or time to prepare questions for witnesses, Secretary Dunlap has been relegated to a position no better than an outside observer with no opportunity to influence the Commission's work or conclusions.  (Dunlap Decl. ¶¶ 18-19).  If Defendants continue to deny Secretary Dunlap access to Commission documents and communications, Secretary Dunlap will be similarly

unable to participate fully in the future Commission meetings.  To Secretary Dunlap's knowledge, each witness will only appear at Commission meetings a single time, so absent the opportunity to prepare and ask questions at meetings, he will forever lose the opportunity to examine and investigate the topics discussed at each meeting.  An injunction ordering Defendants to share all Commission documents to which Secretary Dunlap is entitled far enough in advance of the next meeting for him to have time to review them is necessary.  Given the history of denied access, Defendants cannot be relied upon to provide documents that will be discussed at the next meeting absent a court order.

In two related cases before this Court, defendants represented that "there are few documents that [will] pertain to the [July 19, 2017] meeting." *Lawyers' Comm.*, 2017 U.S. Dist. LEXIS 111184, at *30; *ACLU*, 2017 U.S. Dist. LEXIS 111293, at *23.  This court relied on this representation in denying preliminary injunctions in those cases.  *Lawyers' Comm.*, 2017 U.S. Dist. LEXIS 111184, at *34 (no irreparable harm because "Defendants have represented that, with respect to the July 19 meeting of the Commission, they will disclose the materials that will be used at the meeting."); *ACLU*, 2017 U.S. Dist. LEXIS 111293, at *23 ("Documents 'prepared for or by the Commission' invariably must include documents that will be 'used and discussed' at the July 19 meeting.  Accordingly, Defendants have satisfied their obligation . . . .").  In fact, directly contrary to Defendants' representations, at least four previously undisclosed documents were brought to the July 19, 2017 meeting and were discussed at that meeting.  (Dunlap Decl. ¶ 7).

There also is reason to believe that the next meeting will be held shortly; one outside group has stated that it was invited to present at a December 2017 meeting.  (*Id.* ¶ 12).  The Commission's charter states that meetings will be held approximately every 30 – 60 days.  Charter, Presidential Advisory Commission on Election Integrity ¶ 9.  The last meeting, on

September 12, was more than 60 days ago, giving good reason to believe that the next meeting

will be held shortly.  *See Ass'n of Am. Physicians & Surgeons v. Clinton*, 813 F. Supp. 82, 94 &

n.19 (D.D.C. 1993) (irreparable harm inquiry satisfied under FACA where committee likely to

meet, gather evidence, and publish report within the next 55 days), *rev'd on other grounds*, 997

F.2d 898 (D.C. Cir. 1993).

The issue of notice with respect to the next meeting was raised with Defendants prior to

the filing of this motion.  During pre-motion meet-and-confer, Defendants agreed to notify

Secretary Dunlap of the next meeting "as soon as [it] is scheduled" and with at least fifteen days

advance notice.  (Sandick Decl. Ex. 3).  However, Defendants have not agreed to give more than

15 days' notice, to provide documents to Secretary Dunlap in advance of any meeting, or to

permit Secretary Dunlap to help decide when to hold the next meeting or to play any role in the

setting of the meeting agenda (such as the selection of witnesses or subjects for discussion).  (*Id.*

¶ 8 and Ex. 3).  With these limitations, the only benefit to Secretary Dunlap of the 15 days'

notice is the ability to set his travel itinerary a few days in advance of the meeting.  The promised

notice period does nothing to facilitate his participation in the Commission's work and Secretary

Dunlap therefore remains at serious risk of being unprepared and unable to participate

substantively in future meetings.

Secretary Dunlap has reason to believe that the Commission is forging ahead with work

behind his back.  In response to Secretary Dunlap's letter, Defendant Kossack would not confirm

that the Commission's work was on hold.  (Dunlap Decl. ¶ 15).  Defendants admit that

Commission staff and other Commissioners "have created and received miscellaneous

documents and electronic records" but take the position that Secretary Dunlap is not entitled to

any of them.  (Sandick Decl. Ex. 3).  If he is not provided with Commission documents and

invited to participate in deliberations, there is a substantial risk that Secretary Dunlap will not be

able to contribute to any report issued by the Commission and that the Commission will enjoy undeserved "political legitimacy with respect to its policy decisions." *Cummock*, 180 F.3d at 292; (Dunlap Decl. ¶ 19). Additionally, Secretary Dunlap has the "right to have [a] dissent published with the [Commission's] final report." *Id.* at 293. He is completely in the dark as to when the Commission plans to publish a final report, so an injunction against the publication of a report is necessary to allow Secretary Dunlap time to obtain and review documents and exercise his right to publish a concurrence or a dissent, should he decide to publish one.

Defendants' statement that "there is no particular urgency to resolving these issues" is incorrect. (Sandick Decl Ex. 3). Defendants' inflexible position that FACA does not entitle Secretary Dunlap to *any* of the documents listed on the *Vaughn* index is incorrect and needs to be litigated. Because a meeting may be scheduled at any time with only 15 days' notice, putting the litigation on hold will only require litigating these issues on an emergency basis in the near future. There is no reason to force Secretary Dunlap to wait until the eleventh hour to bring this matter to the Court's attention. A preliminary injunction motion now, while the next meeting is certain to occur but as yet unscheduled, is the most logical way to proceed. A preliminary injunction motion also is superior to a motion for a temporary restraining order because it provides greater time for briefing, argument, and consideration of the motion.

These issues are appropriate for resolution via a preliminary injunction. If forced to wait for the civil litigation process to run its course, relief will come too late to be meaningful. The Commission will terminate no later than two years after it was established by executive order or thirty days after the Commission issues its report to the President, whichever comes first. Charter, Presidential Advisory Commission on Election Integrity ¶ 10. The Commission will cease to exist, at the latest, in May 2019. Meanwhile, meetings and deliberations are taking place. If forced to wait for a final injunction, Secretary Dunlap will not receive documents in

time to permit his active participation and deliberations.  *See Pub. Citizen v. Nat'l Econ. Com.*,
703 F. Supp. 113, 129 (D.D.C. 1989) (the right to transparency and participation *while the
advisory committee is active*, is "expressly protected [by] FACA," causing irreparable harm)
(emphasis added); *Gates v. Schlesinger*, 366 F. Supp. 797, 801 (D.D.C. 1973) (preliminary
injunction warranted because rights under FACA would "be permanently lost" if an injunction
did not issue); *Ala.-Tombigbee Rivers Coal., v. Dep't of Interior*, 26 F.3d 1103, 1106 (11th Cir.
1994) ("Because FACA's dictates emphasize the importance of openness and debate, the timing
of such observation and comment is crucial to compliance with the statute.  [Transparency] must
be contemporaneous to the advisory committee process itself.").  A key message from *Cummock*
was that the exclusion of a commissioner until the conclusion of the commission's work was a
particularly egregious harm: FACA "must be read to confer on a committee member the right to
fully participate in the work of the committee to which he or she is appointed." 180 F. 3d at 291;
*see also id*. at 293 (noting that FACA violations "frustrated [the commissioner's] ability to
prepare a complete and informed dissent" prior to conclusion of the committee's work).

###### C.     The Balance of Harms Weighs in Favor of Preliminary Relief.

The balance of the equities tips sharply in Secretary Dunlap's favor "because a
preliminary injunction will not substantially injure other interested parties."  *Newby*, 838 F.3d at
12 (internal quotation marks and citation omitted).  Defendants will not be injured at all by being
required to comply with their statutory obligations under FACA to provide Commission
documents to all commissioners. *See Gates*, 366 F. Supp. at 801 ("The Court finds no injury to
Defendants in being obliged to conform to the open meeting requirement imposed by statute.").
Moreover, the Commission already has engaged in significant work to identify documents
exchanged between or made available to some of the commissioners as evidenced by the
*Vaughn*-type index prepared for other litigation.

**D.      Preliminary Relief Will Serve the Public Interest.**

Finally, the Defendants cannot deny that the public interest will be served by an order requiring Defendants to comply with FACA by permitting Secretary Dunlap to actively participate in the Commission to which he was appointed.  *See Gates*, 366 F. Supp. at 801 ("[T]he public interest will be best served by requiring strict compliance with the letter and spirit of the Federal Advisory Committee Act.").  In fact, disclosure to Commissioner Dunlap is *necessary* for the Commission to conduct its work in an appropriate manner.  A preliminary injunction is necessary to ensure that interest groups do not "use their membership" on the Commission "to promote their private concerns."  H.R. REP. NO. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491, 3496.

**V.      CONCLUSION**

Secretary Dunlap has satisfied the requirements for a preliminary injunction. Accordingly, he respectfully requests that this Court grant his motion for a preliminary injunction and (1) order Defendants promptly to produce records requested by Secretary Dunlap; (2) order Defendants to produce to Secretary Dunlap all future documents made available to or prepared for or by the Commission promptly and no later than two weeks in advance of any future Commission meeting; (3) order Defendants to permit Secretary Dunlap to fully participate on an equal basis as all other commissioners; and (4) enjoin the Commission from releasing a final report until Secretary Dunlap has received all documents to which he is entitled and has had an opportunity to review them, has participated in the drafting of the report or, if necessary, has completed a concurrence or dissent to the report.

Dated: November 16, 2017                    Respectfully submitted,


By:
    /s/ Daniel S. Ruzumna

PATTERSON BELKNAP WEBB & TYLER LLP
Daniel S. Ruzumna (D.C. Bar No. 450040)
Harry Sandick (*pro hac vice* application pending)
Daniel A. Friedman (*pro hac vice* application pending)
1133 Avenue of the Americas
New York, N.Y. 10036
Tel:  (212) 336-2000
Fax:  (212) 336-2222
druzumna@pbwt.com
hsandick@pbwt.com
dfriedman@pbwt.com

AMERICAN OVERSIGHT
Austin R. Evers (D.C. Bar No. 1002367)
Melanie Sloan (D.C. Bar No. 434584)
John E. Bies (D.C. Bar No. 483730)
Cerissa Cafasso (D.C. Bar No. 1011003)
1030 15th Street NW, B255
Washington, DC 20005
Tel: (202) 869-5246
austin.evers@americanoversight.org
msloan@americanoversight.org
john.bies@americanoversight.org
cerissa.cafasso@americanoversight.org