**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MATTHEW DUNLAP,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>PRESIDENTIAL ADVISORY<br>COMMISSION ON ELECTION<br>INTEGRITY *et al.*,<br><br>　　　　　　Defendants. | Civil Docket No. 17-cv-2361 (CKK) |

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## Table of Contents

INTRODUCTION..........................................................................................................................1

BACKGROUND..........................................................................................................................4

   I.  LEGAL BACKGROUND....................................................................................................4

       A.   The Federal Advisory Committee Act...................................................................4

       B.   The Administrative Procedure Act........................................................................4

  II.  FACTUAL BACKGROUND...............................................................................................5

STANDARDS OF REVIEW........................................................................................................7

ARGUMENT................................................................................................................................8

   I.  PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS................8

       A.   FACA Does Not Provide a Private Right of Action, and Plaintiff Cannot
           Bring His Claims Through the APA.......................................................................8

           1.   Entities within the Executive Office of the President are agencies
                only if they exercise substantial independent authority............................8

           2.   The "substantial independent authority" test applies to the APA...........12

           3.   The Commission is not an agency.........................................................13

           4.   The General Services Administration's ("GSA's") administrative
                support does not convert the Commission into an agency, nor is
                GSA responsible for disclosing materials pursuant to FACA...............15

           5.   The Executive Office of the President, the Office of Administration,
                and the Office of the Vice President are not "agencies" for
                purposes of the APA..............................................................................16

       B.   Mandamus is Unavailable to Plaintiff.................................................................17

           1.   The mandamus standards are stringent..................................................18

           2.   Plaintiff has not satisfied these stringent standards..............................18

               a.   Plaintiff's claim that he cannot participate in Commission
                   activities because he receives Commission materials
                   too late to be of any use is not likely to succeed as a
                   basis for mandamus.....................................................................19

              b.   Plaintiff's claim that he has not received information or
                   materials to which he is entitled under FACA section 10(b)
                   and *Cummock v. Gore* is not likely to succeed as the
                   basis for mandamus.....................................................................22

c.  Plaintiff's claim that the Commission has violated FACA section 5 is nonjusticiable and not likely to succeed as a basis for mandamus relief..........................................................28

i.  Section 5 is not justiciable.................................................29

ii.  In any event, plaintiff's claim is not cognizable under section 5, and even if it were, the factual record does not support it...................................................................35

c.  Plaintiff's claim that the Commission has violated FACA section 9 is not likely to succeed as a basis for mandamus relief..........................................................................................36

3.  Because applying FACA to a presidential commission raises serious constitutional concerns, even if plaintiff satisfied the mandamus standards –and he does not – this Court should decline to exercise mandamus as a matter of discretion........................................................37

II.  PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM..........................39

III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF............................................................................................42

CONCLUSION..............................................................................................................44

## Table of Authorities

**Cases**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ................................................................................................ 17

*Allied Chem. Corp. v. Daiflon, Inc.,*
    449 U.S. 33 (1980) ................................................................................................. 18

*Armstrong v. Exec. Office of the President,*
    90 F.3d 553 (D.C. Cir. 1996) ................................................................................ 12

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
    997 F.2d 898 (D.C. Cir. 1993) ........................................................................ 10, 38

*Baker v. Carr,*
    369 U.S. 186 (1962) ......................................................................................... 29, 30

*Baptist Mem'l Hosp. v. Sebelius,*
    603 F.3d 57 (D.C. Cir. 2010) ................................................................................ 18

*Cargill, Inc. v. United States,*
    173 F.3d 323 (5th Cir. 1999) ................................................................................ 34

*Cheney v. U.S. Dist. Ct. for D.C.,*
    542 U.S. 367 (2004) ........................................................................... 17, 37, 38, 39

*Citizens for Responsibility & Ethics in Wash. v. Office of Admin,*
    566 F.3d 219 (D.C. Cir. 2009) ........................................................... 10, 11, 12, 16

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ................................................................................................ 37

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) .................................................................................. 7

*Clapper v. Amnesty Int'l USA,*
    538 U.S. 398 (2003) .............................................................................................. 42

*Cobell v. Norton,*
    391 F.3d 251 (D.C. Cir. 2004) ................................................................................ 7

*Colo. Envtl. Coal. v. Wenker,*
    353 F.3d 1221 (10th Cir. 2004) ....................................................................... 33, 34

*Ctr. for Biological Diversity v. Tidwell,*
    239 F. Supp. 3d 213 (D.D.C. 2017) ........................................................................ 8

*Ctr. for Policy Analysis on Trade & Health v. Office of U.S. Trade Representative,*
   540 F.3d 940 (9th Cir. 2008).............................................................................31, 34

*Cummock v. Gore,*
   180 F.3d 282 (D.C. Cir. 1999) ....................................................................... passim

Detroit Int'l Bridge Co. v. Gov't of Can.,
   189 F. Supp. 3d 85 (D.D.C. 2016) ......................................................................... 10

Doe v. Shalala,
   862 F. Supp. 1421 (D. Md. 1994) .................................................................... 30, 32

Dong v. Smithsonian Inst.,
   125 F.3d 877 (D.C. Cir. 1997) ............................................................................... 13

Enercons Va. Inc. v. Am. Security Bank, N.A.,
   720 F.2d 28 (D.C. Cir. 1984) ............................................................................ 8, 39

EPIC v. PACEI,
   No. 17-1320 (CKK), 2017 WL 3141907 (D.D.C. July 24, 2017)............................ 8, 13, 14, 17

Fertilizer Inst. v. EPA,
   938 F. Supp. 52 (D.D.C. 1996) ................................................................... 30, 32, 34

Food Chemical News v. Department of Health & Human Services,
   980 F.2d 1468 (D.C. Cir. 1992) ............................................................................. 22

Franklin v. Massachusetts,
   505 U.S. 788 (1992) ......................................................................................... 5, 10

Freedom Watch, Inc. v. Obama,
   807 F. Supp. 2d 28 (D.D.C. 2011) ...................................................................... 8, 17

Heartwood, Inc. v. U.S. Forest Serv.,
   431 F. Supp. 2d 28 (D.D.C. 2006) ..................................................................... 14, 16

Heckler v. Chaney,
   470 U.S. 821 (1985) .............................................................................................. 33

In re Cheney,
   334 F.3d 1096 (D.C. Cir. 2003) ............................................................................. 37

In re Cheney,
   406 F.3d 723 (D.C. Cir. 2005) .......................................................................... 18, 38

In re Navy Chaplaincy,
   534 F.3d 756 (D.C. Cir. 2008) ............................................................................... 39

*In re Navy Chaplaincy*,
  738 F.3d 425 (D.C. Cir. 2013) ........................................................................ 7

*Indian Educators Fed. Local 4524 of Am. Fed. of Teachers, AFL-CIO v. Kempthorne*,
  590 F. Supp. 2d 15 (D.D.C. 2008) ................................................................. 43

*Int'l Counsel Bureau v. CIA*,
  No. 09-2269 (JDB), 2010 WL 1410561 (D.D.C. Apr. 2, 2010) ............................. 17

*Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*,
  389 U.S. 64 (1967) ..................................................................................... 44

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
  933 F. Supp. 2d 58 (D.D.C. 2013) ................................................................... 7

*Judicial Watch v. Dep't of Energy*,
  412 F.3d 125 (D.C. Cir. 2005) ....................................................................... 15

*Judicial Watch v. Nat'l Energy Policy Dev. Grp.*,
  219 F. Supp. 2d 20 (D.D.C. 2002) ................................................................. 37

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
  736 F. Supp. 2d 24 (D.D.C. 2010) ................................................................... 8

*Kissinger v. Reporters Committee for Freedom of the Press*,
  445 U.S. 136 (1980) ................................................................................. 9, 10

*McKinney v. Caldera*,
  141 F. Supp. 2d 25 (D.D.C. 2001) ................................................................. 13

*Metcalf v. Nat'l Petroleum Council*,
  553 F.2d 176 (D.C. Cir. 1977) ....................................................................... 31

*Meyer v. Bush*,
  981 F.2d 1288 (D.C. Cir. 1993) ................................................................ passim

*Murphy v. Hunt*,
  455 U.S. 478 (1982) ................................................................................... 36

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) ..................................................................... 7

*N. States Power Co. v. U.S. Dep't of Energy*,
  128 F.3d 754 (D.C. Cir. 1997) ....................................................................... 18

*Nadar v. Baroody*,
  396 F. Supp. 1231 (D.D.C. 1975) ................................................................. 37

iii

*Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*,
    557 F. Supp. 524 (D.D.C. 1983) ................................................................................. 23

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*,
    No. 2:11-CV-578-FTM-29SPC, 2012 WL 3589804 (M.D. Fla. Apr. 12, 2012) ...................... 31

*Nat'l Sec. Archive v. Archivist of the U.S.*,
    909 F.2d 541 (D.C. Cir. 1990) ................................................................................. 12

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................... 7, 43

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ......................................................................................... 16

*Pac. Legal Found v. Council on Envtl. Quality*,
    636 F.2d 1259 (D.C. Cir. 1980) ............................................................................... 11

*People of Colo. Ex rel. Suthers v. Gonzales*,
    558 F. Supp. 2d 1158 (D. Colo. 2007) ...................................................................... 29

*Pub. Citizen v. Dep't of Health & Human Servs.*,
    795 F. Supp. 1220 (D.D.C. 1992) ............................................................................ 32

*\*Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*,
    886 F.2d 419 (D.C. Cir. 1989) .......................................................................... passim

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) .................................................................................. 4, 37, 38

*Rushforth v. Council of Econ Advisers*,
    762 F.2d 1038 (D.C. Cir. 1985) ......................................................................... 10, 12, 14

*Sanchez v. Pena*,
    17 F. Supp. 2d 1235 (D.N.M. 1998) ......................................................................... 32

*Sculimbrene v. Reno*,
    158 F. Supp. 2d 26 (D.D.C. 2001) ........................................................................... 12

*Sierra Club v. Andrus*,
    581 F.2d 895 (D.C. Cir. 1978) ............................................................................... 11

*Singh v. Carter*,
    185 F. Supp. 3d 11 (2016) ..................................................................................... 7

*\*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971) ......................................................................... 9, 10, 12

*Sweetland v. Walters*,
  60 F.3d 852 (D.C. Cir. 1995) ............................................................. 10, 11, 12

*Texas Children's Hosp. v. Burwell*,
  76 F. Supp. 2d 224 (D.D.C. 2014) ............................................................. 7

*United States v. Espy*,
  145 F.3d 1369 (D.C. Cir. 1998) ............................................................. 17

*United States v. Nixon*,
  418 U.S. 683 (1974) ............................................................. 39

*Wilson v. Libby*,
  535 F.3d 697 (D.C. Cir. 2008) ............................................................. 13, 16

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................. 7, 43

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................. 39

*Wolfe v. Weinberger*,
  403 F. Supp. 238 (D.D.C. 1975) ............................................................. 15

## **Statutes**

5 U.S.C. app. 2 §§ 1-15 ............................................................. passim

5 U.S.C. § 552(f)(1) ............................................................. 9

5 U.S.C. § 551(1) ............................................................. 4, 8, 9

5 U.S.C. §§ 701-706 ............................................................. passim

15 U.S.C. § 1023(c) ............................................................. 14

28 U.S.C. § 1361 ............................................................. 18

## **Other Authorities**

Appel Presentation, https://www.whitehouse.gov/sites/whitehouse.gov/ files/docs/pacei-dr-andrew-appel-report.pdf............................................................. 27

Charter, Presidential Advisory Commission on Election Integrity,
  https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/commission-charter.pdf
  ............................................................. 13, 37, 39

Disclosure of Advisory Comm. Deliberative Materials, 12 U.S. Op. Off. Legal Counsel 73
  (1988)..................................................................................................................................23

Exec. Order No. 13, 799,
  82 Fed. Reg. 22, 389 (May 11, 2017)................................................................................passim

H.R. Rep. No. 93-1380 (1974)..................................................................................................10

H.R. Rep. No. 92-1017 (1972)..................................................................................................32

H.R. Rep. No. 91-1731 (1970)..................................................................................................33

H.R. Rep. No. 92-1403 (1972)..................................................................................................33

Presidential Advisory Commission on Election Integrity By-Laws and Operating Procedures,
  Bylaws § IV(C), https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-
  bylaws_final.PDF.......................................................................................................25, 27, 42

S. Rep. No. 92-1098 (1972).......................................................................................................33

## INTRODUCTION

The President created and charged the Presidential Advisory Commission on Election Integrity (the "Commission") with studying voter registration and voting practices to identify those practices that enhance or undermine public confidence in the election system. *See* Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) [hereinafter "Exec. Order No. 13,799"]. The President appointed plaintiff to that Commission. Despite the fact that no future meeting has been announced, plaintiff now brings an extraordinary motion for preliminary injunctive relief. He seeks, *inter alia*, an unspecified set of documents prepared by Commission staff, and *not* shared with the full Commission, an order requiring that any documents to which he might be entitled be shared with him two weeks before any future meeting, and an order enjoining the publication of the Commission's final report. Plaintiff's motion lacks a basis in law or fact and this Court should deny it.

To begin, plaintiff offers no evidence – only speculation – that he has been deprived of materials that have otherwise gone to the rest of the Commission. As the factual record in this case shows, he has not been. In any event, plaintiff's claim to a preliminary injunction fails at every turn. First, plaintiff is not likely to succeed on the merits of his claim. Plaintiff lacks a right to relief. As he acknowledges, the Federal Advisory Committee Act ("FACA") does not provide a private right of action, and plaintiff cannot avail himself of the Administrative Procedure Act's cause of action because the Commission is not an "agency" as defined by the APA. Nor is the drastic remedy of mandamus available against this Presidential commission chaired by the Vice President. Mandamus requires plaintiff to show that he has a "clear and indisputable" right to relief, a stringent showing he has not made. Plaintiff claims that he cannot participate in Commission activities because he has received Commission materials too late to be of any use at

meetings or in drafting the final report. Plaintiff has not, however, shown that he was provided Commission materials in an untimely manner, and certainly not on a basis different from any other Commission member. Indeed, with respect to the only meeting that witnesses attended and made presentations, plaintiff received the agenda a full week in advance, and the materials to be discussed at that meeting four days in advance. The Commission also provided plaintiff the opportunity (which he availed himself of) to submit his own meeting materials to the other Commission members for discussion at the meeting. Nor has plaintiff shown that the D.C. Circuit requires information to be provided to him any sooner.

Second, plaintiff claims that he has not received materials or information to which he is allegedly entitled under FACA section 10(b) or *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999). But FACA section 10(b) does not require the disclosure of documents that were not shared (or intended to be shared) with the committee as a whole. Nor does *Cummock* require a different result. There, this Circuit stated that a member must have "the opportunity to review documents that were prepared for or relied upon by the Commission in formulating its recommendations," even if those materials would not be available to the public pursuant to FACA section 10(b). 180 F.3d at 284. *Cummock* also prevents the government from treating a committee member "on less-than-equal footing with other committee members." *Id.* at 293 (Rogers, J., concurring). But plaintiff has not alleged, and could not show, that he has been denied materials used by the Commission in formulating its recommendations (of which there are none), nor does he show that he has not received equal treatment alongside his fellow similarly situated Commission members. Instead, he seeks special treatment, beyond that accorded other Commission members. *Cummock* does not require such a result. Moreover, to the extent that plaintiff seeks to provide input to the Commission, the by-laws – for which he voted – provide the appropriate procedural mechanism

for such an opportunity, and they do so without the need for extraordinary judicial intervention. In any event, plaintiff has always been free to communicate suggestions for the agenda to Commission staff, and his suggestions were incorporated into the September 12th meeting.

Third, plaintiff claims that the Commission has violated FACA section 5's provisions concerning fair balance and inappropriate influence. These provisions are not justiciable, and in any event, the factual record does not support his claim of differential treatment. Finally, plaintiff contends that the Commission has violated FACA section 9(c), which prevents an advisory committee from taking action until its charter has been filed. Plaintiff has not shown that the Commission took "action" before that date, and even if he had, the Commission's charter has been filed, so there is no likelihood of future injury – and no basis for prospective injunctive relief.

The other factors counsel against preliminary injunctive relief. Plaintiff's claims of irreparable injury largely rely on his claims that the Commission has refused to provide documents in advance of the meetings at which they were discussed, a claim that is belied by the factual record. Other purported injuries – such as plaintiff's claim that he will not have an adequate opportunity to prepare a concurrence or dissent to the Commission's final report – are wholly speculative. Moreover, the balance of harms and the public interest weigh against injunctive relief. Plaintiff seeks judicial micromanagement of the Commission's operations through a vague injunction that would frustrate rather than further the public interest.

Plaintiff's motion for a preliminary injunction should be denied.

# BACKGROUND

## I.   LEGAL BACKGROUND

### A.   The Federal Advisory Committee Act.

Congress enacted FACA, 5 U.S.C. app. 2 §§ 1-15, to reduce the growing cost of unnecessary blue ribbon commissions, advisory panels, and honorary boards set up by the government to advise the President and federal agencies. *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 446 (1989) (citing 5 U.S.C. app. 2 § 2(b)). To achieve these goals, FACA imposes an array of procedural requirements. As relevant here, advisory committees that are subject to FACA must give advance notice in the Federal Register of any meetings, 5 U.S.C. app. 2 § 10(a)(2), hold their meetings "open to the public," *id.* § 10(a)(1), allow "[i]nterested persons" to "attend, appear before, or file statements with" them, subject to reasonable rules or regulations, *id.* § 10(a)(3), keep minutes of each meeting and copies of all reports received, issued, or approved by the advisory committee, *id.* § 10(c), and make their records available to the public, *id.* § 10(b). FACA also requires that each advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed," *id.* § 5(b)(2), and "not be inappropriately influenced by the appointing authority or by any special interest," *id.* § 5(b)(3).

### B.   The Administrative Procedure Act.

The APA, 5 U.S.C. §§ 701-706, establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected either by agency action or failure to act. *See* 5 U.S.C. §§ 702, 706(1)-(2). These provisions apply only to "agency" action. "[A]gency" is defined as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," with certain exceptions. 5 U.S.C. §§ 551(1), 701(b)(1).

This definition does not include the President, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), or the Vice President, *Meyer v. Bush*, 981 F.2d 1288, 1295 (D.C. Cir. 1993).

## II.   FACTUAL BACKGROUND

The President established the Presidential Advisory Commission on Election Integrity in Executive Order No. 13,799.  Exec. Order No. 13,799; *see also* Decl. of Andrew J. Kossack ("First Kossack Decl.") ¶ 1, *Lawyers' Comm. for Civil Rights Under Law* ("*LCCR*") *v. Presidential Advisory Comm'n on Election Integrity* ("*PACEI*"), No. 17-cv-1354 (CKK) (D.D.C. July 13, 2017), ECF No. 15-1 [attached hereto as Exhibit A]; Decl. of Kris W. Kobach ("First Kobach Decl.") ¶ 3, *Elec. Privacy Info. Ctr.* ("*EPIC*") *v. PACEI*, 17-cv-1320 (CKK) (D.D.C. July 5, 2017), ECF No. 8-1 [attached hereto as Exhibit B].  The Commission is charged with "study[ing] the registration and voting processes used in Federal elections," "consistent with applicable law," in order to provide a report to the President.  Exec. Order No. 13,799, § 3.  Vice President Pence is the Chair of the Commission.  *Id.* § 2.  Kansas Secretary of State Kris Kobach is the Vice Chair of the Commission.  First Kobach Decl. ¶ 1.  Members of the Commission come from federal, state, and local jurisdictions and both political parties.  First Kossack Decl. ¶ 1; First Kobach Decl. ¶ 3.

On June 28, 2017, members of the Commission, including plaintiff, attended an organizational conference call.  First Kossack Decl. ¶ 1; *see also* Decl. of Andrew Kossack ("Third Kossack Decl."), ¶ 3 [attached hereto as Exhibit C].  All of the members were provided an introductory email two days before the call, as well as several email planners and logistical emails the day before the call.  *See* Document Index ("Doc. Index"), Entries No. 131-135, *LCCR v. PACEI*, No. 17-cv-1354 (CKK) (D.D.C. Sept. 29, 2017), ECF No. 33-3 [attached hereto as Exhibit D].  During the call, the members also discussed information request letters that Vice Chair Kobach intended to send out to the states.  First Kossack Decl.  ¶ 5; Third Kossack Decl. ¶ 3.

The Commission has held two public meetings, one introductory meeting on July 19, 2017, and one substantive meeting on September 12, 2017. Commission staff shared several documents with the Commission members in advance of the Commission's first meeting, including the Commission's draft by-laws and the meeting agenda. *See* Second Decl. of Andrew J. Kossack ("Second Kossack Decl.") ¶ 1, *LCCR v. PACEI*, No. 17-cv-1354 (CKK) (D.D.C. July 31, 2017), ECF No. 23-1 [attached hereto as Exhibit E]. Several Commission members also introduced and distributed documents at that meeting that were not provided to other Commission members in advance of the meeting. *Id.* ¶¶ 6-7. These materials were shared by their authors with all of the Commission members, including plaintiff, at the same time. Third Kossack Decl. ¶ 4.

Commission members were informed about the Commission's September 12 meeting on August 18, 2017. *See* Doc. Index, Entry No. 150; *see also* Third Kossack Decl. ¶ 10. They received a draft of the agenda for meeting on September 5, Doc. Index. No. 155, and a revised agenda on September 6, *id.* No. 156. The Commission members also received copies of the materials that were to be discussed at the September 12 meeting, including presenter materials, on September 8, 2018. *Id.* No. 158. These materials included a newspaper article submitted by plaintiff. *Id.* No. 53. No further Commission meeting is scheduled. Third Kossack Decl. ¶ 14.

On November 17, 2017, this Court held a status conference where it suggested that the parties meet-and-confer to define the specific documents that plaintiff sought. On November 21, 2017, plaintiff sent defendants a letter seeking numerous broad categories of documents. *See* Plaintiff's November 21 letter [attached hereto as Exhibit F]. Defendants responded on December 1, 2017, offering to make certain documents related to the September 12 meeting available to plaintiff. *See* Defendant's December 1 letter [attached hereto as Exhibit G].

## STANDARDS OF REVIEW

"The standard for issuance of the extraordinary and drastic remedy of a . . . preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). A party moving for a temporary restraining order or a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). When, as here, the government is opposing a motion for a preliminary injunction, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[1]

Moreover, where plaintiffs seek not to maintain the status quo pending final disposition, but "request[] affirmative injunctive relief," then "the standard for obtaining an injunction is significantly heightened." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 2d 224, 247 (D.D.C. 2014); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000) (court must review plaintiff's "request for injunctive relief with even greater circumspection than usual"); *see*

---

[1] "The D.C. Circuit has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions. . . . The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2007)." *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), for the proposition that all four prongs of the preliminary injunction standard must be met before injunctive relief can be granted). In any event, regardless of which standard is applied, preliminary injunctive relief is inappropriate here.

*also Enercons Va. Inc. v. Am. Sec. Bank, N.A.*, 720 F.2d 28, 29 (D.C. Cir. 1984) ("By ordering [defendant to perform the requested relief], the district court did not simply preserve the status quo, but instead summarily resolved all conflicting claims . . . immediately after commencement of the action on short notice to the defendant.").

## ARGUMENT

### I.   PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS

#### A.   FACA Does Not Provide a Private Right of Action, and Plaintiff Cannot Bring His Claims Through the APA.

As plaintiff correctly acknowledges, Mem. Law In Support of Pl.'s Mot. For a Prelim. Inj. ("Prelim Inj. Mem.") at 13, ECF No. 7-13, FACA does not provide a private cause of action.  *See, e.g.*, *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017); *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 32-33 (D.D.C. 2011); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 30 (D.D.C. 2010).  Plaintiff therefore seeks to use the APA's cause of action.  5 U.S.C. § 702.  The APA, however, only applies to *agency* action, and the Commission is an advisory body, not an agency for the purposes of the APA.  *See EPIC v. PACEI*, No. 17-1320 (CKK), 2017 WL 3141907 (D.D.C. July 24, 2017), *appeal docketed*, No. 17-5171 (D.C. Cir. argued Nov. 21, 2017).

#### 1.   Entities within the Executive Office of the President are agencies only if they exercise substantial independent authority.

"Agency" is defined for the purposes of the APA to mean "each authority of the Government of the United States, whether or not it is subject to review by another agency," with certain limitations not relevant here.  5 U.S.C. § 551(1); *id.* § 701(b)(1).  The Supreme Court and this Circuit have consistently recognized that while the statutory definition of "agency" may be

broad, it does not encompass entities within the Executive Office of the President that do not exercise substantial independent authority.

In *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), for example, the court considered the definition of "agency" under the APA, which then, as now, is defined as any "authority of the Government of the United States, whether or not it is within or subject to review by another agency." *Id.* at 1073 (quoting 5 U.S.C. § 551(1)).  This circuit concluded that the APA "apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions."  *Id.*  Following this reasoning, the court held that the Freedom of Information Act ("FOIA"), which at the time incorporated the APA's definition of "agency," applied to the Office of Science and Technology Policy ("OSTP"), which is an entity within the Executive Office of the President ("EOP").  *Id.* at 1073-74.  It reasoned that OSTP's function was not merely to "advise and assist the President," but it also had an "independent function of evaluating federal programs," and therefore was an agency with substantial independent authority that was subject to the APA.  *Id.* at 1075.

The Supreme Court has confirmed the principle that entities that "advise and assist the President" are not "agencies."  In *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980), the Supreme Court considered the scope of FOIA, whose definition of "agency" had been amended in 1974 to its current version, where "'agency' as defined in [5 U.S.C. §] 551(1) . . . includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (*including the Executive Office of the President*), or any independent regulatory agency."  5 U.S.C. § 552(f)(1) (emphasis added).  The Court concluded that, despite this language, "[t]he legislative history is unambiguous . . . in explaining that the 'Executive Office' does not

include the Office of the President." *Kissinger*, 445 U.S. at 156.  Rather, Congress did not intend "agency" to encompass "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." *Id.* (quoting H.R. Rep. No. 93-1380, at 15 (1974) (Conf. Rep.)).  That Conference Report further specified that "with respect to the meaning of the term 'Executive Office of the President' the conferees intend[ed] the result reached in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)." *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1040 (D.C. Cir. 1985) (quoting H.R. Rep. 93-1380, at 14); *see also Meyer*, 981 F.2d at 1291 n.1 (explaining Congress had codified the D.C. Circuit's analysis of EOP entities in *Soucie* in the 1974 FOIA Amendments).

The controlling question in determining whether an entity within the Executive Office of the President is an "agency" for purposes of the APA or the FOIA, therefore, is whether "the entity in question 'wield[s] substantial authority independently of the President.'" *Citizens for Responsibility & Ethics in Wash.* ("*CREW*") *v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) (quoting *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995)).  This principle is rooted in separation of powers concerns.  The Supreme Court has expressly held that the President's actions are not subject to the APA, as such a review would infringe upon a coordinate branch.  *See Franklin*, 505 U.S. at 800-01; *see also Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 99-100 (D.D.C. 2016) (separation of powers concerns "bar review [of the President's actions] for abuse of discretion" in performance of statutory duties) (citation omitted).  These concerns are equally present when exempting entities within the Executive Office of the President that have the sole function of advising and assisting the President, as such an exemption "may be constitutionally required to protect the President's executive powers." *See Ass'n of Am. Physicians & Surgeons, Inc.* ("*AAPS*") *v. Clinton*, 997 F.2d 898, 909-10 (D.C. Cir. 1993).

10

The D.C. Circuit has repeatedly looked to whether EOP entities "wielded substantial authority independently of the President."[2]  *CREW*, 566 F.3d at 223 (quoting *Sweetland*, 60 F.3d at 854).  Courts have looked to whether these EOP entities have independent regulatory or funding powers or are otherwise imbued with significant statutory responsibilities.  For example, as previously mentioned, OSTP was determined to be an agency because it had independent authority to initiate, fund, and review research programs and scholarships.  *Soucie*, 448 F.2d at 1073-75.  Other courts have found the Council for Environmental Quality ("CEQ") to be an agency because it has the power to issue guidelines and regulations to other federal agencies, *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980), and the Office of Management and Budget ("OMB") to be an agency because it has a statutory duty to prepare the annual federal budget, as well as a Senate-confirmed Director and Deputy Director.  *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978) ("Congress signified the importance of OMB's power and function, over and above its role as presidential advisor, when it provided[] . . . for Senate confirmation of the Director and Deputy Director of OMB."), *rev'd on other grounds*, 442 U.S. 347 (1979).

But many other EOP entities lack such independent authority.  For example, President Reagan's Task Force on Regulatory Relief, which was comprised of senior White House staffers and cabinet officials who headed agencies, was not itself an agency because, while it reviewed proposed rules and regulations, it could not itself *direct* others to take action.  *Meyer*, 981 F.2d at

---

[2] The D.C. Circuit has used different tests to formulate its inquiry:  "These tests have asked, variously, 'whether the entity excercises substantial independent authority,' 'whether . . . the entity's sole function is to advise and assist the President,' and in an effort to harmonize these tests, how close operationally the group is to the President,' 'whether it has a self-contained structure,' and 'the nature of its delegate[ed] authority.'  However the test has been stated, common to every case in which we have held that an EOP unit is [an agency] . . . has been a finding that the entity in question 'wielded substantial authority independently of the President.'"  *CREW*, 566 F.3d at 222-23 (internal citations omitted).

1294 ("we see no indication that the Task Force, *qua* Task Force, directed anyone . . . to do anything."). The Council of Economic Advisors ("CEA") similarly lacks regulatory or funding power, and therefore is not an agency. *Rushforth*, 762 F.2d at 1042. Nor is the National Security Council ("NSC") an agency, because it only advises and assists the President in coordinating and implementing national security policy. *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 560-61 (D.C. Cir. 1996). The Office of Administration ("OA"), which provides "operational and administrative support of the work of the President and his EOP staff," including IT support, is not an agency, *CREW*, 566 F.3d at 224-25, nor is the Executive Residence Staff, which supports the President's ceremonial duties, *see Sweetland*, 60 F.3d at 854. The White House Office is similarly not an agency, *see Sculimbrene v. Reno*, 158 F. Supp. 2d 26, 35-36 (D.D.C. 2001), and neither is the White House Counsel's Office, *Nat'l Sec. Archive v. Archivist of the U.S.*, 909 F.2d 541, 545 (D.C. Cir. 1990), which is within the White House Office. In short, under this Circuit's authority, EOP entities that implement binding regulations (CEQ), grant funding (OSTP), or have important statutorily defined functions (OMB) constitute agencies; those that advise the President (CEA, Task Force), coordinate policy among different entities (NSC), provide administrative support for the President's activities (OA, Executive Residence), or constitute his closest advisors (White House Office) do not.

### 2. The "substantial independent authority" test applies to the APA.

The "substantial independent authority" definition of agency – and its construction – applies to the APA. To begin, *Soucie* itself was a case interpreting the *APA's* definition of "agency." *See Soucie*, 448 F.2d at 1073 ("The statutory definition of 'agency' is not entirely clear, but *the APA* apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions.") (emphasis added). The D.C. Circuit

has since made clear that this definition applies to the APA generally. *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997) ("Our cases . . . requir[e] that an entity exercise substantial independent authority before it can be considered an agency for [5 U.S.C.] § 551(1) purposes."); *McKinney v. Caldera*, 141 F. Supp. 2d 25, 32 n.14 (D.D.C. 2001) ("As the D.C. Circuit explained in a later case, the 'substantial independent authority' standard derives from both the statutory language of the APA and the legislative history characterizing the type of authority required ('final and binding').") (citing *Dong*, 125 F.3d at 881). *See also EPIC v. PACEI*, , 2017 WL 3141907, at *12 n.5 ("substantial independent authority" test is used for determining whether an "entity is an agency for purposes of the APA.") .

### 3. The Commission is not an agency.

The Commission is not an agency subject to the APA, because it lacks "substantial independent authority in the exercise of specific functions." *Soucie*, 448 F.2d at 1073. The Commission reports directly to the President and is "solely advisory." Exec. Order No. 13,799, § 3; *see also* Charter, Presidential Advisory Commission on Election Integrity ¶ 4, https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/commission-charter.pdf ("The Commission will function solely as an advisory body."); *see also EPIC*, 2017 WL 3141907, at *11 ("[T]he Executive Order indicates that the Commission is purely advisory in nature . . . ."). It is chaired by the Vice President, Exec. Order No. 13, 799 § 2a, a constitutional officer who is also not an agency. *See Wilson v. Libby*, 535 F.3d 697, 707-08 (D.C. Cir. 2008) (holding that the Office of the Vice President is not an agency under the Privacy Act); *Dong*, 125 F.3d at 878 (Privacy Act definitions incorporates FOIA definitions). As plaintiffs themselves note, "much of the Commission's operations and communications have been run out of the Office of the Vice President." Prelim Inj. Mem. at 21. The Commission's purpose is to "submit a report to the

President" that identifies rules and activities that enhance and undermine the "American people's confidence in the integrity of the voting process used in Federal elections" and to identify "vulnerabilities in voting systems . . . that could lead to improp[rieties]." Exec. Order No. 13,799, § 3(a)-(c). It will then disband. *Id.* § 6. The Commission has no regulatory, funding, or enforcement powers, nor does it have any independent administrative responsibilities. Instead, it exists solely to provide research and advice to the President. "No independent authority is imbued upon the Commission by the Executive Order, and there is no evidence that it has exercised any independent authority that is unrelated to its advisory mission." *EPIC*, 2017 WL 3141907, at *11. It is not, therefore, an "agency."

This conclusion accords with controlling D.C. Circuit case law. The Council of Economic Advisors, like the Commission, gathers information, develops reports, and makes recommendations to the President. *See* 15 U.S.C. § 1023(c). The Council is not an agency, as defined by the FOIA's materially indistinguishable definition, as it, like the Commission, "has no regulatory power under the statute," "[i]t cannot fund projects based on [its] appraisal, . . . nor can it issue regulations." *Rushforth*, 762 F.2d at 1043. And in *Meyer*, the D.C. Circuit held that the President's Task Force on Regulatory Relief, which, like this Commission, was chaired by the Vice President, was not an agency because, while it reviewed federal regulations and made recommendations, it did not have the power to "direct[] anyone . . . to do anything." 981 F.2d at 1294. The Commission here is situated the same way. In any event, even apart from the functional test establishing that the Commission exists to advise and assist the President, and is therefore not an "agency," it is clear that an entity cannot be at once both an advisory committee (as plaintiffs claim the Commission is) and an agency. *See Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp.

14

2d 28, 36 (D.D.C. 2006) (noting that an "advisory committee cannot have a double identity as an agency") (quoting *Wolfe v. Weinberger*, 403 F. Supp. 238, 242 (D.D.C. 1975)).

Nor does the involvement of federal officials or federal agencies in an advisory committee transform that committee into an "agency." In *Meyer*, the Presidential Task Force at issue included "various cabinet members . . . [who were] unquestionably officers who wielded great authority as heads of their departments." 981 F.2d at 1297. But that did not turn the Task Force into an agency; the relevant inquiry is the function exercised, not the job title. The court of appeals concluded that "there is no indication that when *acting as the Task Force* they were to exercise substantial independent authority . . . . Put another way, the whole does not appear to equal the sum of its parts." *Id.* (emphasis added).

> **4.     The General Services Administration's ("GSA's") administrative support does not convert the Commission into an agency, nor is GSA responsible for disclosing materials pursuant to FACA.**

Plaintiff does not actually challenge the conclusion that the Commission is not an agency. Instead, he notes, correctly, that GSA is an agency, and that it has been charged with providing the Commission with administrative support. Prelim. Inj. Mem. at 14. But the mere presence of a federal agency that provides some administrative support to a non-agency that does not exercise "substantial independent authority" does not transform an otherwise non-agency "whose sole function is to advise and assist" into an agency. *Meyer*, 981 F.2d at 1297-98. Were it otherwise, every advisory committee that received support from federal employees or agencies – *i.e.*, all of them, *see* 5 U.S.C. app. 2 § 10(e) (requiring advisory committees to have support from a designated federal officer or employee) – would constitute an agency, a conclusion that is impossible to square with this Circuit's precedent. *See, e.g.*, *Meyer*, 981 F.2d at 1296 (Presidential Task Force on Regulatory reform was not an agency); *Judicial Watch v. Dep't of Energy*, 412 F.3d 125, 127 (D.C.

Cir. 2005) (Vice President Cheney's National Energy Policy Development Group was not an agency).  It would also be contrary to authority concluding that an entity cannot at once be both an advisory committee and an agency.  *See Heartwood, Inc.*, 431 F. Supp. 2d at 36.

Plaintiff also claims that "GSA's actions in providing administrative support to the Commission without disclosing Commission documents as required by FACA constitutes 'final agency action.'"  Prelim. Inj. Mem. at 14.  This, he says, allows him to bring a claim under section 706(1) of the APA, which permits a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Not so.  "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).  Plaintiff points to no authority that says that GSA's role in providing "administrative services" to the Commission constitutes an enforceable *requirement* that GSA – as opposed to the Commission – is responsible for disclosing documents to plaintiff or the public.  FACA section 10(b) imposes no such requirement on GSA, *see* 5 U.S.C. app. 2 § 10(b), nor does the Executive Order or the Charter.  Plaintiff's cursory assertions about a supposed GSA responsibility for disclosing information does not create an agency "hook" sufficient to avail him of the APA's cause of action.

> **5.    The Executive Office of the President, the Office of Administration, and the Office of the Vice President are not "agencies" for purposes of the APA.**

Finally, plaintiff incorrectly asserts in a footnote that the Office of Administration, Office of the Vice President, and Executive Office of the President are "agencies" for the purpose of the APA.  Prelim Inj. Mem. at 15 n.6.  The D.C. Circuit has explicitly held that the Office of Administration and the Office of the Vice President are not agencies under *Soucie*'s substantial independent authority test.  *See CREW*, 566 F.3d at 224 (OA); *Wilson*, 535 F.3d at 707 (OVP).

Furthermore, the D.C. Circuit has specifically rejected the claim that the Executive Office of the President is the proper unit of analysis for determining whether an EOP entity is an "agency." "[I]t has never been thought that the whole Executive Office of the President could be considered a discrete agency under FOIA." *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998); *see also Int'l Counsel Bureau v. CIA*, No. 09-2269 (JDB), 2010 WL 1410561 (D.D.C. Apr. 2, 2010); *EPIC*, 2017 WL 3141907, at *13. Indeed, were it otherwise, none of the D.C. Circuit's *Soucie* case law would make sense: if a party could simply sue the "EOP," there would be no need for a component-by-component analysis.

<p style="text-align:center">***</p>

Accordingly, because the Commission is not an agency, and because none of the other defendants either are agencies, or, in the case of GSA, do not play a statutorily mandated role with respect to information release, plaintiff cannot avail himself of the APA's cause of action.

### B.      Mandamus is Unavailable to Plaintiff.

Given the unavailability of an APA action here, if this Court were to grant relief to plaintiff under FACA, it could, as plaintiff recognizes, *see* Compl. ¶ 108, ECF No. 1, only be through the "drastic and extraordinary" writ of mandamus.[3] *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004). But mandamus jurisdiction is lacking here: as the Supreme Court and D.C. Circuit

---

[3] In *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999), the D.C. Circuit entered relief against the White House Commission on Aviation Safety and Security based on a FACA violation. While the court did not specify the basis for relief, the plaintiff in that case sought relief solely based on a FACA violation, *id.* at 289, and the court did not award relief on the basis of either the APA or mandamus jurisdiction; in other words, the D.C. Circuit appeared to assume the existence of a private right of action to enforce FACA. *Cummock*, however, predates the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), where the Court refined the process by which implied rights of action can be created. Since *Sandoval*, courts have uniformly held that FACA does not provide a private right of action. *E.g.*, *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 32-33 (D.D.C. 2011). Accordingly, plaintiff can proceed, if at all, only through either the APA or mandamus jurisdiction, and *Cummock* does not suggest otherwise.

have repeatedly recognized, application of mandamus in a presidential context raises serious constitutional concerns.  Those concerns inform the mandamus analysis, where, in any event, plaintiff has not shown he has a "clear and indisputable" right to relief.

### 1.    The mandamus standards are stringent.

A writ of mandamus is "a drastic [remedy], to be invoked only in extraordinary situations." *N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)).  The mandamus statute provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  Mandamus relief is appropriate only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."  *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010).  The party seeking mandamus "has the burden of showing that 'its right to issuance of the writ is clear and indisputable.'"  *N. States Power Co.*, 128 F.3d at 758 (citation omitted).  Even if the plaintiff overcomes all these hurdles, whether mandamus relief should issue is discretionary."  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005).

### 2.    Plaintiff has not satisfied these stringent standards.

Plaintiff's allegations resoundingly fail the mandamus analysis.  While plaintiff's motion is not entirely clear about the nature of his purported injury, he points to four supposed violations as justifying preliminary injunctive relief:  (1) that he cannot participate in Commission activities because he receives Commission materials too late to be of any use; (2) that he has not received materials to which he is allegedly entitled under FACA section 10(b) and this Circuit's decision in *Cummock*; (3) that he has been "walled off" from Commission activities in violation of *Cummock*

18

and FACA section 5, and (4) that the Commission violated FACA section 9 by conducting activities before the filing of the Commission's charter.  Plaintiff cannot demonstrate that defendants violated a "clear, nondiscretionary duty" with respect to any of these alleged FACA violations, or that he has a clear right to relief.

<div style="margin-left: 2em;">

**a.      Plaintiff's claim that he cannot participate in Commission activities because he receives Commission materials too late to be of any use is not likely to succeed as a basis for mandamus.**

</div>

In *Cummock*, the D.C. Circuit held that a FACA committee member is entitled to "review documents that were prepared for or relied upon by the Commission in formulating its recommendations."  180 F.3d at 284; *see also id.* at 292 ("[T]he Commission could not deny [a commission member] access to information that it reviewed and relied upon in formulating its recommendations.").  Plaintiff's primary basis for seeking injunctive relief does not appear to be that he has actually been denied materials used by the Commission in formulating its recommendations (of which there are none), the situation in *Cummock*, but rather that he has not been provided *timely* access to materials "that were "prepared for or relied upon by the Commission."  *See* Prelim. Inj. Mem. at 18 ("The Commission's refusal to provide relevant documents in advance of the phone calls and meetings at which they were discussed has already severely hampered Secretary Dunlap's ability to discharge his responsibilities to the Commission."); *id.* at 19 ("An injunction ordering Defendants to share all Commission documents to which Secretary Dunlap is entitled far enough in advance of the next meeting for him to have time to review them is necessary.").  But this claim fails on both the facts and the law.

First, on the facts, plaintiff has not been given access to Commission materials that were used by the Commission in an untimely manner, as was the concern in *Cummock*, and certainly not on a basis different from any other Commission member.  As detailed in the Document Index

filed in *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, No. 17-cv-1354 (CKK), plaintiff has – consistent with every other Commission member – received copies of the materials used in the Commission's two meetings and its organizational call either in advance of or at those meetings.  For the June 28, 2017, organizational call for example, plaintiff (and the other Commission members appointed at the time) received an email containing the agenda for the call on June 26, 2017, Doc. Index, Entry No. 133.  During that call, Vice Chair Kobach described the information requests that he planned to send to state election officials in a letter, and clarified that it would be sent from him in his capacity as Vice Chair, rather than from the full Commission.  Third Kossack Decl. ¶ 3.  Vice Chair Kobach invited members to provide their feedback on the letter, and the members discussed it during the call, including plaintiff.  *Id.*  Staff revised the letter in response to members' feedback.  *Id.*  Later that day, staff sent the letter to all Commission members prior to sending it to state election officials.  *Id.*; *see also* Doc. Index, Entries No. 136, 137.

For the July 19, 2017, meeting, plaintiff (and all other Commission members) received a copy of the agenda on July 14, Doc. Index, Entry No. 140, and emails containing the draft by-laws and a revised agenda on July 18, *id.* Entry No. 143.  *See also* Third Kossack Decl. ¶ 4.  While plaintiff notes that several documents were brought by individual Commission members and presented for the first time at the July 19 meeting, *see* Prelim. Inj. Mem. at 19, Secretary Dunlap was situated the same as the other Commission members with respect to these documents, which were shared with all Commission members, including plaintiff, at the same time.  *See* Third Kossack Decl. ¶ 4.  Furthermore, plaintiff can rely on these documents moving forward as the Commission prepares its recommendatory report or for any concurrence or dissent to the report he may wish to submit.

Moreover, plaintiff was provided materials well in advance of the September 12 meeting, the only meeting with witnesses. Plaintiff was informed of the date of the September 12, 2017, meeting on August 18, 2017. Doc. Index, Entry No. 150. On August 30, 2017, Commission staff sent all Commissioners a letter from Vice Chair Kobach specifying the timeline for submitting any materials that the members intended to discuss at the September 12 meeting. Third Kossack Decl. ¶ 10; Doc. Index, Entry No. 152. Commission staff sent an email with further details about submitting materials on September 1, 2017. Third Kossack Decl. ¶ 10; Doc Index Entry No. 153. Plaintiff, along with the other Commissioners, received an email containing the agenda for that meeting on September 5, 2017, Doc. Index Entry No. 155, and a revised agenda the next day, *id.* Entry No. 156. And he received several emails containing the materials submitted by the witnesses at that meeting on September 8, 2017, which also noted that those materials had been published on the Commission's webpage, *id.*, Entry Nos. 157, 158. Additionally, the week prior to the September 12 meeting, the Commission's Designated Federal Officer called plaintiff and discussed the agenda and the list of presenters with him. Third Kossack Decl. ¶ 11. The Designated Federal Officer invited plaintiff to send him any written materials he wanted to discuss at the meeting, so they could be posted in advance of the meeting and discussed during the meeting. *Id.*

In response to that discussion, plaintiff submitted a document entitled "Bates in the News: Nov. 11, 2016 – Voter Suppression," which was promptly shared with his colleagues and the public. *Id.*; *see also* Doc. Index, Entry No. 53 In short, plaintiff's claim that he has been "[d]enied time to adequately review – or even review at all – materials or time to prepare questions for witnesses," Prelim. Inj. Mem. at 18, is simply wrong on the facts – plaintiff knew the agenda for the September 12 meeting a full week in advance, had copies of the presentations to be given by

the witnesses four days in advance, and, in fact, after a conversation with Commission staff, submitted materials to the full Commission in advance of the meeting.  *See* Third Kossack Decl. ¶ 11.  Indeed, plaintiff never expressed concerns to Commission staff about the timeline for submitting or reviewing materials for the September 12 meeting.  *See id.*

Plaintiff's claim fails on the law, as well.  *Cummock* stands for the proposition that an advisory committee cannot "deny [a member] access to information that it reviewed and relied upon in formulating its recommendations."  180 F.3d at 293.  But it says nothing about the *timing* for when such information must be provided to members (other than, presumably, in time to be considered in the final report).  In *Food Chemical News v. Department of Health & Human Services*, 980 F.2d 1468, 1472 (D.C. Cir. 1992), the D.C. Circuit held that "whenever practicable, parties [must] have access to the relevant materials before or at the meeting at which the materials are used and discussed."  But plaintiff has not alleged that he has not been given materials before or during the meeting at which the materials were to be used or discussed.  Plaintiff, thus, would impute a requirement that, in order for him to fully participate as a Commission member, he must be provided materials far in advance of any meeting, without any basis in statute or case law for such a rule (much less any guidance from the text of FACA or this Circuit's decisions on the timing for presenting documents to Commission members), and even if he is given that information at the same time and in the same manner as all of the other Commission members.  FACA does not clearly and indisputably require such a result.

> **b.**     **Plaintiff's claim that he has not received information or materials to which he is entitled under FACA section 10(b) and *Cummock v. Gore* is not likely to succeed as the basis for mandamus.**

Plaintiff also asserts that he has been denied materials to which he believes he is entitled to under FACA section 10(b) and *Cummock*.  In this argument, he appears to refer to the documents

listed on the index filed in *Lawyers' Committee for Civil Rights Under Law*. *See* Prelim. Inj. Mem. at 11. But plaintiff has not shown that he has a clear and indisputable right to these materials and thus that he is likely to succeed on the merits of this claim in a mandamus action.

First, he cannot show that he is clearly entitled to these documents pursuant to section 10(b). Section 10(b) states that, with certain exceptions, "documents which were made available to or prepared for or by each advisory committee shall be made available for public inspection." 5 U.S.C. app 2 § 10(b). However, section 10(b) does not clearly require every document connected with every advisory committee be disclosed; instead, this provision only requires that materials that were actually accessible (or intended to be accessible) to the committee as a whole be disclosed. *See* Disclosure of Advisory Comm. Deliberative Materials, 12 U.S. Op. Off. Legal Counsel 73, 76 (1988) ("FACA compels disclosure [only] of a limited subset of information, namely material used by the advisory committee."). Thus, the disclosure requirements of section 10(b) do not include staff materials and materials prepared by individual members, so long as those materials were not used by the committee as a whole. *See id.* at 75 ("The courts and this Office [of Legal Counsel] have construed the concept of advisory committees established or utilized by the President or an agency to preclude section 10(b)'s application to the work prepared by a staff member of an advisory committee . . . or a subcommittee of the advisory committee that is not itself utilized by the President . . . so long as the material was not used by the committee as a whole."); *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 557 F. Supp. 524, 529 (D.D.C. 1983) (rejecting the application of section 10(b) to entities "performing staff functions" and concluding that FACA's disclosure requirements applied only to an entity that "provide[s] advice directly to the President"), *aff'd*, 711 F.3d 1071 (D.C. Cir. 1983).

The Commission has disclosed the materials that are required to be disclosed pursuant to section 10(b), and plaintiff has not demonstrated otherwise.

Nor has plaintiff demonstrated that he has been denied materials clearly and undisputedly due to him pursuant to the D.C. Circuit's decision in *Cummock*.  There, the D.C. Circuit held that because a member has "a right to fully participate in the deliberations of the Commission," a member must have "the opportunity to review documents that were prepared for or relied upon by the Commission in formulating its recommendations," and to make a concurrence or dissent that "reflect[s] this information."  180 F.3d at 284.  In other words, the D.C. Circuit held that a member could not be excluded from reviewing information that was used by *the Commission* in making its final recommendation.  For example, an advisory committee cannot deny a member access to relevant material used by the committee even if that information would not need to be disclosed pursuant to section 10(b) because it would be exempt pursuant to a FOIA exemption.  *Id.* at 292 ("Thus, provided that Cummock was granted the requisite security clearance, the Commission could not deny her access to information that it reviewed and relied upon in formulating its recommendations – even if, for instance, that information might have been withheld from the public pursuant to a FOIA exemption.").  Nor can the government "treat [an advisory committee member] on less-than-equal footing with other committee members," at least without a clear reason.  *Id.* at 293 (Rogers, J., concurring).  In this narrow sense, a FACA member's rights under *Cummock* are broader than the public's rights under section 10(b).

Critically, however, plaintiff has not put forward facts alleging a violation of the type identified in *Cummock*.  Plaintiff is not, for example, contending that he has been denied material that was used by the Commission in formulating its recommendations; indeed, no recommendations (must less a report) have been formulated.  Nor has he shown that he has been

treated differently than other Commission members, or that he has otherwise been put on a "less-than-equal footing" of the type contemplated by *Cummock*.   180 F.3d at 293 (Rogers, J., concurring).[4]   *Cummock* – which concerns a situation where one Commission member was excluded from material relied upon by the rest of the Commission in preparing its final report – is thus inapposite to the facts alleged here.

Indeed, rather than seeking treatment equal to that of other Commission members, plaintiff is seeking *special* treatment, *i.e.*, access to documents that have not been shared with the other Commission members.  Plaintiff alleges that he has not received information about Commission *staff* activities.  *See* Prelim Inj. Mem. at 10 ("And since the September meeting, Secretary Dunlap has received no documents or substantive information from the Commission or its staff."); *id.* ("Secretary Dunlap's inquiries about the actions, if any, that the Commission has taken in response to the arrest [of a staff member] have been met with silence.").  But there are no allegations that other Commission members have received this material while plaintiff has not.  Indeed, the evidence plaintiff himself has put forward suggests the opposite.  In his correspondence with the Commission's Designated Federal Officer, he refers to a comment made by Commission member,

---

[4] Although plaintiff has not shown that he has been treated unequally to other similarly situated members, different members do have different roles, and therefore have engaged with staff in different ways.  For example, Mr. Kobach is the Vice Chair, and thus has specific responsibilities for setting the meeting agenda as outlined in the by-laws (and therefore staff communicated with him on this topic).  *See* By-laws § IV(C).  Similarly, Hans von Spakovksy was a presenter at the September 12 meeting, and so Commission staff communicated individually with him in his capacity as a presenter.  *See, e.g.*, Doc. Index, Entry Nos. 601, 602.  And Secretary William Gardner communicated individually with Commission staff and Vice Chair Kobach regarding his suggestion that the September 12 meeting be held in Manchester, New Hampshire.  These communications included his suggestion of five of the ten panelists, collaboration on the meeting agenda, coordination of the voting machine demonstration, and his invitation to the former Governor of New Hampshire to make opening remarks.  *See* Third Kossack Decl. ¶ 9.  These differential activities are consistent with FACA, and in any event, are inapposite from the situation in *Cummock*, where one member had been deprived of material that was given to the rest of the committee.

Secretary of State Connie Lawson (a Republican), where she said that "she hasn't received any new information [about the Commission] since the last meeting and that she doesn't think members are emailing each other."  Mot. for Prelim. Inj. Ex. 5, ECF No. 7-6.

*Cummock* does not speak to the issue of whether a Commission member has a right to demand access to *staff* material that was not relied upon by the Commission in formulating its recommendations.  Moreover, while *Cummock* mentions a general right to participation, it does not clearly define the contours of that right (outside of the specific context discussed above).  *See Cummock*, 180 F.3d at 292-93.  Accordingly, mandamus relief based on *Cummock* is inappropriate.

While *Cummock* does not address a member's participation rights in this context, the Commission's by-laws – which plaintiff voted for and which were unanimously adopted – do define the Commission members' participation rights.  For example, section IV (C) of the by-laws states that:

> The Chair or, at the Chair's direction, the Vice Chair, shall establish the agenda for all Commission meetings.  The DFO will prepare and distribute the agenda to the Members before each meeting and will make available copies of the agenda to members of the public.  Items for the agenda may be submitted to the Chair by any Member.  Items may also be suggested by any member of the public.

Presidential Advisory Commission on Election Integrity By-Laws and Operating Procedures, By-laws § IV(C), https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-bylaws_final.PDF. *See also* Third Kossack Decl. ¶¶ 5, 6.  Plaintiff complains that he "was not consulted or otherwise involved in the creation of the agenda" for the July and September meetings, and that he "was not asked [his] opinion on possible topics for discussion at the meeting and . . . was not asked to provide the names of any speakers or witnesses that should be invite to the meeting."  Dunlap Decl. ¶¶ 6, 8, ECF No. 7-1.  But the by-laws – which he voted for – vest the

establishment of the agenda with the Chair, subject to suggestions by the Commission's members. Moreover, plaintiff was invited by Commission staff to submit written materials that he wanted to discuss during the meeting.  *See* Third Kossack Decl. ¶ 11; Doc. Index Entry No. 53.  Nor does the Commission's Designated Federal Officer recall plaintiff making any other request regarding the September 12 meeting agenda or meeting materials.  Third Kossack Decl. ¶¶ 11, 12.

In any event, as a factual matter, plaintiff's input was taken into consideration when creating the September 12 agenda.  The July 19 meeting dedicated a portion of the meeting for all members, including plaintiff, to provide input into topics for future Commission meetings.  July 19 Meeting Minutes at 7-8; Third Kossack Decl. ¶¶ 7, 8.  And at the conclusion of that discussion, Vice Chair Kobach asked the members whether there were any objections to staff grouping these suggested issues into related topics that could be covered in future meetings, and no member objected.  July 19 Meeting Minutes at 8; Third Kossack Decl. ¶ 7.

During this discussion, plaintiff brought up the importance of "chain of custody of ballots" as well as cybersecurity issues related to elections.  *See* July 19 Meeting Minutes at 4, 7.  These issues were then incorporated into and discussed during the third panel on the September 12 meeting, which was entitled "Electronic Voting Systems and Election Integrity – A Primer." *See* Sept. 12 Agenda; *see also* Third Kossack Decl. ¶ 8.  That panel, for example, included a session by Professor Andrew W. Appel, entitled "Recording and counting votes in a trustworthy way.  *See* Appel Presentation, https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-dr-andrew-appel-report.pdf.  Furthermore, during the July 19 meeting, plaintiff expressed an interest in studying voter turnout and how turnout is impacted by voters' perceptions of election integrity.  *See* July 19 Meeting Minutes at 8.  These issues were the focus of the September 12 meeting's first

panel, "Historical Election Turnout Statistics and the Effect of Election Integrity Issues on Voter Confidence." *See* September 12 Meeting Agenda; *see also* Third Kossack Decl. ¶ 8.

Finally, the by-laws also state that "any member" may make a motion, without limiting the subject of the motion, By-laws § V(A), and the by-laws further provide that they may be amended upon a two-thirds vote of the members, *id.* § X. In short, there was an established process for providing input to the Commission, or changing the process by which that input is to be given, which plaintiff availed himself of by suggesting meeting topics at the July 19 meeting that were addressed during the September 12 meeting, and by submitting materials for the September 12 meeting that he discussed at that meeting. If plaintiff believed these processes were insufficient for him to provide input, the by-laws establish a process for amendments that could have changed the Commission's procedures. Plaintiff simply did not avail himself of that process. *See* Third Kossack Decl. ¶ 12. Plaintiff's complaint that Commission members or staff did not *affirmatively* reach out to him for suggestions is wrong on the merits. And even if it were true, failure to affirmatively seek input from each Commission member regarding the content of a meeting agenda would not violate the Commission's by-laws, FACA, or the D.C. Circuit's holding in *Cummock*.

> **c.    Plaintiff's claim that the Commission has violated FACA section 5 is nonjusticiable and not likely to succeed as a basis for mandamus relief.**

Far from establishing a clear, nondiscretionary duty on defendants, the fair balance and inappropriate influence provisions of FACA give defendants wide discretion on this issue and are not justiciable, let alone capable of supporting a finding of a "clear duty" or "clear right to relief." Section 5 of FACA requires an advisory committee's "membership to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," 5 U.S.C. app. 2 § 5(b)(2), and that the President, as the appointing authority, put in place "appropriate

28

provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or any special interest[,]" *id.* § 5(b)(3). Plaintiff faces several problems:  first, the weight of authority has concluded that section 5 is not justiciable; second, his factual claim, that he has been "excluded from meaningful participation in the Commission's activities in violation of Section 5," Prelim Inj. Mem. at 12, is not cognizable under the fair balance provision, which addresses the composition of an advisory committee, not the treatment of its constituent members; and third, even if the claim were cognizable, it depends on a factual premise that plaintiff has not established: that he, *but not other members*, has been excluded from the Commission's activities.

### i.      Section 5 is not justiciable.

Consideration of plaintiff's fair balance and improper influence claims[5] would require the Court to oversee the President's appointment process, question the views of individual Commission members, manage the Commission's operations, and develop and mandate a standard for committee balance and independence that is undefined in the law or in the Complaint.   Such issues are not justiciable under Article III of the Constitution.  *See Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods,* 886 F.2d 419, 426, 430-31 (D.C. Cir. 1989) (Silberman, J., concurring in the judgment); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962) (lawsuit is non-justiciable if there is a "lack of judicially discoverable and manageable standards for resolving it").   And where there is not sufficiently manageable standards, mandamus relief of the type sought here cannot lie.  *See, e.g.*, *People of Colo. ex rel. Suthers v. Gonzales, 5*58 F. Supp.

---

[5] Plaintiff's complaint includes a claim that defendants have violated section 5's "improper influence" provision, *see* Compl. ¶¶ 80-83; however, plaintiff only discusses section 5's "fair balance" provision in his motion for a preliminary injunction, *see* Prelim. Inj. Mem. at 11-12.  Defendants address both provisions of section 5 here so as to not waive their arguments with respect to plaintiff's apparent "improper influence" claim.

2d 1158, 1161 (D. Colo. 2007) (concluding that mandamus was inappropriate when there was a lack of "judicially discoverable and manageable standards") (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962).   Accordingly, plaintiff cannot demonstrate that he has a clear and indisputable right to relief under FACA section 5.

First, the "fair balance" provision in section 5(b)(2) does not define "fairly balanced," nor does it specify how a "fairly balanced" membership on an advisory committee is to be achieved, in terms of either the type of representatives or the functions such representatives perform.   As an initial matter, "even before the points of view on an advisory committee can be balanced at all – 'fairly' or otherwise – it must first be determined *which* points of view should be balanced." *Microbiological*, 886 F.2d  at 426 (Silberman, J., concurring).   And there is no "principled basis for a federal court to determine which among the myriad points of view deserve representation on particular advisory committees."   *Id.*   The "relevant points of view on issues to be considered by an advisory committee are virtually infinite . . . ."   *Id.*; *see also Doe v. Shalala*, 862 F. Supp. 1421, 1430 (D. Md. 1994) ("For the Court to become entangled in determining which viewpoints must be represented is for the Court to arbitrarily substitute its judgment for that of the agency.").

There is similarly no "principled way" to determine whether those views are fairly balanced.   *Microbiological*, 886 F.2d at 428 (Silberman, J., concurring).   Such a determination would require the court to make "arbitrary judgments" about "which organizations or individuals qualified as bona fide" representatives of particular policy views.   *Id.* at 428-29; *see also Fertilizer Inst. v. EPA*, 938 F. Supp. 52, 54 (D.D.C. 1996) (finding the "fair balance" provision nonjusticiable because it would raise "difficult questions" such as, "What qualifications must someone have in order to be deemed an adequate representative of the chemical producers?  What if there is a diversity of views among different chemical producers – whose views would then

30

represent the industry?").   Likewise, there is no "principled way" to determine whether the functions to be performed by an advisory committee are fairly balanced among the committee's membership.   Courts would have to make "arbitrary judgments" about an advisory committee's operations including the role of its staff, the timing and manner of communications between committee members and staff and among committee members, the type of activities committee members should engage in to support the committee's mission, and the assignment of specific tasks and/or rolls to specific members.   Such a task is a "hopelessly manipulable" political question that is "best left to the executive and legislative branches of government."   *Ctr. for Policy Analysis on Trade & Health ("CPATH") v. Office of U.S. Trade Representative*, 540 F.3d 940, 945 (9th Cir. 2008).

And even if Congress intended that there be judicial review of agency compliance with the "fairly balanced" requirement, such review would be constitutionally suspect since Congress may not constitutionally confer on the judiciary the power to make policy choices unguided by statutory standards.   *Microbiological*, 886 F.2d at 430 n.6; *cf. Metcalf v. Nat'l Petroleum Council*, 553 F.2d 176, 190 (D.C. Cir. 1977) ("[T]o supervise the membership . . . of federal advisory committees on a continual basis and to alter the composition of these committees according to our subjective determinations as to 'fair balance'" would place courts in the "[inappropriate] role as the 'continuing monitors of the wisdom and soundness of Executive action.'").

The weight of authority has therefore concluded that "fairly balanced" claims under § 5(b)(2) of FACA are nonjusticiable.   *See CPATH*, 540 F.3d at 945 (FACA fails to "articulate what perspectives must be considered when determining if the advisory committee is fairly balanced[;]" the statute, therefore, "provide[s the court] with no meaningful standards to apply."); *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, No. 2:11-CV-578-FTM-29SPC, 2012

31

WL 3589804, at *8-9 (M.D. Fla. Apr. 12, 2012) ("[T]here is no indication from the provisions of

the Organic Act, [or] FACA, that there is a meaningful standard to apply when considering whether

the Secretary complied with the 'fairly balanced' requirement imposed by FACA.") *report and*

*recommendation adopted*, 2012 WL 3590061 (M.D. Fla. Aug. 20, 2012); *see also Sanchez v. Pena*,

17 F. Supp. 2d 1235, 1238 (D.N.M. 1998) ("[T]he task of creating a 'fair balance' . . . is a political

one left to the discretion of the agency by statute and, under the alleged facts of this case, is not a

justiciable issue."); *Fertilizer Inst*., 938 F. Supp. at 54 ("For the Court to become entangled in

determining what represents a 'fair balance' would require the Court to arbitrarily substitute its

judgment for that of the agency.  No meaningful standards are available to assist the Court in

making such determinations."); *Doe*, 862 F. Supp. at 1430 ("The balance of judicial opinion holds

that, by reason of the lack of judicial standards to address alleged 'imbalances' of membership on

such committees, Courts will not decide the issue; it is non-justiciable." (citing, *inter alia*,

*Microbiological*, 886 F.2d at 425)); *Pub. Citizen v. Dep't of Health & Human Servs.*, 795 F. Supp.

1220, 1220-21 (D.D.C. 1992) (citing *Microbiological*, 886 F.2d at 426).  There are no decisional

standards here for the Court to apply concerning the appropriate "balance" of the Commission. [6]

Accordingly, plaintiff's fair balance claim is not justiciable.

---

[6] FACA's legislative history provides no guidance.  The report of the House Committee on Government Operations notes why §§ 5(b)(2) and 5(b)(3) were added to FACA, explaining its view that "[o]ne of the great dangers in the unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns," and that "[t]estimony received at hearings before the Legal and Monetary Affairs Subcommittee pointed out the danger of allowing special interest groups to exercise undue influence upon the Government through the dominance of advisory committees which deal with matters in which they have vested interests."  H.R. Rep. No. 92-1017, at 6 (1972).  But the report does not supply any standard for the Court to apply to determine if an advisory committee is fairly balanced (or if a special interest has exerted improper influence on an advisory committee).  Nor does an earlier House Committee on Government Operations Report, which offered that "[t]he members and staff on an advisory group need also to be free from vested interests and obligations that would impair the judgments and decisions of the committee.  They must be able to examine programs in a fresh

Nor is FACA section 5's inappropriate influence provision justiciable.  Congress also did not define "inappropriately influenced" or "special interest," nor did it specify any procedures to assure that the "advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest," within the meaning of section 5(b)(3).  As a result, this Court has no meaningful standards by which to measure whether this requirement has been met either.

To determine whether an advisory committee's advice and recommendations have been inappropriately influenced by the appointing authority or special interests, a reviewing court would need to answer at least three questions.  First, the Court would need to determine "when an interest is 'special' as opposed to 'general[.]'"  *Microbiological*, 886 F.2d at 430 (Silberman, J., concurring).  But a court does not "have any way to determine what [special interest] means for purposes of judicial review [as] . . . virtually anyone in the United States . . . [c]ould have . . . a special interest with regard to some – perhaps all – advisory committees."  *Id.* at 430-31.

Second, a court must be able to determine when a special interest (or the appointing authority) exerted "inappropriate influence."  *Colo. Envtl. Coal. v. Wenker*, 353 F.3d 1221, 1231 (10th Cir. 2004) (per curiam).  At issue in *Wenker* were federal regulations requiring the Secretary of the Interior to create Resource Advisory Councils ("RACs") to make recommendations regarding federal land use policy.  *Id.* at 1223-24.  Applying *Heckler v. Chaney*, 470 U.S 821, 830 (1985), the court found no meaningful standard of review.  *Wenker*, 353 F.3d at 1231.  The court explained that "[t]he problem we have with this claim centers on the word 'inappropriate,'" given that the applicable statute and the relevant regulations had "call[ed] for various special interest

---

and critical way and reach conclusions that agencies might not."  H.R. Rep. No. 91-1731, at 18 (1970).  The Conference Report, *see* H.R. Rep. No. 92-1403 (1972) (Conf. Rep.), and the Senate Report, *see* S. Rep. No. 92-1098, at 10 (1972), say nothing at all relevant to the present topic.

groups to recommend candidates for appointment to the RACs" and that "[i]t goes without saying that the special interests will recommend nominees who agree with their point of view." *Id.* Consequently, the question became: "what does § 5(b)(1)-(3) mean when it prohibits only 'inappropriate' influence?" *Id.* The Court concluded that "[t]he statute does not give us any guidance as to when the line is crossed between appropriate and inappropriate influence." *Id.*[7]; *see also Microbiological*, 886 F.2d at 431 (asking, "[W]hat legally discernible principles could be employed to determine when a particular special interest is overly represented – when its influence is 'inappropriate?'") (Silberman, J., concurring).

Finally, section 5(b)(3) "on its face, is directed to the establishment of *procedures* to prevent 'inappropriate' external influences on an already constituted advisory committee by outside special interests or the appointing body." *Microbiological*, 886 F.2d at 430. A court would thus need to put itself in the shoes of the President or agency administrator and determine how, preemptively, to prevent special interests (whatever they are) from exerting inappropriate influence (whatever that is). Courts are ill-suited to craft such safeguards out of whole cloth, as doing so is "really an executive branch function." *Fertilizer Inst.*, 938 F. Supp. at 54-55.

FACA provides this Court with no meaningful standard against which to answer any of these three questions and, as a result, determine whether the Commission is being inappropriately influenced by the President or special interests. It would be of no moment if plaintiff was able to craft a standard that he believe to be wise and reasonable. What is important is that the statute

---

[7] In reaching its conclusion, the Tenth Circuit broke ranks with the Fifth Circuit, which found section 5(b)(3) to be justiciable. *See Cargill, Inc. v. United States*, 173 F.3d 323 (5th Cir. 1999). Its explanation of *why*, however, was scant. It stated only that section 5(b)(3) is more "objective" than the "fairly balanced" requirement, which it also found to be justiciable, *see id.* at 335. The explanation for that conclusion, in turn, was hardly persuasive – and, indeed, was rejected by *CPATH*, 540 F.3d at 946 ("[T]he *Cargill* decision offers little explanation *why* FACA's fairly balanced requirement is justiciable.").

does not set forth meaningful guidance for the Court to follow in answering such questions as what constitutes a special interest, when influence becomes inappropriate, and what sorts of steps must be taken to prevent special interests (or the appointing authority) from exerting inappropriate influence.  Resort to any other authority would amount to the Court "mak[ing] a policy judgment, and an arbitrary one at that, as to the optimum character of the Advisory Commi[ssion]," *Microbiological*, 886 F.2d at 431, which is an "utterly nonjudicial task.," *id.* at 427.

### ii.   In any event, plaintiff's claim is not cognizable under section 5, and even if it were, the factual record does not support it.

Even assuming that FACA section 5 were justiciable, plaintiff's claim is not cognizable under FACA's fair balance element.  While plaintiff does not fully develop his argument in his papers, he appears to argue that if the Commission "wall[ed] off" plaintiff from Commission activities while not doing the same for other members, it would violate section 5.  *See* Prelim. Inj. Mem. at 11-12.  (Indeed, were his claim that the Commission had "wall[ed] off" *all of the members*, that would not be a fair balance claim, since all the members, regardless of their points of view, would be treated similarly.)  Section 5(b)(2) requires that the "membership of the advisory committee . . . be fairly balanced," 5 U.S.C. app. 2 § 5(b)(2), but it describes membership *composition*; it does not discuss the treatment of a committee's constituent members.   Plaintiff's allegation that he has been excluded from Commission activities is not, therefore, cognizable under the fair balance provision.  Nor has he cited any case law for the position that FACA section 5 covers a claim that a single member has been treated unfairly.

In any event, however, plaintiff submits no evidence that he has been treated differently from any other Commission member.  In fact, the only evidence he does submit indicates the opposite – that he has been treated the same as other similarly situated Commission members.  For

example, as discussed above, he cites a comment made by Commissioner Lawson where she also said that she had not received any information about the Commission since the September 12 meeting.  *See* Mot. for Prelim. Inj. Ex. 5.  Such a statement is consistent with the *equal* treatment of Commission members, the antithesis of a claim that the Commission is unfairly balanced and inappropriately influenced.

Accordingly, plaintiff has failed to demonstrate a clear and indisputable right to relief under FACA section 5.

> ### d.    Plaintiff's claim that the Commission has violated FACA section 9 is not likely to succeed as a basis for mandamus.

Finally, plaintiff is not likely to establish that the Commission clearly violated FACA section 9(c).  Section 9(c) states that "[n]o advisory committee shall meet or take any action until an advisory committee charter has been filed."  5 U.S.C. app 2. § 9(c).  The Commission's charter was filed on June 23, 2017.  *See* Charter, Presidential Advisory Commission on Election Integrity ¶ 14,        https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/commission-charter.pdf. Plaintiff's claim fails to justify preliminary injunctive relief for two reasons.

First, on the facts, plaintiff has not demonstrated that the Commission met or took any action before the charter was filed.  The first organizational call was held on June 28, 2017, and, Vice Chair Kobach's June 28 letter, was, of course, also sent after the charter was filed.  The first meeting did not occur until July 19.  Moreover, while there was discussion among individuals before the charter was filed, plaintiff has not established that this discussion constituted a "meeting," much less "action" taken by the *Commission* itself.

In any event, it is indisputable that the charter has now been filed, and so there cannot be another violation of FACA section 9(c), even if there was in early to mid-June (and there was not). Such an issue is now moot.  *See, e.g.*, *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) ("In general a

case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.") (internal citation omitted).   Furthermore, given that the alleged violation occurred before the complaint was filed, and there is no likelihood of repetition, there is no basis for injunctive relief.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (standing to seek injunctive relief depends on whether plaintiff is likely to suffer future injury from the defendant).

> **3.     Because applying FACA to a presidential commission raises serious constitutional concerns, even if plaintiff satisfied the mandamus standards –and he does not – this Court should decline to exercise mandamus as a matter of discretion.**

Defendants do not concede that FACA can be constitutionally applied to presidential advisory committees, such as this Commission, which was created by the President and is chaired by the Vice President, a constitutional officer.   Although some courts have assumed, but not definitively held, that mandamus claims may lie against the Vice President and other non-agency participants on presidential advisory committees, *see Judicial Watch v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 44 (D.D.C. 2002), *rev'd on other grounds*, 334 F.3d 1096 (D.C. Cir. 2003), the Supreme Court and numerous judges have noted that the application of FACA to govern the manner in which the President receives advice "present[s] formidable constitutional difficulties."  *Pub. Citizen*, 491 U.S. at 466; *see also Cheney*, 542 U.S. at 385 ("[T]he Executive's constitutional responsibilities and status are factors counseling judicial deference and restraint in the conduct of litigation against it.") (citation omitted); *In re Cheney*, 334 F.3d at 1096, 1113 (D.C. Cir. 2003) (Randolph, J., dissenting) ("As applied to committees the President establishes to give him advice, FACA has for many years teetered on the edge of constitutionality."), *vacated and remanded*, 542 U.S. 367 (2004); *Nadar v. Baroody*, 396 F. Supp. 1231, 1234 (D.D.C. 1975) ("To hold that Congress intended to subject meetings of this kind to press scrutiny and public

participation with advance notice on formulated agendas, etc., as required by [FACA], would raise the most serious questions under our tripartite form of government as to the congressional power to restrict the effective discharge of the President's business.").

Applying FACA to this Commission established by the President raises identical separation of powers concerns to those repeatedly identified by the courts, including the Supreme Court. Accordingly, any argument to proceed against the Commission under the mandamus statute needs to be balanced against the serious constitutional implications of regulating the manner in which the President receives advice; that balance counsels against application of FACA via mandamus here. *Cheney*, 542 U.S. at 382 ("[S]eparation-of-powers considerations should inform a [court's] evaluation of a mandamus petition involving the President or the Vice President."); *see also In re Cheney*, 406 F.3d at 727 ("Although we do not reach the question whether applying FACA to Presidential committees . . . would be constitutional, separation-of-powers considerations have an important bearing on the proper interpretation of the statute."). To be sure, the Commission has agreed voluntarily to abide by the provisions of FACA. *See* Charter ¶¶ 2, 13. But to proceed under a mandamus theory on the basis of plaintiff's allegations would have grave consequences for the operation of the Offices of the President and the Vice President. Allowing suits of this nature would mean that a President's or Vice President's attempts to obtain advice and consultation would be frequently interrupted by litigation, frustrating their ability to obtain timely and valuable advice and information. Moreover, the President's use of advisory groups would be greatly chilled if all that was required to impose the burden of litigation on the government was a complaint that stated that FACA violations have occurred. *See Pub. Citizen*, 491 U.S. at 466 (recognizing that applying FACA to meetings between Presidential advisors and private citizens "present[s] formidable constitutional difficulties"); *AAPS*, 997 F.2d at 908-10 (finding that

applying FACA and its disclosure requirements to a task force set up by the President would seriously burden the President's Article II right to confidential communications).  "[I]t is well established that 'a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any ordinary individual.'"  *Cheney*, 542 U.S. at 381 (quoting *United States v. Nixon*, 418 U.S. 683, 715 (1974)).  As the Supreme Court explained in *Cheney*, this does not mean that the President is above the law.  The point is, rather, that, "the public interest requires that a coequal branch of Government . . . give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties."  *Id.* at 382 (citations omitted).

Accordingly, the Court should decline to issue mandamus both because plaintiff has not established a clear right to relief under the FACA provisions cited in his complaint, and as a matter of discretion.

## II.   PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM

Plaintiff's motion for a preliminary injunction should also be denied because plaintiff has not established that he will suffer irreparable injury absent preliminary relief.  The D.C. Circuit "has set a high standard for irreparable injury."  *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) (citation omitted).   It is a "well known and indisputable principle[]" that a "unsubstantiated and speculative" harm cannot constitute "irreparable harm" sufficient to justify injunctive relief.  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Furthermore, where, as here, plaintiff seeks to alter the status quo (such as, for example, by requiring the release of documents to which his entitlement is an ultimate merits question), the standard for a preliminary injunction is further heightened.  *See Enercons Va. Inc.* 720 F.2d at 29 ("By ordering [defendant to perform the requested relief], the district court did not simply preserve

the status quo, but instead summarily resolved all conflicting claims . . . immediately after commencement of the action on short notice to the defendant.").

Plaintiff has not shown irreparable injury, much less a prospect of irreparable injury moving forward.  First, he asserts that the Commission has refused to provide relevant documents in advance of the phone calls and meetings at which they were discussed, which, he says, has hampered his ability to discharge his responsibilities.  Prelim. Inj. Mem. at 18 (citing Dunlap Decl. ¶¶ 5, 7-8).  But this claim is contradicted by the record.  With respect to the September 12 meeting, plaintiff was provided the agenda a week in advance of the meeting, and the presentations that formed the substantive content of those meetings four days in advance – indeed, plaintiff had an opportunity (which he availed himself of) to present materials to the other Commission members. *See supra; see also* Third Kossack Decl. ¶ 11.  For the July 19 meeting, plaintiff received all the meeting materials that were shared with the other Commission members in advance of the meeting, and while a small number of documents were introduced by other Commission members for the first time at the meeting, *all* of the Commission members were similarly situated with respect to those materials – they all received them for the first time during the discussion.  In any event, as evidenced by the September 12 meeting, the Commission has shared materials to be used at a meeting in advance of the meeting.  Moreover, with respect to the June 28 organizational call, the agenda and an introductory email were shared with plaintiff and the other Commission members in advance of that call, *see* Doc. Index, Entry Nos. 8-9.  In short, plaintiff has been provided materials in advance of the calls and meetings in which they were to be discussed; moreover, there are no indications from the record that he will not be provided materials in the same manner moving forward.

Second, plaintiff states that he has been "[d]enied time to adequately review – or even review at all – materials or time to prepare questions for witnesses."  Prelim. Inj. Mem. at 18.  Again, this claim fails in the face of the record: plaintiff had time to review materials for the July meeting, and, for the September 12 meeting (the only meeting with witnesses), he had a week to prepare questions after receiving the agenda, and four days to do so after receiving the witnesses' presentations.  *See* Third Kossack Decl. ¶ 10.  Plaintiff puts forward no basis for concluding that this reasonable review process was inadequate let alone that it constitutes irreparable injury.  Nor is there a basis for concluding that there will be injury moving forward.  Plaintiff states that "[g]iven the history of denied access, Defendants cannot be relied upon to provide documents that will be discussed at the next meeting absent a court order," Prelim. Inj. Mem. at 19, but this claim ignores the factual record in this case, which demonstrates that plaintiff has *not* been denied access.  Plaintiff's unfounded speculation is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

Third, plaintiff complains that he cannot "play any role in the setting of the meeting agenda (such as the selection of witnesses or subjects for discussion)."  Prelim. Inj. Mem. at 20.  However, the by-laws, which plaintiff voted for and which were duly adopted, states that the Chair or Vice Chair "shall establish the agenda for all Commission meetings," and further states that "[i]tems for the agenda may be submitted to the Chair by any Member."  By-laws § IV(C).  Plaintiff has not claimed that he actually submitted any proposed items to the Chair for inclusion or that, having done so, his proposed items were not included.  To the contrary, the suggestions plaintiff did make with respect to topics of interest to him were adopted and implemented during the September 12th meeting, and staff invited and distributed the materials plaintiff sought to discuss at that meeting.

*See* Third Kossack Decl. ¶¶ 7, 8, 11.  Having failed to do more than that, he cannot now claim irreparable injury.

Fourth, plaintiff states that he has the right to have a dissent published with the Commission's final report, and that "an injunction against the publication of the report is necessary to allow Secretary Dunlap time to obtain and review documents and exercise his right to publish a concurrence or a dissent, should he decide to publish one."  Prelim. Inj. Mem. at 21.  But this claim stacks speculation on top of speculation:  that plaintiff will not have time to rely on documents used in the production of the report (despite evidence to the contrary), that he will choose to write a concurrence or a dissent, and he will be unable to publish a document he has not yet written, in response to a Commission report that does not yet exist, absent preliminary injunctive relief issued at this early juncture.  Such a claim is unsupported and constitutes the type of speculative future injury insufficient to demonstrate standing, *see Clapper v. Amnesty Int'l USA*, 538 U.S. 398, 409 (2003), much less to support preliminary injunctive relief.

Indeed, plaintiff ultimately rests his argument on the claim that a preliminary injunction "is the most logical way to proceed," in order to adjudicate his claims while the Commission remains ongoing.  Prelim. Inj. Mem. at 21.  But this is an argument in support of expedited briefing (something plaintiff has not sought); a preliminary injunction motion is not appropriate merely because a plaintiff wants expedited resolution of his claim.  Accordingly, plaintiff has not demonstrated irreparable injury and his motion may be denied on that basis alone.

## III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF.

A party seeking a temporary restraining order or preliminary injunction must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public

interest."  *Winter*, 555 U.S. at 20.  "These factors merge when the Government is the opposing party."  *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Here, the public interest cuts against an injunction.  The President charged the Commission with the important task of "study[ing] the registration and voting processes used in Federal elections."  Exec. Order No. 13,799, § 3.  Plaintiff's proposed injunction would hinder the Commission's ability to conduct that task.  Rather than preserve the status quo pending final adjudication, it would subject the Commission (and its staff and Commissioners) to judicial micromanagement, even though Commission's internal processes themselves provide a mechanism for resolving many of plaintiff's complaints, a process plaintiff has not availed himself of.  For example, plaintiff's proposed order would order defendants "to permit Secretary Dunlap to fully participate on an equal basis as all other commissioners."  Proposed Order, ECF No. 7-14.  But – notwithstanding the fact that plaintiff has not identified an example of a lack of equal treatment – such an order could eventually require the Court to consider every action taken by the Commission to ensure that it allows plaintiff to "fully participate" (a term that is not defined in FACA or in the complaint) on an "equal basis" (a term that is not defined in FACA or in the complaint) with other Commission members.  Such an action arguably runs afoul of the specificity requirement of Rule 65(d), and in any event, would limit the Commission's ability to manage its own operations.  *See, e.g.*, *Indian Educators Fed. Local 4524 of Am. Fed. of Teachers, AFL-CIO v. Kempthorne*, 590 F. Supp. 2d 15, 20 (D.D.C. 2008) (discussing how balance of hardships counsel against granting imprecisely drafted injunctive relief).

Similarly, plaintiff seeks all documents to which he is entitled "no later than two weeks in advance of any future Commission meeting."  Proposed Order.  But this two-week requirement can be found nowhere in FACA's text or in the decisions of this Circuit, and implementing such a

43

requirement would limit Commission members, staff, and witnesses ability to prepare documents and materials (particularly given their other responsibilities) and would also hinder their ability to respond to documents that are intended to be shared at a future meeting (particularly if they are prevented from responding to any document created fourteen days before a meeting). It would also impose an undue burden on future witnesses, who often do not prepare their materials that far in advance. Several of the witnesses at the September 12 meeting, for example, were not able to submit materials to staff until September 8, 2017, the same day the staff shared the materials with the members. Third Kossack Decl. ¶ 10. Furthermore, the repeated request for documents to which plaintiff is "entitled" embeds a legal conclusion that plaintiff is entitled to documents (without specifying what those documents are) into an injunction in a way not permitted under Rule 65(d). *See Indian Educators*, 590 F. Supp. 2d at 20 ("[T]he Supreme Court long ago held that an injunction that contains an abstract conclusion of law, not an operative command capable of enforcement, fails to meet the specificity requirements of Rule 65.") (citing *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 74-76 (1967)).

Finally, while the public interest may be served by allowing plaintiff to participate in the Commission, Prelim. Inj. Mem. at 23, that interest is not served by affording special treatment to this plaintiff beyond that accorded to all other Commissioners. Rather, the public interest is best served by allowing the Commission to conduct its own operations and its members to run the Commission's own affairs, guided by the by-laws its members have all agreed to.

## CONCLUSION

For the aforementioned reasons, plaintiff's motion for a preliminary injunction should be denied.

44

Dated:  December 1, 2017

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Joseph E. Borson*
CAROL FEDERIGHI
Senior Trial Counsel
KRISTINIA A. WOLFE
JOSEPH E. BORSON
Virginia Bar No. 85519
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Tel: (202) 514-1944 / Fax: (202) 616-8460
E-mail: Joseph.Borson@usdoj.gov