**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MATTHEW DUNLAP,

     *Plaintiff*,

  v.

PRESIDENTIAL ADVISORY
COMMISSION ON ELECTION
INTEGRITY, *et al.*,

     *Defendants.*

---

Civil Action No. 17-2361 (CKK)

**MEMORANDUM OPINION**
(December 22, 2017)

     This case concerns the rights of a specific member of a specific presidential advisory commission governed by the Federal Advisory Committee Act ("FACA") to receive documents that he has requested in order to facilitate his full participation.  Since *Cummock v. Gore*, it has been clear in this circuit that "committee membership [under FACA] bestows both rights and obligations beyond those given to members of the general public."  180 F.3d 282, 292 (D.C. Cir. 1999).  Particularly with respect to accessing information about the commission's work, a commission member has "an even greater right than a member of the public, because, as a Commission member, [he] is entitled to fully participate in its deliberations."  *Id.*

     Plaintiff Matthew Dunlap, Secretary of State of Maine, alleges that he has not received documents associated with the Defendant Presidential Advisory Commission on Election Integrity (the "Commission") that are necessary to inform his efforts to fully participate as a Commission member.  In his Motion for a Preliminary Injunction, ECF No. 7 ("Motion"), he seeks, *inter alia*, an order that the Commission and co-defendant officials and entities "promptly . . . produce records requested by Secretary Dunlap," and that Defendants "produce . . . all future documents made

1

available to or prepared for or by the Commission promptly and no later than two weeks in advance of any future Commission meeting." Pl.'s Mot. for Prelim. Inj., ECF No. 7, at 1. The urgency of Plaintiff's Motion, filed on November 16, 2017, was predicated on the belief that the Commission would convene another meeting soon, possibly in December. *See* Decl. of Kris W. Kobach, ECF No. 30-2, Ex. 2 ¶ 9 ("Kobach Decl.") ("It is estimated the Commission will meet five times at a frequency of approximately 30-60 days between meetings, subject to members' schedules and other considerations.");[1] Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 7-13, at 19-20 (discussing same, and noting last meeting was September 12, 2017). Defendants' counsel subsequently represented that no meeting would be held in December, which permitted this Court, with the parties' consent, to entertain more substantial briefing than a preliminary injunction motion otherwise would permit. *See* Min. Order of Nov. 20, 2017.

Given the preliminary nature of the relief sought, the Court need not at this time decide conclusively whether Plaintiff is, or is not, ultimately entitled on the merits to all the relief he has claimed. Rather, relief may be granted if the Court finds that Plaintiff has a likelihood of succeeding on the merits, that he would suffer irreparable harm absent injunctive relief, and that other equitable factors—that is, questions of fairness, justice, and the public interest—warrant such relief.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a

---

[1] Certain of Defendants' declarations, including this one, were originally filed in one or more related cases. For ease of reference, the Court cites to them using the docket numbers under which they have been refiled in this case.

[2] The Court's consideration has focused on the following documents:

- Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 7-13 ("Pl.'s Mem.");

- Defs.' Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj., ECF No. 30 (Opp'n Mem.);

whole, the Court **GRANTS-IN-PART AND DENIES-IN-PART** Plaintiff's Motion for a Preliminary Injunction, ECF No. 7.  The scope of the Court's consideration and decision today are narrow.   The Court decides only Plaintiff's above-described requests for past and future documents.  The Court finds the other requests in Plaintiff's Motion to be premature.  Moreover, the Court expressly limits its decision to Plaintiff's Motion; the Court does not rule on Plaintiff's underlying Complaint, ECF No. 1, or any claim that other commissioners may assert against the Defendants.

## I.   BACKGROUND

### A.  Statutory Background

FACA imposes a number of procedural requirements on "advisory committees," which are defined to include "any committee . . . which is . . . established or utilized by the President . . . in the interest of obtaining advice or recommendations for the President."  5 U.S.C. app. 2 § 3(2) (2016).  The statute exempts, *inter alia*, "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government."  *Id*.  FACA was enacted out of

> a desire to assess the need for the numerous committees, boards, commissions, councils, and similar  groups which have been established to advise officers and agencies in the executive branch of the Federal Government. . . . Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature.

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 445-46 (1989) (internal quotation marks and citations omitted).   Moreover, FACA is designed to prevent commissions from, *inter alia*,

---

- Pl.'s Reply Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 31 ("Pl.'s Reply Mem.").

convening a group of like-minded individuals, excluding duly appointed members with opposing viewpoints, and rubber-stamping the political agenda of the appointing authority. *See Cummock*, 180 F.3d at 287, 291-92 (citing Jay S. Bybee, *Advising the President: Separation of Powers and the Federal Advisory Committee Act*, 104 Yale L.J. 51, 58-59 (1994) (discussing the "outside, 'neutral' support" necessary to make "salable" the conclusion of an agency decisionmaker)).

To achieve those purposes, FACA requires that an advisory committee, *inter alia*, file a charter before meeting or taking any action, 5 U.S.C. app. 2 § 9(c) (2016), hold its meetings "open to the public," *id*. § 10(a)(1), publish "timely notice" of each such meeting in the Federal Register, *id*. § 10(a)(2), keep minutes and other records of its meetings, *id*. § 10(c), and allow "[i]nterested persons . . . to attend, appear before, or file statements with" the committee, *id*. § 10(a)(3).  FACA also mandates that, unless an exception applies under the Freedom of Information Act ("FOIA"), "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying." *Id.* § 10(b).  Finally, FACA requires that each advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed," *id.* § 5(b)(2), and "not be inappropriately influenced by the appointing authority or by any special interest," *id.* § 5(b)(3).

### B.  Factual Background

The Commission was established by Executive Order on May 11, 2017.  Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ("Exec. Order").  According to the Executive Order, the Commission's purpose is to "study the registration and voting processes used in Federal elections." *Id*. § 3.  The Executive Order states the Commission is "solely advisory," and that it shall disband 30 days after submitting a report to the President on three areas related to "voting

processes" in Federal elections.  *Id*. §§ 3, 6.  The Vice President is the chair of the Commission, and the President may appoint 15 additional members.  From this group, the Vice President is permitted to appoint a Vice Chair of the Commission.  On the same day the Commission was established, the Vice President appointed Kris W. Kobach, Secretary of State for Kansas, to serve as the Vice Chair.  Compl., ECF No. 1, ¶ 37; Kobach Decl. ¶ 1.

Apart from the Vice President and the Vice Chair, there are presently nine other members of the Commission, including Commissioner Christy McCormick of the Election Assistance Commission (the "EAC"), who is currently the only federal agency official serving on the Commission, and a number of state election officials, both Democratic and Republican, and a Senior Legal Fellow of the Heritage Foundation.  *See* Decl. of Andrew J. Kossack (July 13, 2017), ECF No. 30-1, ¶ 1 ("July 13 Kossack Decl."); Decl. of Andrew J. Kossack (Dec. 1, 2017), ECF No. 30-3, ¶ 1 ("Dec. 1 Kossack Decl.").  According to Defendant Kobach's declaration in a related case, "McCormick is not serving in her official capacity as a member of the EAC."  Second Decl. of Kris W. Kobach at 2, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1320 (D.D.C. July 6, 2017), ECF No. 11-1.  The Executive Order also provides that the General Services Administration ("GSA"), a federal agency, will "provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis," and that other federal agencies "shall endeavor to cooperate with the Commission."  Exec. Order §§ 7(a), (b).  Furthermore, the Administrator of General Services—the agency head of the GSA—is charged with performing "any functions of the President under [FACA], except for those in section 6," to the extent that FACA applies to the Commission.  *Id*. § 7(c).  The Court previously has described in detail the roles of various Defendant entities in supporting the Commission.  *See Elec. Privacy Info. Ctr. v.*

*Presidential Advisory Comm'n on Election Integrity*, No. 17-1320 (CKK), 2017 WL 3141907, at *11-*13 (D.D.C. July 24, 2017) [hereinafter *EPIC*].

The Commission filed a charter on June 23, 2017.  Compl., ECF No. 1, ¶ 57; ECF No. 30-2, Ex. 2, at 10-11. In pertinent part, the Charter provides that the Commission "will function solely as an advisory body," ECF No. 30-2, Ex. 2 ¶ 4; that the Commission is established in accordance with the Executive Order "and the provisions of the Federal Advisory Committee Act," *id*. Ex. 2 ¶ 2; and that the GSA "shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission," *id.* Ex. 2 ¶ 6.  Defendants represent that the Commission is voluntarily complying with FACA. July 13 Kossack Decl. ¶ 2.

On June 28, 2017, the Vice President held a teleconference with members of the Commission, during which the Vice Chair discussed his intention to send letters to state election officials requesting certain information on registered voters.  Compl., ECF No. 1, ¶ 44.  There is no evidence in the record that advance notice of this teleconference was provided by the Commission, or that it was accessible to the public.  According to Defendants, the teleconference was merely a preliminary, organizational call, and members were expressly advised that the discussion "would be limited to preparatory and administrative work, and would not address matters on which the Commission was charged with advice and recommendations."  July 13 Kossack Decl. ¶ 4 (citing Exhibit A).  Furthermore, although "[t]he Vice Chair and staff described the request, . . . members were not given a copy of any requests in advance of the call and did not see the request until shortly before it was sent to states."  *Id*. ¶ 5.  Plaintiff indicates that he "was notified of the Commission's decision to request voter data from the states mere hours before the letters were sent."  Pl.'s Mem. at 10.  Plaintiff and others did, however, discuss the request for

several minutes on the call, and although the matter was not put to a vote by the members, the "request was modified in response to some of [their] comments." July 13 Kossack Decl. ¶ 5; Dec. 1 Kossack Decl. ¶ 3.

Subsequently, the Vice Chair directed that identical letters dated June 28, 2017, "be sent to the secretaries of state or chief election officers of each of the fifty states and the District of Columbia." Kobach Decl. ¶ 2. In addition to soliciting the views of state officials on certain election matters by way of seven broad policy questions, each of the letters requests that state officials provide the Commission with the "publicly available voter roll data" of their respective states, "including, if publicly available under the laws of [their] state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information." *Id.* Ex. 3 (June 28, 2017 Letter to the Honorable John Merrill, Secretary of State of Alabama). A substantial number of states have either fully or partially declined to comply with the Commission's request for voter roll data—the exact number and the specific details of the states' responses are unknown to the Court and are not relevant to the disposition of the pending motion. *See generally* Compl., ECF No. 1, ¶ 45. Without doubt, however, "substantial public attention has been focused on the Commission's request" for voter roll information. *EPIC*, No. 17-1320 (CKK), 2017 WL 3141907, at *1.

On July 19, 2017, the Commission held its first public meeting, which occurred in Washington, D.C. Decl. of Matthew Dunlap, ECF No. 7-1, ¶ 6; Dec. 1 Kossack Decl. ¶ 4. Other

decisions by this Court chronicle the circumstances leading up to this meeting.  *See Am. Civil Liberties Union v. Trump*, No. 17-1351 (CKK), 2017 WL 3049418 (D.D.C. July 18, 2017) [hereinafter *ACLU*]; *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1354 (CKK), 2017 WL 3028832 (D.D.C. July 18, 2017) [hereinafter *Lawyers' Comm.*].  What is common to those cases is their focus on the rights of the *public*, rather than Plaintiff as a commissioner, to engage with the Commission by receiving certain Commission documents and participating in its July 19 meeting.  Of particular note here, in the days preceding the meeting the Commission sent to Plaintiff a small set of preparatory documents, namely a copy of the agenda on July 14 and the draft bylaws and a revised agenda on July 18.  Dec. 1 Kossack Decl. ¶ 4.  The Commission bylaws require that meeting agendas be shared with the public, and the bylaws also are available to the public via the Commission's website.  Dec. 1 Kossack Decl. ¶ 6.  Plaintiff alleges that he was not provided with other documents that Commission members simply introduced at the meeting, despite the Government's representations in related cases that, in effect, there would be no undisclosed documents used at the meeting.  *See* Pl.'s Mem. at 19 (citing *Lawyers' Comm.*, No. 17-1354 (CKK), 2017 WL 3028832, at *9 ("Defendants have represented that, with respect to the July 19 meeting of the Commission, they will disclose the materials that will be used at the meeting."); *ACLU*, No. 17-1351 (CKK), 2017 WL 3049418,  at *23 ("Documents 'prepared for or by the Commission' invariably must include documents that will be 'used and discussed' at the July 19 meeting.  Accordingly, Defendants have satisfied their obligation . . . .")).

The Commission next met on September 12, 2017, in Manchester, New Hampshire.  Again, Plaintiff received a small set of materials in advance of the meeting.  *See* Opp'n Mem. at 6 (indicating a draft agenda on September 5, a revised agenda on September 6, and copies of

materials to be discussed at the meeting on September 8).  Citing the *Vaughn*-type index in the

*Lawyers' Committee* litigation, however, Plaintiff objects that he "was not treated on an equal basis

as Commissioner Gardner" leading up to this meeting, because "Defendant Kobach and

Commissioner Gardner 'collaborated on a bipartisan agenda for the meeting.'"  Pl.'s Reply Mem.

at 12 (citing Dec. 1 Kossack Decl. ¶ 9).  Defendants elaborate on their communication with certain

commissioners in preparation for this meeting.

> Hans von Spakovsky was a presenter at the September 12 meeting, and so
> Commission staff communicated individually with him in his capacity as a
> presenter.  And Secretary William Gardner communicated individually with
> Commission staff and Vice Chair Kobach regarding his suggestion that the
> September 12 meeting be held in Manchester, New Hampshire.  These
> communications included the suggestion of five of the ten panelists, collaboration
> on the meeting agenda, coordination of the voting machine demonstration, and his
> invitation to the former Governor of New Hampshire to make opening remarks.

Opp'n Mem. at 25 n.4 (citations omitted).  Plaintiff, on the other hand, indicates that he was not

"invited to suggest witnesses for the September 12, 2017 meeting or to comment on the agenda or

other proposed witnesses for that meeting.  Indeed, the timing of the sending of the agenda—only

a week before the September meeting—made it impossible for Secretary Dunlap to invite

witnesses."  Pl.'s Reply Mem. at 12.

Since the September 12 meeting, the Commission has not met again, despite the charter

provision anticipating that subsequent meetings would be held.  *See* Kobach Decl. Ex. 2 ¶ 9 (setting

forth 30-60 day expectation).  Nevertheless, several outside sources suggested to Plaintiff that

Commission activity continued without his knowledge.  First, a member of the media informed

Plaintiff that Secretary Connie Lawson, one of the other commissioners, "told reporters that it was

her understanding that the work of the election integrity commission had essentially been paused

because of the lawsuits filed against the commission," which was news to the Plaintiff.  ECF No.

7-7, at 2.  He asserts that he should be informed of such communications.  *Id.*  Second, Plaintiff

received an email from the Minnesota Voters Alliance announcing that the organization had been invited to the next Commission meeting, in December 2017. *Id.* at 2-3. That this organization had been invited to present, and indeed that any meeting had been scheduled, came as a surprise to Plaintiff. *Id.* at 2. He asserts that he should be informed and have the opportunity to participate in any such planning. *Id.* While Defendants briefly address Secretary Lawson's comment, Opp'n Mem. at 25-26 (indicating that Secretary Lawson's further reported comment that "she hasn't received any new information [about the Commission] since the last meeting and that she doesn't think members are emailing each other" indicates that other commissioners are not receiving this information either), Defendants do not address Plaintiff's news of the Minnesota Voters Alliance in their briefing. *But see* ECF No. 7-7, at 1 (attaching to Plaintiff's Motion a Commission staff email to Plaintiff indicating "[a]s to the Minnesota group, I have never communicated with this group, and no meeting is scheduled for December").

On October 17, 2017, Plaintiff submitted a request to Andrew Kossack, Designated Federal Officer of the Commission, for certain Commission records pursuant to section 10(b) of FACA. Pl.'s Mem. at 6. In particular, Plaintiff requested that the Commission produce "copies of any and all correspondence between Commission members in the possession of the Commission dating from the signing of the Executive Order on May 11th, 2017 until the receipt of this request," including

> communications between Commissioners themselves, between Commissioners and/or staff and other Federal agencies, communications used in the development of public documents, and any ongoing discourse between Commissioners and staff about the development of policies and/or policy proposals that may be offered to policymakers as either a component of any report or under separate cover of which this Commissioner may be unaware.

ECF No. 7-3. Despite Kossack's acknowledgment, he never provided any documents in response to the request. Pl.'s Mem. at 6.

Since Plaintiff filed this litigation, Defendants have provided him with a limited amount of additional information, but only by way of oral representation of defense counsel or letters exchanged during briefing on the Motion.  First, the Commission will not meet in December.  Min. Order of Nov. 20, 2017; Dec. 1 Kossack Decl. ¶ 14.  Second, Defendants offered to permit Plaintiff to inspect, in person, documents related to the September 12, 2017, meeting, but he would not be provided with copies, nor would he be permitted to take notes.  ECF No. 30-7, at 2.

## II.   LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (emphasis in original; quotation  marks omitted)).  A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20) (alteration in original; quotation marks omitted)).  When seeking such relief, "'the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'"  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).  "The four factors have typically been evaluated on a 'sliding scale.'"  *Davis*, 571 F.3d at 1291 (citation omitted).  Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does

not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92.

The Court notes that it is not clear whether this circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In any event, this Court need not resolve the viability of the sliding-scale approach today, as it finds that Plaintiff has shown a likelihood of success on each of the four factors.

## III.   DISCUSSION

The Court must assess its subject-matter jurisdiction with respect to a particular claim before ruling on the merits. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999). Plaintiff's standing to pursue his claims is uncontested. *See also Cummock*, 180 F.3d at 290 (finding standing "readily" satisfied on facts similar in relevant respects). However, the parties disagree over whether this Court has jurisdiction to grant him relief under either the mandamus statute or the Administrative Procedure Act ("APA").[3] Because this Court finds that Plaintiff is likely to succeed under the mandamus statute, the Court need not decide the availability of relief

---

[3] This Court previously has recognized that "FACA does not provide for a private cause of action," so "judicial review must be sought through some alternative route." *Lawyers' Comm.*, No. 17-1354 (CKK), 2017 WL 3028832, at *7 (citing *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017)).

under the APA.[4]

Bound up with the Court's determination of its subject-matter jurisdiction will be the Court's assessment of the merits of Plaintiff's claim of rights under FACA. "[P]articularly in the context of a request for mandamus relief, the question of the Court's subject-matter jurisdiction sometimes converges with a consideration of the merits." *Bradley Memorial Hosp. v. Leavitt*, 599 F. Supp. 2d 6, 11 (D.D.C. 2009) (citing *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) ("[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action. To this extent, mandamus jurisdiction under § 1361 merges with the merits.")). It is undisputed that the public is entitled to certain documents pertaining to the Commission's work under FACA § 10(b), *see, e.g.*, Opp'n Mem. at 23 (quoting Section 10(b) in pertinent part); the seminal question is what documents Plaintiff, as a commissioner, is entitled to receive.

**A. Likelihood of Success on the Merits**

*1. Mandamus Jurisdiction*

Plaintiff seeks relief pursuant to 28 U.S.C. § 1361 (2016), which provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." In this case, that relief would be an injunction in the form of mandamus requiring Defendants to comply with FACA.

Mandamus is a "drastic remedy, to be invoked only in extraordinary circumstances." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (internal quotation marks omitted; citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)). "To show entitlement to mandamus,

---

[4] The Court nevertheless shall address the APA briefly below as part of the mandamus requirement that there be "no adequate alternative remedy." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).

plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).  These requirements are jurisdictional.  *Id*.  Even when these requirements are met, however, "a court may grant relief only when it finds compelling equitable grounds. . . . The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable."  *Id*. (citing *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).

In this posture, the Court is not deciding in resolving this motion whether to issue mandamus.  Rather, the Court must decide only whether Plaintiff is likely to succeed in obtaining mandamus relief.

### 2.  *"Clear and Indisputable Right" Under FACA*

The D.C. Circuit's ruling in *Cummock* establishes through its discussion of FACA § 10(b) that Plaintiff has a clear and indisputable right to further documents.

In *Cummock*, the widow of a flight disaster victim sought to faithfully perform her role as a member of the White House Commission on Aviation Safety and Security.  M. Victoria Cummock was frustrated in doing so, however, by the repeated occasions on which she learned of, requested, and was refused, in whole or part, documents from commission staff.  180 F.3d at 287-88.  The impression that Cummock was being sidelined was reinforced by the omission of her dissent from the final report delivered to the president, and the omission of her dissent's supporting attachments from the published version of that report, which nevertheless included a "misleading editor's note" about her contribution.  *Id.*  On appeal from this Court's dismissal of her ensuing case, the D.C. Circuit noted that "the only claim before us warranting our attention is Cummock's assertion that the Commission denied her access to relevant documents, and thereby thwarted her

dissenting voice." *Id.* at 289.   And the court concluded that Cummock had "a right to fully participate in the deliberations of the Commission," a right that had been violated because she "was unlawfully denied the opportunity to review documents that were prepared for or relied upon by the Commission in formulating its recommendations, and to amend her dissent if necessary to reflect this information." *Id.* at 284.

Like Cummock, Plaintiff has a right, as a commissioner, to "fully participate" in the proceedings of the Commission.   In the Court's view, his assertion that he will be unable to fully participate without the information contained in relevant documents that the Commission has not shared with the public has merit.   *See* Pl.'s Mem. at 1-2, 16.   He, like Cummock, has the right to receive more than the documents available to the public. *See Cummock*, 180 F.3d at 292.   He has a right to access documents that the Commission is considering relying on in the course of developing its final recommendations.   Without those documents, Plaintiff would be left in the same position as Cummock, whose best recourse after the fact was to receive the documents and amend her dissent, if necessary.

Defendants argue that Plaintiff is not entitled to all of the documents, but rather only those used by the Commission "as a whole."   Opp'n Mem. at 23 ("[S]ection 10(b) does not clearly require every document connected with every advisory committee be disclosed; instead, this provision only requires that materials that were actually accessible (or intended to be accessible) to the committee as a whole be disclosed."); *id.* at 24 ("In other words, the D.C. Circuit held that a member could not be excluded from reviewing information that was used by *the Commission* in making its final recommendation.").   But Defendants have erected and attacked a straw man, and offered in its place an outdated and indefensible view of their own.

To their first point, nowhere does Plaintiff argue that he or someone similarly situated

should be entitled to "every document connected with every advisory committee."  Indeed, in a letter to Defendants during briefing on this Motion, he sensibly indicated a number of categories of documents that he does not seek, presumably because he does not think he would be entitled to them or he does not consider them relevant to his role as a commissioner.  *See* ECF 30-6 App. A (indicating that Plaintiff does not seek, e.g., "Commission members' personal notes and drafts of statements to be given at Commission meetings").

As for their second point, Defendants argue that only material relied on by the Commission "as a whole" should be made available, yet they inexplicably rely primarily on pre-*Cummock* interpretations of Section 10(b).  *See* Opp'n Mem. at 23 (citing 1980s Office of Legal Counsel guidance and district court decisions, one of which was affirmed, also pre-*Cummock*).  And despite Defendants' supporting argument based on *Cummock* language, *Cummock* does not make such a distinction.  Accordingly, Defendants cannot deprive Plaintiff of the requested documents simply because they have not been provided to all commissioners.  *See* Pl.'s Reply Mem. at 6-7.  Like Cummock herself, Plaintiff is as much a part of the Commission as any other member.  The likelihood of Plaintiff's success in securing mandamus relief is attributable to his right to substantive material that would inform his full participation in the Commission and its development of recommendations to the President.

A thread running through Defendants' argument is their distinction of the later posture of commission proceedings in *Cummock*.  *See, e.g.*, Opp'n Mem. at 24.  It is true that the White House Commission on Aviation Safety and Security, unlike the Commission in this case, had already made its final report when the case was filed.  But *Cummock* is a case that never should have happened.  If Cummock herself had received relevant documents along the way, then she would not have needed to file suit and ultimately obtain a D.C. Circuit decision that did the best it could

at that stage to address her rights as a commissioner, namely by finding that she should be permitted to review documents after the fact and consider whether to amend her dissent.  This Court will find that a preliminary injunction is necessary in this case to prevent the Commission from reaching the level of dysfunction that precipitated *Cummock*.  Plaintiff is entitled to substantive information so that he can contribute along the way in shaping the ultimate recommendations of the Commission; he need not wait to assert his rights under *Cummock* until after the fact—when a breach of his right to fully participate could not truly be redressed.

     *3.  "Clear Duty" of the Commission*

An advisory committee has a nondiscretionary duty to comply with the requirements of FACA § 10(b).  *See* 5 U.S.C. app. 2 § 10(b) (2016) ("[T]he records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee *shall* be available for public inspection and copying . . . ." (emphasis added)); Pl.'s Mem. at 16 (discussing nondiscretionary duties under FACA and citing *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010) ("Section 10(b) contains unambiguous language that identifies certain materials, and describes in detail the methods and location by and at which the Government must make those materials available to the public.")).  By describing the rights of a commissioner under Section 10(b), *Cummock* makes clear that an advisory committee also has a nondiscretionary duty to comply with that section with respect to Plaintiff.  *See Cummock*, 180 F.3d at 292 ("[P]rovided that Cummock was granted the requisite security clearance, the Commission could not deny her access to information that it reviewed and relied upon in formulating its recommendations—even if, for instance, that information might have been withheld from the public pursuant to a FOIA exemption.").  To be clear, the Commission's duty to provide information pursuant to Section

10(b) and *Cummock* is, like Plaintiff's right to the same, applicable during the life of the Commission, not simply after it submits its final recommendations.

Turning to the scope of that duty, the Court has not considered line-by-line the documents requested by Plaintiff.  *See* ECF No. 30-6 App. B (identifying series of entries from *Vaughn*-type index in *Lawyers' Committee*).  The Court has not yet ruled in *Lawyers' Committee* on the sufficiency of the *Vaughn*-type index that Plaintiff references.  Accordingly, it will suffice to give some examples, in light of the record, of substantive disclosures that Plaintiff should have received in the past and is entitled to receive in the future.  First, sufficiently in advance of the June 28, 2017, teleconference, Plaintiff should have been informed about, received a draft of, and been given the opportunity to comment on the voter data request that the Vice Chair planned to send to states—which he ultimately did on Commission letterhead, discussing the Commission's work, and offering sentiments "[o]n behalf of [his] fellow commissioners."  Kobach Decl. Ex. 3.  Second, sufficiently in advance of the September 12, 2017, meeting, Plaintiff should have been informed about, received a copy of, and been given the opportunity to comment on Secretary Gardner's proposals for location, content, and possible speakers at that meeting.  *See* Pl.'s Reply Mem. at 12-13.  Third, sufficiently in advance of any invitation being extended to the Minnesota Voters Alliance to speak at a December meeting, Pl.'s Mem. at 6, Plaintiff should have been informed of and been given the opportunity to comment on plans for the next meeting whenever it is held, the decision about whether or not to hold it in December, speaker possibilities for that meeting, and any proposal to invite this particular group.

The Court shall not monitor every document to be released to Plaintiff, but expects Defendants to comply with the guidance set forth in this decision.  The Commission has a clear duty to provide Plaintiff with these documents and any similar documents that exist now or in the

future.

### 4. *"No Adequate Alternative"*

The Government argues that Plaintiff cannot recover under the APA. *See, e.g.*, Opp'n Mem. at 1. Accordingly, the Court shall treat as conceded any argument that the APA would be a sufficient alternative to preclude Plaintiff's recourse to mandamus. *See also EPIC*, No. 17-1320 (CKK), 2017 WL 3141907, at *13 ("Because there is no apparent agency involvement at this time, the Court concludes that APA review is presently unavailable in connection with the collection of voter roll information by the [Presidential Advisory Commission on Election Integrity]."); *Lawyers' Comm.*, No. 17-1354 (CKK), 2017 WL 3028832, at *7 (finding in context of this Commission that "even if APA review were available, Plaintiff has not demonstrated that it has a likelihood of success on the merits").

The Government instead argues that the bylaws decide this question in at least three ways: 1) by according the Chair, and if so designated, Vice Chair, the right to prepare the agenda; 2) by permitting Plaintiff, as a commissioner, to provide input; and 3) by giving Plaintiff a mechanism for changing the bylaws if he and other commissioners are unhappy with the rule regarding the agenda. *See* Opp'n Mem. at 26-28. The Court rejects each prong. The Commission is not permitted to circumvent the FACA obligations recognized by *Cummock* simply by enshrining a particular view in the bylaws; if the converse were true, a commission established under FACA could agree in writing to eviscerate any of that statute's strictures. *See Cummock*, 180 F.3d at 290-91; Pl.'s Reply Mem. at 12-13. Plaintiff's right to change the bylaws in conjunction with other commissioners cannot compensate for a violation of rights protected in this circuit. Moreover, the record reflects that Plaintiff generally does take advantage of the opportunity to give input, but he makes the persuasive argument that he cannot meaningfully do so unless he is fully informed. *See,*

*e.g.*, Pl.'s Reply Mem. at 11-12.

* * *

Based on Plaintiff's likely success in establishing a clear right to substantive information in the Commission's possession, the Government's clear duty to provide Plaintiff with that information with sufficient notice to allow him to exercise his right to fully participate as a commissioner, and the inadequacy of alternatives under the APA or bylaws, the Court finds that mandamus is not only viable at this stage of this particular case, but that it likely should be granted on the basis of compelling equitable grounds.  This is so even if, as Defendant maintains, the standard for an injunction that alters the status quo is higher than for one that does not.  *See* Opp'n Mem. at 7 (citing, *e.g.*, *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 246-47 (D.D.C. 2014)).

The Court is unpersuaded by the Government's argument that, although Defendants "agreed voluntarily to abide by the provisions of FACA," *see* Kobach Decl. Ex. 2 ¶¶ 2, 13, the Court nevertheless should not issue mandamus because "Defendants do not concede that FACA can be constitutionally applied to presidential advisory committees."  Opp'n Mem. at 37-38.  The Court has found *Cummock* to be the applicable law in this circuit, and it has been so for nearly two decades.  *Cummock* does not hesitate to apply FACA to a presidential advisory committee.  While *Cummock* did not provide relief by mandamus, the Court is not doing so today either.  The Court finds that the standard for today's decision—likelihood of success on the merits—is satisfied in light of Section 10(b) and *Cummock*.

In addition to Plaintiff's FACA § 10(b) requests for documents, past and future, Plaintiff's Motion seeks several further types of relief, namely that Defendants be compelled "to permit Secretary Dunlap to fully participate [in Commission activities] on an equal basis as all other

commissioners," and that the Commission be "enjoin[ed] . . . from releasing a final report until Secretary Dunlap has received all documents to which he is entitled and has had an opportunity to review them, has participated in the drafting of the report or, if necessary, has completed a concurrence or dissent to the report."  Pl.'s Mot. for Prelim. Inj., ECF No. 7, at 1-2.[5]  The Court has already addressed Plaintiff's right to fully participate in the Commission by requiring that Defendants supply certain documents to facilitate his informed participation.  Any further order to permit participation on an "equal basis" would assume that he will not be treated equally even after the Government provides documents in compliance with today's decision.  The Court cannot reach that conclusion on this record.  The request to temporarily enjoin the final report is similarly premature, insofar as it assumes that Defendants will not provide the required documents in a timely fashion.  The present record does not warrant that conclusion as of yet.

## B.  Irreparable Harm

"Although the concept of irreparable harm does not readily lend itself to definition, the courts have developed several well known and indisputable principles to guide them in the determination of whether this requirement has been met."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Chief among them is that "the injury must be both certain and great; it must be actual and not theoretical."  *Id.*  District courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate.  *See Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with which the

---

[5] In his complaint, Plaintiff also seeks a ruling that certain alleged activities of the Commission prior to the filing of its charter constitute a violation of FACA § 9(c).  *See* Compl., ECF No. 1, ¶¶ 94-101.  While the parties have addressed this assertion in their preliminary injunction briefing, *see, e.g.*, Pl.'s Mem. at 12;  Opp'n Mem. at 36-37, the Court shall not decide that issue at this time because Plaintiff does not specifically request this relief in his Motion.

plaintiff makes its FOIA request is predicated on a matter of current national debate, due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment."); *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) (finding that plaintiff would be irreparably harmed because it would be "precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program").

In this case, the injunctive remedy is warranted to allay the same kind of irreparable harm to Plaintiff that Cummock herself suffered. Prevented from receiving key documents during the life of the White House Commission on Aviation Safety and Security, Cummock could only obtain from the D.C. Circuit an opportunity to review those documents and secure an equal place for her dissent in the final report. *See Cummock*, 180 F.3d at 292-93. On remand, this Court issued a broad order to that commission to disclose a variety of documents. *See* ECF No. 31-2 (citing Mem. Op. at 2, *Cummock v. Gore*, No. 97-981 (CKK) (D.D.C. June 23, 2000) ("In accordance with the Court of Appeals's holding, this Court issued a scheduling order directing the Defendants to 'disclose to Plaintiff all non-classified records or documents of any kind created by, made available to, or relied upon by the Commission.'" (citation omitted)). There is no way to tell whether Cummock's full participation in that commission along the way would have affected its final report. Perhaps it would have obviated the need for a dissent. Here, the Court finds that in the absence of being provided with past and future documents of the kinds described above, Plaintiff's right to fully participate in the Commission would be irreparably harmed.

### C. Balance of the Equities and the Public Interest

Plaintiff has been appointed to a presidential commission to address an important issue.

Denial of the requested injunction would frustrate his interest in contributing his unique perspective, as well as gaining the "recognition and even prestige," *Cummock*, 180 F.3d at 292 (quoting *Ass'n of Am. Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993) (internal quotation marks omitted)), of full participation in such a commission. *See* Pl.'s Mem. at 18.

From the Government's perspective, there may be some hardship to providing all of the requested documents. However, several factors persuade the Court that this hardship is modest, at most. The Government already collected and categorized the documents to a degree sufficient to present the *Vaughn*-type index in the *Lawyers' Committee* litigation. Moreover, the Government's offer to permit Plaintiff to view the documents suggests that the Government has already contemplated how to physically furnish them—and has found it sufficiently possible that they have volunteered to do so. *See* ECF No. 30-7, at 2.

Accordingly, the Court concludes that, in balancing the equities and considering the public interest, this narrowly tailored preliminary injunction is appropriate. By withholding the substantive documents discussed in this opinion, the Commission ignores the strictures imposed by FACA to prevent unbalanced commissions, and ignores the rights and obligations required by *Cummock*, leaving the public to pay any concomitant price.

### IV.    OPPORTUNITY TO REVIEW DOCUMENTS

Apart from Plaintiff's Motion, the Court separately considers Defendants' offer to permit Plaintiff to review the requested documents, without receiving copies or taking notes. This is not a reasonable offer. If Defendants have decided that Plaintiff should be permitted to review documents, then he should be permitted to take notes and to make copies if he thinks that doing so would be useful.

## V.    CONCLUSION

For all of the foregoing reasons, the Court **GRANTS-IN-PART AND DENIES-IN-PART** Plaintiff's Motion for a Preliminary Injunction, ECF No. 7.

An appropriate Order accompanies this Memorandum Opinion.

Dated:  December 22, 2017

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge
