**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

MATTHEW DUNLAP,

Plaintiff,

- versus -

PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; MICHAEL R. PENCE, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; KRIS W. KOBACH, IN HIS OFFICIAL CAPACITY AS VICE CHAIR OF THE PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; ANDREW KOSSACK, IN HIS OFFICIAL CAPACITY AS DESIGNATED FEDERAL OFFICER FOR THE PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; GENERAL SERVICES ADMINISTRATION; TIMOTHY R. HORNE, IN HIS OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE GENERAL SERVICES ADMINISTRATION; EXECUTIVE OFFICE OF THE PRESIDENT; OFFICE OF THE VICE PRESIDENT; OFFICE OF ADMINISTRATION; MARCIA L. KELLY, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE OFFICE OF ADMINISTRATION,

Defendants.

Civil Action No. 17-cv-2361-CKK

# MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO RECONSIDER THE DECEMBER 22, 2017 ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..... 1
II. BACKGROUND ..... 2
III. MOTIONS FOR RECONSIDERATION ARE STRONGLY DISFAVORED ..... 3
IV. THE COURT SHOULD DENY THE MOTION TO RECONSIDER ..... 4
  A. Secretary Dunlap Is Likely to Succeed on the Merits ..... 5
  B. Secretary Dunlap Is Facing Irreparable Harm ..... 7
  C. The Balance of Harms and Public Interest Favor Secretary Dunlap ..... 10
V. THIS COURT SHOULD ORDER IMMEDIATE PRODUCTION OF DOCUMENTS AND SHOULD NOT GRANT A STAY PENDING APPEAL ..... 11
VI. CONCLUSION ..... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama-Tombigbee Rivers Coalition v. Dep't of Interior*,
26 F.3d 1103 (11th Cir. 1994) ....................9

*Ass'n of Am. Physicians & Surgeons v. Clinton*,
879 F. Supp. 103 (D.D.C. 1994) ....................6

*Ass'n of Am. Physicians & Surgeons v. Clinton*,
997 F.2d 898 (D.C. Cir. 1993) ....................5

*Byrd v. EPA*,
174 F.3d 239 (D.C. Cir. 1999) ....................5

*Cobell v. Norton*,
224 F.R.D. 266 (D.D.C. 2004) ....................3

*Ctr. for Arms Control & Non-Proliferation v. Lago*,
2006 U.S. Dist. LEXIS 83226 (D.D.C. Nov. 15, 2006) ....................5

*Ctr. for Biological Diversity v. Tidwell*,
239 F. Supp. 3d 213, 227 (D.D.C. 2017) ....................5

* *Cummock v. Gore*,
180 F.3d 282 (D.C. Cir. 1999) .................... *passim*

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ....................4

*Elec. Privacy Info. Ctr. v. Dep't of Justice*,
416 F. Supp. 2d 30 (D.D.C. 2006) ....................8

*Ficken v. Golden*,
696 F. Supp. 2d 21 (D.D.C. 2010) ....................11

*Freedom Watch, Inc. v. Obama*,
859 F. Supp. 2d 169 (D.D.C. 2012) ....................5

*In re Guantanamo Bay Detainee Litig.*,
706 F. Supp. 2d 120 (D.D.C. 2010) ....................3

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
235 F. Supp. 3d 194, 205-06 (D.D.C. 2017) ....................13

**TABLE OF AUTHORITIES (CONTINUED)**

**Page(s)**

*Judicial Watch v. Nat'l Energy Policy Dev. Group*,
219 F. Supp. 2d 20 (D.D.C. 2002) ....................5

*Konarski v. Donovan*,
763 F. Supp. 2d 128 (D.D.C. 2011) ....................3

*Negley v. FBI*,
825 F. Supp. 2d 58 (D.D.C. 2011) ....................3

*People for the Am. Way Found. v. United States Dep't of Educ.*,
518 F. Supp. 2d 174 (D.D.C. 2007) ....................13

*Pinson v. United States DOJ*,
202 F. Supp. 3d 86, 102 (D.D.C. 2016) ....................10

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ....................4

*United States v. Newman*,
2017 U.S. Dist. LEXIS 131056 (D.D.C. Aug. 17, 2017) ....................13

*Washington Post v. Dep't of Homeland Sec.*,
459 F. Supp. 2d 61 (D.D.C. 2006) ....................7

*Young v. Office of the United States Senate Sergeant at Arms*,
217 F.R.D. 61 (D.D.C. 2003) ....................10

**Statutes and Rules**

Federal Advisory Committee Act, 5 U.S.C. app. 2 §§ 5, 10(b) .................... *passim*

Fed. R. Civ. P 54(b) ....................3

**Other Authorities**

Casey McDermott, "N.H. Senate Passes Bill to Redefine 'Residency' for Voting," New Hampshire Public Radio (Jan. 3, 2018), *available at* http://nhpr.org/post/nh-senate-passes-bill-redefine-residency-voting ....................7

John Binder, "Exclusive-Kris Kobach: Voter Fraud Commission 'Being Handed Off' to DHS, Will No Longer Be 'Stonewalled' By Dems, Breitbart (Jan. 3, 2018), *available at* http://www.breitbart.com/big-government/2018/01/03/exclusive-kris-kobach-voter-fraud-commission-being-handed-off-to-dhs-will-no-longer-be-stonewalled-by-dems/ ....................2, 8

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

John DiStaso, "NH Senate Passes Voting Residency Requirement Bill 14-9, Along Party Lines," WMUR (Jan. 3, 2018), *available at* http://www.wmur.com/article/nh-senate-debating-voting-residency-requirement-bill/14538559 ....................7

Kris W. Kobach, "Exclusive – Kobach: It Appears That Out-Of-State Voters Changed the Outcome of the New Hampshire U.S. Senate Race," Breitbart (Sept. 7, 2017), *available at* http://www.breitbart.com/big-government/2017/09/07/exclusive-kobach-out-of-state-voters-changed-outcome-new-hampshire-senate-race/ ....................7, 8

Meeting Minutes of Presidential Advisory Commission on Election Integrity (Sept. 12, 2017) at 7, 28, *available at* https://www.whitehouse.gov/wp-content/uploads/2017/12/Meeting-Minutes-for-September-12-2017-Meeting-in-New-Hampshire.pdf ....................8

Statement by the Press Secretary on the Presidential Advisory Commission on Election Integrity (Jan. 3, 2018) ....................2, 8, 10

Tweet, Donald J. Trump (@realDonaldTrump) (Nov. 28, 2016)....................7

Tweet, Donald J. Trump (@realDonaldTrump) (Jan. 4, 2018) ....................10

## I. INTRODUCTION

Less than a month ago, after full briefing, this Court granted in large part Plaintiff Matthew Dunlap's motion for a preliminary injunction (the "Dec. 22 Decision"). Dkt. 33. This Court found that, as a duly-appointed commissioner of the Presidential Advisory Commission on Election Integrity (the "Commission") who was being deprived of Commission documents and communications, (1) Secretary Dunlap was likely to succeed "in establishing a clear right to substantive information in the Commission's possession" pursuant to the Federal Advisory Committee Act ("FACA"), Mem. Op. (Dkt. 33) at 20, (2) he would be irreparably harmed if denied Commission documents, *id.* at 22, and (3) the balance of the equities and public interest factors also favored Secretary Dunlap, *id.* at 23. Rather than comply with the Court's order, Defendants have not produced ***any*** documents and instead dissolved the Commission. They now seek to use the dissolution as an escape hatch from the Court's Order.

Defendants' motion to reconsider and vacate the Dec. 22 Decision should be rejected. Defendants assert that there are "changed circumstances," but Secretary Dunlap remains in the same position he was in before he filed this lawsuit: he lacks the documents to which he is entitled under FACA, a situation that is untenable, as it was in *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999). Meanwhile, commissioners who excluded Secretary Dunlap from participating in Commission activities are now publicly touting the existence and substance of confirmed findings of voter fraud while Secretary Dunlap lacks Commission records to confirm, clarify, or dispute their claims. A preliminary injunction is just as warranted today as it was on December 22, 2017. The Dec. 22 Decision sought to prevent a *Cummock* scenario from arising, but we have now crossed that line due to the pretextual dissolution of the Commission.

## II. BACKGROUND

On January 3, 2018, in apparent response to the Dec. 22 Decision, President Trump issued an Executive Order dissolving the Commission. Dkt. 34.[1] The White House's statement cited "substantial evidence of voter fraud" and noted that President Trump "has asked the Department of Homeland Security to review [the Commission's] initial findings[.]"[2] Vice-Chair Kris Kobach stated that the Commission's work "is being handed off to Homeland Security" and cited findings that the "voter fraud commission ha[d] revealed."[3]

On January 9, 2018, based on the closing of the Commission, Defendants filed a motion to reconsider and vacate the Dec. 22 Decision. Dkt. 39. With the motion, Defendants submitted a single declaration from the Director of White House Information Technology, Charles Herndon. Dkt. 39-2. Mr. Herndon stated that the state voter data collected by the Commission "will not be transferred to, or accessed or utilized by, DHS or any other agency[.]" *Id.* ¶ 4. Mr. Herndon made no representations as to whether all Commission records had been collected from commissioners or as to the status of copies of Commission records outside of his custody. *Id.* In direct contradiction of public statements by both President Trump and Vice-Chair Kobach, Mr. Herndon stated that the "Commission did not create any preliminary findings", *id.* ¶ 5, but he neither defined his understanding of the term "findings," nor provided foundation for any personal knowledge of the substantive work of the Commission. Neither President Trump nor Vice-Chair Kobach has withdrawn their statements that the Commission made "findings."

---

[1] Statement by the Press Secretary on the Presidential Advisory Commission on Election Integrity (Jan. 3, 2018) (stating that Commission was dissolved because of "endless legal battles") (Ex. 1).

[2] *Id.*

[3] John Binder, "Exclusive-Kris Kobach: Voter Fraud Commission 'Being Handed Off' to DHS, Will No Longer Be 'Stonewalled' By Dems, Breitbart (Jan. 3, 2018), *available at* http://www.breitbart.com/big-government/2018/01/03/exclusive-kris-kobach-voter-fraud-commission-being-handed-off-to-dhs-will-no-longer-be-stonewalled-by-dems/

## III. MOTIONS FOR RECONSIDERATION ARE STRONGLY DISFAVORED

"[T]he Supreme Court has admonished that 'courts should be loathe to [reconsider interlocutory orders] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.'" *In re Guantanamo Bay Detainee Litig.*, 706 F. Supp. 2d 120, 122 (D.D.C. 2010) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)). "[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Negley v. FBI*, 825 F. Supp. 2d 58, 60 (D.D.C. 2011) (citation omitted). Defendants carry "the burden of proving that some harm would accompany a denial of the motion to reconsider." *Id.* (internal quotation marks and citations omitted). "Relief upon reconsideration of an interlocutory decision pursuant to Rule 54(b) is available 'as justice requires,'" *Konarski v. Donovan*, 763 F. Supp. 2d 128, 135 (D.D.C. 2011), which amounts to determining "whether [relief upon] reconsideration is necessary under the relevant circumstances[.]" *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004).

Defendants cite a single D.C. Circuit case, which is inapposite, for the proposition that "changed circumstances" may warrant reconsideration of a preliminary injunction. In *Petties v. District of Columbia*, the defendant sought vacatur of a preliminary injunction on the ground that a continued injunction was inequitable because the defendant had cured the underlying violation of law. 662 F.3d 564, 565 (D.C. Cir. 2011). Here, Defendants have not cured their FACA violation; they continue to deprive Secretary Dunlap of Commission records and now tout secret "findings" in furtherance of political goals. This is the same conduct admonished in *Cummock*: burnishing statements with the "political legitimacy" of an improper advisory commission. 180 F.3d at 292.

## IV. THE COURT SHOULD DENY THE MOTION TO RECONSIDER

Defendants' motion to reconsider the Dec. 22 Decision should be denied. The dissolution of the Commission does not undermine this Court's prior findings and conclusions; it affirms them. Defendants continue to withhold Commission records from Secretary Dunlap and they now refuse to allow him to fully participate in the Commission's remaining wind-down activities. Without Commission records, Secretary Dunlap is unable to make informed comment on the Commission's activities or, as termed by the President, the Commission's "initial findings." Vice-Chair Kobach has described these "findings" in some detail to the press. Defendants still have not demonstrated that complying with FACA and with this Court's Dec. 22 Decision would harm them or would be against the public interest. Defendants may not simply invoke "changed circumstances"; they must meet the heavy burden of showing why the dissolution of the Commission is so legally significant as to warrant vacatur of the Dec. 22 Decision. They have not—and cannot—make the required showing.

Nothing warrants reconsideration of this Court's finding that Secretary Dunlap has "shown a likelihood of success on each of the four [preliminary injunction] factors." Even if one of these factors shifted in Defendants' favor—and, as discussed below, none has—a preliminary injunction is still appropriate because in this Circuit, courts evaluate the four factors using a "sliding scale," whereby "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).[4]

---

[4] The sliding-scale approach remains good law, as "the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis." Mem. Op. 12. Regardless, *Winter* at most holds that the likelihood-of-success factor is an independent requirement. *See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011). Secretary Dunlap clearly meets the *Winter* test as well.

**A. Secretary Dunlap Is Likely to Succeed on the Merits**

The dissolution of the Commission does not diminish Secretary Dunlap's clear and indisputable right to Commission records. This Court has already correctly determined that Secretary Dunlap is likely to succeed on his claims under Sections 5 and 10(b) of FACA because "an advisory committee . . . has a nondiscretionary duty to comply with [FACA § 10(b)] with respect to Plaintiff" and that duty is "applicable during the life of the Commission" and afterwards. Mem. Op. 17-18. While the Dec. 22 Order was written in terms of applying *Cummock*'s holding to a still-existing advisory committee—those were the facts at the time—Secretary Dunlap's right to documents generated during the Commission's life is no less clear and indisputable now that the Commission has been dissolved (as was the case in *Cummock*).[5] A "claim for document disclosure survives the termination of a FACA advisory committee, at least until all of the relevant materials have been disclosed." *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 227 (D.D.C. 2017) (citing *Cummock*, 180 F.3d at 292) ("FACA rights are enforceable even after an advisory committee has been disbanded.").[6]

Nothing short of providing the documents—remedying the violation of law—would cure Secretary Dunlap's FACA claim; because Defendants have not provided any documents, Secretary Dunlap's FACA claim remains valid and likely to succeed. *See Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) (FACA claim not moot because defendant had not "provided

---

[5] Indeed, in earlier briefing, Defendants even attempted to distinguish *Cummock* because it involved an advisory committee that had been terminated. Defs.' PI Brief (Dkt. 30) at 24; Mem. Op. 16-17.

[6] *See also Ass'n of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 901 n.1 (D.C. Cir. 1993) (advisory committee's termination "does not render this case moot"); *Judicial Watch v. Nat'l Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 30 (D.D.C. 2002) ("whether relief [under FACA § 10(b)] is available is contingent not on the continued existence of the group, but on the continued existence of the records and information"); *Freedom Watch, Inc. v. Obama*, 859 F. Supp. 2d 169, 174-75 (D.D.C. 2012) (same); *Ctr. for Arms Control & Non-Proliferation v. Lago*, 2006 U.S. Dist. LEXIS 83226, at *10-11 (D.D.C. Nov. 15, 2006) (same).

[plaintiff] with all panel documents"); *Ass'n of Am. Physicians & Surgeons v. Clinton*, 879 F. Supp. 103, 104-05 (D.D.C. 1994) ("[B]efore the court can find that this case is in fact moot, defendants will have to produce such documents.").[7]

Additionally, FACA does not contain a loophole exempting from compliance any advisory committee that does not publish an official "final" report, as Defendants seem to argue. Defs' Br. (Dkt. 39-1) at 10-11.[8] Indeed, FACA's plain language applies to all materials "which were made available to or prepared for or by each advisory committee." 5 U.S.C. app. 2 § 10(b). FACA guarantees a commissioner's full participation in all aspects of an advisory committee even if a formal report is not issued.[9]

Secretary Dunlap is clearly and indisputably entitled to the documents generated through the Commission's dissolution on January 3, 2018.[10] While, due to the dissolution of the Commission, Defendants' "breach of [Secretary Dunlap's] right to fully participate c[annot] truly be redressed," Mem. Op. 17, the "best recourse" is for this Court to order immediate production of Commission communications and records generated during the life of the Commission. *Id.*

[7] Defendants themselves "recognize that the right to information that predated the Commission's dissolution may persist after the Commission's termination." Defs.' Br. at 9 n.2.

[8] As noted, *supra*, Defendants and the White House have issued *de facto* findings through press statements. Moreover, despite the President's use of the term "initial findings," those are effectively "final findings" because the now-shuttered Commission will have no further deliberations.

[9] *See also id.* § 5 ("requir[ing] the ***membership*** of the advisory committee to be fairly balanced") (emphasis added); *Cummock*, 180 F.3d at 292 ("[C]ommittee ***membership*** bestows both rights and obligations beyond those given to members of the general public.") (emphasis added); *id.* at 291 (commissioner has a right to "fully participate ***in the work*** of the committee to which he or she is appointed") (emphasis added).

[10] Defendants' request for a ***third*** round of briefing before disclosing documents should be denied. Defs.' Br. at 11. Defendants identify no errors in the Dec. 22 Decision's Factual Background, Mem. Op. 4-11, or any disputed facts relevant to the disposition of this case that need to be further developed. Defendants already raised "equitable grounds" against disclosure in their first two rounds of briefing. Further briefing is only a delay tactic that should not be indulged.

**B. Secretary Dunlap Is Facing Irreparable Harm**

In the Dec. 22 Decision, this Court correctly applied the principle that "where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate." Mem. Op. 21 (citing *Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006)). The issues that Secretary Dunlap was appointed to the Commission to study—*inter alia*, election integrity, the existence or non-existence of voter fraud, and impediments to the right to vote—are indisputably "matters of current national debate." *Washington Post*, 459 F. Supp. 2d at 75.

States are currently debating whether to pass laws bearing on these issues and such debates (which will not wait for this litigation to end) would benefit from Secretary Dunlap's fully informed views. On the same day the Commission was dissolved, the New Hampshire legislature was on the verge of passing a bill that would redefine residency for voting purposes to include a requirement that an individual demonstrate intent to remain in New Hampshire.[11] This bill is a direct outgrowth of unsupported allegations by President Trump of voter fraud in New Hampshire[12] and similarly unfounded statements by Vice-Chair Kobach that "there's proof" of 5,313 "fraudulent votes" by voters who registered to vote in New Hampshire using out-of-state driver's licenses.[13] This issue also was discussed at the September 12, 2017 Commission

---

[11] Casey McDermott, "N.H. Senate Passes Bill to Redefine 'Residency' for Voting," New Hampshire Public Radio (Jan. 3, 2018), *available at* http://nhpr.org/post/nh-senate-passes-bill-redefine-residency-voting; John DiStaso, "NH Senate Passes Voting Residency Requirement Bill 14-9, Along Party Lines," WMUR (Jan. 3, 2018), *available at* http://www.wmur.com/article/nh-senate-debating-voting-residency-requirement-bill/14538559

[12] Tweet, Donald J. Trump (@realDonaldTrump) (Nov. 28, 2016) ("Serious voter fraud in Virginia, New Hampshire and California – so why isn't the media reporting on this? Serious bias – big problem!")

[13] Kris W. Kobach, "Exclusive – Kobach: It Appears That Out-Of-State Voters Changed the Outcome of the New Hampshire U.S. Senate Race," Breitbart (Sept. 7, 2017), *available at*

meeting[14] so it is likely that the Commission records being withheld from Secretary Dunlap bear on matters relevant to this proposed law. This, along with the public claims of Vice-Chair Kobach and the White House about "findings," is an example of how Secretary Dunlap is irreparably harmed by the continued deprivation of information to which he is entitled and which is relevant to an ongoing public debate.[15] He cannot confirm, clarify, or dispute the Commission statements on which others are relying.

Defendants minimize to meaninglessness the irreparable harm element when they myopically focus on "'current and ongoing debate' ***about the Commission itself***." Defs' Br. at 7 (emphasis added). Putting aside the fact that there ***is*** current and ongoing debate about the Commission itself, contrary to Defendants' assertion, there can be no dispute that the election-related issues Secretary Dunlap was appointed to the Commission to study are the subject of "current and ongoing debate." *See Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006).

Secretary Dunlap will be irreparably harmed if Defendants are permitted to continue to withhold documents—thereby preventing Secretary Dunlap from making informed contributions

---

http://www.breitbart.com/big-government/2017/09/07/exclusive-kobach-out-of-state-voters-changed-outcome-new-hampshire-senate-race/

[14] Meeting Minutes of Presidential Advisory Commission on Election Integrity (Sept. 12, 2017) at 7, 28, *available at* https://www.whitehouse.gov/wp-content/uploads/2017/12/Meeting-Minutes-for-September-12-2017-Meeting-in-New-Hampshire.pdf

[15] The President has made claims regarding the "initial findings" of the Commission and representations about the scope of voter fraud, *see supra* n. 1, and other commissioners have published reports of purported findings from the Commission's activities, *see supra*, n. 3. It is of no moment that Mr. Herndon, the Director of White House Information Technology, made an unsupported claim that the Commission did not make any "preliminary findings." The Herndon Declaration did not define what it meant by "findings," and failed to explain the basis for this claim given that Mr. Herndon performed no role on the Commission. Nor does it reconcile this claim with the President's contrary statement that initial findings would be transmitted to DHS. Similarly, defense counsel's post-hoc litigation driven attempt to explain the term "findings" does not displace the President's official statements. *See* Dkt. 44 at 10 n.1.

to this debate—until there is a final judgment and appeals have been exhausted. *See Alabama-Tombigbee Rivers Coalition v. Dep't of Interior*, 26 F.3d 1103, 1106 (11th Cir. 1994) (affirming grant of preliminary injunction after advisory committee had already issued report because "[i]f public commentary is limited to retrospective scrutiny, [FACA] is rendered meaningless"). Immediate production of Commission records to Secretary Dunlap is the only way to ensure a fair and even playing field.[16]

**Documents and participation post-dating the Commission's closing.** Secretary Dunlap also will be irreparably harmed if he is not permitted to participate in the winding down of the Commission and the decisions regarding the disposition of Commission records. Defendants have offered no authority for their position that the commissioners' roles end the day an advisory committee is terminated and wind-down activities are the exclusive domain of the White House Office of Records Management. *See generally* Dkt. 44. The decision to dissolve and make unrebuttable declarations regarding the Commission's activities and "findings" is of no less consequence and necessary to Secretary Dunlap's full participation than the decisions over when to meet and over whom to invite as witnesses. *See* Mem. Op. 18. The circumstances demonstrate the negative incentives such a rule would create: Defendants have admitted that they have not collected all Commission records in the possession of individual commissioners.[17] Secretary Dunlap's input into the process of collecting Commission records is necessary to

---

[16] This is true both with respect to the documents on the *Vaughn*-like index and similar documents created during the period between the preparation of that index and the dissolution of the Commission on January 3, 2018.

[17] Defendants have not submitted any affidavit by an individual with personal knowledge of Defendants' collection and preservation of documents (other than state voter data). For example, counsel for Defendants has stated only that the White House Office of Records Management "intends to send a letter to all former Commissioners . . . reminding them to forward for preservation any Commission documents that have not already been forwarded." Shapiro email (Ex. 2); Droege Decl. (Dkt. 44-1) ¶ 4. Even this inadequate step has not yet been taken. *Id.*

ensure that the violation of his right to Commission records generated during the life of the Commission can be remedied.

**C. The Balance of Harms and Public Interest Favor Secretary Dunlap**

Since the dissolution of the Commission, the topics the Commission was tasked with studying have remained the focus of intense public interest and discussion.[18] Secretary Dunlap has a strong interest in "contributing his unique perspective" to the ongoing vigorous debate on election integrity, the existence or non-existence of voter fraud, and the wisdom of statutes, regulations, or other actions that could affect the sacred right to vote. Mem. Op. 23. He is harmed when the President, Vice-Chair Kobach, and others make statements regarding the work of the Commission from which he was barred. *See Cummock*, 180 F.3d at 293.

Dissolution does not lessen the public interest in Defendants' compliance with FACA. This Court found, "[b]y withholding the substantive documents discussed in [the Court's] opinion, the Commission ignores the strictures imposed by FACA to prevent unbalanced commissions, and ignores the rights and obligations required by *Cummock*, leaving the public to pay any concomitant price." Dkt. 33 at 23; *see also Pinson v. United States DOJ*, 202 F. Supp. 3d 86, 102 (D.D.C. 2016) (noting the "public interest in knowing what the government is up to"). The "public interest in preserving the integrity of the courts" will also be damaged if Defendants use the dissolution of the Commission to avoid FACA obligations and this Court's Order. *See Young v. Office of the United States Senate Sergeant at Arms*, 217 F.R.D. 61, 70 (D.D.C. 2003).

---

[18] *See, e.g.*, Tweet, Donald J. Trump (@realDonaldTrump) (Jan. 4, 2018) ("Push hard for Voter Identification!"); Statement by the Press Secretary, *supra* n. 1 ("Despite substantial evidence of voter fraud . . . President Donald J. Trump signed an executive order to dissolve the Commission, and he has asked the Department of Homeland Security to review its initial findings.").

With respect to the Commission records through the date of dissolution (that already are subject to the Dec. 22 Order), Defendants identify ***no harm*** that this Court did not already consider and reject in its Dec. 22 Order. And Defendants' allusion to harm from disclosure of "internal deliberations" relevant to the Commission may not be considered in the posture of reconsideration, because it is not any "significant change in the law or fact . . . since the submission of the issue to the court." *Ficken v. Golden*, 696 F. Supp. 2d 21, 35 (D.D.C. 2010).

**Documents and participation post-dating the Commission's closing.** Defendants' abbreviated balance-of-equities discussion is focused on "forward-looking documents related to the disposition of data collected by a now-dissolved Commission." Defs' Br. at 12. Defendants would not be harmed by Secretary Dunlap's participation in ensuring that Commission data and records are methodically collected and preserved and that applicable laws are being followed. The use of personal email accounts and text messaging to conduct Commission business, and the failure to collect and track copies of Commission records, has resulted in the current state of disorder, where defense counsel cannot guarantee (1) that all Commission records have been collected; or (2) that custodians of copies of Commission records are complying with obligations under federal law. *See* Shapiro email (Ex. 2); Dkt. 44. In any event, whether or not Defendants would be harmed by Secretary Dunlap's participation in these post-dissolution activities has no bearing on the existing Dec. 22 Decision requiring Defendants to produce copies of Commission records from the period before the Commission was dissolved.

## V. THIS COURT SHOULD ORDER IMMEDIATE PRODUCTION OF DOCUMENTS AND SHOULD NOT GRANT A STAY PENDING APPEAL

If this Court denies Defendants' motion to vacate the Dec. 22 Decision, Secretary Dunlap respectfully requests that the Court set a date certain for the production of Commission records and communications through the date of the Commission's dissolution. *See* Memorandum

Order, *Cummock v. Gore*, No. 97-00981-CKK (D.D.C.) (Dkt. 31-1) (Nov. 15, 1999) (ordering production of documents in two weeks). Defendants' actions to date and their stated intention to immediately appeal any order issued by this Court, Defs.' Br. at 12-13, shows that they will seek delay by any means possible, apparently in the hope that public interest about the Commission and its work will pass.

Despite Secretary Dunlap's repeated efforts to have a conversation about the specific Commission records to which he is entitled (and which Defendants are required to produce under the Dec. 22 Decision), defense counsel has declined to engage in good faith negotiations:

- On November 21, 2017, undersigned counsel wrote to defense counsel identifying records (by category and by document on the *Vaughn*-type index) to which Secretary Dunlap was entitled. 11/21/2017 Sandick letter (Ex. 3).
- On December 1, 2017, defense counsel stated that it needed more time for a "meaningful document-by-document response" and offered to let Secretary Dunlap view (but not have copies of or take notes on) a small subset of documents, an offer this Court rejected as "not reasonable." Dkt. 30-7; Mem. Op. 23.
- On December 15, 2017, undersigned counsel further narrowed the request, seeking a substantive response to its identification of 20 relevant categories of documents. 12/15/17 Sandick letter (Ex. 4). Defense counsel again delayed, saying they would respond in the "new year." 12/21/17 Borson email (Ex. 5).
- Following the Dec. 22 Decision, undersigned counsel tried again to engage defense counsel (Dkt. 35-2), but defense counsel said only that "your request well exceeds the scope of the Court's order." Dkt. 35-3.

Secretary Dunlap still has yet to see a single document. Given this record, Secretary Dunlap respectfully requests that this Court order the prompt production of all documents identified by Secretary Dunlap on Appendix B to its 11/21/17 letter (Ex. 3) and all similar documents that have been generated since the *Vaughn*-type index was filed.

Finally, this Court should not stay its Dec. 22 Decision pending appeal. Defendants "bear[] the burden of showing the balance of four factors weigh in favor of the stay: (1) the

likelihood that it will prevail on the merits . . . ; (2) the likelihood that it will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting a stay." *People for the Am. Way Found. v. United States Dep't of Educ.*, 518 F. Supp. 2d 174, 177 (D.D.C. 2007) (citing *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). Defendants' single paragraph does not satisfy these requirements. Defs.' Br. at 12-13.[19] Defendants' cases address only the element of irreparable harm and are, in any event, inapposite as they involved matters in which courts granted stays only after also finding that the case presented "serious legal question[s]" on the merits, *John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194, 205-06 (D.D.C. 2017), or noting that the parties agreed that a stay was appropriate, *People for the Am. Way Found.*, 518 F. Supp. 2d at 177. *Cummock* prevents Defendants from showing any likelihood, let alone a "strong" likelihood, of success on appeal, while Secretary Dunlap has shown a strong likelihood of success on the merits, ongoing irreparable injury, and a strong public interest in immediate compliance with FACA. A stay pending appeal should not be granted.[20]

## VI. CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion and order Defendants to immediately comply with the Dec. 22 Decision.

---

[19] Defendants should not be permitted to make new arguments regarding the appropriateness of a stay in their reply brief, when there is no opportunity to respond. *United States v. Newman*, 2017 U.S. Dist. LEXIS 131056, *19 n.3 (D.D.C. Aug. 17, 2017).

[20] If this Court stays its order pending appeal, Secretary Dunlap respectfully requests that the Court require Defendants to petition the Circuit for expedited consideration of the appeal within ten days of the filing of a Notice of Appeal due to the "ongoing detriment to [plaintiff] and the public" from the failure to produce documents. *People for the Am. Way Found.*, 518 F. Supp. 2d at 176. Any extension requests should "include the representation that it is based on an 'unforeseen extraordinary circumstance,' and include a description of the same." *Id.*

Dated: January 17, 2018

Respectfully submitted,

By:
/s/ Harry Sandick

PATTERSON BELKNAP WEBB & TYLER LLP
Daniel S. Ruzumna (D.C. Bar No. 450040)
Harry Sandick (admitted *pro hac vice*)
Daniel A. Friedman (admitted *pro hac vice*)
1133 Avenue of the Americas
New York, N.Y. 10036
Tel: (212) 336-2000
Fax: (212) 336-2222
druzumna@pbwt.com
hsandick@pbwt.com
dfriedman@pbwt.com

AMERICAN OVERSIGHT
Austin R. Evers (D.C. Bar No. 1002367)
Melanie Sloan (D.C. Bar No. 434584)
John E. Bies (D.C. Bar No. 483730)
Cerissa Cafasso (D.C. Bar No. 1011003)
1030 15th Street NW, B255
Washington, DC 20005
Tel: (202) 869-5246
austin.evers@americanoversight.org
msloan@americanoversight.org
john.bies@americanoversight.org
cerissa.cafasso@americanoversight.org