APPEAL,TYPE–E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:17–cv–02361–CKK</u>

| | |
|---|---|
| DUNLAP v. PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY et al<br>Assigned to: Judge Colleen Kollar–Kotelly<br> Case:  1:17–cv–01354–CKK<br>Cause: 28:1361 Petition for Writ of Mandamus | Date Filed: 11/09/2017<br>Jury Demand: None<br>Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>Jurisdiction: U.S. Government Defendant |

**<u>Plaintiff</u>**

**MATTHEW DUNLAP**                    represented by  **Austin Ridgely Evers**
AMERICAN OVERSIGHT
1030 15th Street, NW
Suite B255
Washington, DC 20005
(202) 869–5241
Fax: (202) 871–6523
Email: austin.evers@americanoversight.org
*ATTORNEY TO BE NOTICED*

**Cerissa Cafasso**
AMERICAN OVERSIGHT
1030 15th Street, NW
Suite B255
Washington, DC 20005
(202) 869–5244
Fax: (202) 871–6523
Email: cerissa.cafasso@americanoversight.org
*ATTORNEY TO BE NOTICED*

**Daniel A. Friedman**
PATTERSON BELKNAP WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336–2000
Fax: (212) 336–2222
Email: dfriedman@pbwt.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harry Sandick**
PATTERSON BELKNAP WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336–2000

1

Fax: (212) 336–2222
Email: hsandick@pbwt.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melanie Togman Sloan**
AMERICAN OVERSIGHT
1030 15th Street, NW
Suite B255
Washington, DC 20005
(202) 365–0606
Fax: (202) 871–6523
Email: msloan@americanoversight.org
*ATTORNEY TO BE NOTICED*

**Daniel Seth Ruzumna**
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
Suite 2200
New York, NY 10036–6710
(212) 336–2034
Fax: (212) 336–2222
Email: druzumna@pbwt.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

PRESIDENTIAL ADVISORY          represented by   **Carol Federighi**
COMMISSION ON ELECTION                          U.S. DEPARTMENT OF JUSTICE
INTEGRITY                                       Civil Division, Federal Programs Branch
                                                P.O. Box 883
                                                Washington, DC 20530
                                                (202) 514–1903
                                                Email: carol.federighi@usdoj.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Elizabeth J. Shapiro**
                                                U.S. DEPARTMENT OF JUSTICE
                                                Civil Division, Federal Programs Branch
                                                P.O. Box 883
                                                Washington, DC 20530
                                                (202) 514–5302
                                                Fax: (202) 616–8202
                                                Email: Elizabeth.Shapiro@usdoj.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Joseph Evan Borson**

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20530
(202) 514–1944
Fax: (202) 616–8460
Email: joseph.borson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristina Ann Wolfe**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 353–4519
Email: kristina.wolfe@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL R. PENCE**
*IN HIS OFFICIAL CAPACITY AS
CHAIR OF THE PRESIDENTIAL
ADVISORY COMMISSION ON
ELECTION INTEGRITY*

represented by **Carol Federighi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth J. Shapiro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Evan Borson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**KRIS W. KOBACH**
*IN HIS OFFICIAL CAPACITY AS VICE
CHAIR OF THE PRESIDENTIAL
ADVISORY COMMISSION ON
ELECTION INTEGRITY*

represented by **Carol Federighi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth J. Shapiro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Evan Borson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANDREW KOSSACK**                  represented by   **Carol Federighi**
*IN HIS OFFICIAL CAPACITY AS*                       (See above for address)
*DESIGNATED FEDERAL OFFICER*                        *LEAD ATTORNEY*
*FOR THE PRESIDENTIAL ADVISORY*                     *ATTORNEY TO BE NOTICED*
*COMMISSION ON ELECTION*
*INTEGRITY*                                         **Elizabeth J. Shapiro**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Joseph Evan Borson**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Kristina Ann Wolfe**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**GENERAL SERVICES**                represented by   **Carol Federighi**
**ADMINISTRATION**                                  (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Elizabeth J. Shapiro**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Joseph Evan Borson**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Kristina Ann Wolfe**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Defendant**

**TIMOTHY R. HORNE**                    represented by   **Carol Federighi**
*IN HIS OFFICIAL CAPACITY AS*                            (See above for address)
*ACTING ADMINISTRATOR OF THE*                            *LEAD ATTORNEY*
*GENERAL SERVICES*                                       *ATTORNEY TO BE NOTICED*
*ADMINISTRATION*

                                                         **Elizabeth J. Shapiro**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Joseph Evan Borson**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Kristina Ann Wolfe**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**EXECUTIVE OFFICE OF THE**             represented by   **Carol Federighi**
**PRESIDENT**                                            (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Elizabeth J. Shapiro**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Joseph Evan Borson**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Kristina Ann Wolfe**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE VICE PRESIDENT**        represented by   **Carol Federighi**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Elizabeth J. Shapiro**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Evan Borson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF ADMINISTRATION**           represented by   **Carol Federighi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth J. Shapiro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Evan Borson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCIA L. KELLY**           represented by   **Carol Federighi**
*IN HER OFFICIAL CAPACITY AS*                        (See above for address)
*DIRECTOR OF THE OFFICE OF*                          *LEAD ATTORNEY*
*ADMINISTRATION*                                     *ATTORNEY TO BE NOTICED*

**Elizabeth J. Shapiro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Evan Borson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/09/2017 | 1 | | COMPLAINT against EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY ( Filing fee $ 400 receipt number 0090–5198357) filed by MATTHEW DUNLAP. (Attachments: # 1 Exhibit 1, # 2 Civil Cover Sheet, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons)(Ruzumna, Daniel) (Entered: 11/09/2017) |
| 11/09/2017 | 2 | | NOTICE OF RELATED CASE by MATTHEW DUNLAP. Case related to Case No. 17–cv–01354; 17–cv–01320; 17–cv–01351. (Ruzumna, Daniel) (Entered: 11/09/2017) |
| 11/09/2017 | 3 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Harry Sandick, :Firm– Patterson Belknap Webb & Tyler LLP, :Address– 1133 Avenue of the Americas, New York, New York 10036. Phone No. – 212–336–2000. Fax No. – 212–336–2222 Filing fee $ 100, receipt number 0090–5198713. Fee Status: Fee Paid. by MATTHEW DUNLAP (Attachments: # 1 Declaration of Harry Sandick, # 2 Certification, # 3 Text of Proposed Order)(Ruzumna, Daniel) (Entered: 11/09/2017) |
| 11/09/2017 | 4 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Daniel A. Friedman, :Firm– Patterson Belknap Webb & Tyler LLP, :Address– 1133 Avenue of the Americas, New York, New York 10036. Phone No. – 212–336–2000. Fax No. – 212–336–2222 Filing fee $ 100, receipt number 0090–5198765. Fee Status: Fee Paid. by MATTHEW DUNLAP (Attachments: # 1 Declaration of Daniel A. Friedman, # 2 Certification, # 3 Text of Proposed Order)(Ruzumna, Daniel) (Entered: 11/09/2017) |
| 11/09/2017 | | | Case Assigned to Judge Colleen Kollar–Kotelly. (zsth) (Entered: 11/13/2017) |
| 11/13/2017 | 5 | | SUMMONS (12) Issued Electronically as to EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zsth) (Entered: 11/13/2017) |
| 11/14/2017 | 6 | | ORDER ESTABLISHING PROCEDURES FOR CASES ASSIGNED TO JUDGE COLLEEN KOLLAR–KOTELLY. Signed by Judge Colleen Kollar–Kotelly on 11/14/2017. (DM) (Entered: 11/14/2017) |
| 11/16/2017 | 7 | | MOTION for Preliminary Injunction by MATTHEW DUNLAP (Attachments: # 1 Declaration of Matthew Dunlap, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 |

| | | |
|---|---|---|
| | | Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Declaration of Harry Sandick, # 10 Exhibit 1, # 11 Exhibit 2, # 12 Exhibit 3, # 13 Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction, # 14 Text of Proposed Order)(Ruzumna, Daniel) (Entered: 11/16/2017) |
| 11/16/2017 | | MINUTE ORDER: The Court has received the 3 Motion for Admission of Attorney *Pro Hac Vice* with respect to Harry Sandick and the 4 Motion for Admission of Attorney *Pro Hac Vice* with respect to Daniel A. Friedman. As to both, such motion is GRANTED CONTINGENT upon the respective attorney submitting a declaration by **NOVEMBER 23, 2017**, stating that he has reviewed and is familiar with the Local Rules of this Court. Signed by Judge Colleen Kollar–Kotelly on November 16, 2017. (lcckk1) (Entered: 11/16/2017) |
| 11/16/2017 | | MINUTE ORDER: The Court has received Plaintiff's 7 Motion for a Preliminary Injunction. The Court has arranged a teleconference on the record with the parties on **NOVEMBER 17, 2017**, at 2:30PM to discuss a briefing schedule. On the morning of **NOVEMBER 17, 2017**, the parties shall each file a notice with the Court identifying which of their respective counsel shall participate in the teleconference. Signed by Judge Colleen Kollar–Kotelly on November 16, 2017. (lcckk1) (Entered: 11/16/2017) |
| 11/16/2017 | 8 | NOTICE of Appearance by Joseph Evan Borson on behalf of EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY (Borson, Joseph) (Entered: 11/16/2017) |
| 11/16/2017 | 9 | NOTICE of Appearance by Elizabeth J. Shapiro on behalf of All Defendants (Shapiro, Elizabeth) (Entered: 11/16/2017) |
| 11/16/2017 | 10 | NOTICE of Appearance by Kristina Ann Wolfe on behalf of EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY (Wolfe, Kristina) (Entered: 11/16/2017) |
| 11/17/2017 | 11 | NOTICE of Appearance by Carol Federighi on behalf of All Defendants (Federighi, Carol) (Entered: 11/17/2017) |
| 11/17/2017 | 12 | NOTICE *(Letter from Daniel S. Ruzumna to Judge Kollar–Kotelly regarding 11/17/17 conference)* by MATTHEW DUNLAP re Order, (Ruzumna, Daniel) (Entered: 11/17/2017) |
| 11/17/2017 | 13 | RESPONSE TO ORDER OF THE COURT re Order, *Notice of Participation in Nov. 17, 2017, Teleconference* filed by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY. (Borson, Joseph) (Entered: 11/17/2017) |

| 11/17/2017 | 14 | | NOTICE of Appearance by Austin Ridgely Evers on behalf of MATTHEW DUNLAP (Evers, Austin) (Entered: 11/17/2017) |
|---|---|---|---|
| 11/17/2017 | 15 | | NOTICE of Appearance by Cerissa Cafasso on behalf of MATTHEW DUNLAP (Cafasso, Cerissa) (Entered: 11/17/2017) |
| 11/17/2017 | | | Set/Reset Hearings: Telephone Conference on the record set for 11/17/2017 at 2:30 PM in Chambers before Judge Colleen Kollar–Kotelly. (dot) (Entered: 11/17/2017) |
| 11/17/2017 | | | Minute Entry for proceedings held before Judge Colleen Kollar–Kotelly: Telephone Conference on the record held on 11/17/2017. (Court Reporter Richard Ehrlich.) (dot) (Entered: 11/20/2017) |
| 11/20/2017 | | | MINUTE ORDER: During a teleconference on the record on November 17, 2017, the Court conferred with the parties regarding a briefing schedule for Plaintiff's 7 Motion for a Preliminary Injunction. In his motion, Plaintiff invoked his right, under Local Civil Rule 65.1(d) of the Rules of the United States District Court for the District of Columbia, to a hearing "no later than 21 days after" the filing of that motion. Furthermore, under Local Civil Rule 65.1(c), "[t]he opposition [to an application for a preliminary injunction] shall be served and filed within seven days after service of the application for preliminary injunction." Pursuant to Local Civil Rule 65.1(d), a later hearing date is permissible if the Court "makes a finding that a later hearing date will not prejudice the parties." In the interest of efficient resolution of this matter, in light of the intervening holiday, and based on Defendants' representation that the Presidential Advisory Commission on Election Integrity will not meet in December, the Court has accepted the parties' agreement to adjust the compressed briefing timeline otherwise suggested by the rules and finds that the parties will not be prejudiced by doing so. Accordingly, Defendants' opposition shall be due by **DECEMBER 1, 2017**. Plaintiff's reply, if any, shall be due by **DECEMBER 6, 2017**. Signed by Judge Colleen Kollar–Kotelly on November 20, 2017. (lcckk1) (Entered: 11/20/2017) |
| 11/20/2017 | 16 | | NOTICE – *Declaration of Harry Sandick in Support of Motion for Admission of Attorney Pro Hac Vice* by MATTHEW DUNLAP re Order on Motion for Leave to Appear Pro Hac Vice,,,,, (Ruzumna, Daniel) (Entered: 11/20/2017) |
| 11/20/2017 | 17 | | NOTICE – *Declaration of Daniel A. Friedman in Support of Motion for Admission of Attorney Pro Hac Vice* by MATTHEW DUNLAP re Order on Motion for Leave to Appear Pro Hac Vice,,,,, (Ruzumna, Daniel) (Entered: 11/20/2017) |
| 11/20/2017 | | | NOTICE OF ERROR re 12 Notice (Other); emailed to druzumna@pbwt.com, cc'd 9 associated attorneys –– The PDF file you docketed contained errors: 1. Letters are not permitted; In future, all documents should be in pleading format in accordance with Local Rules; Do not refile. (znmw, ) (Entered: 11/20/2017) |
| 11/20/2017 | 18 | | NOTICE of Appearance by Melanie Togman Sloan on behalf of MATTHEW DUNLAP (Sloan, Melanie) (Main Document 18 replaced on 11/21/2017) (znmw). (Entered: 11/20/2017) |
| 11/20/2017 | | | Set/Reset Deadlines: Defendants' Response to 7 due by 12/1/2017. Plaintiff's Reply due by 12/6/2017. (dot) (Entered: 11/22/2017) |

| 11/21/2017 | 19 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. EXECUTIVE OFFICE OF THE PRESIDENT served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
|---|---|---|---|
| 11/21/2017 | 20 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. GENERAL SERVICES ADMINISTRATION served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
| 11/21/2017 | 21 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TIMOTHY R. HORNE served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
| 11/21/2017 | 22 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARCIA L. KELLY served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
| 11/21/2017 | 23 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KRIS W. KOBACH served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
| 11/21/2017 | 24 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ANDREW KOSSACK served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
| 11/21/2017 | 25 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF ADMINISTRATION served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
| 11/21/2017 | 26 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF THE VICE PRESIDENT served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
| 11/21/2017 | 27 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
| 11/21/2017 | 28 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MICHAEL R. PENCE served on 11/15/2017 (Ruzumna, Daniel) (Entered: 11/21/2017) |
| 11/29/2017 | 29 | | TRANSCRIPT OF TELEPHONE CONFERENCE before Judge Colleen Kollar–Kotelly held on November 17, 2017; Page Numbers: 1 – 50. Date of Issuance:November 29, 2017. Court Reporter/Transcriber Richard D. Ehrlich, Telephone number (202) 354–3269, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased f rom the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the |

| | | | |
|---|---|---|---|
| | | | transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/20/2017. Redacted Transcript Deadline set for 12/30/2017. Release of Transcript Restriction set for 2/27/2018.(Ehrlich, Richard) (Entered: 11/29/2017) |
| 12/01/2017 | 30 | | Memorandum in opposition to re 7 MOTION for Preliminary Injunction filed by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Text of Proposed Order)(Borson, Joseph) (Entered: 12/01/2017) |
| 12/06/2017 | 31 | | REPLY to opposition to motion re 7 MOTION for Preliminary Injunction filed by MATTHEW DUNLAP. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Sandick, Harry) (Entered: 12/06/2017) |
| 12/22/2017 | 32 | 20 | ORDER. The Court hereby GRANTS–IN–PART AND DENIES–IN–PART Plaintiff's 7 Motion for a Preliminary Injunction. Signed by Judge Colleen Kollar–Kotelly on December 22, 2017. (lcckk1) (Entered: 12/22/2017) |
| 12/22/2017 | 33 | 21 | MEMORANDUM OPINION. Signed by Judge Colleen Kollar–Kotelly on December 22, 2017. (lcckk1) (Entered: 12/22/2017) |
| 01/03/2018 | 34 | | NOTICE of Executive Order by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY (Federighi, Carol) (Entered: 01/03/2018) |
| 01/09/2018 | 35 | | MOTION for Temporary Restraining Order by MATTHEW DUNLAP (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Certification of Counsel Pursuant to Local Rule 65.1(a), # 7 Text of Proposed Order)(Sandick, Harry) (Entered: 01/09/2018) |
| 01/09/2018 | 36 | | NOTICE OF SUPPLEMENTAL AUTHORITY by MATTHEW DUNLAP (Attachments: # 1 Exhibit 1)(Sandick, Harry) (Entered: 01/09/2018) |
| 01/09/2018 | 37 | | NOTICE of Correction to the Record by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY re 35 MOTION for Temporary Restraining Order (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Borson, Joseph) (Entered: 01/09/2018) |
| 01/09/2018 | | | MINUTE ORDER: The Court has received Plaintiff's 35 Application for a Temporary Restraining Order, Plaintiff's 36 Notice of Additional Authority, and |

| | | |
|---|---|---|
| | | Defendants' <u>37</u> Notice of Correction to the Record. The Court has arranged a teleconference on the record with the parties on **JANUARY 10, 2018, at 10:15 AM**, to discuss the scope and timeline for briefing on Plaintiff's <u>35</u> Application for a Temporary Restraining Order. The Court asks the parties to call Chambers, preferably on the same telephone line. By **JANUARY 10, 2018, at 9:00 AM**, the parties shall each file a notice with the Court identifying which of their respective counsel shall participate in the teleconference. Signed by Judge Colleen Kollar–Kotelly on January 9, 2018. (lcckk1) (Entered: 01/09/2018) |
| 01/09/2018 | <u>38</u> | NOTICE *of Participation* by MATTHEW DUNLAP re Order,,, (Sandick, Harry) (Entered: 01/09/2018) |
| 01/09/2018 | <u>39</u> | MOTION for Reconsideration re <u>32</u> Order on Motion for Preliminary Injunction by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Declaration Second Herndon Decl., # <u>3</u> Text of Proposed Order)(Borson, Joseph) (Entered: 01/09/2018) |
| 01/09/2018 | <u>40</u> | NOTICE *of Participation* by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY (Wolfe, Kristina) (Entered: 01/09/2018) |
| 01/09/2018 | | Set/Reset Hearings: Telephone Conference on the record set for 1/10/2018 at 10:15 AM in Chambers before Judge Colleen Kollar–Kotelly. (dot) (Entered: 01/10/2018) |
| 01/10/2018 | | MINUTE ORDER: During a teleconference on the record on January 10, 2018, the Court held a full discussion with the parties regarding Plaintiff's <u>35</u> Application for a Temporary Restraining Order, Defendants' <u>39</u> Motion to Reconsider This Court's December 22, 2017, Order ("Motion to Reconsider"), Defendants' obligation to answer or otherwise respond to Plaintiff's <u>1</u> Complaint, and an ancillary issue regarding dissemination of Presidential Advisory Commission on Election Integrity ("Commission") records. With the consent of the parties, the Court shall handle these filings and the ancillary issue as follows.The Court shall hold in abeyance Plaintiff's <u>35</u> Application for a Temporary Restraining Order pending resolution of Defendants' <u>39</u> Motion to Reconsider, which pertains to the Court's <u>32</u> Order and <u>33</u> Memorandum Opinion regarding Plaintiff's <u>7</u> Motion for a Preliminary Injunction.Plaintiff's objection to Defendants' <u>39</u> Motion to Reconsider shall be due by **JANUARY 17, 2018**. Because the memorandum attached to Defendants' <u>39</u> Motion to Reconsider consisted of 13 substantive pages, exceeding the 10–page limit prescribed by this Court's <u>6</u> Order Establishing Procedures for Cases Assigned to Judge Colleen Kollar–Kotelly, the Court has granted Plaintiff's request that its objection also reach 13 pages, provided that they are not repetitive. Defendants' reply to Plaintiff's objection to Defendants' <u>39</u> Motion to Reconsider shall be due by **JANUARY 24, 2018**.In order to facilitate efficient resolution of the above–described filings, the Court shall stay until further order Defendants' |

| | | |
|---|---|---|
| | | obligation to answer or otherwise respond to Plaintiff's 1 Complaint.During the teleconference, the Court and the parties also discussed the ancillary issue of whether restraints can be placed on the unofficial dissemination by former Commission members of official Commission records to the Department of Homeland Security or to other third parties. Plaintiff shall file a brief addressing this issue by **JANUARY 11, 2018, at 5:00 PM**. Promptly thereafter, Defendants' counsel shall notify the Court regarding the timing required for Defendants to file a response to Plaintiff's brief.Signed by Judge Colleen Kollar–Kotelly on January 10, 2018. (lcckk1) (Entered: 01/10/2018) |
| 01/10/2018 | | Minute Entry for proceedings held before Judge Colleen Kollar–Kotelly: Telephone Conference held on 1/10/2018. (Court Reporter Barbara DeVico.) (dot) (Entered: 01/11/2018) |
| 01/11/2018 | 41 | TRANSCRIPT OF PROCEEDINGS before Judge Colleen Kollar–Kotelly held on 1–10–18; Page Numbers: 1–37. Date of Issuance:1–11–18. Court Reporter/Transcriber Barbara DeVico, Telephone number 202–354–3118, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 2/1/2018. Redacted Transcript Deadline set for 2/11/2018. Release of Transcript Restriction set for 4/11/2018.(DeVico, Barbara) (Entered: 01/11/2018) |
| 01/11/2018 | 42 | SUPPLEMENTAL MEMORANDUM to re 35 MOTION for Temporary Restraining Order filed by MATTHEW DUNLAP. (Attachments: # 1 Exhibit 1)(Sandick, Harry) (Entered: 01/11/2018) |
| 01/12/2018 | 43 | NOTICE *of Timing* by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY re 42 Supplemental Memorandum (Borson, Joseph) (Entered: 01/12/2018) |
| 01/12/2018 | | MINUTE ORDER: The Court has received Plaintiff's 42 Supplemental Brief in Support of Plaintiff's Motion for a Temporary Restraining Order ("Supplemental Brief"), and Defendants' 43 Notice of Timing for Filing, each of which concerns the Court's request for briefing regarding "the ancillary issue of whether restraints can be placed on the unofficial dissemination by former Commission members of official Commission records to the Department of Homeland Security or to other third parties." Min. Order of Jan. 10, 2018.With Defendants' consent, Defendants shall submit their response to Plaintiff's 42 Supplemental |

| | | |
|---|---|---|
| | | Brief by **JANUARY 16, 2018, at 12:00 PM**. As part of their response, Defendants shall confirm whether they already have preserved, at the White House during the pendency of this Administration, all documents described in the *Vaughn*–like index in the *Lawyers' Committee* litigation according to the requirements of the Presidential Records Act. *See* Tr. of Telephone Conference, ECF No. 41, at 8 ("[A]ll of the records, everything that's in the Vaughn–like index and even the going–to–lunch–type communication are preserved under the Presidential Records Act."). Defendants also shall indicate their view as to whether the unofficial dissemination of official Commission records, or oral commentary on findings attributed to the Commission as a whole, to the Department of Homeland Security or to other third parties would be a violation of the Presidential Records Act or any other statute.Plaintiff shall submit his reply by **JANUARY 17, 2018, at 12:00 PM**.Signed by Judge Colleen Kollar–Kotelly on January 12, 2018. (lcckk1) (Entered: 01/12/2018) |
| 01/16/2018 | 44 | RESPONSE re 42 SUPPLEMENTAL MEMORANDUM to 35 MOTION for Temporary Restraining Order *re: Defs.' REsponse to Pl.'s Supp. Br.* filed by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY. (Attachments: # 1 Declaration of Philip C. Droege)(Borson, Joseph) Modified event title on 1/17/2018 (znmw). (Entered: 01/16/2018) |
| 01/17/2018 | 45 | SUPPLEMENTAL MEMORANDUM to re 35 MOTION for Temporary Restraining Order filed by MATTHEW DUNLAP. (Attachments: # 1 Exhibit 1)(Sandick, Harry) (Entered: 01/17/2018) |
| 01/17/2018 | 46 | Memorandum in opposition to re 39 MOTION for Reconsideration re 32 Order on Motion for Preliminary Injunction filed by MATTHEW DUNLAP. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Text of Proposed Order)(Sandick, Harry) (Entered: 01/17/2018) |
| 01/24/2018 | 47 | REPLY to opposition to motion re 39 MOTION for Reconsideration re 32 Order on Motion for Preliminary Injunction filed by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY. (Borson, Joseph) (Entered: 01/24/2018) |
| 01/31/2018 | 48 | MOTION for Discovery */Leave to Serve a Subpoena* by MATTHEW DUNLAP (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Memorandum of Law in Support of Plaintiff's Motion for Leave to Serve a Subpoena, # 8 Proposed Order)(Sandick, Harry) (Entered: 01/31/2018) |
| 02/14/2018 | 49 | Memorandum in opposition to re 48 MOTION for Discovery */Leave to Serve a Subpoena* filed by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION |

| | | | |
|---|---|---|---|
| | | | INTEGRITY. (Attachments: # 1 Exhibit A)(Borson, Joseph) (Entered: 02/14/2018) |
| 02/21/2018 | 50 | | REPLY to opposition to motion re 48 MOTION for Discovery /Leave to Serve a Subpoena filed by MATTHEW DUNLAP. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Sandick, Harry) (Entered: 02/21/2018) |
| 06/27/2018 | 51 | 45 | ORDER. The Court DENIES Plaintiff's 35 Application for a Temporary Restraining Order; DENIES Defendants' 39 Motion to Reconsider This Court's December 22, 2017, Order; and DENIES Plaintiff's 48 Motion for Leave to Serve a Preservation Subpoena. Defendants must produce the relevant documents by no later than **JULY 18, 2018**. The parties shall submit a Joint Status Report by no later than **JULY 27, 2018**, indicating how they propose to proceed on the merits. See Order for further details. Signed by Judge Colleen Kollar–Kotelly on June 27, 2018. (lcckk1) (Entered: 06/27/2018) |
| 06/27/2018 | 52 | 46 | MEMORANDUM OPINION. Signed by Judge Colleen Kollar–Kotelly on June 27, 2018. (lcckk1) (Entered: 06/27/2018) |
| 06/27/2018 | | | Set/Reset Deadlines: Defendants production of relevant documents due by 7/18/2018 Joint Status Report due by 7/27/2018. (kt) (Entered: 06/27/2018) |
| 07/18/2018 | 53 | | NOTICE of Compliance with this Court's June 27, 2018 Order by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY re 51 Order on Motion for TRO,,, Order on Motion for Reconsideration,,, Order on Motion for Discovery,, (Borson, Joseph) (Entered: 07/18/2018) |
| 07/27/2018 | 54 | | Joint STATUS REPORT by EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, TIMOTHY R. HORNE, MARCIA L. KELLY, KRIS W. KOBACH, ANDREW KOSSACK, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, MICHAEL R. PENCE, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY. (Attachments: # 1 Exhibit A)(Wolfe, Kristina) (Entered: 07/27/2018) |
| 08/13/2018 | 55 | | ORDER. By **AUGUST 27, 2018**, Defendants shall submit a filing identifying each category of Commission documents they have *withheld* from their production to Plaintiff. Plaintiff shall respond by **SEPTEMBER 10, 2018**, indicating, for each category, whether he seeks the documents therein and furnishing his justification for each such request. See Order for further details. Signed by Judge Colleen Kollar–Kotelly on August 13, 2018. (lcckk1) (Entered: 08/13/2018) |
| 08/13/2018 | | | Set/Reset Deadlines: Defendant's filing due by 8/27/2018. Plaintiff's shall Respond by 9/10/2018. (dot) (Entered: 08/13/2018) |
| 08/24/2018 | 56 | 17 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 51 Order on Motion for TRO,,, Order on Motion for Reconsideration,,, Order on Motion for Discovery,, by GENERAL SERVICES ADMINISTRATION, MARCIA L. KELLY, MICHAEL R. PENCE, TIMOTHY R. HORNE, OFFICE OF THE VICE PRESIDENT, PRESIDENTIAL ADVISORY COMMISSION ON ELECTION |

| | | | INTEGRITY, EXECUTIVE OFFICE OF THE PRESIDENT, KRIS W. KOBACH, OFFICE OF ADMINISTRATION, ANDREW KOSSACK. Fee Status: No Fee Paid. Parties have been notified. (Wolfe, Kristina) (Entered: 08/24/2018) |
|---|---|---|---|

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MATTHEW DUNLAP,

        Plaintiff,

    v.

PRESIDENTIAL ADVISORY
COMMISSION ON ELECTION
INTEGRITY *et al.*,

        Defendants.

Civil Docket No. 17-cv-2361 (CKK)

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Defendants appeal to the United States Court of

Appeals for the District of Columbia Circuit from this Court's June 27, 2018, Order (Docket No.

51) and Memorandum Opinion (Docket No. 52), denying Defendants' motion for

reconsideration of this Court's December 22, 2017, Order and Memorandum Opinion granting-

in-part Plaintiff's motion for a preliminary injunction (Docket Nos. 32 & 33).

Dated:  August 24, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Kristina A. Wolfe*
CAROL FEDERIGHI
Senior Trial Counsel
KRISTINA A. WOLFE
JOSEPH E. BORSON
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel: (202) 353-4519 / Fax: (202) 616-8460
E-mail: kristina.wolfe@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2018, I electronically filed the foregoing paper with

the Clerk of the Court using the ECF system, which shall send notice to all counsel of record.

*/s/ Kristina A. Wolfe*
Kristina A. Wolfe

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MATTHEW DUNLAP,

      *Plaintiff*,

    v.

PRESIDENTIAL ADVISORY
COMMISSION ON ELECTION
INTEGRITY, *et al.*,

      *Defendants.*

Civil Action No. 17-2361 (CKK)

## ORDER
(December 22, 2017)

For the reasons stated in the accompanying Memorandum Opinion, the Court hereby:

**GRANTS-IN-PART AND DENIES-IN-PART** Plaintiff's Motion for a Preliminary

Injunction, ECF No. 7.

**SO ORDERED.**

Dated: December 22, 2017

                        /s/
                        COLLEEN KOLLAR-KOTELLY
                        United States District Judge

| | |
|---|---|
| MATTHEW DUNLAP, | |
| *Plaintiff*, | |
| v. | Civil Action No. 17-2361 (CKK) |
| PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY, *et al.*, | |
| *Defendants.* | |

**MEMORANDUM OPINION**
(December 22, 2017)

This case concerns the rights of a specific member of a specific presidential advisory commission governed by the Federal Advisory Committee Act ("FACA") to receive documents that he has requested in order to facilitate his full participation. Since *Cummock v. Gore*, it has been clear in this circuit that "committee membership [under FACA] bestows both rights and obligations beyond those given to members of the general public." 180 F.3d 282, 292 (D.C. Cir. 1999). Particularly with respect to accessing information about the commission's work, a commission member has "an even greater right than a member of the public, because, as a Commission member, [he] is entitled to fully participate in its deliberations." *Id.*

Plaintiff Matthew Dunlap, Secretary of State of Maine, alleges that he has not received documents associated with the Defendant Presidential Advisory Commission on Election Integrity (the "Commission") that are necessary to inform his efforts to fully participate as a Commission member. In his Motion for a Preliminary Injunction, ECF No. 7 ("Motion"), he seeks, *inter alia*, an order that the Commission and co-defendant officials and entities "promptly . . . produce records requested by Secretary Dunlap," and that Defendants "produce . . . all future documents made

available to or prepared for or by the Commission promptly and no later than two weeks in advance of any future Commission meeting." Pl.'s Mot. for Prelim. Inj., ECF No. 7, at 1. The urgency of Plaintiff's Motion, filed on November 16, 2017, was predicated on the belief that the Commission would convene another meeting soon, possibly in December. *See* Decl. of Kris W. Kobach, ECF No. 30-2, Ex. 2 ¶ 9 ("Kobach Decl.") ("It is estimated the Commission will meet five times at a frequency of approximately 30-60 days between meetings, subject to members' schedules and other considerations.");[1] Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 7-13, at 19-20 (discussing same, and noting last meeting was September 12, 2017). Defendants' counsel subsequently represented that no meeting would be held in December, which permitted this Court, with the parties' consent, to entertain more substantial briefing than a preliminary injunction motion otherwise would permit. *See* Min. Order of Nov. 20, 2017.

Given the preliminary nature of the relief sought, the Court need not at this time decide conclusively whether Plaintiff is, or is not, ultimately entitled on the merits to all the relief he has claimed. Rather, relief may be granted if the Court finds that Plaintiff has a likelihood of succeeding on the merits, that he would suffer irreparable harm absent injunctive relief, and that other equitable factors—that is, questions of fairness, justice, and the public interest—warrant such relief.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a

---

[1] Certain of Defendants' declarations, including this one, were originally filed in one or more related cases. For ease of reference, the Court cites to them using the docket numbers under which they have been refiled in this case.

[2] The Court's consideration has focused on the following documents:

- Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 7-13 ("Pl.'s Mem.");

- Defs.' Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj., ECF No. 30 (Opp'n Mem.);

2

whole, the Court **GRANTS-IN-PART AND DENIES-IN-PART** Plaintiff's Motion for a Preliminary Injunction, ECF No. 7. The scope of the Court's consideration and decision today are narrow. The Court decides only Plaintiff's above-described requests for past and future documents. The Court finds the other requests in Plaintiff's Motion to be premature. Moreover, the Court expressly limits its decision to Plaintiff's Motion; the Court does not rule on Plaintiff's underlying Complaint, ECF No. 1, or any claim that other commissioners may assert against the Defendants.

## I.    BACKGROUND

### A. Statutory Background

FACA imposes a number of procedural requirements on "advisory committees," which are defined to include "any committee . . . which is . . . established or utilized by the President . . . in the interest of obtaining advice or recommendations for the President." 5 U.S.C. app. 2 § 3(2) (2016). The statute exempts, *inter alia*, "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." *Id*. FACA was enacted out of

> a desire to assess the need for the numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government. . . . Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature.

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 445-46 (1989) (internal quotation marks and citations omitted). Moreover, FACA is designed to prevent commissions from, *inter alia*,

---

- Pl.'s Reply Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 31 ("Pl.'s Reply Mem.").

convening a group of like-minded individuals, excluding duly appointed members with opposing viewpoints, and rubber-stamping the political agenda of the appointing authority. *See Cummock*, 180 F.3d at 287, 291-92 (citing Jay S. Bybee, *Advising the President: Separation of Powers and the Federal Advisory Committee Act*, 104 Yale L.J. 51, 58-59 (1994) (discussing the "outside, 'neutral' support" necessary to make "salable" the conclusion of an agency decisionmaker)).

To achieve those purposes, FACA requires that an advisory committee, *inter alia*, file a charter before meeting or taking any action, 5 U.S.C. app. 2 § 9(c) (2016), hold its meetings "open to the public," *id*. § 10(a)(1), publish "timely notice" of each such meeting in the Federal Register, *id*. § 10(a)(2), keep minutes and other records of its meetings, *id*. § 10(c), and allow "[i]nterested persons . . . to attend, appear before, or file statements with" the committee, *id*. § 10(a)(3). FACA also mandates that, unless an exception applies under the Freedom of Information Act ("FOIA"), "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying." *Id.* § 10(b). Finally, FACA requires that each advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed," *id.* § 5(b)(2), and "not be inappropriately influenced by the appointing authority or by any special interest," *id.* § 5(b)(3).

**B. Factual Background**

The Commission was established by Executive Order on May 11, 2017. Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ("Exec. Order"). According to the Executive Order, the Commission's purpose is to "study the registration and voting processes used in Federal elections." *Id*. § 3. The Executive Order states the Commission is "solely advisory," and that it shall disband 30 days after submitting a report to the President on three areas related to "voting

4

processes" in Federal elections. *Id*. §§ 3, 6. The Vice President is the chair of the Commission, and the President may appoint 15 additional members. From this group, the Vice President is permitted to appoint a Vice Chair of the Commission. On the same day the Commission was established, the Vice President appointed Kris W. Kobach, Secretary of State for Kansas, to serve as the Vice Chair. Compl., ECF No. 1, ¶ 37; Kobach Decl. ¶ 1.

Apart from the Vice President and the Vice Chair, there are presently nine other members of the Commission, including Commissioner Christy McCormick of the Election Assistance Commission (the "EAC"), who is currently the only federal agency official serving on the Commission, and a number of state election officials, both Democratic and Republican, and a Senior Legal Fellow of the Heritage Foundation. *See* Decl. of Andrew J. Kossack (July 13, 2017), ECF No. 30-1, ¶ 1 ("July 13 Kossack Decl."); Decl. of Andrew J. Kossack (Dec. 1, 2017), ECF No. 30-3, ¶ 1 ("Dec. 1 Kossack Decl."). According to Defendant Kobach's declaration in a related case, "McCormick is not serving in her official capacity as a member of the EAC." Second Decl. of Kris W. Kobach at 2, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1320 (D.D.C. July 6, 2017), ECF No. 11-1. The Executive Order also provides that the General Services Administration ("GSA"), a federal agency, will "provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis," and that other federal agencies "shall endeavor to cooperate with the Commission." Exec. Order §§ 7(a), (b). Furthermore, the Administrator of General Services—the agency head of the GSA—is charged with performing "any functions of the President under [FACA], except for those in section 6," to the extent that FACA applies to the Commission. *Id*. § 7(c). The Court previously has described in detail the roles of various Defendant entities in supporting the Commission. *See Elec. Privacy Info. Ctr. v.*

5

*Presidential Advisory Comm'n on Election Integrity*, No. 17-1320 (CKK), 2017 WL 3141907, at *11-*13 (D.D.C. July 24, 2017) [hereinafter *EPIC*].

The Commission filed a charter on June 23, 2017. Compl., ECF No. 1, ¶ 57; ECF No. 30-2, Ex. 2, at 10-11. In pertinent part, the Charter provides that the Commission "will function solely as an advisory body," ECF No. 30-2, Ex. 2 ¶ 4; that the Commission is established in accordance with the Executive Order "and the provisions of the Federal Advisory Committee Act," *id.* Ex. 2 ¶ 2; and that the GSA "shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission," *id.* Ex. 2 ¶ 6. Defendants represent that the Commission is voluntarily complying with FACA. July 13 Kossack Decl. ¶ 2.

On June 28, 2017, the Vice President held a teleconference with members of the Commission, during which the Vice Chair discussed his intention to send letters to state election officials requesting certain information on registered voters. Compl., ECF No. 1, ¶ 44. There is no evidence in the record that advance notice of this teleconference was provided by the Commission, or that it was accessible to the public. According to Defendants, the teleconference was merely a preliminary, organizational call, and members were expressly advised that the discussion "would be limited to preparatory and administrative work, and would not address matters on which the Commission was charged with advice and recommendations." July 13 Kossack Decl. ¶ 4 (citing Exhibit A). Furthermore, although "[t]he Vice Chair and staff described the request, . . . members were not given a copy of any requests in advance of the call and did not see the request until shortly before it was sent to states." *Id.* ¶ 5. Plaintiff indicates that he "was notified of the Commission's decision to request voter data from the states mere hours before the letters were sent." Pl.'s Mem. at 10. Plaintiff and others did, however, discuss the request for

several minutes on the call, and although the matter was not put to a vote by the members, the "request was modified in response to some of [their] comments." July 13 Kossack Decl. ¶ 5; Dec. 1 Kossack Decl. ¶ 3.

Subsequently, the Vice Chair directed that identical letters dated June 28, 2017, "be sent to the secretaries of state or chief election officers of each of the fifty states and the District of Columbia." Kobach Decl. ¶ 2. In addition to soliciting the views of state officials on certain election matters by way of seven broad policy questions, each of the letters requests that state officials provide the Commission with the "publicly available voter roll data" of their respective states, "including, if publicly available under the laws of [their] state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information." *Id.* Ex. 3 (June 28, 2017 Letter to the Honorable John Merrill, Secretary of State of Alabama). A substantial number of states have either fully or partially declined to comply with the Commission's request for voter roll data—the exact number and the specific details of the states' responses are unknown to the Court and are not relevant to the disposition of the pending motion. *See generally* Compl., ECF No. 1, ¶ 45. Without doubt, however, "substantial public attention has been focused on the Commission's request" for voter roll information. *EPIC*, No. 17-1320 (CKK), 2017 WL 3141907, at *1.

On July 19, 2017, the Commission held its first public meeting, which occurred in Washington, D.C. Decl. of Matthew Dunlap, ECF No. 7-1, ¶ 6; Dec. 1 Kossack Decl. ¶ 4. Other

decisions by this Court chronicle the circumstances leading up to this meeting. *See Am. Civil Liberties Union v. Trump*, No. 17-1351 (CKK), 2017 WL 3049418 (D.D.C. July 18, 2017) [hereinafter *ACLU*]; *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1354 (CKK), 2017 WL 3028832 (D.D.C. July 18, 2017) [hereinafter *Lawyers' Comm.*]. What is common to those cases is their focus on the rights of the *public*, rather than Plaintiff as a commissioner, to engage with the Commission by receiving certain Commission documents and participating in its July 19 meeting. Of particular note here, in the days preceding the meeting the Commission sent to Plaintiff a small set of preparatory documents, namely a copy of the agenda on July 14 and the draft bylaws and a revised agenda on July 18. Dec. 1 Kossack Decl. ¶ 4. The Commission bylaws require that meeting agendas be shared with the public, and the bylaws also are available to the public via the Commission's website. Dec. 1 Kossack Decl. ¶ 6. Plaintiff alleges that he was not provided with other documents that Commission members simply introduced at the meeting, despite the Government's representations in related cases that, in effect, there would be no undisclosed documents used at the meeting. *See* Pl.'s Mem. at 19 (citing *Lawyers' Comm.*, No. 17-1354 (CKK), 2017 WL 3028832, at *9 ("Defendants have represented that, with respect to the July 19 meeting of the Commission, they will disclose the materials that will be used at the meeting."); *ACLU*, No. 17-1351 (CKK), 2017 WL 3049418, at *23 ("Documents 'prepared for or by the Commission' invariably must include documents that will be 'used and discussed' at the July 19 meeting. Accordingly, Defendants have satisfied their obligation . . . .")).

The Commission next met on September 12, 2017, in Manchester, New Hampshire. Again, Plaintiff received a small set of materials in advance of the meeting. *See* Opp'n Mem. at 6 (indicating a draft agenda on September 5, a revised agenda on September 6, and copies of

materials to be discussed at the meeting on September 8).  Citing the *Vaughn*-type index in the

*Lawyers' Committee* litigation, however, Plaintiff objects that he "was not treated on an equal basis

as Commissioner Gardner" leading up to this meeting, because "Defendant Kobach and

Commissioner Gardner 'collaborated on a bipartisan agenda for the meeting.'"  Pl.'s Reply Mem.

at 12 (citing Dec. 1 Kossack Decl. ¶ 9).  Defendants elaborate on their communication with certain

commissioners in preparation for this meeting.

> Hans von Spakovsky was a presenter at the September 12 meeting, and so
> Commission staff communicated individually with him in his capacity as a
> presenter.  And Secretary William Gardner communicated individually with
> Commission staff and Vice Chair Kobach regarding his suggestion that the
> September 12 meeting be held in Manchester, New Hampshire.  These
> communications included the suggestion of five of the ten panelists, collaboration
> on the meeting agenda, coordination of the voting machine demonstration, and his
> invitation to the former Governor of New Hampshire to make opening remarks.

Opp'n Mem. at 25 n.4 (citations omitted).  Plaintiff, on the other hand, indicates that he was not

"invited to suggest witnesses for the September 12, 2017 meeting or to comment on the agenda or

other proposed witnesses for that meeting.  Indeed, the timing of the sending of the agenda—only

a week before the September meeting—made it impossible for Secretary Dunlap to invite

witnesses."  Pl.'s Reply Mem. at 12.

Since the September 12 meeting, the Commission has not met again, despite the charter

provision anticipating that subsequent meetings would be held.  *See* Kobach Decl. Ex. 2 ¶ 9 (setting

forth 30-60 day expectation).  Nevertheless, several outside sources suggested to Plaintiff that

Commission activity continued without his knowledge.  First, a member of the media informed

Plaintiff that Secretary Connie Lawson, one of the other commissioners, "told reporters that it was

her understanding that the work of the election integrity commission had essentially been paused

because of the lawsuits filed against the commission," which was news to the Plaintiff.  ECF No.

7-7, at 2.  He asserts that he should be informed of such communications.  *Id.*  Second, Plaintiff

9

received an email from the Minnesota Voters Alliance announcing that the organization had been invited to the next Commission meeting, in December 2017. *Id.* at 2-3. That this organization had been invited to present, and indeed that any meeting had been scheduled, came as a surprise to Plaintiff. *Id.* at 2. He asserts that he should be informed and have the opportunity to participate in any such planning. *Id.* While Defendants briefly address Secretary Lawson's comment, Opp'n Mem. at 25-26 (indicating that Secretary Lawson's further reported comment that "she hasn't received any new information [about the Commission] since the last meeting and that she doesn't think members are emailing each other" indicates that other commissioners are not receiving this information either), Defendants do not address Plaintiff's news of the Minnesota Voters Alliance in their briefing. *But see* ECF No. 7-7, at 1 (attaching to Plaintiff's Motion a Commission staff email to Plaintiff indicating "[a]s to the Minnesota group, I have never communicated with this group, and no meeting is scheduled for December").

On October 17, 2017, Plaintiff submitted a request to Andrew Kossack, Designated Federal Officer of the Commission, for certain Commission records pursuant to section 10(b) of FACA. Pl.'s Mem. at 6. In particular, Plaintiff requested that the Commission produce "copies of any and all correspondence between Commission members in the possession of the Commission dating from the signing of the Executive Order on May 11th, 2017 until the receipt of this request," including

> communications between Commissioners themselves, between Commissioners and/or staff and other Federal agencies, communications used in the development of public documents, and any ongoing discourse between Commissioners and staff about the development of policies and/or policy proposals that may be offered to policymakers as either a component of any report or under separate cover of which this Commissioner may be unaware.

ECF No. 7-3. Despite Kossack's acknowledgment, he never provided any documents in response to the request. Pl.'s Mem. at 6.

Since Plaintiff filed this litigation, Defendants have provided him with a limited amount of additional information, but only by way of oral representation of defense counsel or letters exchanged during briefing on the Motion. First, the Commission will not meet in December. Min. Order of Nov. 20, 2017; Dec. 1 Kossack Decl. ¶ 14. Second, Defendants offered to permit Plaintiff to inspect, in person, documents related to the September 12, 2017, meeting, but he would not be provided with copies, nor would he be permitted to take notes. ECF No. 30-7, at 2.

## II.    LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (emphasis in original; quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20) (alteration in original; quotation marks omitted)). When seeking such relief, "'the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis*, 571 F.3d at 1291 (citation omitted). Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does

not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92.

The Court notes that it is not clear whether this circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In any event, this Court need not resolve the viability of the sliding-scale approach today, as it finds that Plaintiff has shown a likelihood of success on each of the four factors.

### III. DISCUSSION

The Court must assess its subject-matter jurisdiction with respect to a particular claim before ruling on the merits. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999). Plaintiff's standing to pursue his claims is uncontested. *See also Cummock*, 180 F.3d at 290 (finding standing "readily" satisfied on facts similar in relevant respects). However, the parties disagree over whether this Court has jurisdiction to grant him relief under either the mandamus statute or the Administrative Procedure Act ("APA").[3] Because this Court finds that Plaintiff is likely to succeed under the mandamus statute, the Court need not decide the availability of relief

---

[3] This Court previously has recognized that "FACA does not provide for a private cause of action," so "judicial review must be sought through some alternative route." *Lawyers' Comm.*, No. 17-1354 (CKK), 2017 WL 3028832, at *7 (citing *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017)).

under the APA.[4]

Bound up with the Court's determination of its subject-matter jurisdiction will be the Court's assessment of the merits of Plaintiff's claim of rights under FACA. "[P]articularly in the context of a request for mandamus relief, the question of the Court's subject-matter jurisdiction sometimes converges with a consideration of the merits." *Bradley Memorial Hosp. v. Leavitt*, 599 F. Supp. 2d 6, 11 (D.D.C. 2009) (citing *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) ("[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action. To this extent, mandamus jurisdiction under § 1361 merges with the merits.")). It is undisputed that the public is entitled to certain documents pertaining to the Commission's work under FACA § 10(b), *see, e.g.*, Opp'n Mem. at 23 (quoting Section 10(b) in pertinent part); the seminal question is what documents Plaintiff, as a commissioner, is entitled to receive.

## A. Likelihood of Success on the Merits

### 1. Mandamus Jurisdiction

Plaintiff seeks relief pursuant to 28 U.S.C. § 1361 (2016), which provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." In this case, that relief would be an injunction in the form of mandamus requiring Defendants to comply with FACA.

Mandamus is a "drastic remedy, to be invoked only in extraordinary circumstances." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (internal quotation marks omitted; citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)). "To show entitlement to mandamus,

---

[4] The Court nevertheless shall address the APA briefly below as part of the mandamus requirement that there be "no adequate alternative remedy." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).

plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). These requirements are jurisdictional. *Id.* Even when these requirements are met, however, "a court may grant relief only when it finds compelling equitable grounds. . . . The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *Id.* (citing *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).

In this posture, the Court is not deciding in resolving this motion whether to issue mandamus. Rather, the Court must decide only whether Plaintiff is likely to succeed in obtaining mandamus relief.

### 2. *"Clear and Indisputable Right" Under FACA*

The D.C. Circuit's ruling in *Cummock* establishes through its discussion of FACA § 10(b) that Plaintiff has a clear and indisputable right to further documents.

In *Cummock*, the widow of a flight disaster victim sought to faithfully perform her role as a member of the White House Commission on Aviation Safety and Security. M. Victoria Cummock was frustrated in doing so, however, by the repeated occasions on which she learned of, requested, and was refused, in whole or part, documents from commission staff. 180 F.3d at 287-88. The impression that Cummock was being sidelined was reinforced by the omission of her dissent from the final report delivered to the president, and the omission of her dissent's supporting attachments from the published version of that report, which nevertheless included a "misleading editor's note" about her contribution. *Id.* On appeal from this Court's dismissal of her ensuing case, the D.C. Circuit noted that "the only claim before us warranting our attention is Cummock's assertion that the Commission denied her access to relevant documents, and thereby thwarted her

dissenting voice." *Id.* at 289. And the court concluded that Cummock had "a right to fully participate in the deliberations of the Commission," a right that had been violated because she "was unlawfully denied the opportunity to review documents that were prepared for or relied upon by the Commission in formulating its recommendations, and to amend her dissent if necessary to reflect this information." *Id.* at 284.

Like Cummock, Plaintiff has a right, as a commissioner, to "fully participate" in the proceedings of the Commission. In the Court's view, his assertion that he will be unable to fully participate without the information contained in relevant documents that the Commission has not shared with the public has merit. *See* Pl.'s Mem. at 1-2, 16. He, like Cummock, has the right to receive more than the documents available to the public. *See Cummock*, 180 F.3d at 292. He has a right to access documents that the Commission is considering relying on in the course of developing its final recommendations. Without those documents, Plaintiff would be left in the same position as Cummock, whose best recourse after the fact was to receive the documents and amend her dissent, if necessary.

Defendants argue that Plaintiff is not entitled to all of the documents, but rather only those used by the Commission "as a whole." Opp'n Mem. at 23 ("[S]ection 10(b) does not clearly require every document connected with every advisory committee be disclosed; instead, this provision only requires that materials that were actually accessible (or intended to be accessible) to the committee as a whole be disclosed."); *id.* at 24 ("In other words, the D.C. Circuit held that a member could not be excluded from reviewing information that was used by *the Commission* in making its final recommendation."). But Defendants have erected and attacked a straw man, and offered in its place an outdated and indefensible view of their own.

To their first point, nowhere does Plaintiff argue that he or someone similarly situated

15

should be entitled to "every document connected with every advisory committee."  Indeed, in a letter to Defendants during briefing on this Motion, he sensibly indicated a number of categories of documents that he does not seek, presumably because he does not think he would be entitled to them or he does not consider them relevant to his role as a commissioner.  *See* ECF 30-6 App. A (indicating that Plaintiff does not seek, e.g., "Commission members' personal notes and drafts of statements to be given at Commission meetings").

As for their second point, Defendants argue that only material relied on by the Commission "as a whole" should be made available, yet they inexplicably rely primarily on pre-*Cummock* interpretations of Section 10(b).  *See* Opp'n Mem. at 23 (citing 1980s Office of Legal Counsel guidance and district court decisions, one of which was affirmed, also pre-*Cummock*).  And despite Defendants' supporting argument based on *Cummock* language, *Cummock* does not make such a distinction.  Accordingly, Defendants cannot deprive Plaintiff of the requested documents simply because they have not been provided to all commissioners.  *See* Pl.'s Reply Mem. at 6-7.  Like Cummock herself, Plaintiff is as much a part of the Commission as any other member.  The likelihood of Plaintiff's success in securing mandamus relief is attributable to his right to substantive material that would inform his full participation in the Commission and its development of recommendations to the President.

A thread running through Defendants' argument is their distinction of the later posture of commission proceedings in *Cummock*.  *See, e.g.*, Opp'n Mem. at 24.  It is true that the White House Commission on Aviation Safety and Security, unlike the Commission in this case, had already made its final report when the case was filed.  But *Cummock* is a case that never should have happened.  If Cummock herself had received relevant documents along the way, then she would not have needed to file suit and ultimately obtain a D.C. Circuit decision that did the best it could

16

at that stage to address her rights as a commissioner, namely by finding that she should be permitted to review documents after the fact and consider whether to amend her dissent. This Court will find that a preliminary injunction is necessary in this case to prevent the Commission from reaching the level of dysfunction that precipitated *Cummock*. Plaintiff is entitled to substantive information so that he can contribute along the way in shaping the ultimate recommendations of the Commission; he need not wait to assert his rights under *Cummock* until after the fact—when a breach of his right to fully participate could not truly be redressed.

### 3. "Clear Duty" of the Commission

An advisory committee has a nondiscretionary duty to comply with the requirements of FACA § 10(b). *See* 5 U.S.C. app. 2 § 10(b) (2016) ("[T]he records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee *shall* be available for public inspection and copying . . . ." (emphasis added)); Pl.'s Mem. at 16 (discussing nondiscretionary duties under FACA and citing *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010) ("Section 10(b) contains unambiguous language that identifies certain materials, and describes in detail the methods and location by and at which the Government must make those materials available to the public.")). By describing the rights of a commissioner under Section 10(b), *Cummock* makes clear that an advisory committee also has a nondiscretionary duty to comply with that section with respect to Plaintiff. *See Cummock*, 180 F.3d at 292 ("[P]rovided that Cummock was granted the requisite security clearance, the Commission could not deny her access to information that it reviewed and relied upon in formulating its recommendations—even if, for instance, that information might have been withheld from the public pursuant to a FOIA exemption."). To be clear, the Commission's duty to provide information pursuant to Section

10(b) and *Cummock* is, like Plaintiff's right to the same, applicable during the life of the Commission, not simply after it submits its final recommendations.

Turning to the scope of that duty, the Court has not considered line-by-line the documents requested by Plaintiff. *See* ECF No. 30-6 App. B (identifying series of entries from *Vaughn*-type index in *Lawyers' Committee*). The Court has not yet ruled in *Lawyers' Committee* on the sufficiency of the *Vaughn*-type index that Plaintiff references. Accordingly, it will suffice to give some examples, in light of the record, of substantive disclosures that Plaintiff should have received in the past and is entitled to receive in the future. First, sufficiently in advance of the June 28, 2017, teleconference, Plaintiff should have been informed about, received a draft of, and been given the opportunity to comment on the voter data request that the Vice Chair planned to send to states—which he ultimately did on Commission letterhead, discussing the Commission's work, and offering sentiments "[o]n behalf of [his] fellow commissioners." Kobach Decl. Ex. 3. Second, sufficiently in advance of the September 12, 2017, meeting, Plaintiff should have been informed about, received a copy of, and been given the opportunity to comment on Secretary Gardner's proposals for location, content, and possible speakers at that meeting. *See* Pl.'s Reply Mem. at 12-13. Third, sufficiently in advance of any invitation being extended to the Minnesota Voters Alliance to speak at a December meeting, Pl.'s Mem. at 6, Plaintiff should have been informed of and been given the opportunity to comment on plans for the next meeting whenever it is held, the decision about whether or not to hold it in December, speaker possibilities for that meeting, and any proposal to invite this particular group.

The Court shall not monitor every document to be released to Plaintiff, but expects Defendants to comply with the guidance set forth in this decision. The Commission has a clear duty to provide Plaintiff with these documents and any similar documents that exist now or in the

future.

### 4. "No Adequate Alternative"

The Government argues that Plaintiff cannot recover under the APA. *See, e.g.*, Opp'n Mem. at 1. Accordingly, the Court shall treat as conceded any argument that the APA would be a sufficient alternative to preclude Plaintiff's recourse to mandamus. *See also EPIC*, No. 17-1320 (CKK), 2017 WL 3141907, at *13 ("Because there is no apparent agency involvement at this time, the Court concludes that APA review is presently unavailable in connection with the collection of voter roll information by the [Presidential Advisory Commission on Election Integrity]."); *Lawyers' Comm.*, No. 17-1354 (CKK), 2017 WL 3028832, at *7 (finding in context of this Commission that "even if APA review were available, Plaintiff has not demonstrated that it has a likelihood of success on the merits").

The Government instead argues that the bylaws decide this question in at least three ways: 1) by according the Chair, and if so designated, Vice Chair, the right to prepare the agenda; 2) by permitting Plaintiff, as a commissioner, to provide input; and 3) by giving Plaintiff a mechanism for changing the bylaws if he and other commissioners are unhappy with the rule regarding the agenda. *See* Opp'n Mem. at 26-28. The Court rejects each prong. The Commission is not permitted to circumvent the FACA obligations recognized by *Cummock* simply by enshrining a particular view in the bylaws; if the converse were true, a commission established under FACA could agree in writing to eviscerate any of that statute's strictures. *See Cummock*, 180 F.3d at 290-91; Pl.'s Reply Mem. at 12-13. Plaintiff's right to change the bylaws in conjunction with other commissioners cannot compensate for a violation of rights protected in this circuit. Moreover, the record reflects that Plaintiff generally does take advantage of the opportunity to give input, but he makes the persuasive argument that he cannot meaningfully do so unless he is fully informed. *See,*

*e.g.*, Pl.'s Reply Mem. at 11-12.

<div align="center">* * *</div>

Based on Plaintiff's likely success in establishing a clear right to substantive information in the Commission's possession, the Government's clear duty to provide Plaintiff with that information with sufficient notice to allow him to exercise his right to fully participate as a commissioner, and the inadequacy of alternatives under the APA or bylaws, the Court finds that mandamus is not only viable at this stage of this particular case, but that it likely should be granted on the basis of compelling equitable grounds. This is so even if, as Defendant maintains, the standard for an injunction that alters the status quo is higher than for one that does not. *See* Opp'n Mem. at 7 (citing, *e.g.*, *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 246-47 (D.D.C. 2014)).

The Court is unpersuaded by the Government's argument that, although Defendants "agreed voluntarily to abide by the provisions of FACA," *see* Kobach Decl. Ex. 2 ¶¶ 2, 13, the Court nevertheless should not issue mandamus because "Defendants do not concede that FACA can be constitutionally applied to presidential advisory committees." Opp'n Mem. at 37-38. The Court has found *Cummock* to be the applicable law in this circuit, and it has been so for nearly two decades. *Cummock* does not hesitate to apply FACA to a presidential advisory committee. While *Cummock* did not provide relief by mandamus, the Court is not doing so today either. The Court finds that the standard for today's decision—likelihood of success on the merits—is satisfied in light of Section 10(b) and *Cummock*.

In addition to Plaintiff's FACA § 10(b) requests for documents, past and future, Plaintiff's Motion seeks several further types of relief, namely that Defendants be compelled "to permit Secretary Dunlap to fully participate [in Commission activities] on an equal basis as all other

commissioners," and that the Commission be "enjoin[ed] . . . from releasing a final report until Secretary Dunlap has received all documents to which he is entitled and has had an opportunity to review them, has participated in the drafting of the report or, if necessary, has completed a concurrence or dissent to the report." Pl.'s Mot. for Prelim. Inj., ECF No. 7, at 1-2.[5] The Court has already addressed Plaintiff's right to fully participate in the Commission by requiring that Defendants supply certain documents to facilitate his informed participation. Any further order to permit participation on an "equal basis" would assume that he will not be treated equally even after the Government provides documents in compliance with today's decision. The Court cannot reach that conclusion on this record. The request to temporarily enjoin the final report is similarly premature, insofar as it assumes that Defendants will not provide the required documents in a timely fashion. The present record does not warrant that conclusion as of yet.

## B. Irreparable Harm

"Although the concept of irreparable harm does not readily lend itself to definition, the courts have developed several well known and indisputable principles to guide them in the determination of whether this requirement has been met." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Chief among them is that "the injury must be both certain and great; it must be actual and not theoretical." *Id.* District courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate. *See Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with which the

---

[5] In his complaint, Plaintiff also seeks a ruling that certain alleged activities of the Commission prior to the filing of its charter constitute a violation of FACA § 9(c). *See* Compl., ECF No. 1, ¶¶ 94-101. While the parties have addressed this assertion in their preliminary injunction briefing, *see, e.g.*, Pl.'s Mem. at 12; Opp'n Mem. at 36-37, the Court shall not decide that issue at this time because Plaintiff does not specifically request this relief in his Motion.

plaintiff makes its FOIA request is predicated on a matter of current national debate, due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment."); *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) (finding that plaintiff would be irreparably harmed because it would be "precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program").

In this case, the injunctive remedy is warranted to allay the same kind of irreparable harm to Plaintiff that Cummock herself suffered. Prevented from receiving key documents during the life of the White House Commission on Aviation Safety and Security, Cummock could only obtain from the D.C. Circuit an opportunity to review those documents and secure an equal place for her dissent in the final report. *See Cummock*, 180 F.3d at 292-93. On remand, this Court issued a broad order to that commission to disclose a variety of documents. *See* ECF No. 31-2 (citing Mem. Op. at 2, *Cummock v. Gore*, No. 97-981 (CKK) (D.D.C. June 23, 2000) ("In accordance with the Court of Appeals's holding, this Court issued a scheduling order directing the Defendants to 'disclose to Plaintiff all non-classified records or documents of any kind created by, made available to, or relied upon by the Commission.'" (citation omitted)). There is no way to tell whether Cummock's full participation in that commission along the way would have affected its final report. Perhaps it would have obviated the need for a dissent. Here, the Court finds that in the absence of being provided with past and future documents of the kinds described above, Plaintiff's right to fully participate in the Commission would be irreparably harmed.

## C. Balance of the Equities and the Public Interest

Plaintiff has been appointed to a presidential commission to address an important issue.

22

Denial of the requested injunction would frustrate his interest in contributing his unique perspective, as well as gaining the "recognition and even prestige," *Cummock*, 180 F.3d at 292 (quoting *Ass'n of Am. Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993) (internal quotation marks omitted)), of full participation in such a commission. *See* Pl.'s Mem. at 18.

From the Government's perspective, there may be some hardship to providing all of the requested documents. However, several factors persuade the Court that this hardship is modest, at most. The Government already collected and categorized the documents to a degree sufficient to present the *Vaughn*-type index in the *Lawyers' Committee* litigation. Moreover, the Government's offer to permit Plaintiff to view the documents suggests that the Government has already contemplated how to physically furnish them—and has found it sufficiently possible that they have volunteered to do so. *See* ECF No. 30-7, at 2.

Accordingly, the Court concludes that, in balancing the equities and considering the public interest, this narrowly tailored preliminary injunction is appropriate. By withholding the substantive documents discussed in this opinion, the Commission ignores the strictures imposed by FACA to prevent unbalanced commissions, and ignores the rights and obligations required by *Cummock*, leaving the public to pay any concomitant price.

## IV.     OPPORTUNITY TO REVIEW DOCUMENTS

Apart from Plaintiff's Motion, the Court separately considers Defendants' offer to permit Plaintiff to review the requested documents, without receiving copies or taking notes. This is not a reasonable offer. If Defendants have decided that Plaintiff should be permitted to review documents, then he should be permitted to take notes and to make copies if he thinks that doing so would be useful.

## V. CONCLUSION

For all of the foregoing reasons, the Court **GRANTS-IN-PART AND DENIES-IN-PART** Plaintiff's Motion for a Preliminary Injunction, ECF No. 7.

An appropriate Order accompanies this Memorandum Opinion.

Dated: December 22, 2017

/s/

COLLEEN KOLLAR-KOTELLY
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MATTHEW DUNLAP,

      *Plaintiff*,

    v.

PRESIDENTIAL ADVISORY
COMMISSION ON ELECTION
INTEGRITY, *et al.*,

      *Defendants.*

Civil Action No. 17-2361 (CKK)

## ORDER
(June 27, 2018)

For the reasons set forth in the accompanying Memorandum Opinion, the Court hereby

**DENIES** Plaintiff's [35] Application for a Temporary Restraining Order;

**DENIES** Defendants' [39] Motion to Reconsider This Court's December 22, 2017, Order, including Defendants' request for a stay of this decision pending their determination of whether to appeal, as well as during any appeal, subject to any finding that the Court lacks jurisdiction over aspects of the case under consideration by the D.C. Circuit; and,

in an exercise of the Court's discretion, **DENIES** Plaintiff's [48] Motion for Leave to Serve a Preservation Subpoena.

Plaintiff is entitled under *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999), to the preliminary relief guaranteed by the Court's December 22, 2017, Order, as further clarified in the accompanying Memorandum Opinion, but not to anything more at this time. Defendants must produce the relevant documents by no later than **JULY 18, 2018**.

The parties shall submit a Joint Status Report by no later than **JULY 27, 2018,** indicating how they propose to proceed on the merits.

**SO ORDERED.**

Dated: June 27, 2018

                    /s/
                    COLLEEN KOLLAR-KOTELLY
                    United States District Judge

| | |
|---|---|
| MATTHEW DUNLAP,<br><br>   *Plaintiff*,<br><br>  v.<br><br>PRESIDENTIAL ADVISORY<br>COMMISSION ON ELECTION<br>INTEGRITY, *et al.*,<br><br>   *Defendants.* | Civil Action No. 17-2361 (CKK) |

**MEMORANDUM OPINION**
(June 27, 2018)

On December 22, 2017, the Court held that Plaintiff Matthew Dunlap was entitled to certain documents to vindicate his right, as an appointed commissioner, to fully participate in the proceedings of the Defendant Presidential Advisory Commission on Election Integrity (the "Commission"). *See Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96 (D.D.C. 2017). The Commission never complied with the Court's Order. Nor did any co-Defendant officials or entities indicate an intention to do so.[1] An Executive Order issued on January 3, 2018, terminated the Commission and triggered a series of motions seeking to clarify

---

[1] As of the filing of the [1] Complaint, Defendants consisted of the Commission; Michael R. Pence, in his official capacity as Chair of the Commission; Kris W. Kobach, in his official capacity as Vice Chair of the Commission; Andrew Kossack, in his official capacity as Designated Federal Officer for the Commission; the General Services Administration ("GSA"); Timothy R. Horne, in his official capacity as Acting Administrator of the GSA; the Executive Office of the President; the Office of the Vice President; the Office of Administration; and Marcia L. Kelly, in her official capacity as Director of the Office of Administration. In this Memorandum Opinion, the Court shall continue to refer to those individuals and entities as Defendants, despite some question as to whether some remain in this case following the Commission's dissolution. The Court need not decide that issue in this Opinion.

the path forward in this case.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, including the Court's [32] Order and [33] Memorandum Opinion of December 22, 2017, which the Court expressly incorporates herein, the Court **DENIES** Plaintiff's [35] Application for a Temporary Restraining Order ("TRO Application"), **DENIES** Defendants' [39] Motion to Reconsider This Court's December 22, 2017, Order ("Motion to Reconsider"), and, in an exercise of the Court's discretion, **DENIES** Plaintiff's [48] Motion for Leave to Serve a Preservation Subpoena ("Subpoena Motion").

Defendants have indicated that if the Court were to deny their Motion to Reconsider, they would consider seeking appellate review rather than producing the documents at issue. MTR Mem. at 12-13. They accordingly requested a stay of any adverse decision to give them time to evaluate. As the Court shall discuss in this Opinion, Defendants are not entitled to a stay either during their determination of whether to appeal or during any appeal, subject to any finding that

---

[2] The Court's consideration has focused on the following documents:

- Mem. of Law in Supp. of Pl.'s Appl. for a TRO, ECF No. 35-1 ("TRO Mem.");
- Defs.' Mot. to Reconsider This Ct.'s Dec. 22, 2017, Order, ECF No. 39 ("MTR Mem.");
- Mem. in Opp'n to Defs.' Mot. to Reconsider the Dec. 22, 2017 Order Granting in Part Pl.'s Mot. for a Prelim. Inj., ECF No. 46 ("MTR Opp'n");
- Reply in Further Supp. of Defs.' Mot. to Reconsider This Ct.'s Dec. 22, 2017, Order, ECF No. 47 ("MTR Reply");
- Suppl. Br. in Supp. of Pl.'s Mot. for a TRO, ECF No. 42 ("TRO Ancillary Issue Mem.");
- Defs.' Resp. to Pl.'s Suppl. Br. in Supp. of Mot. for TRO, ECF No. 44 ("TRO Ancillary Issue Opp'n");
- Suppl. Reply Br. in Supp. of Pl.'s Mot. for a TRO, ECF No. 45 ("TRO Ancillary Issue Reply");
- Pl.'s Mot. for Leave to Serve a Preservation Subpoena, ECF No. 48 ("Subpoena Mem.");
- Defs.' Opp'n to Pl.'s Mot. for Leave to Serve a Subpoena, ECF No. 49 ("Subpoena Opp'n"); and
- Reply Br. in Supp. of Pl.'s Mot. for Leave to Serve a Subpoena, ECF No. 50 ("Subpoena Reply").

the Court lacks jurisdiction over aspects of the case under consideration by the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit" or "Court of Appeals").

Plaintiff is entitled under *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999), to the preliminary relief guaranteed by the Court's [32] Order and [33] Memorandum Opinion of December 22, 2017, as further clarified in this Memorandum Opinion, but not to anything more at this time. Defendants must produce the relevant documents by no later than **JULY 18, 2018**.

## I. BACKGROUND

The Court extensively discussed the statutory and factual background of the Commission in its decision as to Plaintiff's [7] Motion for a Preliminary Injunction. *See Dunlap*, 286 F. Supp. 3d at 99-104. The Court shall only briefly recapitulate here the Commission's short life and Plaintiff's role therein, with emphasis on the factual and procedural developments that have occurred since the Court's decision.

President Donald J. Trump launched the Commission on May 11, 2017, with a mandate to "study the registration and voting processes used in Federal elections." Executive Order No. 13,799 § 3, 82 Fed. Reg. 22,389, 22,389 (May 11, 2017) ("May 11, 2017 Exec. Order"). Plaintiff Matthew Dunlap, Secretary of State of the State of Maine, was among the appointed commissioners. Over the following summer and early fall, the Commission held several meetings regarding election issues and collected some state voter data. Yet, despite his eagerness to contribute to the Commission's work, Plaintiff had reason to believe that Defendants and perhaps other commissioners were inhibiting his ability to fully do so. Plaintiff tried to obtain certain documents from the Commission to vindicate his rights, and when he was unsuccessful, he brought this lawsuit against the Commission, Vice President Michael R. Pence in his capacity as Chair of the Commission, Kris W. Kobach in his capacity as Vice Chair, the Executive Office of the

3

President ("EOP"), and the Office of the Vice President ("OVP"), among others.

Unofficial information shortly thereafter suggested that the Commission might hold a meeting without inviting Plaintiff's involvement in the planning. This precipitated his efforts to obtain preliminary relief, which this Court granted in significant part on December 22, 2017. The Court found that Plaintiff was likely to succeed in obtaining certain relief pursuant to the Court's mandamus jurisdiction, 28 U.S.C. § 1361, and met the remaining elements for a preliminary injunction as to that relief. Defendants were required to provide Plaintiff with certain past and future documents to facilitate his meaningful participation as a commissioner. *See, e.g.*, *Dunlap*, 286 F. Supp. 3d at 107-08. They never did so.

On January 3, 2018, Defendants abruptly notified the Court that President Trump had signed an Executive Order that terminated the Commission. Notice of Executive Order, ECF No. 34. A flurry of public statements comprised the Commission's early epitaph. That day the White House Press Secretary offered one version of the reasons for its demise:

> Despite substantial evidence of voter fraud, many states have refused to provide the Presidential Advisory Commission on Election Integrity with basic information relevant to its inquiry. Rather than engage in endless legal battles at taxpayer expense, today President Donald J. Trump signed an executive order to dissolve the Commission, and he has asked the Department of Homeland Security to review its initial findings and determine next courses of action.

Statement, The White House, Statement by the Press Secretary on the Presidential Advisory Commission on Election Integrity (Jan. 3, 2018), ECF No. 46-1. Mr. Kobach, who had overseen much of the Commission's operations as its Vice Chair, highlighted the realpolitik:

> "It got to the point where the staff of the commission was spending more time responding to litigation than doing an investigation," Mr. Kobach said. "Think of it as an option play; a decision was made in the middle of the day to pass the ball. The Department of Homeland Security is going to be able to move faster and more efficiently than a presidential advisory commission."

4

TRO Mem. at 5 (quoting Michael Tackett and Michael Wines, *Trump Disbands Commission on Voter Fraud*, N.Y. Times (Jan. 3, 3018), https://www.nytimes.com/2018/01/03/us/politics/trump-voter-fraud-commission.html). At least from his perspective, Mr. Kobach evidently would serve as "an informal adviser to homeland security," *id.* (quoting Tackett and Wines, *supra*) (internal quotation marks omitted), who would be "working closely with the White House and DHS to ensure the investigations continue," *id.* at 5-6 (quoting John Binder, *Exclusive—Kris Kobach: Voter Fraud Commission 'Being Handed off' to DHS, Will No Longer Be 'Stonewalled' by Dems*, Breitbart (Jan. 3, 2018), http://www.breitbart.com/big-government/2018/01/03/exclusive-kris-kobach-voter-fraud-commission-being-handed-off-to-dhs-will-no-longer-be-stonewalled-by-dems/) (internal quotation marks omitted). Confirming that the issue would remain on the agenda, President Trump tweeted, "Push hard for Voter Identification!" on January 4, 2018. MTR Opp'n at 10 n.18 (quoting Donald J. Trump (@realDonaldTrump), Twitter (Jan. 4, 2018)) (internal quotation marks omitted).

Nowhere did Defendants indicate that they would comply with the Court's December 22, 2017, Order compelling them to provide Plaintiff with certain documents. Defendants' correspondence with Plaintiff indicated that they would instead seek reconsideration of the Court's Order in light of the Commission's termination. TRO Mem. Ex. 2, ECF No. 35-3, at 1-2. Fearing that his final opportunity to participate in the Commission was slipping away, Plaintiff applied for a temporary restraining order ("TRO") seeking extensive relief, including a variety of orders regarding post-dissolution management of Commission documents and an order compelling Defendants' compliance with the Court's preliminary injunction. *See* Pl.'s Appl. for a TRO, ECF No. 35, at 1-2.

In parallel, Defendants sought reconsideration of the Court's preliminary injunction, citing

the "changed circumstances" of the Commission's termination without "issu[ing] a report or mak[ing] any recommendations before its dissolution." MTR Mem. at 1. In an effort to handle the motion practice most efficiently, the Court held a teleconference with the parties and decided to hold the TRO Application in abeyance while the Court resolved the Motion to Reconsider. Min. Order of Jan. 10, 2018. Plaintiff did, however, request the Court's prompt attention to one issue that he had not expressly raised in the TRO Application, namely whether former Commission members—some of whom were never Defendants in this case—could be restrained from unofficially disseminating official Commission records to the Department of Homeland Security or to other third parties. *Id.* The parties proceeded to brief the Motion to Reconsider, as well as Plaintiff's ancillary request for some form of restraint on former Commission members.

Defendants argued in their briefing that Mr. Kobach, as a Defendant sued only in his official capacity as Vice Chair of the Commission, is no longer a party to this case after the Commission's dissolution.[3] *See, e.g.*, TRO Ancillary Issue Opp'n at 1. Plaintiff accordingly filed a motion for leave to serve a subpoena on Mr. Kobach to ensure that he would preserve documents, in light of Defendants' position that they could not compel him to do so. Subpoena Mem. at 1; *see also* TRO Ancillary Issue Opp'n at 1 ("The Commission no longer exists and no longer has the power to compel the actions of its former Commission members.").

On the basis of the briefing, the Court is now prepared to resolve Defendants' Motion to Reconsider the preliminary injunction, together with Plaintiff's TRO Application, the request ancillary to Plaintiff's TRO Application, and Plaintiff's Subpoena Motion directed to Mr. Kobach.

---

[3] Defendants made the same argument about Vice President Michael R. Pence, sued only in his official capacity as Chair of the Commission. TRO Ancillary Issue Opp'n at 1. Plaintiff has not sought leave to serve a preservation subpoena on him.

## II.    LEGAL STANDARD

### A.  Motion to Reconsider

Under Federal Rule of Civil Procedure Rule 54(b), "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).  As it has before, the Court again shares the view in this district that a Rule 54(b) motion may be granted "as justice requires." *E.g.*, *Coulibaly v. Tillerson*, 278 F. Supp. 3d 294, 301 (D.D.C. 2017) (Contreras, J.); *United States v. Dynamic Visions, Inc.*, 321 F.R.D. 14, 17 (D.D.C. 2017) (Kollar-Kotelly, J.); *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (Lamberth, J.) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004) (Lamberth, J.)).  The proponent carries the burden of proving "that some harm, legal or at least tangible, would flow from a denial of reconsideration," and accordingly persuading the Court that in order to vindicate justice it must reconsider its decision. *Dynamic Visions, Inc.*, 321 F.R.D. at 17 (quoting *Cobell*, 355 F. Supp. 2d at 540) (internal quotation marks omitted).

"In general, a court will grant a motion for reconsideration of an interlocutory order only when the movant demonstrates: '(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order." *Zeigler v. Potter*, 555 F. Supp. 2d 126, 129 (D.D.C. 2008) (quoting *Keystone Tobacco Co., Inc. v. U.S. Tobacco Co.*, 217 F.R.D. 235, 237 (D.D.C. 2003)), *aff'd* No. 09-5349, 2010 WL 1632965 (D.C. Cir. Apr. 1, 2010). "Justice [also] may require reconsideration . . . 'where a controlling or significant change in the . . . facts has occurred since the submission of the issue to the court.'" *McLaughlin v. Holder*, 864 F. Supp. 2d 134, 141 (D.D.C. 2012) (quoting *Ficken v. Golden*, 696 F. Supp. 2d 21, 35 (D.D.C. 2010)).

However, as the parties were warned, "motions for reconsideration . . . cannot be used as an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier." *Estate of Gaither ex rel. Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 10 & n.4 (D.D.C. 2011)) (quoting *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010)) (internal quotation marks omitted); Order Establishing Procedures for Cases Assigned to Judge Colleen Kollar-Kotelly, ECF No. 6, ¶ 13.

## B. Application for Temporary Restraining Order

Like a preliminary injunction, a temporary restraining order is an extraordinary form of relief. An application for a TRO is analyzed using factors applicable to preliminary injunctive relief. *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 723-24 (D.C. Cir. 2011) (applying preliminary injunction standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." (internal quotation  marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*,

555 U.S. at 20) (alteration in original; internal quotation marks omitted)). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis*, 571 F.3d at 1291. Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92.

The Court notes that it is not clear whether this Circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome.

## C. Motion for Leave to Serve Subpoena

Federal Rule of Civil Procedure 26(d) explains that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)," subject to certain exceptions, including a "court order" authorizing such early discovery. Fed. R. Civ. P. 26(d)(1). The Court of Appeals has held that Rule 26 "vests the trial judge with broad discretion to tailor

discovery narrowly and to dictate the sequence of discovery." *Watts v. SEC*, 482 F.3d 501, 507 (D.C. Cir. 2007) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 598 (1998)).  Federal Rule of Civil Procedure 34 sets forth procedures for requesting that a party produce documents during Rule 26 discovery, and expressly directs elsewhere for analogous requests to nonparties.  *See* Fed. R. Civ. P. 34(a); *id.* 34(c) ("As provided in Rule 45, a nonparty may be compelled to produce documents . . . .").

"Federal Rule of Civil Procedure 45 authorizes court-issued subpoenas to obtain discovery from third parties . . . ." *Watts*, 482 F.3d at 507.  Among the requirements of Rule 45, "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1). "The Rule 45 'undue burden' standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties."  *Watts*, 482 F.3d at 509 (citing, e.g., *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("[C]oncern for the unwanted burden thrust upon non-parties [by a subpoena] is a factor entitled to special weight in evaluating the balance of competing needs.")).  "In addition, Federal Rule of Civil Procedure 26(b)(1)-(2) requires district courts . . . to consider a number of factors potentially relevant to the question of undue burden" under Rule 45.[4]  *Id.*  The rule setting forth the general scope of discovery covers some of these factors:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

---

[4] While Rule 26(b)(1)-(2) has been revised since *Watts*, this observation remains true of the present language.

Fed. R. Civ. P. 26(b)(1).  Further findings can trigger non-discretionary restrictions on discovery:

> On motion or on its own, the court *must* limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

*Id.* 26(b)(2)(C) (emphasis added).

### D. Request for Stay Pending Appeal

A party that moves for a stay pending appeal bears the burden of showing that the balance of four factors weighs in favor of the stay:

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.

*Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam); *see also id.* at 978 ("On a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy."); *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1263-64 (D.C. Cir. 2007) (Randolph, J., concurring) (citing *Cuomo* as demonstrative of the Court of Appeals' "long-standing principles governing stays").[5]  A party does not necessarily have to make a strong showing with respect to the first factor (likelihood of success on the merits) if a strong showing is made as to the second factor (likelihood of irreparable harm).  *Cuomo*, 772 F.2d at 974

---

[5] "The test for a stay or injunction pending appeal is essentially the same" as the test for a preliminary injunction, "although courts often recast the likelihood of success factor as requiring only that the movant demonstrate a serious legal question on appeal where the balance of harms strongly favors a stay[.]"  *Al–Anazi v. Bush*, 370 F. Supp. 2d 188, 193 & n.5 (D.D.C. 2005) (citing *United States v. Philip Morris Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003), *abrogated on other grounds*, *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009); *Cuomo*, 772 F.2d at 978; *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843-44 (D.C. Cir. 1977)).

("Probability of success is inversely proportional to the degree of irreparable injury evidenced. A stay may be granted with either a high probability of success and some injury, or *vice versa*."). Ultimately, a court must weigh the factors depending on the circumstances of the particular case. *See, e.g.*, *Ctr. for Int'l Envtl. Law v. Office of the U.S. Trade Representative*, 240 F. Supp. 2d 21, 23 (D.D.C. 2003) ("The remaining two factors—potential harm to plaintiffs and other individuals or to the public interest if a stay is granted—argue against a stay but ultimately do not outweigh defendants' showing of a substantial case on the merits and irreparable harm from disclosure.").

## III. DISCUSSION

### A. Motion to Reconsider This Court's December 22, 2017, Order

#### 1. *Rule 54(b) Standard*

The preliminary injunction granted in this case did not resolve all of Plaintiff's claims, even preliminarily. The Court has yet to resolve on the merits the claims presented in Plaintiff's motion for preliminary injunction. And the Court has not made any decision as to at least one further claim in Plaintiff's [1] Complaint, namely that Defendants violated Section 9(c) of the Federal Advisory Committee Act ("FACA") by acting out of turn with their filing of the Commission charter. *See, e.g.*, *Dunlap*, 286 F. Supp. 3d at 109 n.5 (declining to decide this claim not pursued in preliminary injunction motion). Accordingly, it is appropriate to evaluate the Motion to Reconsider under the Rule 54(b) standard applicable to an order that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties." Fed. R. Civ. P. 54(b). As discussed above, that standard is whether "justice requires" reconsideration. *Dynamic Visions, Inc.*, 321 F.R.D. at 17.

Defendants do not discuss the "as justice requires" standard but instead refer to several other standards, both for Rule 54(b) and other rules on which a decision purportedly could be

based.  As to Rule 54(b), Defendants argue that the relevant standard is whether "a change of circumstances between entry of the injunction and the filing of the motion" to reconsider has occurred "that would render the continuance of the injunction in its original form in equitable [sic]."  MTR Mem. at 4 (quoting *Fox Television Stations, Inc. v. FilmOn X LLC*, 968 F. Supp. 2d 134, 140 (D.D.C. 2013)) (internal quotation marks omitted) (mistake not in original).  However, Defendants do not cite any cases in this jurisdiction that apply this standard to Rule 54(b) decisions.  On the contrary, Defendants' main case expressly recognizes that the "justice requires" standard applies in the Rule 54(b) context.  *See Fox Television Stations, Inc.*, 968 F. Supp. 2d at 140 n.3 ("find[ing] that justice does not require reconsideration" upon "assuming *arguendo* that the Rule 54(b) standard applies").

    In the alternative to resolving this motion on Rule 54(b) grounds, Defendants urge the Court to apply the Rule 59(e) standard.  *See* MTR Mem. at 3-5.  Although Plaintiff does not expressly respond to that alternative argument, the Court finds that it is unnecessary to apply Rule 59(e), which Defendants aptly note "is generally used for reconsideration of final judgments," *id.* at 4.  *See also* Fed. R. Civ. P. 59(e) (setting deadline for "motion to alter or amend a judgment" following "entry of the judgment"); *id.* 54(a) (defining "judgment" as "a decree and any order from which an appeal lies").  "Motions under Rule 59(e) are 'disfavored' and the moving party bears the burden of establishing 'extraordinary circumstances' warranting relief from a final judgment." *United States v. Burwell*, 253 F. Supp. 3d 283, 285 (D.D.C. 2017) (Kollar-Kotelly, J.) (quoting *Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001) (Hogan, C.J.)).  Because the Court has not entered final judgment, and because the Court shall in any event find that the Rule 54(b) standard is not satisfied, the Court need not separately evaluate whether Defendants are entitled to relief based on what appears to be a higher standard associated with Rule 59(e).

13

Defendants also make some reference to case law applying a Rule 60(b) standard. *See, e.g.*, MTR Mem. at 3-4 (citing *Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 571 (D.C. Cir. 2011) ("[C]hanged circumstances ha[ve] rendered continued enforcement of the preliminary injunction . . . contrary to the public interest[.]")). "Rule 60(b)(5) provides that a district court may vacate an order or judgment if 'applying it prospectively is no longer equitable,'" among other possible grounds. *Petties*, 662 F.3d at 568 (quoting Fed. R. Civ. P. 60(b)(5)). But, similarly to Rule 59(e), Rule 60(b) pertains to "a final judgment, order, or proceeding." Fed. R. Civ. P. 60(b). There is no argument here that the Court's preliminary injunction represents a final judgment. Even if there were some argument, the Court clearly has not concluded its management of this case by resolving all of the claims on the merits.

In any event, Defendants have primarily urged the Rule 54(b) standard. *See* MTR Mem. at 4 (arguing that the "more permissive" Rule 54(b) standard, rather than Rule 59(e) standard, applies in these circumstances). Plaintiff does not object. The Court shall now apply the Rule 54(b) standard to Defendants' motion.

### 2. *Justice Does Not Require Reconsideration*

Because Defendants fail to articulate, and consequently, address, the threshold Rule 54(b) consideration of whether "justice requires" reconsideration, they forge ahead with a fresh analysis of whether the Court should grant a preliminary injunction under the standard four-factor test that this Court previously applied. *See Dunlap*, 286 F. Supp. 3d at 104 (citing *Aamer*, 742 F.3d at 1038). But they are not entitled to that second bite at the apple. For the reasons that follow, the Court finds that justice does not require reconsideration of its decision to grant partial preliminary relief to Plaintiff.

The dissolution of the Commission on January 3, 2018, is a relevant factual development,

in the basic sense that a commission existed when the Court issued the preliminary injunction and now does not exist. But that change is not "controlling or significant" for purposes of compelling reconsideration of whether Plaintiff satisfies the standards for preliminary relief. *See McLaughlin*, 864 F. Supp. 2d at 141 (contemplating reconsideration in the event of "a controlling or significant change" of fact (internal quotation marks omitted)). The Commission's termination does not affect the premise of the Court's December 22, 2017, opinion: "Plaintiff ha[d] a right, as a commissioner, to 'fully participate' in the proceedings of the Commission," and his ability to do so was stunted by Defendants' failure to provide him with documents during the life of the Commission. *Dunlap*, 286 F. Supp. 3d at 106 ("[Plaintiff] has a right to access documents that the Commission is considering relying on in the course of developing its final recommendations."); *see also Cummock*, 180 F.3d at 291 ("[FACA] must be read to confer on a committee member the right to fully participate in the work of the committee to which he or she is appointed."). The Court's December 22, 2017, decision affords Plaintiff access to documents described therein that were generated before the Court's Order and those that were generated afterwards through the point of the Commission's termination. *See Dunlap*, 286 F. Supp. 3d at 108 (holding that "[t]he Commission has a clear duty to provide Plaintiff with these [exemplary categories of past] documents and any similar documents that exist now or in the future.").

Defendants argue that they should not be required to turn over documents to Plaintiff because there is no longer a Commission in which to participate using those documents. MTR Mem. at 2 (quoting *Dunlap*, 286 F. Supp. 3d at 107 ("Plaintiff is entitled to substantive information so that he can contribute along the way in shaping the ultimate recommendations of the Commission . . . .")). Neither was there still a commission in which to participate in *Cummock*. In its December 22, 2017, decision, the Court "[found] that a preliminary injunction is necessary

in this case to prevent the Commission from reaching the level of dysfunction that precipitated *Cummock*," namely by frustrating Ms. Cummock's ability to fully participate in the relevant commission *before* that commission was terminated. *Dunlap*, 286 F. Supp. 3d at 107. Unfortunately, by January 3, 2018, despite the Court's best efforts the same dysfunction had materialized in this case: a commissioner whose full participation had been thwarted during the life of his commission service was now left to vindicate his rights after the fact.

The principle that "FACA rights are enforceable even after an advisory committee has been disbanded" is settled law in this Circuit. *Cummock*, 180 F.3d at 292 (citing *Byrd v. EPA*, 174 F.3d 239, 243-44 (D.C. Cir. 1999)). In *Cummock*, the Court of Appeals again recognized this principle in finding that a former commissioner of a then-defunct commission was nevertheless "entitled to review" any "information that was made available to [that] Commission during the course of its deliberative process and without which her ability to fully and adequately participate in that process was impaired." *Id.*

Courts in this Circuit continue to observe that *Cummock* preserves certain rights after dissolution of a commission subject to FACA. "A claim for document disclosure survives the termination of a FACA advisory committee, at least until all of the relevant materials have been disclosed." *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 227 (D.D.C. 2017) (Kollar-Kotelly, J.) (citing, e.g., *Cummock*, 180 F.3d at 292); *see also, e.g.*, *Nat. Res. Def. Council v. Abraham*, 223 F. Supp. 2d 162, 184 (D.D.C. 2002) (Collyer, J.) ("In *Cummock v. Gore*, the D.C. Circuit held that a request for documents pursuant to FACA is not rendered moot by the termination of the advisory committee in question."), *set aside in part on other grounds sub nom.*, *Nat. Res. Def. Council v. Dep't of Energy*, 353 F.3d 30 (D.C. Cir. 2004) (mem.). Although such cases generally concern the post-dissolution availability of documents to the public under FACA § 10(b),

a similar policy rationale is applicable to this former commissioner's right to documents under

*Cummock*:

> A finding that disclosure of the documents was no longer available because the committee[ ] ceased to exist would allow [Defendants] to frustrate the purposes of FACA by convening committees and disbanding them before materials could be requested, or a lawsuit concluded. The documents that [P]laintiff[ ] request[s] are still in existence and have not been produced to [him].

*Abraham*, 223 F. Supp. 2d at 184.

Whereas the former commissioner in *Cummock* needed documents to amend her response to that commission's final report, Defendants distinguish this case as not involving a final report to which Plaintiff has responded or could now do so. *See* MTR Mem. at 6. In support of this argument, Defendants submit a declaration from Charles C. Herndon, the Director of White House Information Technology, indicating that "[t]he Commission did not create any preliminary findings." 2d Decl. of Charles C. Herndon, ECF No. 39-2, ¶ 5. It is undisputed that there is no published final report in this case, and the Court shall accept for a moment, *arguendo*, that there are no preliminary findings either. Even so, this distinction is not persuasive. *Cummock* itself articulated the commissioner's separate rights 1) to review any documents to which she was entitled, as discussed above, *and* 2) "assuming that Cummock is entitled to review certain Commission documents to which she has heretofore been denied access, [to] be given an opportunity to amend and publish a dissent incorporating her fully enlightened views." *Cummock*, 180 F.3d at 293. Under Defendants' reasoning, a former commissioner's right to documents under *Cummock* turns on the arbitrary fact of whether the commission published a report before its termination. But the Court of Appeals' decision clearly establishes otherwise. Full participation in the Commission would have involved the opportunity to contribute to a published report if there was one, but even where there is not, still Plaintiff's right must be vindicated to any remaining

17

extent to which it was abridged.[6]

Only upon Plaintiff's review of the documents generated by the Commission will the extent to which his participation was thwarted become clear. Why should the Plaintiff, a duly appointed member of that body, be expected to rely on the assertion of a records custodian that there are no "preliminary findings"? There is no claim that Mr. Herndon had a substantive role in the work of the Commission. *See* TRO Ancillary Issue Mem. at 7 n.10 (noting it is not "clear what basis Mr. Herndon had to make this declaration, including what is meant by 'finding' in the declaration and whether Mr. Herndon, in his role as Director of White House Information Technology, was privy to all communications between DHS (or other federal agencies and officials) and the Chair, Vice Chair, Executive Director, and/or other Commission officials"). Among those who did have such a substantive role, the Vice Chair, Mr. Kobach, was interviewed in preparation for a *Breitbart* article that ultimately stated that "the voter fraud commission has revealed" certain specific findings. Binder, *supra*; TRO Ancillary Issue Mem. at 7-8 & nn. 8-11 (inaccurately asserting that article "quoted" Mr. Kobach as saying this).[7] Defendants—purportedly not representing Mr. Kobach any longer[8]—suggest that this assertion is attributable, at least in part, not to "findings by

---

[6] As Judge Judith W. Rogers separately observed of the decision in *Cummock*, this Court likewise "has not considered, and expresses no view about, whether 'full' participation necessarily entails an equal opportunity to participate at all times." *Cummock*, 180 F.3d at 293 (Rogers, J., concurring). Defendants make no argument, for example, that they withheld "classified . . . information" from Plaintiff to which other commissioners were entitled by virtue of security clearance. *Id.*

[7] Plaintiff's "id." citation in his note 11 would seem to refer to the Tackett and Wines article in the *New York Times*, but the "voter fraud commission has revealed" language cannot be found there. The citation appears instead to refer to the Binder article in *Breitbart*, where this language can indeed be found. *See* TRO Ancillary Issue Mem. at 7-8 & nn. 8-11 (citing, *inter alia*, Binder, *supra*).

[8] There is some dispute as to whether Mr. Kobach remains a Defendant in this suit, as he was sued exclusively in his official capacity. *See, e.g.*, Subpoena Mem. at 2-3 (observing Defendants' counsel's disclaimers). The Court need not decide that point here, because the press secretary's

18

the Commission itself" but rather to "reference material that was presented to the Commission at its meetings," TRO Ancillary Issue Opp'n at 10 n.1. But this suggestion of findings cannot be skirted so easily. On behalf of the President, whose Executive Office was and indisputably remains a Defendant in this matter, the press secretary has stated that the President "asked the Department of Homeland Security to review [the Commission's] initial findings." Statement, The White House, *supra*. President Trump likewise seemed to suggest that the issues entrusted to the Commission were still live topics, rather than dead-ends proven by an absence of findings. *See* MTR Opp'n at 10 n.18 (quoting Donald J. Trump (@realDonaldTrump), Twitter (Jan. 4, 2018)) ("Push hard for Voter Identification!" (internal quotation marks omitted)). Defendants' effort to walk back public statements consists of the records custodian's assertion as well as a footnote addressing the *Breitbart* article referenced above:

> [T]he statement by Mr. Kobach appears to reference material that was presented to the Commission at its meetings, not findings by the Commission itself. Material presented to the Commission at a meeting does not constitute a "finding" by the Commission any more than material presented to a Court in the context of litigation constitutes a "finding" by the Court.

TRO Ancillary Issue Opp'n at 10-11 & n.1 (citations omitted).[9] But such post-hoc rationalizations are not persuasive, particularly where Defendants offer no declarations from Mr. Kobach or the press secretary (or the President), nor even counsel's own explanation of the press secretary's statement on the part of those Defendants who indisputably remain in this case.

A review of the records themselves will reveal whether some of them could be

_____

statement effectively makes the same admission on the part of a Defendant—the Executive Office of the President—that undisputedly remains in the case.

[9] Defendants' comment about a "statement by Mr. Kobach" comes close to an admission that Mr. Kobach supplied the statistics that the *Breitbart* article quotes. But because the Court does not decide today whether Mr. Kobach remains a Defendant in this case, the Court does not attribute Defendants' comment specifically to him.

characterized as findings, or even a report, although they may not be captioned as such. Perhaps there were draft findings or a draft report that simply were not deemed "final." Or perhaps e-mails exist that informally characterize the results of the Commission's work. It is more difficult to envision a presidential commission, with paid staff, being terminated without *any* internal characterization of that commission's work over more than six months. In any event, now that the Commission is terminated, any findings, any report, or any internal characterization of the Commission's work is "final" from the perspective of the historical record that will be preserved in the National Archives pursuant to the Presidential Records Act ("PRA"). *See generally* 2d Decl. of Charles C. Herndon, ECF No. 39-2, ¶ 5 ("Non-public Commission records will continue to be maintained as Presidential Records."). Plaintiff is entitled to see for himself whether any documents that were generated can be considered "findings" by Commission staff or between certain of the commissioners and staff that, in lieu of a formal set of "findings" or formal final report, will be recorded for posterity in the Archives as the fruits of the Commission.

When Commission records preserved in the Archives under the PRA are made publicly accessible at the appointed time after the end of the Trump Administration, the documents themselves will represent to the public the findings and the report of the Commission. In the meantime, the press secretary's statement to the public—if not also Mr. Kobach's statements—takes the place of final findings and a final report.[10] Plaintiff is entitled to see any such findings, report, or internal characterization that was not shared with him before it became the final work product of the Commission. In turn, Plaintiff may respond in public, if he chooses, to any such

---

[10] Defendants "have also directly followed up with Secretary Kobach . . . and requested that he not share with DHS or any other federal entity (except the White House) any Commission records not otherwise already made public during the pendency of the plaintiff's motion. He has agreed to do so." TRO Ancillary Issue Opp'n at 2; *see also id.* at 14 (same). But Mr. Kobach has not committed not to speak to the public.

20

work product in what may be deemed for posterity as an informal oral or written version of any alternative findings, or an informal concurring or dissenting report.

The last reason for denying reconsideration is a matter of respect for the tribunal. Shutting down the Commission due to "endless legal battles," Statement, The White House, *supra*, and as part of an "option play," TRO Mem. at 5 (quoting Tackett and Wines, *supra*) (internal quotation marks omitted), suggests an effort to evade this Court's December 22, 2017, Order. Were it not so, the Court would have expected Defendants to pursue an interlocutory appeal, rather than termination of the Commission twelve days after this Court's preliminary injunction compelling a document production. They shall not be permitted to further postpone compliance with a preliminary injunction.

As in *Abraham* discussed above, termination of the Commission should not change the *ability* of Defendants to comply. *See Abraham*, 223 F. Supp. 2d at 184. Even before the Court's December 22, 2017, decision, Defendants had already reviewed and organized a number of Commission documents pursuant to court-ordered production of a *Vaughn*-type index in a related case before this Court involving the Commission. *Dunlap*, 286 F. Supp. 3d at 110 (citing *Vaughn*-type index in *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, Civil Action No. 17-1354-CKK). Moreover, Defendants already offered to make available some of those documents for Plaintiff's inspection. Mem. in Opp'n to Pl.'s Mot. for a Prelim. Inj. Ex. G, ECF No. 30-7, at 2 (extending offer to inspect certain documents related to September 12, 2017, meeting). Defendants do not assert that they are no longer able to produce those documents or that they are unable to produce documents post-dating the *Vaughn*-type index. As discussed above, the White House records custodian's declaration suggests that they are all preserved.

21

Defendants have not persuaded the Court that justice requires reconsideration. Accordingly, Defendants must produce the documents discussed in the Court's December 22, 2017, decision through the time of the Commission's termination. *See Dunlap*, 286 F. Supp. 3d at 108 (giving guidance as to types of documents to which Plaintiff is entitled). For the avoidance of doubt, the Court makes clear that such production must include relevant documents listed on the *Vaughn*-type index as well as those generated or received afterwards.[11] The covered time period includes relevant documents generated or received between the Court's December 22, 2017, decision and the Commission's termination. The Court has reason to believe that at least some such documents exist. *See* TRO Mem. at 8 n.11 (citing Allison Kite, *Kobach Voter Integrity Commission, Stalled by Lawsuits, Will Meet in January*, Topeka Capital-Journal (Dec. 29, 2017), http://cjonline.com/news/state-government/2017-12-29/kobach-voter-integrity-commission-stalled-lawsuits-will-meet). Plaintiff ultimately should receive relevant documents that *any* of the former commissioners generated or received. This includes material that commissioners solicited and subsequently received from third parties. *See, e.g.*, TRO Ancillary Issue Opp'n at 10 n.1 (attributing certain statistics to one such third-party submission, albeit allegedly supplied at one or more Commission meetings). Defendants are *not* obligated, however, to disclose any materials that were generated before the termination of the Commission but which exclusively concern document management after its termination. *See* MTR Mem. at 12.

## B. Application for Temporary Restraining Order & Ancillary Request

In his TRO Application, Plaintiff seeks not only a further order compelling the relief granted by the Court's December 22, 2017, preliminary injunction, but also additional relief

---

[11] The Court does not here decide the sufficiency of the *Vaughn*-type index for purposes of the *Lawyers' Committee* litigation.

stemming directly from the Committee's dissolution. Any necessity for a TRO is much diminished, however, by the Court's denial today of Defendants' Motion to Reconsider that preliminary injunction. Plaintiff's fears, for example, that Defendants might publish a report or findings absent Court intervention simply have not materialized. None of the briefing of motions decided today—which fully ripened on February 21, 2018—identified any verifiable example of such report or findings since the Commission's January 3, 2018, termination. Nor has any party brought such publication to the Court's attention during the pendency of the motions decided today.

Plaintiff's fears came closest to realization when the White House Press Secretary announced that the Commission's "initial findings" would be given to DHS. Statement, The White House, *supra*. But the press secretary made this statement on the very day of the Commission's termination, when perhaps an assertion of findings was little more than hasty boilerplate. Reinforcing that possibility, the Court has observed a slightly different version of the press secretary's statement that is also in the record. The version attached to Andrew Kossack's January 3, 2018, email informing commissioners of the dissolution of the Commission refers to the President in the first person as instructing DHS to "review these issues," rather than review "initial findings." TRO Ancillary Issue Mem. Ex. 1, ECF No. 42-1. While it is unclear which version of the statement was produced first, at the very least the discrepancy appears to signal uncertainty as to the existence of any findings. Mr. Kobach may have referred to some information as findings on or about January 3, 2018. *See* Binder, *supra*. But as discussed above, these statements by the press secretary and any by Mr. Kobach are undercut by Mr. Herndon's declaration that "[t]he Commission did not create any preliminary findings." 2d Decl. of Charles C. Herndon, ECF No.

23

39-2, ¶ 5. And no more definitive revelations have been docketed with the Court since then.[12]

As set forth in full below, Plaintiff's requests in his TRO Application may be summarized in pertinent part as follows: (1) preservation of Commission documents; (2) Plaintiff's participation in Commission wind-down and document retention activities; (3) his participation in document transfer decisions; (4) an injunction against document transfer; (5) an injunction against dissemination or publication of a report or findings until Plaintiff has had an opportunity to respond; and (6) an order that Defendants comply with the Court's December 22, 2017, Order. *See* Pl.'s Appl. for a TRO, ECF No. 35, at 1-2. The Court also considers here Plaintiff's ancillary request to prohibit the unofficial transfer of official Commission records by former Commission officials. *See* Min. Order of Jan. 10, 2018.

Because the Court held the TRO Application in abeyance during its consideration of the Motion to Reconsider, the Court did not receive an opposition from Defendants (or reply from Plaintiff). But the salient information is contained in other briefing. Plaintiff's memorandum in support of his TRO, and the parties' full briefing of his ancillary request, sufficiently identify the issues to make clear that Plaintiff is not entitled to relief. The Court therefore decides the TRO Application at this time.

---

[12] The foregoing analysis of the likelihood of a report or findings may seem to be in some tension with the parallel analysis supporting the Court's denial of Defendants' Motion to Reconsider. But the Court finds no inconsistency. Uncertainties about any report or findings work against each of the parties as to their respective burdens in their respective motions. Defendants fail to obtain reconsideration due, in part, to the possibility that a draft report or informal findings are among the documents. Plaintiff fails to obtain a TRO due, in part, to the low likelihood that such a report or findings exist. In any event, Plaintiff shall soon see whether these documents are among the Commission records.

1. *Document Management Requests*

    a. Likelihood of Success

Plaintiff's requests collectively seek a substantial role, for himself and effectively this

Court, in the management of documents after the termination of the Commission.  He seeks a

decision:

> (1) ordering Defendants to preserve, pending the outcome of this litigation, all documents and communications relating to the Commission, including but not limited to all documents and communications on the *Vaughn*-type index, all documents and communications regarding the decision to dissolve the Commission, all documents and communications regarding the disposition of Commission data and documents, and all documents and communications regarding the transfer of Commission activities and responsibilities to the Department of Homeland Security or any other agency, person, group, or entity; (2) ordering Defendants to permit Secretary Dunlap to fully participate, on an equal basis as any other commissioner, in all remaining Commission activities, including but not limited to . . . the disposal or other disposition of documents, data, and communications (including but not limited to all documents and communications listed on the *Vaughn*-type index) received by, generated by, or otherwise related to the Commission; (3) ordering Defendants to permit Secretary Dunlap's full participation in discussions regarding whether and how to transfer documents, data, and communications (including but not limited to all documents and communications listed on the *Vaughn*-type index) received by, generated by, or otherwise related to the Commission to the Department of Homeland Security, any other agency, or any other person, group or entity; [and] (4) enjoining Defendants from transferring to the Department of Homeland Security or any other agency, person, group or entity any documents, data, and communications (including but not limited to all documents and communications listed on the *Vaughn*-type index) received by, generated by, or otherwise related to the Commission[.][13]

Pl.'s Appl. for a TRO, ECF No. 35, at 1-2.  In addition, Plaintiff's ancillary request, as framed in

his supplement to the TRO Application, is for

> [A]n order preserving the status quo by enjoining Mr. Kobach and those acting in concert with him from distributing Commission records (including documents on the *Vaughn*-type index) in his possession to the Department of Homeland Security or otherwise pending the resolution of the motion for reconsideration and the receipt by Secretary Dunlap of documents to which he is entitled under the Court's

---

[13] The Court separately considers below the portion of Plaintiff's request (2) seeking participation in Commission wind-down activities.

December 22, 2017 Order.

TRO Ancillary Issue Mem. at 1-2.[14]  Plaintiff characterizes his request as "only seek[ing] a *temporary* injunction" pending his receipt of the documents at issue, which would equip him to "fully and fairly participate in ongoing discussions."  TRO Ancillary Issue Reply at 16.

In order to assess the first of the TRO elements, the likelihood of success, the Court shall begin with a brief overview of the statutory and regulatory regime that applies to Commission documents now that the Commission has terminated.  Federal regulations governing advisory committee records provide as follows concerning their retention:

> Official records generated by or for an advisory committee must be retained for the duration of the advisory committee. Upon termination of the advisory committee, the records must be processed in accordance with the Federal Records Act (FRA), 44 U.S.C. Chapters 21, 29–33, and regulations issued by the National Archives and Records Administration (NARA) (see 36 CFR parts 1220, 1222, 1228, and 1234), or in accordance with the Presidential Records Act (PRA), 44 U.S.C. Chapter 22.

41 C.F.R. § 102-3.175(e).  Pursuant to Section 102-3.175(e), it is necessary to determine whether post-termination management of official Commission documents is subject to the FRA and NARA regulations, or to the PRA.  The parties do not argue that the FRA and NARA regulations apply.  *But see* TRO Ancillary Issue Opp'n at 13 n.5 (observing that Presidential records sent to federal agencies "then become federal records subject to the Freedom of Information Act").  Rather, they acknowledge that the PRA is applicable here.  *See, e.g.*, TRO Ancillary Issue Mem. at 6 (making argument about certain "Commission records subject to the Presidential Records Act"); TRO Ancillary Issue Opp'n at 12-13 ("The Presidential Records Act governs Presidential records (including, in this context, Commission records)." (citation omitted)).  The Court agrees that the

---

[14] Plaintiff "does not seek a gag order that would prevent any [former] commissioner from speaking about Commission records or about his or her experiences on the Commission."  TRO Ancillary Issue Mem. at 2 n.3.

entities that produced or received the documents at issue render the Commission records subject to the PRA.

> Documentary materials produced or received by the President, the President's staff, or units or individuals in the Executive Office of the President the function of which is to advise or assist the President, shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt and be filed separately.

44 U.S.C. § 2203. The Commission's charter recognized that the Commission would "provide its advice and recommendations to the President" and that its documents would "be maintained pursuant to the [PRA] and FACA." Charter, ECF No. 30-2, ¶¶ 5, 13. Accordingly, the Commission seems to be subjected by its charter to the above-referenced PRA provision applicable to "units . . . in the Executive Office of the President" whose "function" is to "advise or assist the President." If that were not clear, Mr. Herndon, the Director of White House Information Technology, has confirmed by declaration in this litigation that "[n]on-public Commission records will continue to be maintained as Presidential records," while those that are public are available on the White House website. 2d Decl. of Charles C. Herndon, ECF No. 39-2, ¶ 5.

Even if the Commission documents were properly associated with the Vice President, rather than the President, the documents would similarly be covered by the PRA's document management regime. The President's Executive Order establishing the Commission designated the Vice President as its chair. May 11, 2017 Exec. Order § 2. For purposes of this opinion, all PRA provisions applicable to the President and Presidential records are also applicable to the Vice President and Vice-Presidential records. *See* 44 U.S.C. § 2207 (drawing some distinctions not relevant here). Accordingly, whether official Commission documents were created or received by units or individuals within the EOP, or by those within the OVP, both of which are Defendants in this case, they would be covered by the PRA.

27

The Presidential Records Act defines certain records as "Presidential records" (and, correspondingly, "Vice-Presidential records") subject to the categorization required above:

> The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2); *see also id.* § 2207 (Vice-Presidential records). The President and Vice President have obligations to ensure that Presidential records and Vice-Presidential records, respectively, are appropriately maintained:

> Through the implementation of records management controls and other necessary actions, the President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law.

44 U.S.C. § 2203(a); *see also id.* § 2207 (Vice President's obligations). It is clear to this Court that the PRA is a comprehensive regime that does not expressly afford a third party, such as Plaintiff, any role in the management of Presidential or Vice-Presidential records. Indeed, the President and Vice President are charged with taking "*all* . . . steps as may be necessary," for preservation under the PRA, 44 U.S.C. § 2203(a) (emphasis added); *id.* §2207 (Vice President), in conjunction with the activities of the Archivist, *see id.* § 2203 (c)-(g).

Plaintiff argues that Defendants are not fulfilling their document preservation obligations under the PRA, among other authorities. *See* TRO Ancillary Issue Reply at 2-5. But the D.C. Circuit has generally prohibited courts in this jurisdiction from evaluating compliance with the PRA: "We conclude that permitting judicial review of the President's compliance with the PRA would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise

important competing political and constitutional concerns. We therefore hold that the PRA is one of the rare statutes that does impliedly preclude judicial review." *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) (*Armstrong I*); *see also Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1294 (D.C. Cir. 1993) (*Armstrong II*) (recognizing that "the PRA impliedly precludes judicial review of the President's decisions concerning the creation, management, and disposal of presidential records during his term of office"). The Circuit's limited carve out from that blanket rule is not applicable to this case, at least at this juncture. *See Armstrong II*, 1 F.3d at 1294 (permitting "review [of] guidelines outlining what is, and what is not, a 'presidential record' to ensure that materials that are not subject to the PRA are not treated as presidential records").

Despite the Court's inability to evaluate Defendants' compliance with the PRA, the Court would be remiss to omit their representations of efforts to manage Commission documents. Regarding document preservation, as indicated above, certain "Commission documents and records remain publicly accessible on the former Commission's public webpage," while "[n]on-public Commission records will continue to be maintained as Presidential Records." 2d Decl. of Charles C. Herndon, ECF No. 39-2, ¶ 5. And again, with the exception of certain administrative text messages, "all records reflected on the Vaughn-like index [filed in *Lawyers' Committee*] have been preserved either physically . . . at the Executive Office of the President or on the computer network maintained by the Director of White House Information and Technology and his staff." Decl. of Philip C. Droege, ECF No. 44-1, ¶ 3.

As far as document transfer, "no Commission records or data will be transferred to the DHS or another agency, except to NARA, if required, in accordance with federal law." 2d Decl. of Charles C. Herndon, ECF No. 39-2, ¶ 5. In particular, "[t]he state voter data has never been," and "will not be transferred to, or accessed or utilized by, DHS or any other agency, except to

[NARA], pursuant to federal law, if the records are not otherwise destroyed." *Id.* ¶ 4.[15]  As with all of their affidavits in this case, the Court shall hold Defendants responsible for following through with their representations, in particular here that they will not transfer Commission records or data, including the state voter data.  A magistrate judge handling another Commission case also was persuaded in part by similar representations as to state voter data.  *See Joyner v. Presidential Advisory Comm'n on Election Integrity*, Case No. 17-22568-CIV-Cooke/Goodman, 2018 WL 1863751, at *1, *8-*9, *12-*13 (S.D. Fla. Feb. 6, 2018) (issuing recommendation that district judge deny preliminary relief of "prevent[ing] the now-terminated [Commission] and other federal defendants from transferring or using voter registration information and other data that the Commission collected or otherwise obtained from the states").

Defendants make separate representations specific to Plaintiff's ancillary request, indicating that they have attempted to control the unofficial flow of Commission records as well.

> What defendants are doing to preserve the status quo is to request that the former Commission members not share Commission records with other entities. The White House Office of Records Management is sending all the former Commission members a letter requesting that they not independently transfer non-public Commission records to DHS or any other entity. Counsel from the White House Counsel's Office has also reached out to Mr. Kobach in his personal capacity, requesting that he not share with the Department of Homeland Security or any other federal entity, other than the White House for preservation purposes, any Commission records not otherwise made public, during the pendency of the plaintiff's motion. Secretary Kobach has agreed to that request.

TRO Ancillary Issue Opp'n at 14.  The White House has tried to collect any Commission documents—official or otherwise—that it does not yet have.  Philip C. Droege, the Director of the White House Office of Records Management, has attested to such undertakings.  *See* Decl. of

---

[15] Mr. Herndon has also confirmed that "[n]o Commission member was provided access to the state voter data prior to the Commission's termination and none has access now."  2d Decl. of Charles C. Herndon, ECF No. 39-2, at 2.

Philip C. Droege, ECF No. 44-1, ¶¶ 3-4 (indicating that Mr. Droege would be "sending a letter to all former Commissioners instructing them to forward to [his] office any documents that they created or received regarding Commission work that they [had] not already sent to the White House, to include [certain] text messages" regarding "administrative topics like scheduling" that had not previously been collected (internal quotation marks omitted)); Subpoena Opp'n at 2-3 (confirming that Mr. Droege sent this letter to all former commissioners, including Plaintiff and Mr. Kobach); Subpoena Opp'n Ex. A, ECF No. 49-1 (containing Plaintiff's copy of aforementioned letter sent by Mr. Droege).

It is true that those representations do not cover all eventualities. For example, Defendants make no commitments regarding documents that former commissioners may have that have not yet been provided to the White House. Plaintiff objects to the implications of Defendants' argument that former commissioners, such as Mr. Kobach, are neither party to this case any longer nor subject to compulsion by Defendants now that the Commission has terminated. *See, e.g.*, TRO Ancillary Issue Opp'n at 3-4 (asserting that "individual former Commission members [who were sued only in official capacity] are no longer defendants as soon as they no longer have an official capacity"); TRO Ancillary Issue Reply at 3 (arguing that "the Government now takes the position . . . that the best the Government can do is make a non-binding and non-enforceable 'request' . . . that the individual commissioners forward documents for preservation to the White House"). Plaintiff also notes that Mr. Droege seems to make no representation about maintenance of Commission documents generated after the *Vaughn*-type index was filed on September 29, 2017, in the *Lawyers' Committee* litigation. *See* TRO Ancillary Issue Reply at 2-4; Decl. of Philip C. Droege, ECF No. 44-1, ¶¶ 3-4 (appearing to explain such an omission by reference to "no further meetings of the Commission" between its September 2017 meeting and its January 2018

termination). Plaintiff evidently fears the destruction of documents wherever Defendants have not expressly represented that they are ensuring preservation.

The Court is of the view that the President and Vice President must preserve more than what is listed on the *Vaughn*-type index, which purports to represent only the entitlement of the public to certain Commission documents at a specific point in time. It would seem that *all* Commission materials should be provided to the Archivist, whether during or upon the conclusion of this Administration, with the Archivist ultimately playing a significant role in determining what is to be preserved and released after the end of the Trump Administration. *See, e.g.*, 18 U.S.C. § 2203(f) (giving President (and Vice President) the option during Administration to entrust maintenance and preservation to Archivist); *id.* § 2203(g) (turning all responsibility over to Archivist after Administration). But the Court shall opine no further, because *Armstrong I* prohibits this Court from evaluating whether the President and Vice President are fulfilling their obligations under the PRA with respect to Commission documents.[16]

Even if the Court were not prohibited, the Court is not persuaded that this case, at least in its current posture, is the appropriate vehicle for adjudicating the President's obligations under the PRA to maintain Commission documents. The operative [1] Complaint chiefly concerns Plaintiff's role on the Commission. That Complaint does not—and could not at the time—make claims about post-termination management of Commission documents.

For the foregoing reasons, Plaintiff is not likely to succeed on the merits of his attempt to

---

[16] Because the Court finds that the President and Vice President are generally responsible for Commission records under the PRA, the Court need not reach Plaintiff's arguments about the extent of judicial power over former commissioners who may hold some documents, or copies thereof. *See, e.g.*, TRO Ancillary Issue Mem. at 4-5 (asserting that Court has authority over commissioners in "active concert or participation with" Defendants (quoting Fed. R. Civ. P. 65(d) (internal quotation marks omitted)). The Court also need not reach Defendants' opposing arguments concerning, e.g., due process. *See, e.g.*, TRO Ancillary Issue Opp'n at 10-11.

establish a right to intervene in the management of documents after the termination of the Commission, insofar as he seeks an order to preserve them (request (1)), a role in activities regarding their disposition (request (2), in pertinent part), a role in discussions about their transfer (request (3)), or an injunction against their transfer (request (4), and the ancillary request). Plaintiff was appointed to serve as a commissioner of a now-defunct commission; that appointment did not include an invitation to linger on afterwards—if Plaintiff thought necessary—as a *de facto* member of the White House records management team.

One further word must be said about Plaintiff's ancillary request. Defendants argue that the Court is without jurisdiction over former Commission officials, such as Mr. Kobach. Defendants cite a ream of cases, most of which are not persuasive authority, for the proposition that suit cannot proceed against a former official who was sued only in his or her official capacity. *See* TRO Ancillary Issue Opp'n at 4. The Court shall shortly consider this issue to some degree in the context of the Subpoena Motion, but the Court need not reach it here. The Court has resolved the document management requests in the TRO, including the ancillary request, on the grounds that Plaintiff does not have a right to insert himself into the post-dissolution management of Commission records, as this process is governed by the PRA. The Court need not evaluate Defendants' assertion that "any dissemination [of Commission materials] by the now-decommissioned individuals [who formerly were Commission members] would not violate the Presidential Records Act or any other statute of which defendants are aware." *Id.* at 1. That is an issue of Defendants' interpretation of their PRA obligations, which the Court is unlikely, under *Armstrong I*, to be permitted to address. In any event, unofficial dissemination of the defunct Commission's materials is an issue not properly before this Court on the operative [1] Complaint. The issue of how to handle any copies of Commission documents that may reside with former

commissioners alone is likewise an issue of Defendants' compliance with the PRA that the Court is not in a position to address. *See* TRO Ancillary Issue Reply at 4 (arguing that the United States' "complete ownership" of Presidential records requires that individual commissioners return their copies of such documents (citing 44 U.S.C. § 2202 (internal quotation marks and emphasis omitted))). The Court's finding that Plaintiff has no role in the document management he seeks means that the Court need not separately decide whether it still has jurisdiction over certain individuals who may have relevant documents but purportedly are no longer Defendants.

### b. Irreparable Harm, Balance of Equities, and the Public Interest

Plaintiff has likewise failed to persuade the Court that he should prevail on the other elements of the test for a TRO. The Court need not re-hash its above description of Defendants' obligations under the PRA and their representations of efforts to comply. When Defendants are charged with, *inter alia*, maintaining Commission records pursuant to the PRA, Plaintiff is not likely to sustain the irreparable harm, in the absence of a TRO, of alleged destruction of those documents. Nor could Plaintiff be irreparably harmed by an inability to participate in document management decisions, TRO Mem. at 8, when the President and Vice President, not Plaintiff, are charged with management of those documents.

Plaintiff will still "'obtain[ ] in a timely fashion information vital to the current and ongoing debate' surrounding election and voter fraud," TRO Mem. at 9 (quoting *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006)), through the Court's decision to enforce its preliminary injunction. Accordingly, Plaintiff's interest in participating in public dialogue— assuming *arguendo* that such an interest is a legitimate consideration in this analysis—will be vindicated to the extent that the Court has found that he is entitled to some documents that would support that participation. This interest alone does not entitle him to the further document

34

management he seeks in his TRO.

Plaintiff could be irreparably harmed if documents containing any "findings" or "report" were destroyed, inhibiting his ability to respond to them, as contemplated by the Court's denial of Defendants' Motion to Reconsider. But it is not plausible that any such findings or report will be destroyed while this litigation is pending, for at least three reasons.

First, Defendants' preservation initiatives are very likely to encompass any such findings or report, which presumably would be easily identified as Commission documents subject to preservation under the PRA, rather than peripheral documents at some risk of routine purge— absent litigation hold—or documents residing only in the possession of a former commissioner. *See* Notice of Correction to the Record, ECF No. 37, at 2 (conveying Defendants' representation that "documents are being preserved in accordance with the litigation holds in place in this and other related litigation, and in any event are being preserved in accordance with the Presidential Records Act"); TRO Ancillary Issue Mem. Ex. 1, ECF No. 42-1 (containing January 3, 2018, email from Andrew Kossack, Designated Federal Officer for the Commission, informing members of Commission's termination and reminding them of August 4, 2017, Litigation Hold Notice).

Second, the President's press secretary had indicated that the "initial findings" would be passed to DHS. Statement, The White House, *supra*. Transfer entails preservation somewhere.

And finally, the affidavit from Mr. Herndon, the Director of White House Information Technology, that disavows "creat[ion] [of] any preliminary findings"—limited though this representation may be—suggests that no official Commission findings (and, accordingly, no report encompassing them) exist anyway. *See* 2d Decl. of Charles C. Herndon, ECF No. 39-2, ¶ 5. Accordingly, no transfer could take place. If that were not enough, Defendants' declaration confirms that no transfer to an agency (other than NARA, if necessary) will occur. *Id.* Defendants

also indicate that Mr. Kobach agrees not to make such a transfer either of any non-public documents in his possession. TRO Ancillary Issue Opp'n at 14. However, the Court mentions Mr. Kobach's assurance only for completeness. The Court does not rely on Defendants' representation of Mr. Kobach's assent because the Court has not decided whether it still has jurisdiction over Mr. Kobach. Even if it did have jurisdiction, the Court has found that the President and Vice President—but not Plaintiff—are responsible for managing Commission documents pursuant to the PRA.

The balance of equities tips in favor of Defendants as well. As a former commissioner, Plaintiff has a general interest in the maintenance of documents created by the former Commission. That interest is reinforced by the Court's December 22, 2017, decision recognizing that Plaintiff is entitled to certain documents of which he has been deprived. But when it comes to management of documents after the Commission's termination, Defendants have a concrete interest in complying with document maintenance obligations imposed by the PRA. The Court is disinclined to interfere with Defendants' statutory obligations for the sake of Plaintiff's interest, which is loosely connected to the Court's own preliminary injunction. Moreover, the Court's denial of Defendants' Motion to Reconsider the preliminary injunction should vindicate the rights that Plaintiff does have regarding Commission documents; the scope of his legitimate interest in this further relief, in light of the foregoing discussion, is minimal.

The public's interest in this dispute is to ensure that pertinent documents concerning the Commission's life and work survive to see the light of day. Defendants' obligations under the PRA, coupled with their representations in this case, assure the Court that the public interest will be protected. The Court is not persuaded that the public interest will be better served by issuing a TRO that the Court does not otherwise find to be justified than by the alternative: enforcing the

Court's preliminary injunction with its more limited scope and ultimately resolving the remainder of this dispute on the merits.

The foregoing analysis demonstrates that Plaintiff has not carried his burden to prove that he is entitled to a TRO granting him the document management relief that he requests.

### 2. *Plaintiff's Participation in Commission Wind-Down Activities*

As part of his request (2), Plaintiff seeks a Court order compelling "Defendants to permit Secretary Dunlap to fully participate, on an equal basis as any other commissioner, in all remaining Commission activities, including but not limited to the winding down of the Commission." Pl.'s Appl. for a TRO, ECF No. 35, at 2. Plaintiff represents the wind-down aspect as a subcomponent of any "remaining Commission activities." The Commission is no more, however, and so there are no further Commission activities as such. The Court considers only Plaintiff's request specifically to participate in wind-down activities, and only insofar as any such activities can remain after dissolution of the Commission.

Setting aside decisions about documents and data, which the Court elsewhere considers, it is not clear what kind of wind-down activities remain (or remained at the time Plaintiff's TRO Application was filed). The Court shall not specifically fault Plaintiff where details of any such wind-down may reside only with Defendants, but the absence of detail does undermine his ability to discharge his burden.

Plaintiff is not likely to succeed on the merits of proving that he should be allowed to participate in any wind-down. Just as Plaintiff's appointment to the Commission did not entail an informal appointment to the White House records team after his service, so he was not informally deemed an official of the EOP or OVP who is now responsible for any remaining wind-down. *Cummock* did not create any such entitlement. It is unclear, too, how Plaintiff could be irreparably

harmed by depriving him of a right to participate in the wind-down of a defunct organization of which he is no longer a member by operation of the organization's status. The documents are properly his concern, and the Court elsewhere deals with those. Defendants' legitimate interest in wrapping up the affairs of the Commission in an orderly fashion clearly outweighs the interest of Plaintiff, now a member of the public, in intervening on some grounds.

The public's interest here is rather ambiguous. The Court supposes that the American people would be concerned more with the former Commission's documents than with any wind-down that does not in some way concern those documents. The potential caveat is decisions about who should carry the torch, as it were, of further inquiry into election integrity. If Plaintiff is any indication, the public would be interested in those decisions. But the determination of whether DHS or another agency, if any, continues to perform work that the Commission had engaged in during its existence is a decision for the President, who constituted the Commission, not for the Plaintiff.

Plaintiff has not established a preliminary entitlement to participate in wind-down of the former Commission's affairs.

### 3. *Injunction Against Dissemination or Publication of a Report or Findings Until Plaintiff Has Had an Opportunity to Respond*

In his request (5), Plaintiff would have the Court "enjoin[ ] Defendants from disseminating or publishing any initial, preliminary, or final findings or report of the Commission until such time as Secretary Dunlap has been provided with all Commission documents to which he is entitled, given a meaningful opportunity to participate in deliberations that lead to the findings, and has been given a reasonable amount of time in which to draft comments, a concurrence, or dissent to the findings or report." Pl.'s Appl. for a TRO, ECF No. 35, at 2.

Of the claims in his TRO, this one comes closest to the scenario that occurred in *Cummock* and was the concern of this Court in its December 22, 2017, Order. In each instance, a commission concluded without permitting a commissioner to fully participate in its proceedings along the way. But the crucial difference is that the *Cummock* commission had produced a final report before its doors were closed. The plaintiff commissioner had dissented from that report, but the Court of Appeals recognized a further right to amend her dissent upon receiving any information to which she was entitled but had been denied. *See Cummock*, 180 F.3d at 286-87, 292-93. There is no published majority report here, unlike in *Cummock*. And it is not clear that any findings have been circulated either. Nor has the state data been consulted.

Even though some type of report, or underlying findings, may lurk in the non-public Commission documents, the Court finds that an injunction against their dissemination or publication is either unnecessary, or at least still premature. *See Dunlap*, 286 F. Supp. 3d at 109 ("The request to temporarily enjoin the final report is similarly premature, insofar as it assumes that Defendants will not provide the required documents in a timely fashion."). First, there is no Commission left to carry out the Commission's obligation to issue a report to the President. *See* May 11, 2017 Exec. Order § 3 ("The Commission . . . shall submit a report to the President . . . ."). Second, although Defendants did not follow through by providing the documents compelled by the preliminary injunction in a timely fashion, the Court today enforces their compliance. Plaintiff will be able to vindicate his right to fully participate by reviewing—and, if need be, responding to—the documents contained in Defendants' forthcoming production. Lastly, the Court reiterates that, in the period since briefing concluded, the parties have not given any indication that Defendants may move forward with a report or findings. Accordingly, Plaintiff is not likely at this

time to succeed on the merits of a claim that he is entitled to an injunction against dissemination or publication of a report or findings.

Nor is there any appreciable likelihood of irreparable harm. Defendants' representations render it unlikely that Defendants have any findings or report to release, and likewise unlikely—recall the "endless legal battles" to which the press secretary expressly adverted—that they would do so pending the merits in this case, if not also in others. Plaintiff's ability soon to consult the documents compelled by the Court's December 22, 2017, preliminary injunction further diminishes any likelihood that he would be prejudiced by denying this additional injunction.

Neither side of this dispute appears to have markedly greater equities here. Plaintiff's desire to prevent dissemination or publication of findings or a report to which he could not fully contribute is a legitimate one. He still has an "interest in contributing his unique perspective" to the Commission to which he was appointed, and "gaining the 'recognition and even prestige' of full participation in such a commission." *Dunlap*, 286 F. Supp. 3d at 110 (quoting *Cummock*, 180 F.3d at 292). But Plaintiff will have his opportunity, under the December 22, 2017, preliminary injunction, to review Commission documents to see whether there are any informal findings or draft report on which he wishes to informally comment in the public square. *See* TRO Mem. at 10 (arguing that Plaintiff "is still entitled to draft and publish a 'dissent incorporating [his] fully enlightened views' responding to the statements published in the press by President Trump and Vice-Chair Kobach" (citing *Cummock*, 180 F.3d at 293)). For their part, Defendants of course would want to avoid the imposition of an expansive further injunction, especially when the injunction which the Court shall now enforce may ultimately have the same effect. Even if Plaintiff's equities were greater than Defendants', prevailing on this prong would not make up for

Plaintiff's inability to carry his burden as to the likelihood of success or likelihood of irreparable harm.

The public's interest would seem to lie in efficient resolution of this matter, together with the release of any Commission documents evidencing informal findings or a draft report. Without a greater showing that findings or a report likely exist, in the Court's view the public is better served by avoiding duplicative orders in the interest of focusing on the document production to which Plaintiff is entitled.

Plaintiff cannot discharge his burden on this claim either.

### 4. *Order to Comply with the Court's December 22, 2017, Order*

Lastly, in his request (6), Plaintiff asks the Court to "order[ ] Defendants to produce without further delay the documents required by the Court's December 22, 2017 Order and requested in Secretary Dunlap's January 4, 2018 letter to counsel for Defendants." Pl.'s Appl. for a TRO, ECF No. 35, at 2. It is not clear whether this request seeks more than the preliminary injunction entitles Plaintiff to, and for the reasons set forth above, Plaintiff is not likely to succeed in proving that he is entitled to more than that. The Court supposes that the request to "produce without further delay," attempts to add some urgency to the Court's preliminary injunction. But because the Court's Order accompanying this Memorandum Opinion shall add that urgency by other means, Plaintiff is not likely to be irreparably harmed by denial of this request in the TRO. The balance of equities tilts in favor of subjecting Defendants to only one Court order pertaining to the Court's December 22, 2017, Order, namely that Order itself, unburdened by this more-or-less redundant command. Plaintiff's interest is served by other means, chiefly enforcement of the December 22, 2017, preliminary injunction. The public's interest in ensuring that the documents ordered by the Court are produced will be vindicated without this further command. The Court finds that Plaintiff

is not entitled to this essentially redundant preliminary relief in light of the Court's decision to deny Defendants' Motion to Reconsider the preliminary injunction. Plaintiff might in any event agree that such further relief is moot.

### C. Motion for Leave to Serve Subpoena

Plaintiff seeks leave to serve a subpoena on Mr. Kobach that would require him to preserve, or produce at an unspecified future time, any Commission-related documents in his possession. Subpoena Mem. at 1, 10. It is not fully clear whether Plaintiff intends such a subpoena to apply solely during the pendency of Defendants' Motion to Reconsider, or rather throughout the pendency of the merits of this case. *See id.* at 6 (arguing that "there is a strong likelihood . . . that the White House is not in possession of all documents to which the Court's December 22 Decision applies, *or which might otherwise be relevant to this litigation*" (emphasis added)). Erring on the side of caution, the Court assumes the latter. Even upon denial of the Motion to Reconsider, Plaintiff presumably would be interested in the preservation of documents by Mr. Kobach, particularly because the Court has not decided whether Mr. Kobach remains a Defendant in this matter. The Court again finds the issue of Mr. Kobach's status in this case to be not properly before the Court in this posture—rather than in a motion to dismiss—but the Court need not resolve it in order to dispose of the present motion.

Ordinarily, the Court would consider whether Plaintiff's request for leave to serve a subpoena satisfies Rule 45's "undue burden" standard, to which Rule 26 adds additional limitations that are standard in the discovery context. *See Watts*, 482 F.3d at 509. But Plaintiff's request arrives before this Court has held an initial scheduling conference with the parties pursuant to Federal Rule of Civil Procedure 16(b) and discussed the parameters of discovery. Generally such expedited discovery is not permissible, though the Court may grant an exception. *See* Fed.

R. Civ. P. 26(d) (recognizing that early discovery exceptions include court approval). The decision *not* to permit expedited discovery is, of course, also squarely within the Court's broad discretion. *See Watts*, 482 F.3d at 507 (quoting *Crawford–El*, 523 U.S. at 598) (indicating that Rule 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery"). The Court shall proceed to consider Plaintiff's purported grounds for obtaining expedited discovery. Only upon a finding that expedited discovery is warranted would the Court turn to assess under Rule 45 (and Rule 26) the burden that such discovery would impose on Mr. Kobach.

At the threshold, the Court observes that the Federal Rules expressly permit a document production subpoena but do not provide for a document preservation subpoena. *See* Fed. R. Civ. P. 45(a)(1)(A)(iii) (including among a seemingly exhaustive list of potential subpoena contents a command to "*produce* designated documents, electronically stored information, or tangible things in that person's possession, custody, or control" (emphasis added)). Plaintiff's argument effectively admits as much:

> [T]here is no reason why the authority of district courts to permit the issuance of a document production subpoena pursuant to Rule 45 should not also encompass the lesser authority to issue a document preservation subpoena where appropriate, which would impose a lesser burden on the third party than production.

Subpoena Mem. at 5. Plaintiff urges the Court to bootstrap the authority of Rule 45 into permitting what that rule does not expressly provide, citing two strands of case law in support.

Plaintiff's first context for a document preservation subpoena is litigation under the Private Securities Litigation Reform Act ("PSLRA"). *Id.* at 4. That statute requires that "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss [in covered private securities litigation], unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C.

43

§ 78u-4(b)(3)(B).  But FACA contains no comparable provision for staying discovery subject to exceptions.  Nor does this case raise the kind of concerns that prompted Congress to address discovery in legislation specific to securities litigation.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 129, 129-30 (S.D.N.Y. 2003) (articulating Congress's interest in preventing securities class actions that seek discovery to fish for plausible claims).

Apart from the PSLRA context, Plaintiff offers two out-of-circuit decisions that permitted document preservation subpoenas.  *See* Subpoena Mem. at 5 (citing *District of Columbia v. Trump*, No. 17-cv-1596 (D. Md. Nov. 28, 2017), ECF No. 64; *Johnson v. U.S. Bank Nat'l Ass'n*, 2009 U.S. Dist. LEXIS 120111, at \*1 (S.D. Ohio Dec. 3, 2009)).  Neither involved FACA or the PRA, however.  And one, *District of Columbia v. Trump*, is a boilerplate order omitting all substantive reasoning entirely.  *Johnson*, on the other hand, found that the preservation subpoena was warranted under a good cause standard, in a case in which the operations of the third party at issue had been dormant for more than three years.  *Johnson*, 2009 U.S. Dist. LEXIS 120111, at \*1 (reciting the plaintiff's concern that "critical records and databases [could be] destroyed, lost, or otherwise despoiled").  The specific target of Plaintiff's Subpoena Motion, Mr. Kobach, is not an institutional entity as in *Johnson*, nor is Mr. Kobach—in contrast with the Commission— "dormant" in a comparable way.  Nevertheless, below the Court shall evaluate, under the standards applicable in this jurisdiction, whether Plaintiff is entitled to expedited discovery based on his concern that Mr. Kobach could destroy documents.

That said, resolution of Plaintiff's request should not require much more than the principles articulated elsewhere in this Opinion.  Now that the Commission has been terminated, the disposition of Commission documents is generally governed by the PRA, which for present purposes is beyond the scope of judicial review.  Commission documents are also subject to the

Court's December 22, 2017, preliminary injunction, of course, which impliedly requires document preservation to facilitate compliance. If any Commission documents have been destroyed following the issuance of that preliminary injunction, and if the Court determines that Plaintiff was entitled to such documents under the injunction, then Defendants could well be subject to a finding of contempt for failure to comply with obligations created by that injunction.[17] Defendants, particularly the EOP and OVP, would be wise to do all within their power to preserve documents in accordance with the PRA and the December 22, 2017, preliminary injunction. If they are not confident that they can comply through the combination of efforts that they have represented to the Court, then they ought to go further, e.g., to issue a subpoena of their own to the individual former commissioners. Perhaps their proposal of replevin could be appropriate as well. *See* TRO Ancillary Issue Opp'n at 13 (citing, e.g., *Jackson v. United States*, 248 F. Supp. 3d 167, 170 n.2 (D.D.C. 2017)).

With this in mind, the Court shall consider the two tests for expedited discovery that courts in this Circuit have typically applied when determining whether to grant a request for expedited discovery: the *Notaro* test and a reasonableness, or good cause, test. *See, e.g.*, *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006) (describing these as the "commonly recognized approaches"). Plaintiffs seeking expedited discovery under the *Notaro* test should prove

> (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

---

[17] Any argument that Defendants should be absolved by virtue of seeking reconsideration of that injunction would not obviate their obligation to preserve documents in the event that reconsideration were denied, as it now has been.

*Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982). Courts applying the more lenient reasonableness test evaluate the "reasonableness of the request in light of all of the surrounding circumstances." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014) (quoting *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 142-43 (D.D.C. 2005)) (internal quotation marks omitted).

Colleagues in this Circuit have recently found that the reasonableness "approach [is] more suited to the application of the Court's broad discretion in handling discovery," *id.* at 97-98, than the older *Notaro* approach adapted from the preliminary injunction standard, *Notaro*, 95 F.R.D. at 405 n.4. *See also Legal Tech. Grp., Inc. v. Mukerji*, Civil Action No. 17-631 (RBW), 2017 WL 7279398, at *2 (D.D.C. June 5, 2017) (opting for reasonableness standard); *Attkisson v. Holder*, 113 F. Supp. 3d 156, 161-62 (D.D.C. 2015) (same); *True the Vote, Inc. v. IRS*, No. 13-734 (RBW), 2014 WL 4347197, at *7 (D.D.C. Aug. 7, 2014) (same). An inexhaustive set of guidelines for the reasonableness inquiry includes: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Guttenberg*, 26 F. Supp. 3d at 98 (quoting *In re Fannie Mae Derivative Litig.*, 227 F.R.D. at 142-43) (internal quotation marks omitted). This Court likewise adopts the reasonableness test, recognizing that it is not only more consonant with the Court's discretion in discovery matters in general but also more consistent with the good cause standard for issuing a protective order, an arguably analogous context. *See* Fed. R. Civ. P. 26(c)(1).

Whether the Court contemplates a document preservation subpoena or, in the alternative, a document production subpoena, the reasonableness inquiry is largely the same, though the Court shall differentiate as needed. First, the preliminary injunction entered on December 22, 2017, militates against a further order compelling document preservation or production. The Court's

46

enforcement of this injunction in short order shall ensure that the documents to which Plaintiff is entitled are furnished by Defendants.

Plaintiff's sprawling list of nineteen specific document categories likely would render compliance with this subpoena rather difficult, even assuming Mr. Kobach has diligently maintained the documents at issue. *See* List of Documents to Be Preserved and/or Produced Pursuant to Subpoena, ECF No. 48-6, at 3-5. And it is not clear that Plaintiff even would be entitled to all of the documents that he seeks to subpoena. For example, he may not be entitled to all of the "Documents concerning . . . how Documents should be treated upon the Commission's closure or termination," *id.* at 5, if some of those documents concern the President's or Vice President's document management obligations under the PRA.

While Plaintiff wants this subpoena to prevent document destruction, it is not clear that he has anything substantial to fear. Plaintiff evidently presumes that some Commission documents reside with Mr. Kobach, or others, that have not been collected by the President's or Vice President's records management staff. *See* Subpoena Mem. at 6 ("[T]here is a strong likelihood—undisputed by DOJ—that the White House is not in possession of all documents to which the Court's December 22 Decision applies, or which might otherwise be relevant to this litigation."). *But see* Subpoena Opp'n at 2 (describing Defendants' September 2017 records collection efforts). Plaintiff would have to believe that Mr. Kobach did not comply with PRA training in July 2017 in which the commissioners were "instructed to copy the Commission's former Designated Federal Officer [Andrew Kossack], or the Commission's email account, on all communications." Subpoena Opp'n at 2. Plaintiff's motion further assumes that Mr. Kobach will not comply with litigation holds in this and related litigation. *See* Notice of Correction to the Record, ECF No. 37, at 2; TRO Ancillary Issue Mem. Ex. 1, ECF No. 42-1. And Plaintiff's request also assumes that

Mr. Kobach will not forward his documents to the records management staff as they requested after the Commission's termination.[18]  *See* Decl. of Philip C. Droege, ECF No. 44-1, ¶¶ 3-4 (describing this plan); Subpoena Opp'n at 2-3 (confirming that letter was sent); Subpoena Opp'n Ex. A, ECF No. 49-1 (containing Plaintiff's copy of this letter).  This series of assumptions sallies beyond reasonableness.

The Court is aware that Mr. Kobach's reputation for candor to the tribunal and compliance with its orders is less than sterling.  *See* Subpoena Mem. at 7-8 (citing *Fish v. Kobach*, 267 F. Supp. 3d 1297, 1303 (D. Kan. 2017) (upholding sanctions against Mr. Kobach, in capacity as Secretary of State for the State of Kansas, for misleading statements to magistrate judge), *appeal dismissed*, No. 17-3161, 2017 WL 7065741 (10th Cir. Aug. 30, 2017)); *Fish v. Kobach*, 294 F. Supp. 3d 1154, 1168-69 (D. Kan. 2018) (granting motion for contempt and imposing sanctions against Secretary Kobach for his failure to ensure compliance with court orders), *appeal dismissed*, No. 18-3094 (10th Cir. May 22, 2018); *Fish v. Kobach*, Case Nos. 16-2105-JAR-JPO, 15-9300-JAR-JPO, 2018 WL 3017768, at *55 (D. Kan. June 18, 2018) (imposing further sanction for Secretary Kobach's "pattern and practice . . . of flaunting disclosure and discovery rules").  But the Court is not prepared to assume that Mr. Kobach would disregard the White House's requests when other Defendants—and he too, if the Court finds that he remains a Defendant—are at risk of contempt if they irresponsibly lose documents to which the Court finds that Plaintiff was entitled under the December 22, 2017, Order.  Should it come to light that Mr. Kobach has Commission documents that he has not provided to other Defendants, and that other Defendants do not have their own

_____

[18] Defendants also represent that Mr. Kobach "has already sent a number of records to the former Commission."  Subpoena Opp'n at 10.  But, as Plaintiff observes, it is unclear whether he sent those pursuant to the Commission's September 2017 records collection effort, during the remaining life of the Commission, or in response to the latest collection efforts.  Subpoena Reply at 6 n.3.

copies of such documents, then Plaintiff may seek further relief from this Court as appropriate.

The burden of compliance with this subpoena could be significant. That burden might not fall on Defendants, per se, as *Guttenberg* suggests that the Court consider. But for these purposes, it is appropriate to consider the potential burden on Mr. Kobach himself, whether or not he remains a Defendant. Mr. Kobach would have to go to the effort of ensuring that every document responsive to all nineteen of Plaintiff's categories is safeguarded for preservation or production. Plaintiff's subpoena would further burden Mr. Kobach because its boilerplate definitions are expansive. They dictate that the term "Document(s)" be interpreted "in the *broadest possible sense* as interpreted under the Federal Rules of Civil Procedure . . . whether in hard copy, handwritten, printed, electronic, or other form." List of Documents to Be Preserved and/or Produced Pursuant to Subpoena, ECF No. 48-6, at 1 (emphasis added). Actual production of those documents, if the Court granted the Subpoena Motion in that form, would entail further time and expense. Even though Plaintiff has offered to permit Mr. Kobach to produce the documents at a later date in such a circumstance, Subpoena Mem. at 10, Mr. Kobach still would have to shoulder the burden of isolating all documents that may be responsive to Plaintiff's request.

And this request comes well in advance of typical discovery. Defendants have yet to file a response to Plaintiff's [1] Complaint. *See* Min. Order of Jan. 10, 2018 (staying this obligation until further order). It is unknown whether the Court shall be able to proceed shortly upon Defendants' filing of an answer or whether the Court shall need to entertain briefing of a motion to dismiss.

The Court finds that, for the manifold reasons above, Plaintiff has not carried his burden of persuading the Court that it would be reasonable to grant expedited discovery in the form of leave to serve a subpoena on Mr. Kobach.

49

### D. Request for Stay Pending Appeal

As part of their Motion to Reconsider, Defendants seek a stay pending a possible appeal if the decision is not in their favor. MTR Mem. at 12-13. Presumably their request would fall within the scope of Rule 62(c) if they had already filed their appeal. *See* Fed. R. Civ. P. 62(c) ("While an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the court may suspend . . . an injunction . . . ."). They argue that permitting Plaintiff now to have the documents at issue would effectively prohibit Defendants from seeking appellate review of this decision. *Id.* (citing, e.g., *People for the Am. Way Found. v. U.S. Dep't of Educ.*, 518 F. Supp. 2d 174, 177 (D.D.C. 2007) (citing *John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1308-09 (1989) (Marshall, J., in chambers))). But neither side adequately briefs the application of the basic four-factor standard for a stay pending appeal. *See Cuomo*, 772 F.2d at 974. Accordingly, the Court forges ahead with its application of that *Cuomo* standard largely based on its own examination of the relevant authorities.

First, Defendants have not sustained their burden to prove a likelihood of success on appeal. In its December 22, 2017, decision, the Court found that *Cummock* entitles Plaintiff to the documents at issue. Today the Court has determined that dissolution of the Commission does not entitle Defendants to reconsideration of the preliminary injunction. It follows from those two decisions that the Court views Defendants as unlikely to succeed on appeal. It is true that a "serious legal question" could help tip the scales on this factor when the likelihood of success on appeal is low. *See Al–Anazi*, 370 F. Supp. 2d at 193 & n.5. But that option is available only where the movants would otherwise prevail on the harm prong, *see id.*, which the Court shall find below is not the case here. *See also In re Special Proceedings*, 840 F. Supp. 2d 370, 372 (D.D.C. 2012) (citing, e.g., *Holiday Tours, Inc.*, 559 F.2d at 844) (finding that "serious legal question" standard

50

replaces likelihood of success on the merits "only when the other three factors tip sharply in the movant's favor"). The fact that the likelihood of success and irreparable harm prongs are subject to a sliding scale, *see Cuomo*, 772 F.2d at 974, does not, of course, mean that the movants can avoid the conclusion that they failed to adequately prove both of them.

Defendants argue that enforcement of the preliminary injunction before they could seek appellate review would work irreparable damage, MTR Mem. at 13, but their reasoning appears to apply, at most, to only a subset of the documents at issue. Of note, Defendants say nothing about any privileged, classified, or otherwise sensitive documents in the portion of their Motion to Reconsider requesting a stay pending appeal. *See supra* note 6 (citing *Cummock*, 180 F.3d at 293 (Rogers, J., concurring)). Rather, Defendants elsewhere point to the "sensitive and privileged information" contained in "forward-looking documents related to the disposition of data collected by a now-dissolved Commission." MTR Mem. at 12 (asserting that Plaintiff's "request would insert a non-federal employee into sensitive internal government discussions about the proper disposition of records in compliance with federal law, and may also touch upon internal security practices and litigation-related obligations"); *see also* MTR Reply at 9. But these are not the kinds of documents to which the Court found Plaintiff to be entitled in the Court's December 22, 2017, decision, nor in today's decision to deny reconsideration of it. Evidently some documents pre-dating the Commission's termination are privileged as well. *See, e.g.*, TRO Ancillary Issue Opp'n at 12 n.4 ("Some documents on the *Vaughn*-like index are clearly privileged (*i.e.*, internal discussion with counsel), but there is no indication that former Commissioners are in possession of any such documents, with the possible exception of litigation-related documents sent to Mr. Kobach in his former capacity as Vice Chair."). But Plaintiff appears not to seek those privileged documents. ECF No. 46-3, app. A at 12 (disclaiming Plaintiff's interest in entries on *Vaughn*-type

51

index consisting of "[l]itigation-related documents exchanged between named defendants and DOJ"). Plaintiff is entitled only to the documents discussed in the Court's December 22, 2017, decision, which did not contemplate documents concerning post-termination records management. *See Dunlap*, 286 F. Supp. 3d at 108. Defendants likewise should not be disturbed by Plaintiff's effort, in his TRO Application, to participate in document management decisions, as the Court has denied that relief. Moreover, as the Court has permitted above, Defendants may withhold documents generated before the termination of the Commission that exclusively concern document management after its termination. That limited carve out would appear to encompass all of the documents about which Defendants have presently expressed specific concerns.

Defendants' failure to argue that *any other* documents are sensitive is consistent with prior proceedings in this case: Defendants already offered, prior to the Court's December 22, 2017, decision, to make certain documents available for Plaintiff's in-person review. *See Dunlap*, 286 F. Supp. 3d at 103-04 ("Defendants offered to permit Plaintiff to inspect, in person, documents related to the September 12, 2017, meeting [of the Commission], but he would not be provided with copies, nor would he be permitted to take notes."). Their willingness to let Plaintiff see certain documents, absent a court order compelling them to do so, suggests that Defendants are not concerned about their content. If Defendants were in fact concerned about the content of other documents that they did not offer to show Plaintiff, then it would have behooved them to say so in briefing the Motion to Reconsider. The Court presumes that Defendants are troubled, not about the content of documents they did not address, but rather by the Court's finding, on December 22, 2017, that Plaintiff has a *right* to certain Commission documents.

If Defendants truly are concerned only about the precedential effect of a finding that Plaintiff is entitled to documents under *Cummock*, then the delivery of those documents pending

appeal would not work any irreparable injury. A finding by the Court of Appeals that Plaintiff is *not* entitled to the documents would remedy Defendants' legal concern by establishing the precedent they desire. In such an event, Plaintiff could simply be required to return the documents to Defendants for lack of entitlement to them. The Court can only speculate as to putative harms that the Defendants could suffer in the meantime—e.g., responding to comments that Plaintiff may make to the press—but finds it unlikely that any such "harms" would be irreparable.

The Court also finds that release of the documents would not moot any appeal, as Defendants' conclusory citations are meant to suggest. *See* MTR Mem. at 12-13. In *Church of Scientology of California v. United States*, the Supreme Court considered whether the delivery of copies of certain tape recordings to the IRS during the litigation mooted an appeal of the district court order compelling the tapes to be delivered. 506 U.S. 9, 10-12 (1992). The applicable standard was whether the appellate court could "grant 'any effectual relief whatever' to a prevailing party." *Id.* at 12 (citing *Mills v. Green*, 159 U.S. 651, 653 (1895)); *see also Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 43 (D.C. Cir. 2015) (finding that availability of some effectual relief under *Church of Scientology* standard precluded mootness). Even after delivery of the tapes, the appellate court could grant some relief, the Supreme Court found:

> While a court may not be able to return the parties to the *status quo ante*—there is nothing a court can do to withdraw all knowledge or information that IRS agents may have acquired by examination of the tapes—a court can fashion *some* form of meaningful relief in circumstances such as these. Taxpayers have an obvious possessory interest in their records. When the Government has obtained such materials as a result of an unlawful summons, that interest is violated and a court can effectuate relief by ordering the Government to return the records. Moreover, even if the Government retains only copies of the disputed materials, a taxpayer still suffers injury by the Government's continued possession of those materials, namely, the affront to the taxpayer's privacy. A person's interest in maintaining the privacy of his "papers and effects" is of sufficient importance to merit constitutional protection. Indeed, that the Church considers the information contained on the disputed tapes important is demonstrated by the long, contentious history of this litigation. Even though it is now too late to prevent, or to provide a fully satisfactory

53

remedy for, the invasion of privacy that occurred when the IRS obtained the information on the tapes, *a court does have power to effectuate a partial remedy by ordering the Government to destroy or return any and all copies it may have in its possession. The availability of this possible remedy is sufficient to prevent this case from being moot.*

*Id.* at 12-13 (final emphasis added; footnotes omitted).  As in *Church of Scientology*, so upon any successful appeal in this case, the Court of Appeals could still craft a remedy that grants some relief to Defendants.  At the very least, Plaintiff could be compelled to return all copies of documents provided to him in compliance with the Court's preliminary injunction.  While there may not be a privacy interest comparable to *Church of Scientology*, that case articulated a second interest—the taxpayer's "obvious possessory interest"—that has an analogue here.  If the Court of Appeals were to order Plaintiff to return Commission documents to Defendants, that would seem to vindicate an obvious possessory interest in Commission documents that the President and Vice President, and by extension, Defendants EOP and OVP, are required to maintain pursuant to the PRA.  *Church of Scientology* is clear that even if Plaintiff retains some knowledge or information derived from the documents that he is provided, that is not enough to render wholly ineffectual the relief of returning the documents.  Because this situation is analogous to the Supreme Court's decision in *Church of Scientology*, the Court finds strong authority that delivery of the documents in this case would *not* moot any appeal of the Court's preliminary injunction.

The harm to Plaintiff of a stay pending appeal is the harm of further delaying the limited means—under the Court's preliminary injunction—by which he can still vindicate his right to fully participate in the Commission.  The Court shall not recapitulate here its description of the kind of informal alternative findings or informal concurring or dissenting report that he may choose to issue to the public.  Plaintiff would have received the documents necessary to vindicate that right shortly after December 22, 2017, had the Court not needed to decide the Motion to Reconsider.  If Defendants had promptly delivered the documents, then much of the separate relief that Plaintiff

54

sought—in the form of the TRO, ancillary request, and subpoena—could have been prevented too. That said, if Defendants are merely required to show that "issuance of the stay will not cause *substantial* harm" to Plaintiff, *United States v. Philip Morris Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003) (citing *Holiday Tours, Inc.*, 559 F.2d at 843) (emphasis added), then perhaps Defendants can discharge their burden on this prong. But Defendants never directly address the harm that Plaintiff would sustain if the Court's decision were stayed. *See* MTR Mem. at 13 (asserting only that "any injury to the plaintiff . . . would be significantly diminished relative to his previous posture where the Commission remained in existence"); MTR Reply at 10 (arguing simply that "the balance of equities[ ] cut[s] in favor of the defendants"). And in any event, Defendants would need to succeed on more than this one prong.

Defendants offer no specific analysis of the public interest factor either. *See id.* The public interest seems to lie in the efficient resolution of litigation concerning the now-defunct Commission. By facilitating the provision of the documents at issue, today's decision moves the Court and parties one step closer to identifying what remains to resolve via this litigation.

In the end, the Court's decision to issue a stay is a matter for the Court's inherent discretion, which can be triggered only in exceptional circumstances. *See Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n.6 (1998) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)); *Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."); *Landis*, 299 U.S. at 255 (requiring movant to prove "a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one [sic] else"). The Court shall not permit Defendants to have what amounts to a Trojan Horse for re-litigating the Court's December 22, 2017, preliminary injunction and the Court's decision herein to deny reconsideration

of it. The Court granted Plaintiff a preliminary injunction—which Defendants did not appeal, whether before or after the Commission's termination—and Plaintiff is entitled now to the benefits of it. If Defendants appeal this decision, then they may seek expedited relief from the Court of Appeals. *See* Fed. R. App. P. 8(a)(1)(A), (2)(A)(ii); *see also* Fed. R. Civ. P. 62(g) (recognizing that appellate court may issue stay pending appeal). Moreover, depending on the scope of that appeal, it may trigger an automatic stay of certain proceedings in this Court pending its resolution. *See Loumiet v. United States*, Civil Action No. 12-1130 (CKK), 2018 WL 2694448, at *2 (D.D.C. June 5, 2018) (Kollar-Kotelly, J.) (citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam); *United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997)) (recognizing that appeal triggers stay as to claims on appeal). An answer or motion to dismiss may remain within the boundaries of proceedings that this Court still could facilitate during appeal of its preliminary injunction. And, in any event, the welter of requests that the Court decides today renders it unclear how the parties will choose to proceed. Defendants have not made out the "clear case of hardship or inequity" that would be required to warrant a stay. *Landis*, 299 U.S. at 255.

## IV. CONCLUSION

For all of the foregoing reasons, the Court hereby

**DENIES** Plaintiff's [35] Application for a Temporary Restraining Order;

**DENIES** Defendants' [39] Motion to Reconsider This Court's December 22, 2017, Order, including Defendants' request for a stay of this decision pending their determination of whether to appeal, as well as during any appeal, subject to any finding that the Court lacks jurisdiction over aspects of the case under consideration by the D.C. Circuit; and,

in an exercise of the Court's discretion, **DENIES** Plaintiff's [48] Motion for Leave to Serve a Preservation Subpoena.

56

Plaintiff is entitled under *Cummock v. Gore*, 180 F.3d 282, to the preliminary relief guaranteed by the Court's December 22, 2017, Order, as further clarified in this Memorandum Opinion, but not to anything more at this time. Defendants must produce the relevant documents by no later than **JULY 18, 2018**.

The parties shall submit a Joint Status Report by no later than **JULY 27, 2018,** indicating how they propose to proceed on the merits.

An appropriate Order accompanies this Memorandum Opinion.

Dated: June 27, 2018

<div style="text-align:right">

/s/

COLLEEN KOLLAR-KOTELLY
United States District Judge

</div>