**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATTHEW DUNLAP,<br><br>                 *Plaintiff*,<br><br>         v.<br><br>PRESIDENTIAL ADVISORY<br>COMMISSION ON ELECTION<br>INTEGRITY, *et al.*,<br><br>                 *Defendants.* | Civil Action No. 17-2361 (CKK) |

**MEMORANDUM OPINION**
(May 29, 2020)

This case concerns the rights of a specific member of a specific presidential advisory commission governed by the Federal Advisory Committee Act ("FACA") to receive documents that he has requested in order to facilitate his full participation. The Court previously granted in part Plaintiff Matthew Dunlap's Motion for a Preliminary Injunction. *See* Dec. 22, 2017 Order, ECF No. 32; Dec. 22, 2017 Mem. Op., ECF No. 33.

Now pending before the Court are Plaintiff's Motion to Compel Compliance with the Court's Orders, ECF No. 73, and Defendants' Motion to Dismiss, ECF No. 74. Plaintiff argues that Defendants have failed to comply with the previously issued preliminary injunction in this case. In response, Defendants argue that they have complied, and that Plaintiff's remaining claims should be dismissed on various grounds. Upon consideration of the briefing,[1] the relevant

---

[1] The Court's consideration has primarily focused on the following:
- Pl.'s Mot. to Compel Compliance with the Ct.'s Orders ("Pl.'s Mot. to Compel"), ECF No. 73;
- Mem. of Law in Supp. of Pl.'s Mot. to Compel Compliance with the Ct.'s Orders ("Pl.'s Mem."), ECF No. 73-1;
- Defs.' Mem. in Supp. of Their Mot. to Dismiss and in Opp'n to Pl.'s Mot. to Compel Compliance with the Ct.'s Orders ("Defs.' Mot. and Opp'n"), ECF No. 74-1;

authorities, and the record as a whole, the Court **DENIES** Dunlap's Motion to Compel Compliance and **GRANTS** Defendants' Motion to Dismiss.

# I. BACKGROUND

A. Statutory Background

FACA imposes a number of procedural requirements on "advisory committees," which are defined to include "any committee . . . which is . . . established or utilized by the President . . . in the interest of obtaining advice or recommendations for the President." 5 U.S.C. app. 2 § 3(2) (2016). The statute exempts, *inter alia*, "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." *Id.* FACA was enacted out of

> a desire to assess the need for the numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government. . . . Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature.

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 445–46 (1989) (internal quotation marks and citations omitted). Moreover, FACA is designed to prevent commissions from, *inter alia*, convening a group of like-minded individuals, excluding duly appointed members with opposing viewpoints, and rubber-stamping the political agenda of the appointing authority. *See Cummock*

---

- Reply in Supp. of Pl.'s Mot. to Compel Compliance with the Ct.'s Orders and Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n and Reply"), ECF Nos. 77 & 78;
- Defs.' Reply Mem. in Further Supp. of Their Mot. to Dismiss ("Defs.' Reply"), ECF No. 88; and
- Mar. 6, 2020 Joint Status Report, ECF No. 92.

In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision. *See* LCvR 7(f).

*v. Gore*, 180 F.3d 282, 287, 291–92 (D.C. Cir. 1999) (citing Jay S. Bybee, *Advising the President: Separation of Powers and the Federal Advisory Committee Act*, 104 Yale L.J. 51, 58–59 (1994) (discussing the "outside, 'neutral' support" necessary to make "salable" the conclusion of an agency decisionmaker)).

To achieve those purposes, FACA requires that an advisory committee, *inter alia*, file a charter before meeting or taking any action, 5 U.S.C. app. 2 § 9(c), hold its meetings "open to the public," *id*. § 10(a)(1), publish "timely notice" of each such meeting in the Federal Register, *id*. § 10(a)(2), keep minutes and other records of its meetings, *id*. § 10(c), and allow "[i]nterested persons . . . to attend, appear before, or file statements with" the committee, *id*. § 10(a)(3). FACA also mandates that, unless an exception applies under the Freedom of Information Act ("FOIA"), "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying." *Id.* § 10(b). Finally, FACA requires that each advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed," *id.* § 5(b)(2), and "not be inappropriately influenced by the appointing authority or by any special interest," *id.* § 5(b)(3).

B.  Factual and Procedural Background

The Court previously described the factual background underlying this case in its prior memorandum opinion initially considering Dunlap's Motion for a Preliminary Injunction. *See Dunlap v. Presidential Advisory Comm'n on Election Integrity* ("*Dunlap I*"), 286 F. Supp. 3d 96, 100–04 (D.D.C. 2017). The Court includes again here some relevant details and procedural history and refers readers to its prior memorandum opinion, which it incorporates and makes a part of its opinion here, for additional background.

Defendant the Presidential Advisory Commission on Election Integrity (the "Commission") was established by Executive Order on May 11, 2017.  Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017).  The Vice President was Chair of the Commission. *See id.* § 2; *Dunlap I*, 286 F. Supp. 3d at 100.  President Donald Trump also appointed Plaintiff Matthew Dunlap to the Commission.  The Commission had its first public meeting on July 19, 2017 and its second meeting on September 12, 2017.  *Dunlap I*, 286 F. Supp. 3d at 102.  Dunlap received a small set of materials before both meetings.  *See id.*  Dunlap, believing that he did not receive Commission materials to which other members had access, submitted a request to Andrew Kossack, Designated Federal Officer of the Commission, for certain Commission records under section 10(b) of FACA on October 17, 2017.  *Id.* at 103.  Dunlap specifically requested that the Commission produce "copies of any and all correspondence between Commission members in the possession of the Commission dating from the signing of the Executive Order on May 11th, 2017 until the receipt of this request," including

> communications between Commissioners themselves, between Commissioners and/or staff and other Federal agencies, communications used in the development of public documents, and any ongoing discourse between Commissioners and staff about the development of policies and/or policy proposals that may be offered to policymakers as either a component of any report or under separate cover of which this Commissioner may be unaware.

*Id.*

Dunlap filed this suit on November 9, 2017, claiming, among other things, that he had still not been provided materials to which he was entitled.  *See* Compl., ECF No. 1.  In particular, he brought five claims: (1) violation of FACA section 5, *id.* ¶¶ 77–85, (2) violation of FACA section 10(b), *id.* ¶¶ 86–93, (3) violation of FACA section 9(c), *id.* ¶¶ 94–101, (4) violation of the Administrative Procedure Act ("APA"), *id.* ¶¶ 102–06, and (5) in the alternative, seeking relief under the Mandamus and Venue Act (28 U.S.C. § 1361), *id.* ¶¶ 107–10.  He further filed a Motion

for Preliminary Injunction on November 16, 2017. *See* Mot. for Prelim. Injunction, ECF No. 7. He was provided with a limited amount of the information he requested after the filing of this litigation. *See Dunlap I*, 286 F. Supp. 3d at 103–04.

After the parties briefed the issues relating to the requested preliminary injunction, the Court granted in part and denied in part Dunlap's Motion for Preliminary Injunction. *See id.* at 111. In particular, the Court found that Dunlap had "a clear and indisputable right to further documents" under the D.C. Circuit's ruling in *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999). *See Dunlap I*, 286 F. Supp. 3d at 105. Dunlap generally had "the right to receive more than the documents available to the public" to ensure that he could "'fully participate' in the proceedings of the Commission." *Id.* at 106. This included "documents that the Commission [was] considering relying on in the course of developing its final recommendations." *Id.* The Court provided several examples of "substantive disclosures that [Dunlap] should have received" in its opinion. *Id.* at 108.

The Commission was subsequently terminated on January 3, 2018. Termination of Presidential Advisory Comm'n on Election Integrity, Executive Order No. 13,820 § 1, 83 Fed. Reg. 969 (Jan. 3, 2018). Defendants thereafter moved for reconsideration, which this Court denied in a memorandum opinion that this Court also incorporates and makes a part of its opinion here. *See Dunlap v. Presidential Advisory Comm'n on Election Integrity* ("*Dunlap II*"), 319 F. Supp. 3d 70 (D.D.C. 2018). The Court found that the termination of the Commission did not impact Dunlap's rights with respect to document disclosures under FACA. *See id.* at 86–89. The Court clarified that the preliminary injunction extended to "relevant documents listed on the *Vaughn*-type index as well as those generated or received afterwards" and included "relevant documents that *any* of the former commissioners generated or received," including "material that

commissioners solicited and subsequently received from third parties," as long as those documents were "documents discussed in the Court's December 22, 2017" decision. *Id.* at 89–90.

Following this, Defendants produced certain documents to Dunlap. *See, e.g.*, Notice of Compliance, ECF No. 53. The parties continued to meet and confer—and discuss with the Court— which categories of documents Defendants had withheld that Dunlap still sought. *See* July 27, 2018 Joint Status Report, ECF No. 54; Aug. 13, 2018 Order, ECF No. 55; Notice of Categories of Withheld Docs., ECF No. 58; Pl.'s Resp. to Defs.' Notice of Categories of Withheld Docs., ECF No. 59; Sept. 17, 2018 Min. Order; Sept. 28, 2018 Joint Status Report, ECF No. 60; Oct. 1, 2018 Min. Order; Oct. 9, 2018 Joint Status Report, ECF No. 61; Oct. 12, 2018 Order, ECF No. 62; Oct. 24, 2018 Joint Status Report, ECF No. 63; Jan. 28, 2019 Order, ECF No. 64.

This Court further ruled upon certain categories of documents sought by Dunlap in its January 28, 2019 Order, ECF No. 64. Among other things, the Court ordered that Defendants produce certain emails. *Id.* at 3–4. Included in that Order were "[e]mails discussing potential Commission members (e.g., *Vaughn* Index entry Nos. 361, 167)." *Id.* at 3. Defendants appealed this portion of the Order to the D.C. Circuit. *See* Notice of Appeal, ECF No. 67. The Court ultimately stayed production of the emails at issue while the appeal was pending. *See* Mar. 4, 2019 Min. Order; May 22, 2019 Min. Order; June 11, 2019 Min. Order; June 13, 2019 Min. Order; June 21, 2019 Order, ECF No. 84.

On appeal, the D.C. Circuit reversed this Court's January 28, 2019 Order as to the emails discussing potential Commission members. *Dunlap v. Presidential Advisory Comm'n on Election Integrity* ("*Dunlap III*"), 944 F.3d 945, 950 (D.C. Cir. 2019). In doing so, the D.C. Circuit reiterated that *Cummock* found that "a FACA committee member should receive information 'made available to the [committee] during the course of its deliberative process and without which

[the committee member's] ability to fully and adequately participate in that process [would be] impaired.'"  *Id.* (quoting *Cummock*, 180 F.3d at 292).  While the emails at issue were "'made available to' certain individuals who were Commission members but not others," they were not part of the "work of the committee" or its "deliberative process" and were unrelated to its purpose. *Id.*  As a result, Dunlap could not meet the demanding mandamus standard.[2]  *Id.*

While the D.C. Circuit was considering Defendants' appeal, the parties briefed the two pending motions: Dunlap's Motion to Compel Compliance and Defendants' Motion to Dismiss. These two motions are now ripe.

## II. LEGAL STANDARD

A. Motion to Compel Compliance

While Dunlap's motion is styled as a Motion to Compel Compliance, he is requesting that the Court order that Defendants produce specific categories of documents in accordance with the preliminary injunction issued in this case.  This requires the Court to determine whether these documents are covered by the preliminary injunction issued in this case and also whether Dunlap is entitled to those specific documents under the relevant preliminary injunction standard.

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (emphasis in original; quotation marks omitted)).

---

[2] The Court consequently withdraws the portion of its January 28, 2019 Order, ECF No. 64, directing that these emails be produced.  The Court further finds that, in light of the D.C. Circuit's ruling, Dunlap's claim with respect to these emails must be dismissed.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (internal quotation marks omitted) (quoting *Sherley*, 644 F.3d at 392). "'When seeking a preliminary injunction, the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). Where the preliminary injunction would be a mandatory one, meaning that its terms would alter rather than preserve the status quo, the Court's power to issue a preliminary injunction "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969).

B. Motion to Dismiss for Lack of Subject-Matter Jurisdiction

Defendants move to dismiss in part due to lack of subject-matter jurisdiction. A court must dismiss a case pursuant to Federal Rule 12(b)(1) when it lacks subject matter jurisdiction. In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal quotation marks omitted) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").

In reviewing a motion to dismiss pursuant to Rule 12(b)(1), courts must accept as true all factual allegations in the complaint and construe the complaint liberally, granting plaintiff the

benefit of all inferences that can be drawn from the facts alleged. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005) ("At the motion to dismiss stage, counseled complaints as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact."); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) ("We review here a decision granting a motion to dismiss, and therefore must accept as true all the factual allegations in the complaint."); *Koutny v. Martin*, 530 F. Supp. 2d 84, 87 (D.D.C. 2007) ("[A] court accepts as true all of the factual allegations contained in the complaint and may also consider 'undisputed facts evidenced in the record.'" (internal citations omitted) (quoting *Mineta*, 333 F.3d at 198)).

Despite the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. United States Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted) (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001)), *aff'd*, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008). A court need not accept as true "a legal conclusion couched as a factual allegation" or an inference "unsupported by the facts set out in the complaint." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotation marks omitted) (quoting *Papasam v. Allain*, 478 U.S. 265, 286 (1986)).

## C. Motion to Dismiss for Failure to State a Claim

Defendants also move to dismiss certain claims under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Federal Rules require that a complaint include "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* Instead, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 556, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III. DISCUSSION

The Court first addresses Dunlap's Motion to Compel Compliance before turning to Defendants' Motion to Dismiss.

A. Motion to Compel Compliance

Dunlap seeks to have Defendants produce three categories of documents that they have withheld.  He describes them as: (1) "internal and confidential documents sent to the Vice President by his staff," (2) "materials written by the Vice President's personal staff for his use," and (3) "other internal records of the Office of the Vice President ('OVP') and the Executive Office of the President ('EOP')".  Pl.'s Mot. at 2 (internal quotation marks omitted) (quoting Jan. 28, 2019 Order, ECF No. 64, at 1).  Defendants also provide details on these three categories: (1) "broader OVP and EOP discussion about the Commission itself, including internal discussions within OVP and EOP about the future status of the Commission;" (2) "a limited number of draft memoranda prepared by OVP staff that were intended, in final form, to update the Vice President about the Commission's activities and pending litigation regarding the Commission;" and (3) "internal emails and electronic documents created by OVP and EOP staff in the context of conducting staff and/or preparatory work for the former Commission, including internal staff discussions about logistics for the September 2017 meeting."  Defs.' Mot. and Opp'n at 10–11 (quoting and citing Decl. of Matthew Morgan ("Morgan Decl."), ECF No. 74-3, at ¶¶ 2–3).

Dunlap now argues that these three categories of documents are materials encompassed by the preliminary injunction in this case, as well as *Cummock* and FACA, because they are "substantive work of the Commission generated by, prepared for, or shared with any commissioner" and "substantive Commission materials generated or received by the Commission's staff."  Pl.'s Mem. at 10.  In response, Defendants argue these documents are not

covered by the preliminary injunction and cannot be, as Dunlap has failed to show that he is likely to have a clear and indisputable right to these specific categories of documents.[3]  Defs.' Mot. and Opp'n at 16–26, 30–35, 39–42.  The Court agrees with Defendants as to these three categories of documents.  Neither *Cummock* nor FACA establishes that Dunlap has a clear and indisputable right that would satisfy the strict standard for mandamus.  As a result, he is not entitled to these documents under the preliminary injunction, which required Defendants to produce those documents for which Dunlap was likely to be succeed on the merits under the statute and *Cummock*.

Dunlap suggests that the Court need not examine whether these documents were within the scope of *Cummock* and/or FACA because they are covered by the Court's prior orders.  *See* Pl.'s Opp'n and Reply at 8.  That is not the case.  In making this argument, Dunlap repeatedly focuses on certain language in *Dunlap II*:  "Plaintiff ultimately should receive relevant documents that *any* of the former commissioners generated or received.  This includes material that commissioners solicited and subsequently received from third parties."  *Dunlap II*, 319 F. Supp. 3d at 89.  What Dunlap overlooks, however, is that these sentences refer only to "relevant documents."  A few sentences earlier, the Court used the same phrase in requiring that Defendants produce "relevant documents listed on the *Vaughn*-type index as well as those generated or received afterwards."  *Id.*

---

[3] Defendants address Dunlap's arguments in several different portions of their combined Motion to Dismiss and Opposition.  They first address these issues in the context of their Motion to Dismiss the mandamus claims, as they argue there that Dunlap cannot show that he has a clear and indisputable right to the documents.  Defs.' Mot. and Opp'n at 16–26, 30–35.  As the Court considers whether Dunlap is entitled to the categories of documents he seeks under the mandamus standard, these arguments are also applicable in this context and the Court considers them here.  Second, Defendants argue that these documents are not encompassed by the Court's preliminary injunction in this case, which this Court also addresses in this section.  *Id.* at 39–42.  Defendants further argue in opposition that Dunlap's Motion is procedurally improper.  *See id.* at 38–39.  Because the Court denies Dunlap's Motion on other bases, the Court does not address this latter argument in this Memorandum Opinion.

The prior sentence sheds some light on what "relevant documents" means in this context, as it referred to "the documents discussed in the Court's December 22, 2017, decision through the time of the Commission's termination." *Id.* Dunlap assumes that the relevancy of the documents still at issue is clear, and that essentially *all* documents related to the Commission must be produced, *see* Pl.'s Opp'n and Reply at 10–11, but he is mistaken.

The Court has made several broad findings in this case regarding the documents to which Dunlap is entitled. In *Dunlap I*, the Court found that, in light of *Cummock*, Dunlap had a right to "fully participate" in the Commission's proceedings and "a right to access documents that the Commission is considering relying on in the course of developing its final recommendations." *Dunlap I*, 286 F. Supp. 3d at 106. In short, he had a "right to substantive material that would inform his full participation in the Commission and its development of recommendations to the President." *Id.* at 107. Rather than catalog all the documents that Dunlap should have received, the Court provided select examples. *See id.* at 107–08. Then, in *Dunlap II*, the Court explained that Dunlap was entitled to see any "findings, report, or internal characterization that was not shared with him before it became the final work product of the Commission." *Dunlap II*, 319 F. Supp. 3d at 88. None of these findings clearly apply to the documents at issue here.

These findings remain relevant in light of the D.C. Circuit's recent opinion in this case, which confirms that the standard under *Cummock* applies here. As the D.C. Circuit explained in *Dunlap III*, under *Cummock*, "a FACA committee member should receive information 'made available to the [committee] during the course of its deliberative process and without which [the committee member's] ability to fully and adequately participate in that process [would be] impaired.'" *Dunlap III*, 944 F.3d at 950 (quoting *Cummock*, 180 F.3d at 292). For example, the D.C. Circuit there found that emails regarding the members to be appointed to the Committee was

not so clearly part of the Committee's work or deliberative process to establish a likelihood of success on the merits of satisfying the mandamus standard. *Id.*

Dunlap agrees with this characterization of the Court's prior findings and the applicable law, as he argues that the Court's prior opinions "confirm that the government was and is required to produce to Secretary Dunlap all *substantive Commission documents necessary for his full and informed participation*." Pl.'s Mem. at 14 (emphasis added). But the Court has not yet determined whether *these* specific categories of documents are covered by the preliminary injunction—that is, whether they are "substantive material that would inform his full participation in the Commission and its development of recommendations to the President." *Dunlap I*, 286 F. Supp. 3d at 106. As Defendants note, the Court has not previously examined the types of staff materials at issue here. *See* Defs.' Mot. and Opp'n at 39–42. And, as the Court has relied upon *Cummock* in all its opinions for guidance on which types of documents the preliminary injunction included, whether Dunlap may compel production of these documents requires the Court to examine whether he has a right to these categories of documents under *Cummock* or FACA.

Moreover, all of this must be considered under the preliminary injunction and mandamus standards. Pursuant to the preliminary injunction, Defendants had to produce those documents to which Dunlap was likely to be entitled via writ of mandamus. *See Dunlap I*, 286 F. Supp. 3d at 105–07 (analyzing Dunlap's rights through lens of "clear and indisputable right" prong of mandamus, which was part of discussion regarding likelihood of success on merits). The writ of mandamus is available "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "Mandamus is 'one of the most potent weapons in the judicial arsenal,' a 'drastic and extraordinary remedy reserved for really extraordinary causes.'" *Dunlap III*, 944 F.3d at 949 (quoting *Cheney v. U.S. Dist. Court*,

542 U.S. 367, 380 (2004)).  "To show entitlement to mandamus, plaintiffs must demonstrate (1) a

clear and indisputable right to relief, (2) that the government agency or official is violating a clear

duty to act, and (3) that no adequate alternative remedy exists."  *Am. Hosp. Ass'n v. Burwell*,

812 F.3d 183, 189 (D.C. Cir. 2016).  These requirements are jurisdictional.  *Id.*  Even when these

requirements are met, however, "a court may grant relief only when it finds compelling equitable

grounds . . . .  The party seeking mandamus has the burden of showing that its right to issuance of

the writ is clear and indisputable."  *Id.* (citing *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir.

2002)).  The D.C. Circuit has explained that "the word 'duty' in § 1361 must be narrowly defined,

and that a plaintiff's legal grounds supporting the government's duty to him must 'be clear and

compelling.'"  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (quoting *13th Regional Corp. v.

Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).

To summarize, the Court must consider whether Dunlap has a likelihood of success of

establishing a "clear and indisputable" right sufficient to meet the mandamus standard to the three

categories of documents at issue here.  To do so, and in light of Dunlap's current arguments, the

Court must again apply *Cummock* and FACA to these documents.  This application reveals that

Dunlap has not sufficiently established why any of the three categories of documents he now seeks

were materials "made available to the [committee] during the course of its deliberative process

and without which [the committee member's] ability to fully and adequately participate in that

process [would be] impaired."  *Dunlap III*, 944 F.3d at 950 (internal quotation marks omitted).

*1. The First and Third Categories*

The first category of documents are records with a "broader OVP and EOP discussion about

the Commission itself," such as "internal discussions within OVP and EOP about the future status

of the Commission."  Morgan Decl. ¶ 3(a).  The third category of documents are "internal e-mails

and electronic documents (e.g., Microsoft Office and Adobe documents) created by OVP and EOP staff in the context of conducting staff and/or preparatory work for the former Commission." Morgan Decl. ¶ 3(c).  This includes, for instance, "internal staff discussions about logistics for the former Commission's September 12, 2017 meeting."  *Id.*

Dunlap suggests that *Cummock*, "on facts identical to this case," mandates that "all materials, including staff materials and materials shared with the Vice President," must be produced.  Pl.'s Mem. at 11.  Dunlap improperly applies *Cummock* to this situation.  The D.C. Circuit held in *Cummock* that the commissioner was "entitled to review" materials with "information that was made available to the Commission during the course of its deliberative process and without which her ability to fully and adequately participate in that process was impaired."  *Cummock*, 180 F.3d at 292.  *Cummock* did not, as Dunlap suggests, clearly establish that Commissioners are entitled to work prepared by staff that is not made available to Commissioners.  In fact, in his briefing, Dunlap assumes without explaining that all the materials he seeks were substantive materials "available to the Commission during the course of its deliberative process," the lack of which would prevent him from "fully and adequately" participating in the Commission's work.

But it is far from clear that is the case for these two categories of documents.  To begin with, it is unclear that the documents—which either discussed the Commission itself or logistics for the Commission—are substantive materials concerning the purpose of the Commission, which was to "study the registration and voting processes used in Federal elections."  *See* Executive Order No. 13,799 § 3, 82 Fed. Reg. at 22,389.  It is further unclear how Dunlap would have required these materials to fully participate in the Commission; in light of the declaration from Matthew Morgan, Counsel to the Vice President, the materials cannot be described as documents that the

Commission was considering relying upon, as they were about the Commission itself, underlying preparatory and staff work, and meeting logistics.  *See* Morgan Decl. ¶¶ 2–3; *see Dunlap I*, 286 F. Supp. 3d at 106.  Nor can they be clearly described as reports, findings, or internal characterizations that might have ultimately become the final work of the Commission.  *Dunlap II*, 319 F. Supp. 3d at 88.  These documents were also not provided to any former members of the Commission, including the Vice President in his role as Chair of the Commission.  This suggests that they would not have been necessary for Dunlap to fully participate in the Commission.  *See* Morgan Decl. ¶¶ 2–3.  These facts also distinguish this case from *Cummock*, in which the "briefing paper" that Dunlap references was shared with two Commission members.  *Cummock*, 180 F.3d at 287.  In brief, in no way does *Cummock* establish a clear and indisputable right to these documents, and thus Dunlap is unlikely to succeed on the merits and satisfy the mandamus standard by relying upon *Cummock*.

Dunlap also argues that FACA itself entitles him to these documents.  However, as documents in this first category were not shared with the Committee, it is not clear how these documents were "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were *made available to* or *prepared for* or *by* each advisory committee" under FACA.  5 U.S.C. app. 2 § 10(b) (emphasis added).  Dunlap suggests that this extends to advisory committee staff because the statue refers to "the advisory committee" rather than "commissioners."  Pl.'s Mem. at 14.  But he presents no other authority to support this conclusion.  *See id.*

In fact, at least one other court in this district has found that not all staff members involved in committee work are subject to FACA's disclosure requirements.  In *National Anti-Hunger Coalition v. Executive Committee of President's Private Sector Survey on Cost Control*, 557 F.

Supp. 524 (D.D.C.), *aff'd*, 711 F.2d 1071 (D.C. Cir. 1983), the court found that staff on "task forces" that "provide[d] information and recommendations for consideration to the Committee" were not subject to section 10(b)'s disclosure requirements. *Id.* at 529. In particular, the court found that FACA did "not cover groups performing staff functions such as those performed by the so-called task forces" because they did not "provide advice directly to the President or any agency." *Id.* So too does the language of FACA "distinguish between advisory committee members and advisory committee staff." *Id.* (comparing 5 U.S.C. app. 2 § 5(b)(2) with 5 U.S.C. app. 2 § 5(b)(5)). "[S]urely Congress," the court explained, "did not contemplate that interested parties like the plaintiffs should have access to every paper through which recommendations are evolved, have a hearing at every step of the information-gathering and preliminary decision-making process, and interject themselves into the necessary underlying staff work so essential to the formulation of ultimate policy recommendations." *Id.*

While the instant case presents different facts, the reasoning in *National Anti-Hunger Coalition* is persuasive and still applies here. The OVP and EOP staff members preparing these internal documents were not appointed to the Committee. Nor were the internal documents, which contained "discussion about the Commission itself" and/or regarded "staff and/or preparatory work for the former Commission," clearly contributing to the substantive work of the Committee. Morgan Decl. ¶ 3(a). The declaration submitted by the Government in fact clarifies that the documents in this category were not "shared with any former Commissioner." *Id.* ¶¶ 2–3. Taken together, this persuades the Court that these documents are not documents to which Dunlap is clearly and indisputably entitled to under section 10(b). He has therefore also failed to demonstrate that he has a likelihood of success on the merits of demonstrating that he has a clear and indisputable right to the documents in categories one and three under FACA.

*2. The Second Category*

The second category of documents is "a limited number of draft memoranda prepared by OVP staff that, in final form, were intended to update the Vice President in his capacity as Vice President, not in his capacity as a commission member, about the Commission's activities and pending litigation regarding the Commission."   Morgan Decl. ¶ 3(b).   Dunlap argues that *Cummock* establishes a clear right to these documents on facts that he claims are "identical" to those in this case.  Pl.'s Mem. at 11.  The Court disagrees that *Cummock* establishes a right to these claims that is sufficiently clear and indisputable to satisfy the mandamus standard.

Vice President Albert Gore was the chair of the committee at issue in *Cummock*.  180 F.3d at 286.  One of the documents at issue, and the document to which Dunlap analogizes the documents that were shared with the Vice President here, was a "an inch-thick briefing paper that [Cummock] saw Commissioners Gore and [John M.] Deutch reviewing."  *Id.* at 287.  As has been discussed, the D.C. Circuit ultimately found that she was entitled to review "information that was made available to the Commission during the course of its deliberative process and without which her ability to fully and adequately participate in that process was impaired."  *Id.* at 292.  While Dunlap claims that the parties were ordered by the D.C. Circuit to produce the briefing paper, Pl.'s Mem. at 12, in fact the D.C. Circuit remanded to the district court "to determine whether any additional materials [fell] within the parameters of information to which Cummock [was] entitled," *Cummock*, 180 F.3d at 293.

Regardless, the briefing paper referenced in *Cummock* and the documents in this second category differ in at least two vital ways.  First, the briefing paper in *Cummock* was shared not only with the Vice President but also with another commissioner.  *Id.* at 287.  Here, these documents were shared only with the Vice President and not with any other Commissioner, and

they were shared with the Vice President in his capacity as Vice President.  Morgan Decl. ¶¶ 2–3.

Second, the briefing paper in *Cummock* more clearly contained substantive material relevant to the

work of the commission at issue—Cummock actually saw the briefing paper in *Cummock* being

reviewed by the two commissioners.  180 F.3d at 287.  Here, the draft memoranda were intended

to update the Vice President about  "the Commission's activities and pending litigation regarding

the Commission."  Morgan Decl. ¶ 3(b).  These differences are significant in light of the D.C.

Circuit's ultimate finding that Cummock was entitled to information that was "made available to

the Commission" as part of its "deliberative process" and that she required to "fully and adequately

participate in that process was impaired."  180 F.3d at 292.

In short, the draft memoranda at issue here do not clearly satisfy the standard in *Cummock*.

While the memoranda were made available to the Vice President, they were made available to him

not in his role as Chair of the Commission but instead his role as Vice President.  Morgan Decl.

¶¶ 2–3.  Moreover, as they were not shared with any other members of the Commission or the Vice

President in his role as a Commissioner, it is far from clear that these documents were or would

have become part of the Commission's "deliberative process" under *Cummock*, or "documents

that the Commission [was] considering relying on in the course of developing its final

recommendations," *Dunlap I*, 286 F. Supp. 3d at 106, to which Dunlap might be entitled.  This is

especially the case since the materials were "about the Commission's activities and pending

litigation regarding the Commission," Morgan Decl. ¶ 3(b), and not about the Commission's

underlying purpose or work.  That in turn suggests that their absence would not hinder Dunlap's

full participation in the Commission's deliberative process.  For the same foregoing reasons, these

documents would not be clearly encompassed by FACA section 10(b); they were not clearly "made

available to or prepared for or by" the Committee.  *See* 5 U.S.C. app. 2 § 10(b).  Accordingly,

Dunlap cannot demonstrate a likelihood of success on the merits regarding his clear and indisputable right to this third category of documents.

For the foregoing reasons, the Court denies Dunlap's Motion to Compel Compliance. The Court now turns to Defendants' Motion to Dismiss.

B. Defendants' Motion to Dismiss

Defendants argue that Dunlap's claims should be dismissed. As Defendants have produced numerous documents to Dunlap under the preliminary injunction in this case, Defendants appear to specifically move for dismissal of any claims remaining in light of those productions. This includes Counts I, III, and IV of the Complaint, which this Court has not previously addressed, and any remaining claims under Dunlap's FACA section 10(b) claim in Count II and his mandamus claim in Count V. The Court agrees with Defendants that the remaining claims should be dismissed.

*1. Subject-Matter Jurisdiction—Mootness (Count I and Count III)*

First, Defendants move to dismiss Counts I and III on the basis that the Court lacks subject-matter jurisdiction to hear them. Defs.' Mot. and Opp'n at 12–14. Count I of the Complaint alleges a violation of sections 5(b)(2) and 5(b)(3) of FACA. Compl. ¶¶ 77–85. Section 5(b)(2) of FACA requires "the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. app. 2 § 5(b)(2). Section 5(b)(3) requires that legislation establishing or authorizing the establishment of an advisory committee "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." *Id.* § 5(b)(3). Dunlap alleges in Count I of his Complaint

that these provisions were violated because Dunlap and other commissioners had been precluded from meaningful participation in the Commission.  Compl. ¶¶ 81–85.

Count III of the Complaint alleges a violation of FACA section 9(c), which specifies that "[n]o advisory committee shall meet or take any action until an advisory committee charter has been filed."   5 U.S.C. App. 2 § 9(c).   Dunlap alleges that "the Commission and certain commissioners . . . conducted activities prior to the filing of the Charter on June 23, 2017," including certain listed activities, in violation of this provision.  Compl. ¶¶ 94–101.

Defendants argue that these non-document claims are moot in the wake of the Commission's dissolution and, as a result, this Court lacks subject-matter jurisdiction over them. Defs.' Mot. and Opp'n at 12–14.  The jurisdiction of federal courts is limited by Article III of the Constitution to the adjudication of actual, ongoing cases or controversies.  This limitation "gives rise to the doctrines of standing and mootness."  *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003); *see Sierra Club v. Jackson*, 648 F.3d 848, 852 (D.C. Cir. 2011) ("Article III of the Constitution limits the federal courts to adjudication of actual, ongoing controversies."). Pursuant to the mootness doctrine, it "is not enough that the initial requirements of standing and ripeness have been satisfied; the suit must remain alive throughout the course of litigation, to the moment of final appellate disposition.  If events outrun the controversy such that the court can grant no meaningful relief; the case must be dismissed as moot."  *People for the Ethical Treatment of Animals, Inc. v. United States Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 95 (D.D.C. 2014) (internal quotation marks and citations omitted) (quoting 13B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3533 (3d ed. 2014); *McBryde v. Comm. to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001)).   "A case is moot when the challenged conduct ceases such that there is no

reasonable expectation that the wrong will be repeated in circumstances where it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009) (internal quotation marks omitted) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).

Courts in the D.C. Circuit have routinely held that claims based on FACA's non-document, procedural requirements are mooted when the relevant advisory committee ceases to exist. *See Freedom Watch, Inc. v. Obama*, 859 F. Supp. 2d 169, 174 (D.D.C. 2012) ("Because there are no grounds to find that the alleged committee, even if it did at some point exist, exists at present, the case is moot with respect to [plaintiff's] claims for advance notice of, and the ability to participate in, any future meetings of the [committee], and with respect to [plaintiff's] claim for the appointment of 'at least one person with a different point of view' to the committee."); *Citizens for Responsibility & Ethics in Washington v. Duncan*, 643 F. Supp. 2d 43, 51 (D.D.C. 2009) ("Regarding the Department's other alleged FACA violations, including the violation of FACA's open meetings and charter requirements, the Department's establishment of the New Panel renders these claims moot."); *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 879 F. Supp. 103, 106 (D.D.C. 1994) ("Plaintiffs' suggestion that a declaratory judgment might be appropriate even if the working group has been terminated and all appropriate working group documents have been publicly released is also rejected.  At that point, there will simply be no continuing case or controversy for judicial resolution.  Nor will there be any basis for injunctive or other equitable relief.  The case will in fact be moot, and defendants will be legally entitled to dismissal."); *see also Byrd v. E.P.A.*, 174 F.3d 239, 244 (D.C. Cir. 1999) (noting that plaintiff's "injury would be mooted if EPA convened another panel . . . in compliance with FACA and provided [plaintiff] with all panel documents either before or at the meeting").

Dunlap recognizes that courts have so held and therefore "does not oppose dismissal without prejudice of Claims One and Three and the related requested declaratory relief."  Pl.'s Opp'n and Reply at 25.  The Court agrees that Counts I and III are moot and accordingly dismisses them.

### 2. Failure to State a Claim—No Private Cause of Action under FACA (Count II)

Defendants next move to dismiss Count II of the Complaint, which alleges a violation of FACA section 10(b), on the basis that there is no private cause of action under FACA.  This section provides that:

> the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

5 U.S.C. app. 2 § 10(b).  In response, Dunlap does not appear to contest that FACA itself does not provide a private cause of action.  *See, e.g.*, Pl.'s Opp'n and Reply at 30–31 (arguing that violations of FACA may be addressed by mandamus).  Instead, he suggests that his claims may be brought under the APA or the mandamus statute.  *Id.* at 25–31.

The Court agrees that courts in this district have, in recent years, consistently found that "FACA does not provide for a private cause of action."  *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, 265 F. Supp. 3d 54, 66 (D.D.C. 2017); *see also, e.g.*, *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 221 (D.D.C. 2017) (finding that "that FACA does not provide a private cause of action in this case"); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 30 (D.D.C. 2010) ("[T]he court holds that the FACA does not provide the plaintiff with a private right of action."); *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 34 (D.D.C. 2002) (explaining that "this Court cannot

read into a statute a cause of action that Congress has not expressly created" and consequently dismissing claims brought under FACA).

However, the Court also agrees that violations of FACA may be redressed under other statutes as appropriate.  *See, e.g.*, *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 34 (D.D.C. 2011) (finding that claims for violations of FACA could be brought under mandamus statute, 28 U.S.C. § 1361); *Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d at 34 (finding that plaintiffs had sufficiently pled certain claims under APA for failure to comply with FACA).  Accordingly, in light of this precedent, the reasoning therein, and Dunlap's silence on the issue of whether FACA provides a private cause of action, the Court dismisses Dunlap's claims in Counts I through III insofar as they seek to rely solely on FACA.  The Court does not dismiss Dunlap's claims brought under the APA or the mandamus statute on this basis.

### 3. Failure to State a Claim—APA Does Not Apply (Count IV)

Defendants further move to dismiss Count IV of the Complaint, in which Dunlap alleged that each Defendant's actions were final agency actions that were arbitrary and capricious in violation of the APA.  Compl. ¶¶ 102–06.  In particular, he alleged that the Defendants violated the APA by:

> (i) refusing to provide Secretary Dunlap with the Commission's records, in violation of Section 10 of FACA; and (ii) failing to ensure that the Commission is fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee in violation of Section 5 of FACA.

*Id.* ¶ 103.  The APA provides for judicial review of certain agency actions and requires the reviewing court to set aside any "agency action, findings, and conclusions" found to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  However, an action must be a "final agency action" to be challenged under this provision of the APA.  *Id.* at § 704.

Defendants argue that Dunlap's APA claims must be dismissed because the former Commission was not an agency subject to APA.  Defs.' Mot. and Opp'n at 14–16.  In response, Dunlap contends that Defendant the General Services Administration ("GSA") and its designee, Andrew Kossack, "failed to ensure the Commission complied with FACA."  Pl.'s Opp'n and Reply at 25.  But, Defendants claim, Dunlap has failed to sufficiently plead a claim under the APA because Dunlap has failed to explain how GSA or its designee played any role in managing or producing the Commission's records.  Defs.' Reply at 14–18.

Before diving into what is still contested by the parties, the Court examines what is not in contention.  Dunlap no longer appears to suggest that *all* the Defendants have violated the APA. In his opposition, Dunlap focuses solely on Defendants associated with the GSA.  *See* Pl.'s Opp'n and Reply at 25 ("Secretary Dunlap has a claim under the Administrative Procedure Act ('APA') because the General Services Administration ('GSA')—and its designee, Andrew Kossack— have failed to ensure the Commission complied with FACA."); *id.* at 27 ("Secretary Dunlap has adequately pled that defendants GSA and Kossack violated the APA; Defendants' motion to dismiss this claim against these defendants should be denied.").  At no point in his briefing does he explain how he has sufficiently plead an APA claim against the other Defendants, including the Commission itself, the Vice President (Chair of the Commission), Kris W. Kobach (Vice Chair of the Commission), EOP, OVP, the Office of Administration, and Marcia L. Kelly (Director of the Office of Administration), and he appears to concede that any APA claims against these Defendants should be dismissed.  *See id.* at 27 (concluding only that claims against GSA and Kossack should not be dismissed).  As Dunlap does not address the arguments against the other Defendants, he has conceded them, and any APA claims against them are dismissed.  *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well

understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

Moreover, as noted above, Dunlap concedes that his claims under sections 5 and 9 of FACA have been mooted by the dissolution of the Commission. *See* Pl.'s Opp'n and Reply at 25. For the same reasons as discussed above, any claims arising out of those sections brought under the APA are also mooted. Nor does Dunlap address any APA claims pursuant to the sections of FACA not related to document disclosures in his opposition, despite Defendants arguing that they should be dismissed. *See id.* at 25 (addressing only "decision by the GSA about the release of documents"). Accordingly, any APA claims against Defendants related to those provisions are also dismissed.

What remains at issue is whether Dunlap has sufficiently pled an APA claim against Defendants GSA (including its Administrator) and Kossack related to section 10(b) of FACA. To state an APA claim, Dunlap must identify an "agency action" that is "final." 5 U.S.C. § 704. The Court agrees with Defendants that Dunlap has failed to sufficiently allege an APA claim against these Defendants.

Dunlap's Complaint, in fact, has few allegations regarding GSA. He alleged that it "provide[d] the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary, and [had to] perform the President's functions under FACA." Compl. ¶ 15; *see also id.* ¶ 71 (discussing same in context of Executive Order that established Commission). He also clarified that the Commission was registered in GSA's "FACA database," and that the page for the Commission within that database had the Commission's Charter. *Id.* ¶ 72. Lastly, the Complaint alleged that "GSA posted notice in the Federal Register

on July 5, 2017 that the Commission would meet on July 19, 2017." *Id.* ¶ 73 (citing 2017 Fed. Reg. 14210).

The Complaint has more allegations regarding Defendant Kossack. Dunlap alleges that Kossack was the Designated Federal Officer for the Commission, *id.* ¶ 14, and that he told the Commissioners in an email that he would "ensure the Commission complies with" FACA, *id.* ¶ 75. On October 17, 2017, Dunlap allegedly wrote to Kossack to request "any and all correspondence between Commission members in the possession of the Commission dating from the signing of the Executive Order on May 11th, 2017." *Id.* ¶ 53 (internal quotation marks omitted). He explained in that letter that without this information, "he could not competently carry out his duties as a Commissioner," and that he was "entitled to the information" under FACA and *Cummock*. *Id.* ¶ 59. Kossack responded that he was consulting with counsel and would be back in touch soon. *Id.* ¶ 60. Then, according to Dunlap, Kossack did not respond to Dunlap's November 1, 2017 renewal of his request for Commission documents. *Id.* ¶¶ 62–63.

In his briefing, Dunlap suggests that the final agency action by the GSA that he challenges is "a decision by the GSA about the release of documents." Pl.'s Opp'n and Reply at 25. But at no point does Dunlap identify in either his Complaint or his briefing what exactly that decision was, when it occurred, or how it was a final decision. To address this, Dunlap seems to imply that Kossack was either an employee or agent of GSA and that he made decisions with regard to the release of Commission documents. Pl.'s Opp'n and Reply at 26–27. But although he claims that Kossack was appointed by the GSA Administrator "to ensure that the Commission complied with FACA," *id.* at 26, he still does not explain how that imputes Kossack's alleged decisions to the GSA. He offers no other support for his APA claim against the GSA. Indeed, Executive Order 13,799, which Dunlap references in his Complaint, explained that GSA was to solely "provide the

Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis." Executive Order No. 13,799 § 7, 82 Fed. Reg. 22,389. Dunlap does not allege that GSA had any authority over the documents at issue, or explain what decisions they had made, and Executive Order 13,799 suggests that they were not in any position to make any such decisions. Accordingly, the Court agrees that Dunlap has failed to identify any final agency action on the part of those Defendants, with the potential exception of Kossack acting on their behalf.

But review of Dunlap's allegations and authorities reveals that he has also failed to sufficiently plead an APA claim against Kossack. In particular, while he appears to allege that Kossack's action was not producing the documents that Dunlap requested of him, *see* Compl. ¶¶ 53–63, he does not fully address why Kossack's action would be an "agency action." The parties do not dispute that, aside from Kossack's position as the Designated Federal Officer, he was a staff member in OVP. *See, e.g.*, Pl.'s Mot. to Compel, Ex. 4 (Email from Andrew J. Kossack titled "Welcome; Initial Organizational Call"), ECF No. 73-5, at 2 (containing Kossack's signature, which identified him as Associate Counsel in OVP); Pl.'s Opp'n and Reply at 26 n.5 (clarifying that Kossack was sued in his official capacity and not as OVP staff member); Def.'s Reply at 14–15 (arguing that Kossack was never "an employee or agent of GSA" while arguing that OVP is not subject to APA). It is far from clear that his actions as a member of OVP would be subject to the APA. *See Wilson v. Libby*, 535 F.3d 697, 707 (D.C. Cir. 2008) (finding that Office of President and Vice President are not agencies in similar context under Privacy Act).

Dunlap does not argue that Kossack is subject to the APA on account of that position. He instead suggests that Kossack's designation as the Designated Federal Officer by GSA has made him (and GSA) subject to the APA. But Dunlap has failed to explain why Kossack's designation

would subject him to the APA.   There is nothing in the Executive Order establishing the Commission and cited by Dunlap that suggests that Kossack became an employee or agent of GSA.   The Commission's Charter, which Dunlap references and cites to in his Complaint, *see, e.g.*, Compl. ¶¶ 15, 46, 57, 70–72, is also attached as an exhibit to his Motion to Compel, *see* Charter, Presidential Advisory Commission on Election Integrity ("Charter"), ECF No. 73-4.   It specified that, "[p]ursuant to 41 CFR § 102-3.106 and in consultation with the chair of the Commission," the Vice President, GSA would "appoint a full-time or part-time federal employee as the Commission's Designated Federal Officer ('DFO')," who would "approve or call all Commission meetings, prepare or approve all meeting agendas, attend all Commission meetings and any subcommittee meetings, and adjourn any meeting when the DFO determines adjournment to be in the public interest." Charter ¶ 8.   This language does not suggest that Kossack was acting on behalf of GSA or that his status as a member of OVP was altered.   *Cf.* 41 C.F.R. 102-3.130(h) (GSA regulation explaining that federal employees assigned duties to an advisory committee remain covered by their previous compensation system).

Furthermore, Dunlap does not allege that either GSA or Kossack have control over the documents at issue any longer.   Basically, while neither party puts it in such terms, it is unclear how Dunlap's APA claims are redressable against Defendants.   *See Smith v. United States*, 237 F. Supp. 3d 8, 11 (D.D.C. 2017) ("Standing requires, at a minimum, that the Plaintiff have suffered an injury in fact, that was or is actual or imminent, not conjectural or hypothetical; that there be a causal relationship between the injury and the basis for the claim; and that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (internal quotation marks omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992))), *aff'd*, 715 F. App'x 10 (D.C. Cir. 2018).

As Defendants argue in their briefing, after dissolution of the Commission, the custodian of the documents in question is no longer Kossack or GSA, but instead the White House. Defs.' Mot. and Opp'n at 15; Def.'s Reply at 17. In fact, the Court has previously "recognized that management of the Commission documents is now properly the province of the President and Vice President, in conjunction with the Archivist, pursuant to the Presidential Records Act" ("PRA"). Aug. 13, 2018 Order, ECF No. 55, at 1. Dunlap has failed to allege how, even if Kossack and GSA had been subject to APA claims regarding the documents, any favorable decision from this Court with respect to Kossack, GSA, and the GSA Administrator would redress his injuries, as those parties no longer have control over the documents at issue. Dunlap also failed to address this in his briefing. *See* Defs.' Mot. and Opp'n at 14–16 (repeatedly raising point that office of President and Vice President have custody over documents at issue); Pl.'s Opp'n and Reply at 25–27 (not addressing issue of current custodianship in relation to this claim after Defendants raised argument). Based on that apparent concession and for the foregoing reasons, the Court finds that Dunlap has failed to sufficiently allege a redressable APA claim against GSA, its Administrator, and Kossack. His APA claims are accordingly dismissed.

### 4. Failure to State a Claim—Lack of Mandamus Jurisdiction (Count V)

Lastly, Defendants argue that Dunlap's remaining claims brought under mandamus in Count V must be dismissed because he cannot meet the stringent mandamus standard and the Court therefore lacks jurisdiction over the claims. The Court must first examine exactly what Dunlap's claims still entail at this point in the litigation.

In his Complaint, Dunlap originally requested that the Court "enter a writ of mandamus compelling Defendants to comply with their clear, indisputable, non-discretionary obligations under FACA." Compl. ¶ 108. After the Court issued its preliminary injunction in this case, and

denied reconsideration of that preliminary injunction, certain documents were provided to Dunlap. Consequently, the parties further met and conferred and, on October 24, 2018, updated the Court on the categories that remained at issue. *See* Joint Status Report, ECF No. 63. The Court then ordered that Dunlap cease pursuing six categories of documents that he had offered to conditionally forego. Order (Jan. 28, 2019), ECF No. 64, at 1. The Court also ordered that Defendants produce additional categories of documents, with certain exceptions. *Id.* at 2. With respect to the remaining categories of documents at issue, the Court required further description and reasoning from the parties. *Id.* at 2–4. The parties submitted a further update on February 27, 2019. *See* Joint Status Report ECF No. 66. Defendants had produced certain at-issue categories in lieu of providing further information and had provided to Dunlap the categories of documents that they had conditionally offered to provide. *Id.* at 1–2.

Based on the representations in the parties' previous filings, and on the briefing presented by the parties, it appears that the documents Dunlap claims he is still entitled to are those at issue in his Motion to Compel, which the Court considered, and denied, above. *See* Pl.'s Mem. at 1 (outlining remaining contested categories); *see also id.* at 7–10 (describing, from Dunlap's perspective, series of events following issuance of the preliminary injunction and discussing the remaining categories of documents sought by Dunlap); Defs.' Mot. and Opp'n at 17 (proposing that documents remaining at issue in case were three categories of "OVP and EOP Internal Records"); Mar. 6, 2020 Joint Status Report, ECF No. 92, at 1. The scope of his remaining mandamus claim thus appears to overlap with the categories of documents to which the Court has found Dunlap is not entitled to under the mandamus standard because he cannot show a clear and

indisputable right to any of the categories of still-contested documents.[4]  *See* Section III.A, *supra*.

Those findings carry over here, where the Court must consider whether it has mandamus jurisdiction over his remaining claims.  *See Burwell*, 812 F.3d at 189 (explaining that mandamus requirements are "are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction").  "To show entitlement to mandamus, [Dunlap] must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists."  *Id.*  For the same reasons catalogued in depth above in Section III.A of this Memorandum Opinion, the Court finds that Dunlap has not satisfied this standard.  Most importantly, he has not demonstrated that he has a clear and indisputable right to these documents under *Cummock* and/or FACA.  Accordingly, for the reasons discussed above in Section III.A of this Memorandum Opinion, the Court agrees that Dunlap has failed to meet the mandamus standard with respect to the categories of documents still at issue. His claims as to those documents must therefore be dismissed.

C. Adequacy of the Records Search

Dunlap further claims that the method of searching and identifying Commission records was inadequate.  *See* Pl.'s Mem. at 10 n.18; Pl.'s Opp'n and Reply at 24–25.  Dunlap contends that the electronic records of custodians other than Kossack should also be searched, including those belonging to the Vice President and other staff members "conducting business on behalf of the Commission." Pl.'s Opp'n and Reply at 24–25.  Before considering Dunlap's arguments, the Court considers the process used by Defendants.[5]

---

[4] The exception might be the emails that were at issue in the appeal to the D.C. Circuit.  *See* Joint Status Report, ECF No. 92, at 5.  However, in light of the D.C. Circuit's ruling, the Court must also dismiss that claim because it lacks mandamus jurisdiction over it.  *See supra* note 2.

[5] Defendants do not directly address Dunlap's arguments at length.  Defendants do discuss some of Dunlap's arguments regarding collection efforts in relation to the Presidential Records Act, *see*

The Declaration of Matthew Morgan, Counsel to the Vice President, ECF No. 74-3, outlined the process used to identify electronic records. Morgan Decl. ¶ 1. First, it indicates that Defendants searched Kossack's email for responsive records. *Id.* Second, the Declaration also indicates that Defendants followed the procedure laid out in their August 27, 2018 Notice of Categories of Withheld Documents, ECF No. 58. There, Defendants explained that electronic records "are not segregated and identified as Commission records," *id.* at 1–2, unlike paper records. Electronic documents related to the Commission that were generated by the White House, OVP, or EOP that fell under the PRA were preserved under the PRA. *Id.* at 2. Counsel for Defendants searched those electronic records by following the process used to create the *Vaughn*-type index submitted in *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, Case No. 17-cv-1354 (CKK), a case that has since been dismissed.[6] *Id.*

Defendants' search process was described in a Notice of Filing and two declarations from Andrew J. Kossack in that case. Sept. 29, 2017 Notice of Filing, ECF No. 33, No. 17-cv-1354 (CKK) (DDC). In particular, the Fourth Declaration of Andrew J. Kossack, ECF No. 33-2, explains some of the process used to preserve and collect records. In conjunction with the September 12, 2017 Commission meeting, Kossack asked Commission members to "identify and collect all documents which he or she had created, gathered, received, or used in connection with the Commission," including "any documents that they did not share with other Commission members. Fourth Kossack Decl. ¶¶ 5–6. The instructions "directed Commissions to review any

---

Defs.' Reply at 18 n.9, and discuss in another context their methodology in reviewing and producing certain documents, *see* Defs.' Mot. and Opp'n at 40–42, but do not appear to directly address the adequacy of their search in depth, other than in the Morgan Declaration.
[6] This Court did not consider the adequacy of these searches in that case before it was voluntarily dismissed.

email accounts they used to conduct Commission business, as well as other forms of electronic communication, including text messages and Facebook and other social media." *Id.* ¶ 5.  He also provided a certification for each Commission member to sign attesting that he or she had completed the necessary searches and further provided a Federal Express envelope to members present at the September 12, 2017 meeting to send their materials to him or directly to counsel. *Id.* ¶ 7.  Each of the Commission members apparently complied with his instructions and provided the documents they collected to either him or Department of Justice counsel, with the exception of certain withheld documents.  *Id.* ¶ 9.  The Declaration was signed on September 29, 2017 and he indicated intent to follow the same process for any future meetings.  *Id.* ¶ 10.  In particular, he "reminded Commission members that they should copy or forward to [his] email address or another Commission staff email address all communications related to Commission business, regardless of whether or not any disclosure obligation attache[d]."  *Id.*  Kossack had his email account mirrored and searched and the other full-time Commission staff member searched his own email account and provided to counsel copies of all messages on which Kossack was not copied.[7] *Id.* ¶ 8.  In short, in this case, the electronic records searched using a combination of manual review and search terms were documents in Kossack's email account and on his hard drive that ran through the end of the Commission.  Aug. 27, 2018 Notice of Categories of Withheld Documents, ECF No. 58, at 1–2; Morgan Decl. ¶ 1.  The origins of these documents were included in the *Vaughn*-type index, which listed as the document originator various persons and groups, including GSA, various Commission members, and Commission staff.   Sept. 29, 2017 Notice of Filing Ex. 3, ECF No. 33–3, No. 17-cv-1354 (CKK) (DDC).

---

[7] This seems to contradict Dunlap's supposition that no other Commission staff members had their electronic records searched in creating the *Vaughn*-type index referenced in this case.  Pl.'s Opp'n and Reply at 24.

Dunlap's arguments that the electronic records identification and search was inadequate raise several issues.  Most importantly, as noted above, the Court has previously found that many aspects related to the collection, retention, and management of the documents at issue are no longer within the Court's jurisdiction.  Management of the Commission documents is now the province of the President and Vice President, as well as the Archivist, under the Presidential Records Act. Aug. 13, 2018 Order, ECF No. 55, at 1.  And judicial review of the President's compliance with, and acts under, the Presidential Records Act is precluded.  *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1992); *see* June 27, 2018 Mem. Op., ECF No. 52, at 28–29; Aug. 13, 2018 Order, ECF No. 55, at 1.  While the Court might have had a role in ensuring that Dunlap receives certain documents that have already been designated as Commission records, *see* Aug. 13, 2018 Order, ECF No. 55, at 1, it is not clear exactly what role the Court can play in evaluating the adequacy of Defendants' search at this juncture if it involves the searching or identification of electronic records governed by the PRA.

While Dunlap argues that his current argument "does not seek or require reconsideration of this Court's rejection of his prior request that the Court supervise Defendants' document collection and preservation obligations," Pl's Opp'n and Reply at 25, in effect he is raising issues similar to those that this Court has previously considered related to the management of these documents under the PRA.  In particular, Dunlap argues that "the method of identifying *Commission* records was inadequate," *id.* at 24 (emphasis added), and he specifically pushes for a search of the Vice President's electronic records, *id.* at 24–25.  But this Court has found that official Commission documents "created or received by units or individuals within the EOP, or by those within the OVP," are covered by the PRA.  June 27, 2018 Mem. Op., ECF No. 52, at 27.  And the Commission records more generally are covered by the PRA.  *See id.*  It is therefore problematic

to ask this Court to consider whether the methods used to identify Commission records were adequate.  Dunlap offers no guidance or precedent addressing this interaction between FACA and the PRA.

Even if the Court could consider this question, however, the search would be adequate in this instance.  Few cases discuss the adequacy of searches for records in the context of FACA section 10(b), and FACA itself does not appear to provide any particular standard.  At least one case, however, has applied the same standard used in Freedom of Information Act ("FOIA") cases at the summary judgment stage.  *See, e.g.*, *Citizens for Responsibility & Ethics in Washington v. Duncan*, 643 F. Supp. 2d 43, 48 (D.D.C. 2009).  The Court will do the same here, even though FOIA and the PRA generally serve different purposes, and will take into account that this question does not arise here in the summary judgment context, where the affidavits submitted by agencies regarding searches are generally more detailed.  *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 227–28 (D.C. Cir. 2013).

An agency fulfills its obligations to perform an adequate search if it can demonstrate beyond material doubt that its search was "reasonably calculated to uncover all relevant documents."  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal quotation marks omitted) (quoting *Truitt v. Department of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).  Agency affidavits "enjoy a presumption of good faith, which will withstand purely speculative claims about the existence and discoverability of other documents."  *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).  Ultimately, the adequacy of a search is "determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003); *see also Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) ("[T]he issue to be

resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*.").

Here, the primary electronic records searched belonged to Kossack.[8]  Morgan Decl. ¶ 1. As Kossack noted in his Fourth Declaration in *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, ECF No. 33-2, No. 17-cv-1354 (CKK) (DDC), he was the main point of contact for members of the Commission with respect to Commission records, *id.* ¶¶ 7–10.  Commissioners were to submit their Commission records to either him or Department of Justice counsel.  *Id.*  He was one of two full-time staff members working for the Commission and was the Designated Federal Officer for the Commission.  *See id.*; Pl.'s Mot. to Compel, Ex. 4 (Email from Andrew J. Kossack titled "Welcome; Initial Organizational Call"), ECF No. 73-5.  As Dunlap himself claims, it was Kossack who told the Commissioners that it was his role to "support the Commission's work and its members with administrative needs and ensure the Commission complies with" FACA.  Pl.'s Mot. to Compel, Ex. 4 (Email from Andrew J. Kossack titled "Welcome; Initial Organizational Call"), ECF No. 73-5.

Considering Kossack's role as the Designated Federal Officer for the Commission, and considering that other Commission documents were retained and searched in paper form, Morgan Decl. ¶ 1, it was reasonable to focus the electronic records search on his email and hard drive.  This is especially the case considering the standard for relevant documents.  *See, e.g.*, *Dunlap III*, 944 F.3d at 950 ("[A] FACA committee member should receive information 'made available to

---

[8] Although it is not discussed by either party in this case, it does appear that another staff member's electronic records were at least partially searched to create the *Vaughn*-type index referenced in this case.  *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, No. 17-cv-1354 (CKK) (DDC), ECF No. 33-2 ¶ 8.

the [committee] during the course of its deliberative process and without which [the committee member's] ability to fully and adequately participate in that process [would be] impaired.'" (quoting *Cummock*, 180 F.3d at 292)); *see also* Aug. 27, 2018 Notice of Categories of Withheld Documents, ECF No. 58 (explaining Defendants' rationale in searching for relevant documents). In other words, searching his electronic records, in conjunction with the search of the paper records, *see* Morgan Decl. ¶ 1, was reasonably calculated to uncover all relevant documents. Dunlap's speculation that relevant electronic records may be found elsewhere is therefore unavailing.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's Motion to Compel Compliance with the Court's Orders, ECF No. 73. The Court further GRANTS Defendants' Motion to Dismiss, ECF No. 74, insofar as it seeks dismissal of Plaintiff's claims that are still at issue and raised in his Motion to Compel Compliance.

An appropriate Order accompanies this Memorandum Opinion.


Dated: May 29, 2020

                                            /s/
                                     COLLEEN KOLLAR-KOTELLY
                                     United States District Judge